# EXHIBIT G

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2021CV354729**

**SEP 17, 2021 02:56 PM**

Cathelene Robinson, Clerk
Fulton County Superior Court

| | |
|---|---|
| RAY SCOTT FUSS, | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| FREDRICK M. BENSCH, a/k/a FREDDY | ) |
| BENSCH; CHEESE GRITS, LLC; | ) |
| CLASS V, INC.; SWBC CRAFT, LLC; | ) |
| SWB MANAGEMENT, LLC; SWBC | ) |
| CRAFT HOLDINGS, LP; SWBC CRAFT | ) |
| MANAGEMENT, LLC; SWBC | ) |
| BLOCKER SELLER, LP; CHILLY | ) |
| WATER, LLC; JOHN DOE | ) |
| UNITHOLDERS, | ) |
| **Defendants.** | ) |

CIVIL ACTION
FILE NO.

*Discovery Served
With Complaint*

## COMPLAINT FOR DAMAGES AND, ALTERNATIVELY, PETITION FOR A REMEDY FOR UNJUST ENRICHMENT AND OTHER EQUITABLE RELIEF

Ray Scott Fuss ( "Mr. Fuss" or "Plaintiff"), by and through counsel, files this Complaint against FREDRICK M. BENSCH, a/k/a Freddy Bensch ("Mr. Bensch" or "Bensch"), CHEESE GRITS, LLC ("Cheese Grits"), SWBC CRAFT, LLC ("SWBC Craft, LLC"), CLASS V, INC. ("Class V"), SWB MANAGEMENT, LLC ("SWB Management"), SWBC CRAFT HOLDINGS LP ("Blocker"),  SWBC CRAFT MANAGEMENT, LLC ("Blocker GP"), SWBC BLOCKER SELLER, LP ("Blocker Seller"), CHILLY WATER, LLC ("Securityholders' Representative"), and JOHN DOE UNITHOLDERS ("Doe Unitholders"), who are sometimes collectively referred to as "Defendants." Plaintiff shows the Court as follows:

*Introduction*

This case arises from Mr. Bensch's intentional conversion, fraud, deceit, concealment, and misrepresentations concerning Mr. Fuss's intellectual property (the "Fuss Intellectual Property") as part of a November 2020 merger and acquisition worth one-third of a billion dollars.  Around 1996, Mr. Bensch and some friends launched SweetWater Brewing Company ("SweetWater").[1] SweetWater's success culminated in a recent merger and acquisition wherein Aphria Inc., a Canadian-based, publicly traded cannabis company ("Aphria"), acquired SweetWater in late November 2020 for USD 366,000,000 (the "Merger and Acquisition").[2]  A few months later, on May 3, 2021,  Aphria merged with Tilray, Inc., another Canadian-based, publicly-traded company, and continues today as Tilray, with a combined market capitalization of USD 8.2 billion.[3]  Mr. Bensch now sits on Tilray's executive committee.[4]  This lawsuit will reveal a very disturbing part of this success story.

---

[1] "SweetWater" refers to the original brewing company, SweetWater Brewing Co., LLC (a Georgia limited liability company), which first sold SweetWater 420 beer on or about April 20, 1997. SweetWater was awarded "Small Brewery of the Year" at the Great American Beer Festival in 2002; founded the popular SweetWater 420 Fest in Atlanta in 2005; and was recognized as the Brewer's Association top 15 craft brewery by volume in 2015. https://www.sweetwaterbrew.com/our-story/news/ last visited 07/15/21.

[2] As set forth in the Agreement of Merger and Acquisition dated and effective *as of* November 4, 2020 (but signed, on or about November 25, 2020) by and among Aphria Inc., Project Golf Merger Sub, LLC, SW Brewing Company, LLC, SWBC Craft Holdings LP, SWBC Craft Management, LLC, SWBC Blocker Seller, LP and Chilly Water, LLC (the "Agreement of Merger and Acquisition" attached hereto as Exhibit 1), and/or financial disclosures related thereto, the Purchase Price for the Merger and Acquisition of SweetWater included an "Enterprise Value" of USD 300,000,000 (250,000,000 in cash, 50,000,000 in Aphria stock) and additional Earn Out Payments capped at USD 66,000,000 contingent on meeting EBITDA targets for 2022 & 2023. Exchange rate USD 255,543,000 = CAD 332,283,000 (USD1=CAD1.3003). https://www.exchange-rates.org/HistoricalRates/A/CAD/11-25-2020.

[3] https://www.tilray.com/  "Tilray & Aphria Announce Closing of Transaction That Creates the "New" Tilray – a Global Cannabis Leader."  May 3, 2021.

[4] https://www.tilray.com/home/#management  and  https://www.tilray.com/freddy-bensch  last visited 07/15/2

As a material part of the Agreement of Merger and Acquisition, Bensch represented to Aphria that SweetWater had *written* agreements including *present*, *affirmative assignments* for all the intellectual property for SweetWater's business and that, "No employee, contractor or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property." As this Complaint will reveal, these statements were demonstrably and categorically false.   Bensch knew that important copyrighted property, foundational to the SweetWater brand Aphria was seeking to acquire, was authored and owned solely by Plaintiff. Nevertheless, Bensch executed a Confidentiality Agreement with Aphria and negotiated behind closed doors, while excluding Plaintiff, then surreptitiously closed the deal with Aphria, thereby converting Plaintiff's property.   A few days later, on a phone call scheduled weeks earlier by Plaintiff and Bensch—reasonably believed to have been set to discuss Bensch buying Plaintiff's property *before* closing—Bensch uttered for the first time his false new claim in response to Plaintiff's offer to sell the Fuss Intellectual Property:   ***"I already own that shit!"***   Incredibly, unbeknownst to Plaintiff at the time, Bensch had already closed the deal with Aphria a few days earlier. This lawsuit involves claims for relief that are extra, in addition to, and, quite frankly, fundamentally different in purpose and effect than the copyright infringement claims that Plaintiff has (and reserves) against other parties. This Complaint seeks to right the primary, fundamental wrong, have Bensch and others disgorge the ill-gotten gain, and deter this conduct in the future.

### *Images based on the Fuss Intellectual Property*

For over 24 years, the parties shared a mutual understanding that SweetWater's trademark, branding, and marketing would be built upon a foundation of Plaintiff's copyrighted property.   The following sampling of images utilize Plaintiff's copyrighted work in the SweetWater branding:



### *Parties, Venue, and Jurisdiction*

1.

Plaintiff is a resident of the State of Georgia and entitled to bring this case in this Court.

2.

a.   Bensch is subject to the general jurisdiction of this Court either in his capacity as a resident of the State of Georgia and/or because of his extensive contacts and business dealings in the State of Georgia, or, alternatively or in addition to the foregoing, Bensch is subject to the general jurisdiction of this Court based on his having committed a tort in this state, said tort having sufficient and direct contacts related to and in connection with the State of Georgia and causing a harm herein to Plaintiff and, further, based on Bensch being a joint-tortfeasor with the other Defendants who are residents of the State of Georgia, including, but not limited to, Class V, Cheese Grits, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

b.   To the extent Bensch is a non-resident of the State of Georgia, Bensch is subject to the personal jurisdiction of this Court under the Georgia Long Arm Statute, that is, O.C.G.A. § 9-10-91, as follows:  This cause of action arises from one or more acts, omissions, ownership, use, and/or possessions enumerated as a basis for jurisdiction within the State of Georgia, and Bensch, in person or through an agent, (1) transacts business within this state; (2) committed a tortious act or omission within this state; (3) committed a tortious injury in this state caused by an act or omission outside this state while regularly soliciting business, or engaging in other persistent course of conduct, or deriving substantial revenue from goods used or consumed or services rendered in this state; and/or (4) owns, uses, or possesses real property situated within this state.

c.   Moreover, the relationship between Plaintiff and Bensch from which these claims stem originated in the State of Georgia.  Plaintiff's work was in the State of Georgia.  The SweetWater brewery was and remains headquartered in Georgia.  The 2002 Agreement and the

2003 Assignment between Plaintiff and Bensch were in the State of Georgia.  Bensch's business with and relationship to SweetWater was, and, after the merger, continues to be, primarily based out of the State of Georgia and, notably, in association with an address referred to in notices as connected with the same brewery address location on 195 Ottley Drive, NE, Atlanta GA 30324 that is the location of the SweetWater brewery.  Additionally, the 195 Ottley Drive, NE, Atlanta GA 30324 address serves as the address of record for Cheese Grits, LLC, a Georgia limited liability company, and co-defendant, which has as its registered agent Fredrick Bensch and, therefore, Bensch uses such real property here in Georgia both in his capacity with Cheese Grits, LLC as well as in his continuing capacity with SweetWater.  Bensch also is associated with, and uses, real property at 75 14th St NE, Ste 2200, Atlanta, GA, 30309-3693, as said address is listed as his address as CEO, Secretary, and Treasurer of Class V, Inc., also a co-defendant and joint tortfeasor in this Complaint.  All communications herein related to Bensch and the Fuss Intellectual Property, and to Bensch at one time physically taking possession of the original artwork of the Fuss Intellectual Property subject to the 2002 Agreement, and to Bensch's intent to convert, his acts of conversion, and his intent and acts in defrauding, deceiving, and fraudulently withholding information from Plaintiff, were all done by Bensch with full knowledge that such acts related to a business principally in the State of Georgia and that the harm from such acts would be borne by a person he knew to reside in the State of Georgia.  Additionally, after the closing of the Aphria-SweetWater Merger and Acquisition, through two separate attorneys licensed in Georgia and acting on his behalf, Bensch continued the tort of conversion in Georgia by again asserting false claims of ownership in the Fuss Intellectual Property hostile to Plaintiff's rightful ownership, hostile to the 2002 Agreement, and in furtherance of maintaining the positions of false representation contained in Article III of the Agreement of Merger and Acquisition, such

representations being Bensch's representations through his agents for purposes of O.C.G.A. § 9-10-91.

       d.   Moreover, Securityholders' Representative (Chilly Water, LLC, a Delaware limited liability company styled as the Securityholders' Representative in the Agreement of Merger and Acquisition) maintains a presence in Georgia by authorizing mail and notices under and related to the Agreement of Merger and Acquisition to be sent to Chilly Water, LLC, c/o SweetWater Brewing Company, LLC, 195 Ottley Drive, Atlanta, GA 30324, Attention: Fredrick M. Bensch, Chief Executive Officer.  Because Securityholders' Representative is a co-defendant and joint-tortfeasor with Bensch and others, and because it is transacting business in Georgia in connection with the Agreement of Merger and Acquisition, and because such business of the Securityholders' Representative is directly connected to the torts set forth herein, and because it treats the Atlanta Cheese Grits address and SweetWater brewery address as a contact notice address for itself (with notices being directed to the attention of Bensch), and because Bensch maintains active and numerous contacts with the business at the above location by and through a continuing consultancy arrangement with the SweetWater brewery at that location, personal jurisdiction over Bensch for this matter is proper in Georgia and this Court.

<div align="center">3.</div>

       Cheese Grits is a Georgia limited liability company with its principal place of business located at 195 Ottley Drive, Atlanta, Fulton County, Georgia.  Bensch is the registered agent for Cheese Grits.  According to Georgia Secretary of State records, Cheese Grits may be served via Bensch, its registered agent, at the 195 Ottley Drive, Atlanta, Fulton County, Georgia address. Cheese Grits is subject to the jurisdiction and venue of this Court.  Upon information and belief, Cheese Grits participated in, benefited from, and helped facilitate the Merger and Acquisition and Bensch's conversion of Plaintiff's intellectual property.  Cheese Grits is a joint-tortfeasor with

Bensch, Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

4.

SWBC Craft, LLC is a Delaware limited liability company whose registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801.  SWBC Craft, LLC received a significant portion of the Purchase Price from the Merger and Acquisition, that is, by direct receipt of a portion of the Estimated Purchase Price as set forth in paragraph 2.11(f) of the Agreement of Merger and Acquisition (which upon information and belief would be a significant portion of the USD 250,000,000 cash within the total USD 300,000,000 Enterprise Value) less the following: a) reductions set forth in paragraphs 2.11(a) – (e); b) payments to Blocker Seller as referred to in 2.11(f) and 1.2; and c) payments to Securityholders' Representative for Unitholders (other than Blocker Members).  SWBC Craft, LLC and its members and managers intentionally and knowingly directed, participated in, facilitated, and benefited from Bensch's acts of conversion, fraud, and deceit.  SWBC Craft, LLC is a joint-tortfeasor with Bensch, Cheese Grits, Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

5.

SWB Management is a Delaware limited liability company and its registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  SWB Management, and its members and managers, including Bensch, intentionally and knowingly directed, participated in, facilitated, and benefited from Bensch's acts of conversion, fraud, and deceit.  SWB Management is a joint-tortfeasor with Bensch, Cheese Grits, Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

6.

Further to the above regarding Securityholders' Representative, the registered agent of Securityholders' Representative is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  As previously stated, Securityholders' Representative has an office and maintains a presence in Georgia by authorizing mail and notices under and related to the Agreement of Merger and Acquisition to be sent to Chilly Water, LLC, c/o SweetWater Brewing Company, LLC, 195 Ottley Drive, Atlanta, GA 30324, Attention: Fredrick M. Bensch, Chief Executive Officer.  As such, in this capacity, Securityholders' Representative uses the Georgia address as its office as does Bensch.  And so, Securityholders' Representative has an office and conducts business in the State of Georgia.  It may be served via its registered agent at the above-listed Delaware address.   Upon information and belief, Securityholders' Representative participated in, received monies from, and is still holding or retaining money from, the Merger and Acquisition and otherwise facilitated the Merger and Acquisition and Bensch's conversion of the Fuss Intellectual Property.  Securityholders' Representative is a joint-tortfeasor with Bensch, Cheese Grits, Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

7.

Class V is a Georgia corporation with, upon information and belief, its principal place of business located at 2870 Peachtree Road, Suite 920, Atlanta, Fulton County, Georgia 30305.  Class V's registered agent is Midtown Registered Services, Inc., located at 2870 Peachtree Road, Suite 920, Atlanta, Fulton County, Georgia 30305 or at 75 14th St NE, Ste 2200, Atlanta, GA, 30309-3693.  Class V was principally owned, operated, and managed by Bensch.  In the Agreement of Merger and Acquisition, Class V is identified as one of the SWB Members, or otherwise has an agreement by and among various entities involved in the Merger and Acquisition, such that it

received, controlled, directed, or benefited from certain funds and proceeds paid from the closing of the Merger and Acquisition.  Class V, and its shareholders, executive employees, and managers, including Bensch, intentionally and knowingly directed, participated in, facilitated, and benefited from Bensch's acts of conversion, fraud, and deceit.  Class V is a joint-tortfeasor with Bensch, Cheese Grits, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

<div align="center">8.</div>

Blocker is a Delaware limited liability partnership and its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware  19801.  Blocker held interests of SweetWater immediately before the Merger and Acquisition closed and was the vehicle via which the SweetWater interests were transferred to Project Golf Merger Sub, LLC, as a necessary step in the Merger and Acquisition.  Blocker facilitated Bensch's conversion, fraud, and deceit.  Blocker is a joint-tortfeasor with Bensch, Cheese Grits, and Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

<div align="center">9.</div>

Blocker Seller is a Delaware limited liability partnership and its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware  19801.  Immediately prior to the closing of the Merger and Acquisition, Blocker Seller held the limited partnership interests in Blocker, was an entity through which the Merger and Acquisition was facilitated, and received direct proceeds from the Merger and Acquisition. Blocker Seller facilitated Bensch's conversion, fraud, and deceit and is a joint-tortfeasor with Bensch, Cheese Grits, Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

10.

Blocker GP is a Delaware limited liability company and its registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801. Blocker GP held the general partnership interests in Blocker and, as such, was an entity through which the Merger and Acquisition was facilitated. Blocker GP took such actions to hold interests of SweetWater immediately before the closing of the Merger and Acquisition and then transferred same to Project Golf Merger Sub, LLC as a step in the closing of the Merger and Acquisition. Blocker GP facilitated Bensch's conversion, fraud, and deceit and is a joint-tortfeasor with Bensch, Cheese Grits, and Class V, and other Defendants, including Doe Unitholders, who are residents of the State of Georgia.

11.

The Doe Unitholders are individuals, persons, companies, limited liability companies, corporations, partners, venturers, partnerships, limited partnerships, or other business entities which are presently unknown to Plaintiffs, but are reasonably known to Bensch and the other Defendants, who participated (along with Bensch and the other Defendants) in facilitating the Merger and Acquisition and which, along with Blocker Seller, received the remaining proceeds from the sale pursuant to paragraphs 2.11(f) and 2.18(a) of the Agreement of Merger and Acquisition and subject to the Payment Schedule referenced therein. The Doe Unitholders, with actual or constructive knowledge, participated in, or directly benefited from, Bensch's conversion of the Fuss Intellectual Property. The Doe Unitholders participated in Bensch's acts of conversion, fraud, and deceit, have been unjustly enriched thereby, and are joint-tortfeasors with Bensch, Cheese Grits, Class V, and other Defendants, including each other, who are residents of the State of Georgia.

12.

Bensch knows or has in his possession, directly or indirectly, the name and last known address of each of the Doe Unitholders.  Bensch also knows or has in his possession, directly or indirectly, the percentage or amount of the sales proceeds paid to said Doe Unitholders as a result of the closing of the Merger and Acquisition, and which Doe Unitholders would have had actual and specific knowledge, or reason to know, of Plaintiff's interests in the Fuss Intellectual Property.  Further, Bensch knows the identity, name, address, and contact information for all Doe Unitholders.

13.

Upon information and belief, some or all of the Doe Unitholders are residents of the State of Georgia and are subject to the jurisdiction of this Court.  In addition, the Doe Unitholders are joint-tortfeasors with Bensch and the other Defendants and, thus, are subject to jurisdiction in this Court.

14.

This Court has subject matter jurisdiction.

15.

Venue is proper in this Court.

***Factual Background***

16.

Around 1996, Bensch, having worked in the craft brewery industry in his native Colorado, moved to Atlanta to found with others the brewery that would become SweetWater.

17.

At that time, Bensch and his co-founders recognized they needed artwork conveying a lifestyle and attitude upon which they could build their brand.

18.

Around that same time, Plaintiff, a young, talented artist, opened Petroglyph Studios: a one-man art and graphic-design firm in a small building on his personal property outside of Covington, Georgia.

19.

Plaintiff was referred to Bensch in 1996.  The first visit included Plaintiff driving to Bensch's startup brewery in Atlanta to meet Bensch and his team.  Bensch shared with Plaintiff some existing concepts with which Bensch and the SweetWater team were not happy and asked Plaintiff if he could come up with something different and better for the SweetWater branding. Plaintiff accepted the challenge.

20.

At all times related to this Complaint, Plaintiff was an independent contractor.  Plaintiff has never been an employee of SweetWater or Bensch, and neither Bensch nor anyone at SweetWater contributed to, or otherwise directed, the artistic effort of Plaintiff.  Neither Bensch, SweetWater, nor Bensch's associates directed Plaintiff's efforts, provided any materials used to create the work, provided offices or instruments used to produce the work, or provided details as to what and how things were to be drawn.  Likewise, neither Bensch, SweetWater, nor Bensch's associates retained the slightest right to control the manner in which the work was accomplished. Quite to the contrary, when the work was created and brought to the next meeting, the parties had not discussed or even agreed on a price, or any payment terms, and neither Bensch nor SweetWater had accepted the work, and had no payment obligation or duty to accept or use the work Plaintiff produced and brought with him.

21.

Plaintiff, at his risk and expense, and using his office and supplies, went back to his studio and created the distinctive font for the SweetWater name, the unique aged-looking scrolled banner across which the SweetWater literal element appears (the "Trout banner"), and the highly detailed fishing scene (the "Fishing Scene") that is dominated by what would become the iconic "SweetWater leaping rainbow trout." True and correct copies of the "Fishing Scene" (which includes the "SweetWater leaping rainbow trout") and the "Trout banner" are attached hereto as Exhibits 2 and 3, respectively, and incorporated herein by reference.

22.

Plaintiff returned to SweetWater's offices with the artwork in hand, including the "Trout banner" and the "Fishing Scene" (including its iconic "SweetWater leaping rainbow trout"), *inter alia*.

23.

Bensch and his team loved the artwork that Plaintiff brought with him and requested no changes or modifications to it.

24.

Bensch and Plaintiff agreed in that meeting that SweetWater would ***use*** (not own) the artwork that he brought with him; and, Bensch requested that Plaintiff sculpt a three-dimensional representation of a trout that would be used by SweetWater for the manufacture of beer tap handles. They agreed that, for $500, SweetWater could and would ***use*** (not own) the artwork that was brought with him, and Plaintiff would retain ownership and control of that artwork, including the drawings, concepts, art, intellectual property, and moral rights thereto; and, they agreed that Plaintiff would sculpt a three-dimensional representation of a trout for SweetWater to use for the manufacture of beer tap handles.  With regards to the three-dimensional representation of a trout,

the parties agreed that Bensch and SweetWater would use it, and Plaintiff would nevertheless retain ownership of all intellectual property rights to the work associated with the three-dimensional trout.

25.

The understanding implicit in the agreement at the conclusion of that meeting was that Plaintiff's interest in, and the value of, his intellectual property rights would grow as such intellectual property was used in, and foundational to, the growth of the SweetWater brand. Furthermore, implicit in the agreement was that Plaintiff, as owner, would realize the economic return on his property interest when Bensch eventually sold or transferred the company in a way that required the transfer or assignment of Plaintiff's property.  Thus, Plaintiff and Bensch, at the earliest instance, by both word and conduct, created a mutual understanding that SweetWater would *use* Plaintiff's property, but not own it; implicit in this understanding was that Plaintiff would benefit in an amount attributable to the value of *his* property at the time of any SweetWater sale or transfer.

26.

Based on the mutual understanding, Plaintiff invoiced SweetWater the agreed-upon $500 fee.  This fee was paid.  A true and accurate copy of the invoice is attached hereto as Exhibit 4.

27.

Thereafter, as agreed, Plaintiff created a three-dimensional representation of a trout for the beer tap handles, and delivered that to Bensch.

28.

Apart from when he gave access to it for Bensch's use, Plaintiff has maintained possession of his original artwork for the Trout banner and Fishing Scene (which includes the iconic "SweetWater leaping rainbow trout"), and has taken special care to protect it, for over 24 years.

29.

In view of the mutual understanding, Plaintiff assisted in, with the expectation of benefit from, the branding and growth of SweetWater.

### 2002 – 2003:  The Virginia Lawsuit and Two Key Documents

30.

On June 5, 2002, SweetWater brought a trademark infringement lawsuit in Virginia against a restaurant/business that was using at least the marks "Sweetwater Tavern" and "Sweetwater Light" to sell beer, among other goods, in its restaurants and through other nearby retailers. SweetWater Brewing Co., LLC v. Great American Restaurants, Inc., 266 F. Supp. 2d. 457 (E. D. Va. 2003) ("Virginia Lawsuit").

31.

While the Virginia Lawsuit was pending, in October 2002, Bensch approached Plaintiff and requested temporary physical possession of the original artwork of the Fuss Intellectual Property, representing that he would return it to Plaintiff shortly.  Upon information and belief in view of Bensch's request, Plaintiff understood this would be used in and would help protect the still nascent but growing SweetWater brand.  However, because of the importance of physical possession of this original artwork, and knowing he had never assigned the ownership to anyone else, as a condition to transferring temporary possession to Bensch, Plaintiff drafted a document for the parties to sign before allowing Bensch to take physical possession of Plaintiff's property. A true and correct copy of the 2002 Agreement ("2002 Agreement") is attached hereto as Exhibit 5 and is incorporated herein by reference.

32.

The 2002 Agreement reflected and validated the true and original mutual understanding between the parties and was consistent with the parties' original intent going back to 1996: the artworks comprising the Fuss Intellectual Property "are the copywritten materials and the property of Ray Scott Fuss and/or Scott Fuss doing business as Petroglyph Studio." Both parties executed the agreement in front of a notary, and Plaintiff, trusting Bensch, thereafter provided the original artwork to Bensch based thereon.[5] Bensch took possession of the original artwork based on the 2002 Agreement, and recognizing Plaintiff had trusted him with the originals, used the originals and returned the originals to Plaintiff in the time specified in the 2002 Agreement.

33.

Upon information and belief, Bensch, through his lawyers, caused and allowed SweetWater to use this original material of the Fuss Intellectual Property in relation to the Virginia Lawsuit.

34.

Plaintiff never believed Bensch's or SweetWater's use of this original material temporarily possessed by Bensch per the terms of the 2002 Agreement, or the use of copies of it, whether for establishing marks, or obtaining registered trademarks, or using it to expand and grow SweetWater's brand, was inconsistent with Plaintiff's ownership interest in the Fuss Intellectual Property. The 2002 Agreement, consistent with the parties' understanding from the beginning, provided a special circumstance and a tangible, written basis upon which Plaintiff justifiably grounded his special relationship of trust in Bensch as Bensch developed the SweetWater brand.

---

[5] At no time until December 2, 2020, would Bensch ever challenge, dispute, or take a position hostile to the contents of the 2002 Agreement. Plaintiff objects to any untimely claims, defenses, or assertions contrary to the 2002 Agreement.

35.

Bensch did not disagree with the contents, or object to, the 2002 Agreement; and they signed it before a notary. While not legally required to make the document binding, the use of a notary elevated the formality and thereby provided each party additional reason to appreciate its special significance.

36.

The very fact that the 2002 Agreement was executed while SweetWater was engaged in active trademark litigation in Virginia shows that Bensch did not believe the 2002 Agreement was inconsistent with the mutual understanding between the parties from the beginning.  Moreover, the very fact that the 2002 Agreement was executed while SweetWater was engaged in the Virginia Lawsuit not only indicates that Bensch understood and acknowledged Plaintiff's ownership of the Fuss Intellectual Property but also that Bensch understood that any of Bensch and SweetWater's trademark rights built on the Fuss Intellectual Property were dependent thereupon.  (More on this point will be discussed below).

37.

 In 2003, Bensch came back to Plaintiff and requested a transfer and assignment of all rights associated with the three-dimensional representation of a trout, and all photos, two-dimensional representations, and other intellectual property associated with it.  At this time, Bensch commented to Plaintiff that Plaintiff's artwork was an important factor in the success of SweetWater's growing brand.  This request, and Plaintiff's response to it, shows a further development of the special relationship of trust Plaintiff reposed in Bensch.  Plaintiff signed this 2003 Assignment based on a) the mutual understanding of the parties dating back to 1996; b) the existence of the notarized 2002 Agreement; and c) the fact that expanding the SweetWater brand increased the value of  the Fuss Intellectual Property  thus benefiting Plaintiff. Plaintiff never

would have assigned the tap handle rights to Bensch if he did not trust that Bensch would honor the mutual understanding, the 2002 Agreement, and respect all the rights and privileges that go along with Plaintiff's clear ownership of the Fuss Intellectual Property.  Therefore, Plaintiff signed the 2003 Assignment (the "2003 Assignment").  An unsigned copy of the 2003 Assignment is attached hereto as Exhibit 6 and incorporated by reference herein.  The original of the 2003 Assignment was executed and delivered to Bensch.[6]

38.

The mere existence of the 2003 Assignment provides clear proof that Bensch knew what an assignment was, what it says, what it does, and why it is legally important (including to the likes of Aphria!).  Further, he knew full well that the 2003 Assignment, which he or his attorney drafted, only applied to the three-dimensional representation of a trout and the intellectual property associated with it.  For that reason, he is without any excuse:  the 2003 Assignment document reflects the prior knowledge of Bensch and offers clear evidence compounding his knowledge, namely, that he was building the SweetWater brand directly on top of the Fuss Intellectual Property that Plaintiff alone owned.  This entire series of events, and the two key documents generated thereby (i.e., the 2002 Agreement and the 2003 Assignment), reveal that the SweetWater trademarks and brand were knowingly built upon the Fuss Intellectual Property, based on a symbiotic relationship that would benefit both parties, and that the SweetWater trademarks were in no way hostile to Plaintiff's ownership rights in the Fuss Intellectual Property.

---

[6]Upon information and belief, the 2003 Assignment might be in the possession of Bensch, his prior legal counsel in the Virginia Lawsuit, or the National Archives in Philadelphia.  Undersigned counsel has attempted to obtain the files, which, based on the age of the case, are stored in the National Archives, Philadelphia Records, Transfer #021-050-105, Location B2503441, Boxes 97 and 98 (phone 215-305-2020).  The National Archives staff is in process of responding to counsel's request, and has been delayed because of COVID-19.

39.

Over the years, Bensch and/or SweetWater obtained registered trademarks that utilized and incorporated the Fuss Intellectual Property, all the while doing so with full knowledge of the 2002 Agreement, full knowledge of the 2003 Assignment, and full knowledge that no other document or agreement or understanding between the parties existed that might suggest the Fuss Intellectual Property was owned or controlled by anybody other than Plaintiff.  SweetWater's use of, and expansion of, its trademarks on the back of the Fuss Intellectual Property, caused the value of the Fuss Intellectual Property to grow – just as intended by Plaintiff and Bensch.

40.

Defendants' efforts at marketing and branding related to the projected "lifestyle brand" was dependent upon, and built directly on, the Fuss Intellectual Property.  Therefore, the Fuss Intellectual Property made up a large component of the Intellectual Property component of Enterprise Value in the Agreement of Merger and Acquisition.  Because Bensch and SweetWater knowingly and intentionally built the SweetWater trademarks and brand on the Fuss Intellectual Property while knowing that Plaintiff was the owner of it, Bensch and others knew that the Plaintiff should be involved in any sale or transfer of the SweetWater that called for transfers or assignments of intellectual property.

41.

Plaintiff protected and kept the original artwork of the Fuss Intellectual Property safe from 1996 to present.  In fact, for several years, Plaintiff has stored it in a safety deposit box.

***Plaintiff's Prior Offer to Sell to Bensch***

42.

Over the years, the SweetWater brand continued to grow and increase in value.  As a

corollary, so, too, did the value of the Fuss Intellectual Property.  It was, as they say, a textbook example of *"a rising tide lifts all boats."*  During these years, Plaintiff and Bensch maintained a good relationship.

<div align="center">43.</div>

Recognizing that the SweetWater brand had grown considerably, in 2018 Plaintiff reached out to ask Bensch if he would like to go ahead and purchase the Fuss Intellectual Property (even though, to Plaintiff's knowledge at the time, there was not yet a SweetWater sale or transfer on the table or immediate horizon).  Bensch responded with the inquiry something to the effect of, "What are you looking for?" and Plaintiff, looking for Bensch to make the initial valuation, responded in effect, "hey, I'm just putting it out there." Bensch hesitated at that time, so Plaintiff said something to the effect of, "We don't have to do this at this time, but when you do get around to selling your company, we need to get square on my intellectual property."

<div align="center">44.</div>

Importantly, in response to the prior offer by Plaintiff to sell the Fuss Intellectual Property to Bensch, not once did Bensch suggest he was surprised, confused, or otherwise caught off guard by the offer; not once did Bensch question the nature or scope of the offer; not once did Bensch dispute the property interest Plaintiff was offering to sell; not once did Bensch assert, or even hint, that SweetWater or Bensch already owned the Fuss Intellectual Property; and not once did Bensch make any statement in the least bit contrary to, or contradictory of, the 2002 Agreement.  To the contrary, Bensch's informed declining of the offer reconciled with the mutual understanding of, and course of conduct between, the parties and the 2002 Agreement.  Moreover, it was in keeping with the obvious fact known to both parties that Bensch had no document remotely similar to the 2003 Assignment that might be applicable to the remainder of the Fuss Intellectual Property.

45.

With the value of the Fuss Intellectual Property reaching significant heights, and an eventual sale or transfer of SweetWater to a third party seeming more likely, in 2017 and 2018, Plaintiff, as the author and rightful claimant, applied for, and received, federal copyright registrations for the "SweetWater leaping rainbow trout" (VA0002084616) and the "Trout banner" (VAu001326605).  True and correct copies of the copyright registrations for these works are attached hereto as Exhibits 7 and 8.  Both of these registrations reflect integral parts of the Fuss Intellectual Property.

46.

A combination of documentation, history, and course of dealing with Bensch gave Plaintiff every reasonable basis to believe he was protected.  With the 2002 Agreement in hand, and the course of dealings over the years in mind, mixed with the extra protection provided by the copyright registrations, Plaintiff was reasonably justified in trusting and believing that Bensch would, as a matter of course, openly, honestly, and in good faith deal with Plaintiff when it came time for the big sale or transfer event of SweetWater.  That trust, though reasonable, was misplaced.

***2019-2020:  The Merger and Acquisition***

47.

In December 2019, Bensch and others signed a Confidentiality Agreement related to the negotiations with Aphria for the Merger and Acquisition of SweetWater.

48.

Between December 2019 and November 2020, the negotiations for the Merger and Acquisition took place, leading to what would become the Agreement of Merger and Acquisition.

49.

Upon information and belief, Mr. Bensch, individually and through legal and financial advisors, was substantially and directly involved in the negotiations.  As the owner of the controlling interest in the SweetWater entities that would become, in effect, the "Sellers" at the eventual closing of the Merger and Acquisition, Bensch was effectively in control of the terms of the deal from the Sellers' side of the table (subject to the terms and conditions of the articles, bylaws, and operating agreements of the various entities).  As a practical matter, Bensch had primary, if not total, control of the decision-making authority for purposes of deciding whether and when to sell, and for negotiating the price and other material terms from the Sellers' side of the Agreement of Merger and Acquisition.  While other persons might well have had votes on the matter related to the sale, or might have participated in the negotiations, Bensch had the controlling vote, power, and authority to decide the key issues on behalf of the Sellers related to the Agreement of Merger and Acquisition.  The Merger and Acquisition would not, and could not, have happened without Bensch's approval and agreement on the material terms.

50.

Upon information and belief, throughout most of 2020, after the Confidentiality Agreement had been signed, Bensch knew the SweetWater Intellectual Property (consisting of copyrights, trademarks, branding, and recipes) would be a large component of the negotiations and eventual Purchase Price paid for SweetWater.  The Fuss Intellectual Property was foundational to the SweetWater brand, and the branding was undoubtedly an important and significant part of what Aphria desired to acquire through the Merger and Acquisition.

51.

Upon information and belief, before November 9, 2020, Bensch had received and reviewed draft versions of the Agreement of Merger and Acquisition with substantially similar warrants and

representations as those contained in Article III of the final version of the Agreement of Merger and Acquisition.  Moreover, in view of the fact that the Agreement of Merger and Acquisition is identified on its face as an "Execution Version" of the Agreement of Merger and Acquisition (*See* Ex. 1, p. 1), includes Bensch's signatures, and is dated on its cover "as of November 4, 2020," Bensch had received and reviewed multiple versions of the Agreement of Merger and Acquisition prior to November 9, 2020, all of which presumably included substantially similar, if not identical, warrants and representations as those contained in Article III of the final, Execution Version of the Agreement of Merger and Acquisition he signed.

52.

Before Bensch signed the Agreement of Merger and Acquisition in November 2020, Bensch would have known (at least if he intended to act in accordance with the warranties and representations in Article III) that he or someone on his behalf for SweetWater needed to approach Plaintiff concerning obtaining a *written agreement* with a *present*, *affirmative* assignment of the Fuss Intellectual Property.

53.

Throughout 2020 and before November 9, 2020, Bensch knew Plaintiff's contact information and easily could have reached out to Plaintiff about the Fuss Intellectual Property.

54.

Throughout 2020, and before November 9, 2020, Bensch never reached out to Plaintiff in any way to discuss the Fuss Intellectual Property or seek to obtain an assignment.

55.

Throughout 2020 and before November 9, 2020, Bensch had no intent to reach out or communicate with Plaintiff about the Fuss Intellectual Property.

56.

Throughout 2020 and before November 9, 2020, none of the Defendants or Aphria, or any of their agents, reached out to Plaintiff about the Fuss Intellectual Property.

57.

Throughout 2020 and before the Agreement of Merger and Acquisition was signed, other than the texts between Plaintiff and Bensch, none of the other Defendants or Aphria, or any of their agents, reached out to Plaintiff about the Fuss Intellectual Property.

58.

Plaintiff was not involved in or aware of the Confidentiality Agreement.

59.

Plaintiff was not invited, included, or involved in the negotiations for or related to the Agreement of Merger and Acquisition.

60.

Plaintiff only learned about the impending Merger and Acquisition in early November when speaking to a friend. And, some time shortly thereafter, Plaintiff read or heard that the impending SweetWater sale would close at the end of December 2020.

61.

On November 9, 2020, Plaintiff contacted Bensch by text message to congratulate him on the impending sale of SweetWater and, in that context, to again bring up Plaintiff's interests in the Fuss Intellectual Property. A true and accurate copy of the text chain is attached hereto and incorporated herein by reference as Exhibit 9.

62.

Upon receiving the initial November 9, 2020 text from Plaintiff, Bensch knew that Plaintiff was again broaching the sale of the Fuss Intellectual Property and that some response would be in

order.  Again, Bensch also was fully apprised and aware, at the time of receiving the November 9,

2020, text communication from Plaintiff, of the Article III warrants and representations contained

in the final "Execution Version" of the Agreement of Merger and Acquisition that Bensch would

sign later that month.

<div align="center">63.</div>

On November 10, 2020, Bensch responded to Plaintiff that he appreciated the November

9, 2020, text and asked if it was okay if Bensch got back with Plaintiff on the matter after

Thanksgiving.  Bensch made no assertion or claim in his November 10, 2020 text exchange with

Plaintiff that he, not Plaintiff, owned the Fuss Intellectual Property.  Moreover, in no way, shape

or form did Bensch indicate to Plaintiff in the text exchange that the closing of the Merger and

Acquisition was actually scheduled to occur later in November.  Bensch's motive at this point

clearly was to delay, deceive, and stall Plaintiff in order to get through the closing Bensch knew

was scheduled later that month and, thereby, get into the Non-Recourse Provision before dropping

the bomb of a false claim on Plaintiff that he, not Plaintiff, owned the Fuss Intellectual Property.

Of course, Plaintiff knew none of Bensch's motives for delay and so took Bensch at face value,

consistent with the special trust relationship that existed with Bensch for decades.  Again, and

importantly, Bensch's text response to Plaintiff on November 10, 2020, did not hint at any question

or doubt as to Plaintiff's rightful ownership in the Fuss Intellectual Property, the appropriateness

of Plaintiff's intent to sell the Fuss Intellectual Property to Bensch, or otherwise indicate that

Bensch believed that he, not Plaintiff, owned the Fuss Intellectual Property.

<div align="center">64.</div>

At the time of the November 9-10 text exchange between Plaintiff and Bensch, Bensch

knew that the Merger and Acquisition of SweetWater would close in the latter part of November

2020, had actual knowledge of the 2002 Agreement and the 2003 Assignment, and remembered

Plaintiff's prior offer to sell the Fuss Intellectual Property in 2018.  Additionally, Bensch had actual knowledge of the Article III representations in the final version of the Agreement of Merger and Acquisition that he was scheduled to execute later that same month.

65.

Plaintiff did not know or have reason to know that the closing was scheduled for November 25, 2020.  Plaintiff believed and trusted Bensch that the conversation between the parties to purchase the Fuss Intellectual Property could be *after Thanksgiving*, as suggested by Bensch. Thus, on November 10, 2020, by text, Plaintiff suggested that he and Bensch confer sometime between **November 25 and November 30, 2020.**  Bensch's response was to ask for further delay, claiming he would be out of town with family *for Thanksgiving* (leaving out the critical and material point, of course, that he was likely attending the closing of the Merger and Acquisition around that same time period).  Bensch asked if the conversation could take place **December 2, 2020.**  Plaintiff, having no reason to believe that December 2, 2020 would not be appropriate and timely, agreed and said he would "listen out" on December 2, 2020.

66.

Unbeknownst to Plaintiff, Bensch signed the Agreement of Merger and Acquisition on November 25, 2020.

67.

When December 2, 2020, arrived, Plaintiff did not know, and indeed had no reason to know, Bensch had already signed the Agreement of Merger and Acquisition.  At 10:15 am, Plaintiff texted Bensch, and they agreed to talk later that day.

68.

Plaintiff and Bensch spoke by phone on December 2, 2020.

69.

The December 2, 2020, phone call did not last longer than a few minutes.

70.

In the December 2, 2020, phone call, Plaintiff again offered to sell the Fuss Intellectual Property.

71.

In response to Plaintiff's offer to sell made in the December 2, 2020, phone call, Bensch responded, among other things, with a hostile, false claim of "*I already own that shit!*"

72.

Bensch did not tell Plaintiff on the December 2, 2020, phone call that Bensch had already signed the Agreement of Merger and Acquisition.

73.

Bensch did not tell Plaintiff that Bensch had already signed representations and warranties as part of the Agreement of Merger and Acquisition, namely, Article III, that would involve representations signed by Bensch that SweetWater had *written agreements* containing *present, affirmative assignments* of all intellectual property, and that "No employee, contractor or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property." Yet, Bensch knew he had signed the Agreement of Merger and Acquisition making these very representations.

74.

Based on the totality of the circumstances and their relationships, and the documents between them, Bensch owed Plaintiff a duty to communicate in good faith about the Fuss Intellectual Property. Bensch had a duty not to conceal material facts from Plaintiff, not to exclude Plaintiff from a deal involving the Fuss Intellectual Property, and not to sign a Confidentiality

Agreement that aided and assisted in keeping Plaintiff in the dark.  Moreover, in the time period between December 2019 and November 9, 2020, and up until closing of the Merger and Acquisition, Bensch had a duty not to withhold at least the following material facts: a) the anticipated closing date of the Merger and Acquisition; b) the Article III, Paragraph 3.8(e) representations in the Agreement of Merger and Acquisition as they relate to the Fuss Intellectual Property; c) Bensch's present intention of going through the closing of the Merger and Acquisition without getting an assignment of the Fuss Intellectual Property from Plaintiff; d) Bensch's intention to make, for the first time in over 24 years, his own open and notorious false claim of ownership in opposition to Plaintiff's rights to the Fuss Intellectual Property; and e) that he intended to stall Mr. Fuss until after the closing to prevent Mr. Fuss from attempting to halt the transaction or otherwise protect his rights in the Fuss Intellectual Property.  Bensch also withheld that, once he closed on the Merger and Acquisition of SweetWater, vis-à-vis Aphria and Bensch, there was a Non-Recourse Provision that limited Bensch's downside risk in the event of a successful intellectual property rights challenge.  Given that this all involved Plaintiff's property, the relationship of the parties, and Bensch's knowledge that the Intellectual Property of SweetWater had an allocation of as much as USD 92,000,000 in the Agreement of Merger and Acquisition, Bensch had a duty of candor, truthfulness, and good faith in his communications with Plaintiff related to Plaintiff's property interest.

<div align="center">75.</div>

Upon information and belief, Plaintiff alleges the following related to the fraud, deception, and conversion prior to Bensch's signing the Agreement of Merger and Acquisition:

      a. Bensch never told his legal counsel or financial advisors before the closing of the Merger and Acquisition about the 2002 Agreement, even though he knew about the

2002 Agreement and knew it was contrary to his affirmative representations in the Agreement of Merger and Acquisition;

b.  Bensch never told his legal counsel or financial advisors before the closing of the Merger and Acquisition about the 2003 Assignment, even though he knew about the 2003 Assignment and knew its disclosure would have put all persons on notice about Plaintiff and his role in the development of the early, foundational intellectual property upon which SweetWater's brand was built;

c.  Bensch never told his legal counsel or financial advisors before the closing of the Merger and Acquisition about Plaintiff's prior offer to sell the Fuss Intellectual Property to Bensch or SweetWater;

d.  Bensch never told his legal counsel or financial advisors before the closing of the Merger and Acquisition about Plaintiff's November 9, 2020, text communication inquiring about the Fuss Intellectual Property within the context of the impending sale of SweetWater to Aphria;

e.  Neither Bensch nor his legal counsel or financial advisors ever told Aphria, Inc., or Aphria's legal counsel and financial advisors, about the items (a) – (d) above;

f.  Bensch never had the intent to tell his legal counsel or his financial advisors about the items (a) – (d) above;

g.  Bensch never had the intent to tell Aphria about the items (a) – (d) above;

h.  Bensch never told Plaintiff about the Merger and Acquisition closing date before the closing date and, moreover, never had the intent to do so; and

i.  Bensch never told Plaintiff, and intended to conceal, his already-formed intent to make his own hostile claim of ownership, shortly after closing of the Merger and

Acquisition, and he intentionally delayed making that claim until December 2, 2020, safely after closing of the Merger and Acquisition.

76.

Plaintiff was defrauded, deceived, and misled by Bensch's fraud, deceit, and active concealment.  Had Bensch talked with Plaintiff earlier and before the closing of the Merger and Acquisition, asserted his false claim of ownership, advised Plaintiff of the date of the closing, advised Plaintiff that Bensch was not going to involve Plaintiff in the closing, advised Plaintiff that he intended to represent in the closing that he was in compliance with the Article III representations without buying the Fuss Intellectual Property or otherwise addressing the Fuss Intellectual Property, Plaintiff would have been in a position to take action, and could have taken action, to attempt to protect his interest in the Fuss Intellectual Property before the closing.  Once the closing occurred, however, the parties to the Agreement of Merger and Acquisition came within the Non-Recourse Provision of the Agreement of Merger and Acquisition and the R&W Policy, which, despite Bensch's fraud, would still be a benefit to Bensch.  Moreover, with significant money and value having already changed hands via the closing and public announcements of the Merger and Acquisition already released, it was too late for Plaintiff to receive the fair value of the Fuss Intellectual Property as part of the deal:  Aphria, and certainly its shareholders, would have concluded it already paid for the Fuss Intellectual Property as a part of the USD 92,000,000 in the deal that was allocated to Intellectual Property and, as a publicly traded company with shareholders, could not reasonably be expected to pay twice for the Fuss Intellectual Property, much less implicitly acknowledge the fraud and outright deception perpetrated by a newly minted member of its executive team.  And, Bensch would have no incentive to admit his wrongdoing and pay Plaintiff after the closing because he had both the ill-gotten gain and the protection of being in the Non-Recourse Provision.  In other words, Bensch knew that if he could

keep Plaintiff in the dark long enough to get through the closing, it would be "too late" for Plaintiff (absent a lawsuit) to obtain relief.

<div align="center">77.</div>

After the December 2, 2020, phone call, counsel for Bensch and other entities attempted improperly to assert claims or positions completely at odds with the 2002 Agreement and which Defendants should not, at law or equity, be allowed to now use affirmatively or defensively. Plaintiff hereby reasserts objections to Defendants being allowed to assert such false positions that contradict the 2002 Agreement at this late date and, by mentioning these generally for context and candor with the Court, Plaintiff expressly reserves objections to said defenses or claims that are barred by the Statute of Limitations or laches.

<div align="center">78.</div>

Thereafter, Plaintiff, through counsel, obtained partial copies of the Agreement of Merger and Acquisition.  Only then did Plaintiff learn the extent of Bensch's fraud, deceit, concealment, and conversion.  Plaintiff also discovered for the first time that the Merger and Acquisition closed on November 25, 2020, a fact that brought to light the material and outrageous nature of Bensch's stall tactics with Plaintiff leading up thereto.

<div align="center">***The Agreement of Merger and Acquisition***</div>

<div align="center">79.</div>

Section 3.8 of the Agreement of Merger and Acquisition addresses Intellectual Property.

<div align="center">80.</div>

Section 3.8(a) of the Agreement of Merger and Acquisition provides that Paragraph 3.8(a) of the Disclosure Letter attached thereto provides a "complete and accurate list of all Company Intellectual Property," both registered and unregistered. In Section 3.8(a) of the Agreement of Merger and Acquisition, Bensch represented and warranted that "[e]ach item of Company

Registered Intellectual Property is valid and enforceable, and each item of Company Registered Intellectual Property is subsisting … No loss or expiration of any Company Owned Intellectual Property is threatened in writing, pending or reasonably foreseeable." *See* Ex. 1, p. 30. This representation and warranty was materially false when made, as Bensch was well aware that Plaintiff, not the Company, owned, and held valid copyright registrations to and for, the Fuss Intellectual Property.

<p style="text-align:center">81.</p>

Paragraph 3.8(b) of the Agreement of Merger and Acquisition, provides as follows:

**Except as set forth on <u>Section 3.8(b)</u> of the Disclosure Letter, the Company and its Subsidiaries collectively own or have the rights to use, pursuant to a written, enforceable license agreement, all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the businesses of the Company and any of its Subsidiaries. Immediately subsequent to the Closing, subject to obtaining any required consents listed on <u>Section 3.4(a)</u> of the Disclosure Letter, the Company Intellectual Property will be exclusively owned by one of the Company and its Subsidiaries and all other Intellectual Property that is material to or necessary for the conduct of the businesses of the Company and its Subsidiaries as currently conducted and currently proposed to be conducted immediately subsequent to the Closing will be available for use by the Company and its Subsidiaries on terms and conditions substantially similar to those under which the Company and its Subsidiaries used such Intellectual Property immediately prior to the Closing, without the payment of additional fees.**

Section 3.8(b) of the Agreement of Merger and Acquisition states that, except as set forth on Section 3.8(b) of the Disclosure Letter, the Company and its Subsidiaries collectively own or have the rights to use, pursuant to a written, enforceable license agreement, all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the businesses of the Company and any of its Subsidiaries and can be carried out in the same manner and terms as before the Merger and Acquisition. In Section 3.8(b) of the Agreement of Merger and Acquisition, Bensch represented and warranted that SweetWater or its subsidiaries "own or have the rights to

use, pursuant to a written, enforceable license agreement, all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the businesses of the Company and any of its Subsidiaries." *See* Ex. 1, p. 31.  This representation and warranty was materially false when made, as SweetWater does not own, and has no written license agreement to use, the Fuss Intellectual Property, which is clearly necessary for, or material to, the conduct of SweetWater's business.

<div align="center">82.</div>

In Section 3.8(e) of the Agreement of Merger and Acquisition, Bensch represented and warranted that "the Company or one of its Subsidiaries has secured from each employee, contractor or other Person who is or was involved in the creation or development of any Company Intellectual Property, a written agreement containing (A) a present, affirmative assignment of all Intellectual Property developed by such employee, contractor or Person rights in such Company Intellectual Property for or on behalf of, or during their employment by the Company of any of its Subsidiaries to the Company or any of its Subsidiaries and a waiver of all moral rights therein, and (B) a confidentiality provision protecting the Trade Secrets and other confidential information of the Company or a Subsidiary … No employee, contractor or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property." *See* Ex. 1, p. 31.

<div align="center">83.</div>

Annex I of the Agreement of Merger and Acquisition contains Definitions.  The Fuss Intellectual Property falls squarely within the definition of "Intellectual Property Rights," contained within Annex I of the Agreement of Merger and Acquisition, as follows:

> **"Intellectual Property Rights" means any and all intellectual property and proprietary rights throughout the world including each of the following: (i) all United States and foreign patents and utility models and applications therefor (including provisional applications) and all**

**reissues, divisions, renewals, extensions, provisionals, continuations and continuations in part thereof (collectively, "Patents"); (ii) all Trade Secrets and similar rights in confidential information, know-how and materials; (iii) copyrights and all other rights corresponding thereto in any works of authorship, including Software (collectively, "Copyrights"); (iv) all trademark rights and similar rights in trade names, logos, trademarks and service marks together with all of the goodwill associated with the foregoing (collectively, "Trademarks"); (v) all rights in databases and data collections (including knowledge databases, customer lists and customer databases); (vi) all rights to Uniform Resource Locators, Web site addresses and domain names; and (vii) any registrations of or applications to register any of the foregoing.**

84.

The Agreement of Merger and Acquisition had the following representation and warranty regarding having a written agreement containing a "present, affirmative assignment of Intellectual Property" *etc.*, as follows:

**Except as set forth on Section 3.8(e) of the Disclosure Letter, the Company or one of its Subsidiaries has secured from each employee, contractor or other Person who is or was involved in the creation or development of any Company Intellectual Property, a written agreement containing (A) a present, affirmative assignment of all Intellectual Property developed by such employee, contractor or Person rights in such Company Intellectual Property for or on behalf of, or during their employment by the Company or any of its Subsidiaries to the Company or any of its Subsidiaries and a waiver of all moral rights therein, and (B) a confidentiality provision protecting the Trade Secrets and other confidential information of the Company or a Subsidiary. No employee, contractor or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property. No funding, facilities or personnel of any governmental authority or any university, college, research institute or other educational institution (other than refundable tax credits) have been or are being used, directly or indirectly, to develop or create, in whole or in part, any Company Intellectual Property, and to the Knowledge of the Company, no employee, contractor or other Person who was involved in, or who contributed to, the creation or development of any Company Intellectual Property performed services for any governmental authority, university, college, research institute or other educational institution during a period of time during which such employee, contractor or other Person was also performing services for the Company or its Subsidiaries.**

85.

Defendants knew of, agreed with, and signed the Agreement of Merger and Acquisition acknowledging that USD 92,000,000 was the value associated with and allocated to the Intellectual Property.

86.

Defendants also knew that Intellectual Property Rights was a large part of the deal and that the Intellectual Property allocation of USD 92,000,000 under the Agreement of Merger and Acquisition would contain a large and significant portion attributable directly to the Fuss Intellectual Property.

87.

Aphria and Bensch negotiated, and then agreed on, the Purchase Price in the Agreement of Merger and Acquisition.

88.

The Agreement of Merger and Acquisition refers to, and contains, a Payment Schedule. *See* Ex. 1, Section 1.2.

89.

Upon information and belief, the Payment Schedule is reflected in the allocation set forth therein and reported by Aphria in its Condensed Interim Consolidated Financial Statements for the Three and Nine Months Ended February 28, 2021 and February 29, 2020 (attached hereto as Exhibit 10), the value of SweetWater Intellectual Property, including the Fuss Intellectual Property (of which it has no ownership), is USD 92,000,000.

90.

The allocation of the Purchase Price to the Intellectual Property included in the Agreement of Merger and Acquisition equals USD 92,000,000.

91.

The decision by Aphria to allocate USD 92,000,000 for Intellectual Property in the Agreement of Merger and Acquisition was made by Aphria in good faith. Bensch knew of and agreed to the Purchase Price and the allocation, including the allocation of the USD 92,000,000 to Intellectual Property.

92.

The allocation of USD 92,000,000 for the SweetWater Intellectual Property reflects the value of the Intellectual Property (as that term is defined under the Agreement of Merger and Acquisition) as of November 4, 2020 (the date of the Execution Version of the Agreement of Merger and Acquisition).

93.

Because the Fuss Intellectual Property was not carved out of, or excepted from, the Agreement of Merger and Acquisition, its value is a portion of the allocation of USD 92,000,000 for the Intellectual Property, which amount shall be determined by the jury.

94.

Bensch and other Defendants, including, without limitation, Doe Unitholders, received and benefited from, and will continue to receive and benefit from, the USD 92,000,000 in funds allocated to Intellectual Property in proportion to their interests. Bensch and other Defendants, and their counsel, have actual knowledge of who received the Purchase Price and in what percentages or amounts.

95.

Plaintiff has received no compensation or funds or other remuneration from the Agreement of Merger and Acquisition, despite demand.

96.

Plaintiff has demanded that Aphria, Sweetwater, and Tilray stop using the Fuss Intellectual Property, but they have declined to do so.  Based on the arguments that have been asserted by counsel for Bensch and others, Bensch and other Defendants have no intention to, nor have they manifested any intent to, negotiate with Plaintiff and pay the fair value of the Fuss Intellectual Property to Plaintiff in order to gain rights, *nunc pro tunc*, for Aphria, SweetWater, and Tilray to use same.

97.

Plaintiff has demanded that Bensch compensate, hand over, pay over, or disgorge the portion of funds reasonably allocable from the Merger and Acquisition to the Fuss Intellectual Property, but Bensch and others have not done so and have made it abundantly clear that they have no intent to voluntarily set aside the conversion and the ill-gotten gains received from their conversion.

98.

Bensch has taken positions making it clear that neither he nor any other Defendants intend to pay, compensate, or remunerate Plaintiff for the funds received by them that, as a matter of right in law or equity, are attributable to the Fuss Intellectual Property and which rightfully belong to Plaintiff.

99.

Bensch, and presumably other Defendants, through counsel, continue to further compound and add to their tortious conduct by continuing to deny that Plaintiff owns the Fuss Intellectual Property.  Bensch continues to deny that he did anything wrong and has rejected Plaintiff's demands, even though he has never addressed the 2002 Agreement and/or 2003 Assignment even

once.  In fact, the gist of counsel's last response merely rejected Plaintiff's demand, without explanation, and offered to accept service of a complaint.

<div align="center">100.</div>

For all intents and purposes, the approach by Bensch, and possibly other Defendants, is simply one of "sue me," without addressing the 2002 Agreement, the 2003 Assignment, and the natural implications of ownership that flow directly therefrom; as such, this approach exemplifies the continuation of the Defendants' torts while also evidencing bad faith and stubborn litigiousness.

<div align="center">101.</div>

Aphria, n/k/a Tilray, and SweetWater, have continued to utilize the Fuss Intellectual Property after May 18, 2021, thus reflecting their belief, based on the Article III representations and warranties, that the Fuss Intellectual Property was paid for at the closing of the Merger and Acquisition as a part of the Intellectual Property that was defined in the Agreement of Merger and Acquisition.

<div align="center">

## **COUNT I – CONVERSION OF INTANGIBLE PROPERTY**

</div>

<div align="center">102.</div>

Plaintiff incorporates the above paragraphs as if fully restated herein.

<div align="center">103.</div>

Plaintiff had all ownership rights, such as the right to authorize, distribute, license, sell, assign, and transfer right, title, and use of the Fuss Intellectual Property.  Bensch knew, and other Defendants either knew (because of Bensch's knowledge imputed to them or otherwise) or should have known, that Plaintiff had all ownership rights, such as the right to authorize, distribute, license, sell, assign, and transfer right, title, and use of the Fuss Intellectual Property.

104.

In 2002, Bensch obtained the actual original artwork underlying and comprising the core of the Fuss Intellectual Property pursuant to his license, the mutual understanding between Plaintiff and himself, and the 2002 Agreement.  While Bensch and Defendants were within the scope of the mutual understanding with Plaintiff to build the SweetWater brand upon the Fuss Intellectual Property, all Defendants knew or should have known that no one had the right make representations hostile and contrary to Plaintiff's ownership of the Fuss Intellectual Property and that Plaintiff was the sole owner of the Fuss Intellectual Property uniquely vested with the right and authority to transfer or authorize the use of the Fuss Intellectual Property.

105.

Defendants signed the Confidentiality Agreement and excluded Plaintiff from participation in or knowledge of the negotiations for and execution of the Agreement of Merger and Acquisition.

106.

During negotiations for the Agreement of Merger and Acquisition, draft versions were shared among the parties that contained, among other things, the draft versions of the warrants and representations of Article III, (which were ultimately the same or substantially similar to the final terms and conditions in Article III of the final, Execution Version of the Agreement of Merger and Acquisition dated as of November 4, 2020).

107.

The final, Execution Version of the Agreement of Merger and Acquisition representing that a "written agreement" containing a "present, affirmative assignment of Intellectual Property" existed was abundantly clear and easy to understand.  The draft versions of same were, upon information and belief, likely substantially similar to the final version and equally clear and easy to understand.

108.

The representations and warranties contained in Article III of Agreement of Merger and Acquisition concerning the possession of written agreements containing present, affirmative assignments constitutes a material statement of fact.

109.

Once a draft version of the Agreement of Merger and Acquisition was distributed by, between, and among the anticipated parties to the agreement, including Bensch and his legal counsel, Bensch and other Defendants would have read or reviewed the terms contained therein and, at that time, would have known or have been chargeable with knowing that the reasonable expectation of Aphria or its subsidiary would be that Defendants would be expected to reach out, contact, communicate, and involve persons like Plaintiff who had participated in creating the Intellectual Property.  It is, after all, a representation and warranty to receive *present* assignments, and Defendants knew as much.  Defendants would be expected to seek out and obtain present affirmative written assignments related to any "employee, contractor or Person" and obtain a "present, affirmative assignment" of said Person's intellectual property.  If that could not be done, Defendants would have known that Aphria and its subsidiary would expect that any such failure of that condition to be listed as an exception or notation on the Disclosure Letter so it could be addressed before closing.

110.

Once it became reasonably clear that, as part of the Merger and Acquisition Agreement, Aphria or its subsidiary would be expecting written agreements with present affirmative assignments from all employees, contractors, or Persons involved in the Intellectual Property, Defendants would have known that Plaintiff and the Fuss Intellectual Property, which was essential and foundational to the SweetWater brand, was a key component to the Intellectual

Property and, by extension, to any allocation of the Purchase Price to Intellectual Property. Therefore, all Defendants would have known or should have known how valuable Plaintiff's property interest was in this specific transaction for Merger and Acquisition and that Plaintiff was being expressly excluded from the transaction.

<div align="center">111.</div>

Further, in this same time period, Defendants knew they would be contractually expected to obtain said present, affirmative assignments before closing; as a corollary, Defendants knew at that time that they should have been actively reaching out and negotiating with Plaintiff to obtain said assignments (unless, of course, Defendants did not intend to honor those obligations at all and chose instead to simply conceal the deal from Plaintiff and lie to Aphria and its subsidiary, which is exactly what happened). Defendants never reached out, communicated with, or negotiated with Plaintiff regarding a present, affirmative assignment of the Fuss Intellectual Property before the closing of the Merger and Acquisition.

<div align="center">112.</div>

At no point during this time period did any Defendant take any action or make the slightest effort to encourage or request that Aphria contact or communicate with Plaintiff or his agents regarding the Fuss Intellectual Property.

<div align="center">113.</div>

Throughout 2020 before the closing of the Merger and Acquisition, and through and including the execution of the Agreement of Merger and Acquisition, and even after such execution, Defendants exercised, asserted, and assumed full ownership, dominion, and control over the Fuss Intellectual Property just as though it was Defendants' property and, in doing so, they converted the Fuss Intellectual Property so as to recover and receive funds that represent the actual value of the Fuss Intellectual Property to the Enterprise Value and Purchase Price.

114.

During this critical time period in 2020 before the execution of the Agreement of Merger and Acquisition and closing of the Merger and Acquisition, Defendants had no belief, and no reasonable basis for any such belief, that had they honestly advised Aphria or its subsidiary about Plaintiff and the Fuss Intellectual Property or that Aphria or its subsidiary would have gone through with the closing of the Merger and Acquisition without receiving a present affirmative assignment from Plaintiff.  Bensch, and possibly other Defendants, knew that the choice was either to expressly deal with Plaintiff and "put it on the table," or "invite Plaintiff to the table," or ignore Plaintiff's interests, hide and conceal the deal from Plaintiff, make false representations to close, and make it within the Non-Recourse Provision and the R&W Policy protections.  Bensch, and possibly other Defendants, chose the latter.

115.

During this critical time period in 2020 before the execution of the Agreement of Merger and Acquisition and closing of the Merger and Acquisition, Defendants fully knew that Plaintiff was not a party to the Confidentiality Agreement and would not have any reasonable chance of discovering the Confidentiality Agreement before the closing of the Merger and Acquisition unless and until said Confidentiality Agreement was made public.

116.

During this critical time period in 2020 before the execution of the Agreement of Merger and Acquisition and closing of the Merger and Acquisition, Defendants knew that Plaintiff was not a party to, or involved in, the negotiations with Aphria in connection with the Agreement of Merger and Acquisition; and Defendants also knew (and hoped) that Aphria would not reach out to Plaintiff concerning the Fuss Intellectual Property.

117.

During this critical time period in 2020 before the execution of the Agreement of Merger and Acquisition and closing of the Merger and Acquisition, Defendants knew that it would be unlikely for Aphria or its agents and attorneys to obtain a copy of, or knowledge about, the 2002 Agreement (especially given it was 18 years old), unless Bensch disclosed to Aphria, its agents and attorneys, the identity of Plaintiff, his role in the development and ownership of the Fuss Intellectual Property, and/or the existence of the 2002 Agreement.

118.

During this critical time period in 2020 before the execution of the Agreement of Merger and Acquisition and closing of the Merger and Acquisition, Defendants had no intention of disclosing, and did not disclose, any of the information in the preceding paragraph to Aphria or its subsidiary, agents, and attorneys.

119.

After December 2, 2020, Bensch continued to withhold from his agents and attorneys information about the 2002 Agreement and the 2003 Assignment, and the knowledge of same, so as to continue his conversion, fraud, and deceit.

120.

*Intangible property sufficiently merged into written documents to be a basis for a conversion claim:* The Fuss Intellectual Property, and the rights of ownership, control, and moral rights related and appurtenant thereto, were reflected and merged into written documents sufficient for a claim of conversion of said intangible property, namely, the following:

    a.  in the 2002 Agreement;

    b.  the 2017 and 2018 copyright registrations;

c.  the Agreement of Merger and Acquisition, specifically the Article III representations therein, the Disclosure Letter, and the fact that the Fuss Intellectual Property is a subset of, and contained within, the definition of Intellectual Property and Intellectual Property Rights as defined within the Agreement of Merger and Acquisition.

d.   The Purchase Price Allocation documents, as well as the public notices of said allocation, which, in furtherance of and a carrying out of the Merger and Acquisition Agreement, as required by the reporting agencies related to a publicly traded company (Aphria), which specifically list the Intellectual Property as a category of the Purchase Prices, which documents recognize, reflect, and demonstrate that the parties, including Defendants, treated the Intellectual Property as sufficiently known, definite, and identified, and capable of placing a valuation on, sufficient for a claim of conversion.

121.

Defendants knew of, participated in, agreed to, and specifically benefited by treating the Intellectual Property as a) valuable; b) sufficiently known, definite, and identifiable; and c) capable of being valued separately from other assets.

122.

All the parties to the Agreement of Merger and Acquisition treated the intangible property of Intellectual Property in the exact same manner as the tangible personal property.

123.

All the parties to the Agreement of Merger and Acquisition treated the intangible property of Intellectual Property in a separate, detailed, and specifically identifiable way for tax and accounting purposes.

124.

It would be inequitable, unjust, and a violation of equal protection of the law, as applied to the facts of this case, to allow Bensch to expressly list Intellectual Property as a major asset and component of a Merger and Acquisition with a publicly traded company, make warrants and representations as to that Intellectual Property in the same manner as other personal property, and place a significant monetary value on that Intellectual Property so that persons receive a significant portion of the compensation because of, and tied to, this particular category of intangible property that is Intellectual Property, which is separated out from other assets (tangible and intangible alike) and identified in the Agreement of Merger and Acquisition, without allowing a corresponding judicial recognition that Plaintiff's own intangible property rights in the Fuss Intellectual Property, as a component of that very Intellectual Property on the very same agreement, which is reflected in registered copyrights and the 2002 Agreement, was not sufficiently merged into a written document to provide a basis for a conversion claim.  Every party to the Agreement of Merger and Acquisition treated the Intellectual Property, which included the Fuss Intellectual Property, as a specific form of intangible property capable of being identified, valued, and transferred, for their purposes, in the very deal that harmed Plaintiff.  As such, as a matter of common law and equal protection of the law, including that the judicial development recognizing claims related to conversion and property rights should comport with equal protection under the law in a manner recognizing, by judicial opinion, that the writings clearly reflect and merge with the 2002 Agreement and copyright registrations, and the Agreement of Merger and Acquisition, to allow a conversion claim under law.

125.

Parties that engage in a financial transaction, like the closing of the Merger and Acquisition, that treats Intellectual Property as a personal property capable of identification,

capable of being listed as an asset, capable of valuation, capable of transfer, and capable of exchange, should be judicially or equitably estopped from avoiding a conversion claim related to that same category of intangible property in cases where:

a) Plaintiff's property meets that same definition of the Intellectual Property so defined by the financial transaction, that is, in this case, the definition of Intellectual Property provided in the Agreement of Merger and Acquisition;

b) Plaintiff's property interest is represented in a clear and separate writing long before the transaction took place (that is, the 2002 Agreement);

c) Plaintiff has registered the copyrights;

d) The parties in the past have dealt with a subset of the very property at issue by addressing it in a separate document to transfer same (that is, the 2003 Assignment of the Tap Handle that was a subset of the Initial Fuss Intellectual Property).

In such a case, when it is clear the parties sought to be charged with conversion know exactly what comes within the property rights at issue, and how to transfer same, and have acted accordingly years before, so that they each know the other is treating this as a recognizable and distinct personal property interest, one of the parties should not be allowed to specifically profit from the delineation of, and valuation of, this category of property without the other having a claim in conversion related to that very category of property. Because there were clear and distinct documents and a course of dealing, treating this property in a manner sufficiently identified and merged in the written documents, and the interest being reflected in the 2002 Agreement, the 2003 Assignment (or absence thereof), and the copyright registrations, and the Agreement of Merger and Acquisition, as a matter of due process, fundamental fairness, equal protection of the laws, and common law, as it relates to judicial recognition of claims for Conversion of Intangible

Property, Plaintiff's claim on conversion should be treated so as to deem the interest sufficiently merged in these documents to allow a conversion claim to proceed.

126.

Bensch signed the Confidentiality Agreement.

127.

Bensch signed the Agreement of Merger and Acquisition and, when signing, knew he was signing to affirm the Article III representations and warranties therein.

128.

When reviewing draft versions of the Agreement of Merger and Acquisition, Bensch knew about Plaintiff's ownership interest in the Fuss Intellectual Property.

129.

The Agreement of Merger and Acquisition, and the closing of the Merger and Acquisition that resulted therefrom, served as the very *means* by which Bensch and other Defendants converted Plaintiff's property interest.

130.

Bensch obtained the physical originals of the artwork in 2002 because of the 2002 Agreement.  He made use of the original artwork in 2002 based on the 2002 Agreement.  Bensch had full knowledge that Plaintiff was the owner of the Fuss Intellectual Property.

131.

During the negotiations for the Merger and Acquisition, and in the Agreement of Merger and Acquisition (including without limitation the use of the Confidentiality Agreement, the absence of any mention in the draft versions of the Agreement of Merger and Acquisition of Plaintiff or his interests, the election by Bensch and possibly others to not reach out to Plaintiff prior to closing the Merger and Acquisition, the decision to withhold information from Plaintiff as

to the fact of the Article III representations, the fact that Bensch was going to claim to own the Fuss Intellectual Property only after the closing of the Merger and Acquisition, and the decision to preclude Plaintiff from participating in the deal with Aphria or the negotiations that resulted in such deal), and in signing the Agreement of Merger and Acquisition with its clear and categorical Article III representations and warranties that were false, and knowing that the Fuss Intellectual Property was foundational to SweetWater's branding and the Intellectual Property to which was allocated USD 92,000,000 in the Agreement of Merger and Acquisition, Defendants exercised exclusive and total dominion and control over Plaintiff's property treating it exactly as "their own" when it was not. Their actions after the fact through Bensch's claim that "I already own that shit!" and other false claims thereafter show that Bensch and others treated Plaintiff's property exactly as though they owned it. Claims or allegations that Plaintiff does not own the Fuss Intellectual Property is a furtherance of the conversion, and a ratification and continuation of same, that is done to specifically harm Plaintiff and so justifies the award of punitive damages.

132.

The Non-Recourse Provision, along with the R & W Policy, provided an additional motive for, and means used by, Defendants to complete the act of conversion.

133.

Aphria has paid to Defendants the Purchase Price consideration, except for the Earn Out Payments, as called for in the Agreement of Merger and Acquisition.

134.

Defendants have received the present consideration, or their portion of the present consideration, of the Purchase Price funds from the Agreement of Merger and Acquisition.

135.

Bensch and other Defendants, who, collectively, constituted the "Seller's" side of the Merger and Acquisition, converted the Plaintiff's interest by negotiating under the Confidentiality Agreement without including Plaintiff, signing documents and taking such actions to effectuate the closing on the Merger and Acquisition, signing the Agreement of Merger and Acquisition, receiving money or stock that rightfully should have been attributable to and allocated for the Fuss Intellectual Property, and, after closing,  making claims of ownership, and otherwise treating the Fuss Intellectual Property just as if it belonged to Bensch and the other "Sellers." To the extent in this case any Defendant files any pleading, motion, interrogatory response, or deposition testimony asserting and maintaining the false positions, allegations, averments, defenses, or claims contrary to Plaintiff's interest, if that Defendant has also received a benefit from the conversion, or participated in or effectuated the closing in which the conversion took place, said action constitutes by that Defendant a continuation and/or ratification of the tort of conversion clearly committed primarily by Bensch.  As such, and based on such continued conversion and ratification, Plaintiff seeks punitive damages against those Defendants for the specific intent to harm, and continue to harm, Plaintiff.  Plaintiff has a right, at law and equity, that Defendants formally cease and desist from said positions, and disavow, renounce, and relent from any prior position, that is contrary, hostile, or adversarial to Plaintiff's interest in the Fuss Intellectual Property, or in any way colors or slanders his title in said Fuss Intellectual Property.

136.

Plaintiff has demanded the return of the Fuss Intellectual Property and said demand was refused.

137.

Defendants' intentional conversion of the Fuss Intellectual Property has caused Plaintiff compensatory damages in an amount to be proved at trial and to be, at the election of Plaintiff, either the greater of the value of the Fuss Intellectual Property at the time of the initial conversion in November/December 2020 or the value of the Fuss Intellectual Property at the time of trial, all in an amount determined by a fair and impartial jury.

138.

Pursuant to O.C.G.A. § 51-12-5.1, based on the intentional tort of conversion, with Bensch's and other Defendants' specific intent to deceive, defraud, and harm Plaintiff concerning his property interest in the Fuss Intellectual Property, and based on the willful and wanton actions and blatant disregard of the Plaintiff's property interest in the Fuss Intellectual Property, Plaintiff is entitled to punitive damages in an amount to be determined by a fair and impartial jury.

## COUNT II – FRAUD, DECEIT, FRAUDULENT CONCEALMENT, INTENTIONAL MISREPRESENTATION

139.

Plaintiff incorporates the above paragraphs as if fully restated herein.

140.

At all times relevant to this Complaint, Bensch had a duty to Plaintiff based on the special circumstances in this case and the special relationship of trust justly reposed by Plaintiff in Bensch over the years resulting from, *inter alia*, the 2002 Agreement, the 2003 Assignment, the course of dealings between Bensch and the Plaintiff, Bensch's oral representations to Plaintiff about the Fuss Intellectual Property and its value, and Bensch's ownership capacity and executive position with Sweetwater when it had a symbiotic relationship between the Fuss Intellectual Property and the trademarks and other Intellectual Property.  As such, Bensch owed Plaintiff a duty such that

Bensch (and other Defendants) committed the tort of fraud, deceit, and fraudulent concealment against Plaintiff in reference to the communications in this matter.  These torts were committed by the following actions:

a.  Defendants had knowledge of the oral statements by Bensch to Plaintiff about the value of the Fuss Intellectual Property to the SweetWater brand, the mutual understanding that Plaintiff would realize the full value of the Fuss Intellectual Property when SweetWater was eventually sold or transferred, the 2002 Agreement, the 2003 Assignment, and the prior 2018 offer of Plaintiff to sell the Fuss Intellectual Property;

b.  Defendants knew of the Confidentiality Agreement and that Plaintiff was not a party to the Confidentiality Agreement or included in the negotiations for the Merger and Acquisition;

c.  Defendants entered into negotiations that had draft versions of documents that clearly called for reaching out to Plaintiff to obtain written, present, affirmative assignments of his interests in the Fuss Intellectual Property;

d.  Defendants knew that the Fuss Intellectual Property should have been disclosed on the Disclosure Letter;

e.  Defendants knew the Fuss Intellectual Property was instrumental and core to the SweetWater Intellectual Property that was being sold per the Agreement of Merger and Acquisition;

f.  Defendants had a duty based on the course of dealing with Plaintiff, the 2002 Agreement, and the prior oral representations to contact Plaintiff so as to negotiate with him concerning the Fuss Intellectual Property and, further, knew that Aphria

would be relying on Defendants to do so, as part of the Agreement of Merger and Acquisition, so that Aphria would not be negotiating with Plaintiff directly;

g.  Defendants knew that Plaintiff desired, intended, and had a reasonable right and expectation to have good faith communication with Defendants about the Fuss Intellectual Property *before* the closing on the Merger and Acquisition,

h.  Defendants knew that they had no intention to have good faith communications with Plaintiff before closing on the Merger and Acquisition; and, knew they intended not to have any communications after the November 9, 2020 text and before the closing on the Merger and Acquisition, rather, Defendants intended to mislead Plaintiff by keeping relations cordial and implying an intent to communicate in good faith before the closing, while in reality, Defendants intended to keep Plaintiff in the dark and excluded from the negotiations for the Agreement of Merger and Acquisition and the closing of the Merger and Acquisition; Defendant had the express intent of negotiating and signing the Agreement of Merger and Acquisition without Plaintiff being involved, and without Plaintiff even knowing it was signed, even though they knew Plaintiff's property was included in the closing and knew Article III had false representations about the Intellectual Property.

i.  Defendants' plan to falsely represent and not approach and communicate with Plaintiff before closing was in place before Plaintiff's November 9, 2020, text to Bensch to discuss the sale or transfer of Plaintiff's rights in the Fuss Intellectual Property;

j.  Bensch and other Defendants had ample time, notice, and knowledge of Plaintiff's property interest in this matter, and knowingly and willfully withheld from Plaintiff

the date of the anticipated closing of the Merger and Acquisition, the fact of the closing of the Merger and Acquisition, and the fact that the draft versions of the Agreement of Merger and Acquisition had already included false statements, and the fact that Defendants would be signing a final version of the Agreement of Merger and Acquisition that contained those same false statements about Plaintiff and his property, and that they desired to withhold this information in order to conceal the false claims of ownership in the Fuss Intellectual Property until after closing and, to that end, provided pretextual reasons to Plaintiff for not talking sooner (such as the use of the Thanksgiving holiday travel, and then the return date, to get past the dates of November 25 – 30 offered by Plaintiff, and then suggesting December 2, 2020, knowing that date would be safely after the closing of the Merger and Acquisition); yet Bensch knew on November 10, 2020, when he pushed back the date of the conversation with Plaintiff to December 2, 2020, that he was going to take a position on that December 2, 2020, phone call hostile to the 2002 Agreement and that, when Bensch would do so, he knew that it would be the first time he had ever taken such a position.  Bensch never intended to actually discuss in good faith the Plaintiff's property interest in the Fuss Intellectual Property, even though Bensch knew full well that was the point of the text, and the reasonable expectation by Plaintiff in the scheduled call.  Yet, Bensch misled Plaintiff by leading him along to his detriment until he was past the closing of the Merger and Acquisition, before Bensch sprung the December 2, 2020, false claim on Plaintiff. Bensch also withheld the closing date of the Merger and Acquisition and his real reasons for the delay of the conversation with Plaintiff until December 2, 2020 – that is, on November 10, 2020, when Bensch pushed Plaintiff off until December

2, 2020, Bensch knew he was making false representations in Article III of the Agreement of Merger and Acquisition and knew the closing was going to happen on November 25, 2020.  Bensch also knew that if he made to Plaintiff his false claim of ownership in the Fuss Intellectual Property before closing, Plaintiff would have been in a position to contact Aphria before closing of the Merger and Acquisition and thereby both preventing the closing from occurring and preventing Bensch from reaching the Non-Recourse Provision provided in the Agreement of Merger and Acquisition.  By that time, the positions of the parties had changed to Plaintiff's detriment and to Bensch's benefit, because Bensch by means of the closing became situated within the Non-Recourse Provision which provides significant protection in its own right and by the R&W Policy,[7] not to mention Bensch received significant cash funds (including funds properly allocable to Plaintiff's property) with which to deny claims and litigate with Plaintiff.

k.  For these reasons, it was deceptive, misleading, and constituted fraudulent concealment and an intentional misrepresentation by Bensch, and possibly other Defendants, for Bensch to very quickly and politely agree to talk to Plaintiff abut Plaintiff's property interest (while he knew full well that Plaintiff's November 9, 2020, text was renewing an offer to sell the Fuss Intellectual Property to Bensch, and while knowing  Plaintiff reasonably expected this communication to take place before the closing), when Bensch actually had no intention to talk to Plaintiff about the Fuss Intellectual Property *before* the closing of the Merger and Acquisition, and no intention to talk to him in good faith and in keeping with the 2002 Agreement at

---

[7] Nothing in this averment about Bensch making it to the Non-Recourse Provision is an admission, express or implied, that there was not in fact fraud.

all; but rather, Bensch only intended to spring his false claim on Plaintiff at that time, and, in so doing, tricked and misled Plaintiff.

l.   By scheduling the December 2, 2020, meeting to discuss something Bensch in fact had no intention of discussing in good faith (and, in fact, by affirmatively scheduling such a meeting under the misleading and false pretenses of discussing the purchase of the Fuss Intellectual Property from Plaintiff in good faith and in keeping with the 2002 Agreement, when Bensch actually intended to use the call to spring his false new claim on Plaintiff that was contrary to Plaintiff's reliance on their 24-year course of dealings and the 2002 Agreement), and by setting up the December 2, 2020, meeting in polite and courteous manner without providing any warning or notice whatsoever to cause Plaintiff to think that Bensch would, in the call for the first time in 24 years take a false position that he, and not Plaintiff, owned the Fuss Intellectual Property, Bensch was tricking Plaintiff, concealing the facts of the closing of the Merger and Acquisition, concealing the date of the closing of the Merger and Acquisition, concealing the facts about Article III of the Agreement of Merger and Acquisition, and concealing his intention to make his own hostile, false claim of ownership in the Fuss Intellectual Property, while at the same time affirmatively creating a calendared event so as to create the reasonable expectation of Plaintiff exactly to the contrary.  Bensch concealed all these things for the very purpose of carrying out his fraud and deceit of Plaintiff to the end and for his express intent to convert or otherwise benefit himself by Plaintiff's property and harm Plaintiff, while ensuring that he would get the added benefit of making it to the Non-Recourse Provision with as little "paper trail" as possible and with as little chance as possible that Plaintiff would reach out to Aphria before closing of

the Merger and Acquisition; and in a manner that would make it unlikely that Plaintiff would suspect Bensch was making false statements to Aphria (a publicly-traded company) about the Fuss Intellectual Property, and unlikely that Plaintiff would suspect Bensch was going to change a 24 year course of dealing by making a false claim only after the closing.

141.

The actual knowledge and intent of Bensch is chargeable to all business entities named as Defendants herein for which Bensch is, or at the relevant time was, an employee, officer, director, member, manager, or shareholder, to the extent those Defendants participated in the Merger and Acquisition with actual or constructive knowledge of what Bensch knew.

142.

Bensch and other Defendants acted with specific, actual knowledge and scienter in making these fraudulent representations and deceitful and misleading statements, and actively concealed these above facts, speaking to Plaintiff in a way to misrepresent the facts as well as to conceal the true nature of what was going on through negotiations and leading up to the closing of the Merger and Acquisition.  Especially between November 9, 2020 through closing of the Merger and Acquisition on November 25, 2020, when Plaintiff was actively reaching out to Bensch and Bensch was agreeing to speak to Plaintiff about Plaintiff's property interest in the Fuss Intellectual Property while he withheld and concealed key facts and critical timing related to the impending closing of the Merger and Acquisition, Bensch and other Defendants acted with specific, actual knowledge and scienter to harm Plaintiff.

143.

Bensch and other Defendants acted with specific intent to cause reliance by Plaintiff to Plaintiff's detriment, and specific intent to harm Plaintiff.

144.

Plaintiff in fact relied to his detriment on Bensch and other Defendants' fraud, deception, concealment of facts, and misrepresentation.

145.

Plaintiff's reliance was reasonable based on the history between the parties, the oral representations by Bensch over the years, the 2002 Agreement, the knowledge that there was no corresponding document like the 2003 Assignment applicable to the Fuss Intellectual Property, and the Plaintiff's 2018 offer to sell the property that was declined by Bensch without any objection to Plaintiff's right or position to make such offer.  Moreover, because it was known that this impending Merger and Acquisition of SweetWater was a very large, international transaction involving a publicly traded company, Plaintiff, like any reasonable person in a similar situation, held the logical belief that key parties to such a transaction (and Bensch certainly was a key party) likely had an express duty to not make categorically false claims about the ownership of intellectual property.  To this end, Plaintiff's reliance on Bensch that Bensch would not make false claims about the Fuss Intellectual Property, such as Bensch actually did in Article III of the Agreement of Merger and Acquisition related to Plaintiff's property, was objectively understandable and reasonable.  In fact, Bensch calculated his careful responses on November 10, 2020, to build upon such reliance and to avoid providing any reason for Plaintiff to know that the December 2, 2020, conversation they had just scheduled would only take place after Bensch not only signed the Agreement of Merger and Acquisition but even after the Merger and Acquisition closed.

146.

Plaintiff justifiably relied upon Bensch's fraud, deceit, and concealment by believing that Bensch was acting in good faith and would actually confer in good faith in a manner to address

with Plaintiff the value of the Fuss Intellectual Property and to include Plaintiff or his interest and

allocation in the deal as a precondition of, or as part of, the Agreement of Merger and Acquisition.

As such, between November 10, 2020, and December 2, 2020, Plaintiff was misled to his detriment

as he waited for the December 2, 2020, call from Bensch and had no reason to take affirmative

action to protect his interest by contacting Aphria directly or moving to enjoin the sale or take

other actions.  Moreover, in the December 2, 2020, call, Bensch still did not tell Plaintiff that the

Merger and Acquisition had closed, or what Bensch had represented to Aphria as part of the

Agreement of Merger and Acquisition.

<div align="center">147.</div>

Defendants' fraud, deceit, and concealment concerning the Fuss Intellectual Property has

caused Plaintiff damages in an amount to be determined by a fair and impartial jury.  Because the

Fuss Intellectual Property serves as the foundation of much of the SweetWater Intellectual

Property, including their key trademarks based thereon, and because the trademarks cannot be used

at this point without violating the copyrights of Plaintiff in the Fuss Intellectual Property, a

significant portion of the USD 92,000,000 (other than that portion properly attributable to recipes

and the like) are properly Plaintiff's as compensatory damages in an amount to be determined by

a fair and impartial jury.

<div align="center">148.</div>

Pursuant to O.C.G.A. § 51-12-5.1, based on the clear and convincing evidence of

intentional fraud, intentional deceit, intentional concealment, and intentional misrepresentation,

with a specific intent to harm, deceive, and defraud Plaintiff concerning his property interest in the

Fuss Intellectual Property, Plaintiff is entitled to the award of punitive damages in an amount to

be determined by a fair and impartial jury, in order to punish and deter Defendants from this

conduct in the future.  Additionally, to the extent certain other Defendants did not act with the

same actual intent to harm Plaintiff that Bensch had, nevertheless they acted in a manner so as to constitute constructive fraud by those Defendants, sufficient to justify the award of punitive damages against other Defendants.

## COUNT III – BREACH OF CONTRACT/QUANTUM MERUIT

149.

Plaintiff incorporates the above paragraphs as if fully restated herein.

150.

Plaintiff and Bensch had a mutual understanding, in the nature of an enforceable contract and/or implied in fact contract, that for the $500 fee for the license, Bensch and SweetWater would use, and Plaintiff would maintain the ownership interest in, the Fuss Intellectual Property and, inherent in said ownership, Bensch would include Plaintiff or Plaintiff's interest in any sale or transfer event whereby Plaintiff's interest in the Fuss Intellectual Property was the subject of said sale or transfer such that Plaintiff, as owner, would receive the value of Plaintiff's interest.  It was a contractual understanding and agreement that Plaintiff, as the sole owner of the Fuss Intellectual Property, would either sell and assign to Bensch or SweetWater his full property interest before the sale or transfer event with the third-part buyer or, alternatively, be included in the negotiation process with the third-party buyer so as to receive the value of the Fuss Intellectual Property.  The oral representations in 1996 at the time Plaintiff created the Fuss Intellectual Property, the oral representations at the time of the 2002 Agreement, and the oral representations at the time of the 2003 Agreement, along with the inherent and implicit incidents of ownership of the Fuss Intellectual Property, reflect this mutual understanding and agreement between Plaintiff and Bensch.  Moreover, implicit in the mutual understanding and agreement was the covenant of good faith which, as applied to the circumstances in this case, meant that Bensch had a duty of open, candid, and good faith communications about the existence of the impending Merger and

Acquisition, the negotiations related thereto, and the likely date of the closing of the Merger and Acquisition, as well as any and all representations that would be made as to, or related directly to, the Fuss Intellectual Property. Moreover, implied in the mutual agreement was that Bensch would not act contrary to, hostile to, or adversarial to the property ownership Bensch acknowledged and represented that Plaintiff had in the Fuss Intellectual Property and, further, that Bensch would not profit or gain from the sale or transfer related to the Fuss Intellectual Property in a manner that did not compensate Plaintiff by Plaintiff receiving the fair value of the Fuss Intellectual Property.

151.

Plaintiff provided services and authorized the continued use of his property and goods (including, without limitation, the 2003 Assignment related to the Tap Handle) to Defendants in the form of continuing the permitted use of the Fuss Intellectual Property based on this mutual understanding and with the implicit understanding, as a condition of that understanding, that neither Bensch nor SweetWater would act contrary to the 2002 Agreement or the mutual understanding to include Plaintiff and his interest in any sale or transfer.

152.

Such goods and services, i.e., the Fuss Intellectual Property, are owned by Plaintiff and provide significant monetary value to Defendants subject to this mutual understanding.

153.

Defendants specifically requested that Plaintiff create the Fuss Intellectual Property and permit Defendants to use the Fuss Intellectual Property while Plaintiff retained ownership of said property and while Defendants knew Plaintiff retained ownership of same. Moreover, Bensch had Plaintiff sign the 2003 Assignment, while not having a similar agreement signed for the remaining Fuss Intellectual Property, based on the same mutual understanding, such that Plaintiff and Bensch acted in reliance on the agreement.

154.

At all times relevant to this Complaint, Plaintiff, as the owner of the Fuss Intellectual Property, reasonably expected to receive compensation for the fair value of the Fuss Intellectual Property at the time of any sale or transfer, if the sale or transfer involved the Fuss Intellectual Property, and Bensch recognized and agreed to this as evidenced by the 2002 Agreement, the 2003 Assignment, the course of dealings between the parties over the years (including Plaintiff's 2018 offer and Bensch's declining of same).

155.

In light of the use of the Fuss Intellectual Property to build its brand over a period of more than twenty years, during which time the SweetWater brand grew exponentially based heavily on the use of the Fuss Intellectual Property, and during which time Defendants knew the Fuss Intellectual Property was Plaintiff's property, it would be unjust and unconscionable to permit Defendants to refuse to compensate Plaintiff based on the mutual agreement and implied obligations related thereto for the value of the Fuss Intellectual Property, as the value of the Fuss Intellectual Property was included within the USD 92,000,000 attributed to the Intellectual Property in the Agreement of Merger and Acquisition.

156.

Bensch breached his mutual understanding and contract with Plaintiff.  Bensch and other Defendants who realized a gain directly attributable to the breach are liable for his, her, or its respective share of the funds received from USD 92,000,000 allocated to Intellectual Property in the Agreement of Merger and Acquisition to the extent of the value of same attributable to the Fuss Intellectual Property as a component thereof or otherwise, for the fair value as determined by a jury, based on breach of contract or quantum meruit/implied in fact contract, for the value of the benefit conferred upon Defendants via the Fuss Intellectual Property, all in an amount to be

determined at trial by jury.

## COUNT IV – UNJUST ENRICHMENT

In the alternative to Count III (quantum meruit) and, as an alternative remedy to the legal claims or in the event any contract claim fails or is void or otherwise not enforceable (which Plaintiff denies is the case), Plaintiff hereby prays for a remedy based on equitable principles of unjust enrichment as set forth below.

### 157.

As a basic matter of equity, it is unjust and inequitable to allow Bensch and other Defendants to take temporary possession of Plaintiff's original artwork only after signing the 2002 Agreement, and then take the 2003 Assignment for a subset of the Initial Fuss Intellectual Property, but never request or obtain an assignment for the remainder of the Fuss Intellectual Property, and then enter a deal where they specifically identify and allocate USD 92,000,000 to Intellectual Property, which definition would include the Fuss Intellectual Property, which was not excluded, and make false representations that they had written present affirmative assignments, and represent that no employee, contractor, or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property, and use Confidentiality Agreements during the negotiations, and have the protection of the Non-Recourse Provision after closing, so as to close the deal when they know full well they did not have such assignments from Plaintiff to the Fuss Intellectual Property.

### 158.

Plaintiff and Bensch did not set forth the specific agreement in writing as to the exact mechanism of how Defendant would include Plaintiff upon the sale or transfer, but same was inherent to, and understood as incidental to, the fact that Plaintiff was the owner of the Fuss Intellectual Property.  As such, the parties knew Plaintiff alone had the right to receive the full fruit

and value of his ownership of the Fuss Intellectual Property.  These incidents of ownership of the Fuss Intellectual Property include Plaintiff's right to either be "at the table" or "in the negotiations" beforehand, in whatever sequence, so as to obtain what was rightfully his.

159.

All along, it was clearly understood by Plaintiff and Bensch that Plaintiff was, and would remain, the owner of the Fuss Intellectual Property for all times up through the closing of the Merger and Acquisition and that, if there was to be a sale or transfer, Plaintiff would of necessity need to be party to the transaction.

160.

Bensch and Defendants received the license to use the Fuss Intellectual Property, the Tap Handle via the 2003 Assignment, and the right to utilize the original artwork, based on that mutual understanding that Plaintiff would be the owner of the Fuss Intellectual Property and thereby benefit from the value of such ownership.

161.

Bensch expressly built the SweetWater brand knowingly and intentionally on top of the Fuss Intellectual Property and with the permission of Plaintiff.  The SweetWater brand was built on the Fuss Intellectual Property openly and based on the 2002 Agreement and the 2017 and 2018 registered copyrights.  Plaintiff provided this valuable service to Defendants, and allowed the full use of the original artwork and the Fuss Intellectual Property as SweetWater expanded and grew, based upon the implied obligation that Defendants would not act contrary to Plaintiff's known ownership rights in the Fuss Intellectual Property.

162.

The 2002 Agreement includes a corresponding duty of good faith, given Bensch was the person running SweetWater at the time and knew that Plaintiff owned the intellectual property

upon which Bensch was building the SweetWater brand.  At equity, it is implied that Bensch and others cannot be allowed to take positions hostile, adversarial, or contrary to the very claims they know to be true, namely, that Plaintiff is the owner of the Fuss Intellectual Property; there is also an implied in law obligation that they not take steps to conceal facts from Plaintiff concerning Plaintiff's property, or otherwise exclude Plaintiff from a transaction involving Plaintiff's property, when they know that such transaction involves affirmative representations concerning, and significant remuneration for, just that type of property.

163.

It would be unjust and inequitable to allow Defendants to obtain these services from Plaintiff and receive a significant allocation of Purchase-Price proceeds for just this category of Intellectual Property that rightfully belongs to Plaintiff, while denying Plaintiff his share of that sales price attributable to the Fuss Intellectual Property.

164.

Because Defendants knew the Fuss Intellectual Property was core, essential, and foundational to the very brand being sold in the Merger and Acquisition, and because Defendants knew that branding was a key component of what Aphria sought to acquire through the Merger and Acquisition, this was clearly a material and substantial inequity for Defendants to unjustly gain that which was rightly value attributable to Plaintiff.  In fact, because Defendants would have known that Plaintiff and his interest were not properly identified in the Disclosure Letter, and that Plaintiff was not privy to the negotiations or in privity as a party to the Agreement of Merger and Acquisition, or listed as a third-party beneficiary or rightful claimant on the R & W Policy, Defendants were aware that Plaintiff would be harmed.  It would be unjust to allow Defendants to keep the value of Plaintiff's ownership in the Fuss Intellectual Property that flows from the very Agreement of Merger and Acquisition from which Defendants intentionally excluded Plaintiff.

165.

The Merger and Acquisition has closed, so Plaintiff cannot bring a claim to enjoin the closing in order to seek to obtain the fair value of his ownership interest in the Fuss Intellectual Property.

166.

Bensch and others benefited greatly by this payment for Plaintiff's services and use of his intellectual property; yet, they benefited without Plaintiff's knowledge and consent or participation in their falsehoods to others or the transaction that conferred the benefit.  Bensch, and other Defendants, as the parties sought to be charged, have been conferred a significant benefit based on Bensch's wrongful actions of fraud, concealment, and deceit in order to induce the very benefits that equitably belong to Plaintiff.  Bensch, and others, would be unjustly enriched if a remedy in equity is not allowed to force Defendants to disgorge their ill-gotten gain.

167.

By acknowledging that Plaintiff was the owner of the Fuss Intellectual Property and providing false pretenses that he would benefit by the continued growth of the SweetWater brand, Defendants induced and encouraged Plaintiff to provide and render something of value (that is, Plaintiff's original artwork), so that they could make full use thereof to their own benefit, under and conditioned on the 2002 Agreement and the absence of any document like the 2003 Assignment that would be applicable to the Fuss Intellectual Property that remained after assignment of the Tap Handle.  Defendants wrongfully benefited by receiving the value of the Fuss Intellectual Property within the USD 92,000,000 of Intellectual Property that, as a matter of equity, fairness, and justice belongs to Plaintiff as the owner of the Fuss Intellectual Property.

168.

As such, given that only Plaintiff, as owner of the Fuss Intellectual Property, had the actual right to sell, assign, and authorize use of same to others, to prevent the Defendants' unjust gain and provide a remedy for this outrageous conduct, the remedy of unjust enrichment should apply to the facts in this case as a remedy for a claim and right implied in law.

169.

Defendants are liable for his or her respective share of the funds received from USD 92,000,000 allocated to Intellectual Property in the Agreement of Merger and Acquisition, to the extent of the value of same attributable to the Fuss Intellectual Property as a component thereof, all in an amount to be determined at trial by jury.

## COUNT V – CONSTRUCTIVE TRUST/EQUITABLE LIEN/EQUITABLE OR LEGAL ACCOUNTING

170.

Plaintiff incorporates the above paragraphs as if fully restated herein.

171.

Bensch had specific, actual knowledge of Plaintiff's ownership of the Fuss Intellectual Property.

172.

Bensch was the primary active tortfeasor, with a specific intent to harm Plaintiff and recover a benefit from the conversion of Plaintiff's property.

173.

The total funds for Intellectual Property in the Agreement of Merger and Acquisition total USD 92,000,000.

174.

Plaintiff's *compensatory* claims for the conversion or unjust enrichment against all persons and entities receiving proceeds from the sale are less than USD 92,000,000.

175.

Bensch, directly or through business entities he owns and controls, received and presently controls more than USD 92,000,000 from the closing of the Merger and Acquisition.

176.

As for how the Purchase Price was allocated and flowed to various entities and persons as a result of the closing of the Merger and Acquisition, Bensch knows such allocations and persons and entities to which amounts of funds or stock flowed.

177.

Plaintiff prays for a legal or equitable accounting, as provided by law, from Bensch so that Bensch is required by the Court to identify, account for, and set out the amount and date of proceeds paid to any and all recipients of said proceeds, to include all persons or entities receiving some of the Purchase Price allocated to the Intellectual Property in the Agreement of Merger and Acquisition, and so that  Bensch is required to account for the percentage received by said person or entity such that all Doe Unitholders can be identified and joined to this lawsuit, if possible, and so that Plaintiff can obtain complete legal or equitable relief.

178.

Because Bensch was the active tortfeasor with a specific intent to harm Plaintiff, the funds he received up to and including the USD 92,000,000, and in the amount determined as compensatory damages to belong rightly to Plaintiff, should have a constructive trust and/or equitable lien imposed thereon to include all of Bensch's entire funds or stock gained from the closing of the Merger and Acquisition sufficient, up to USD 92,000,000, until such time as a

judgment and verdict can be had as to what portion of said funds is attributable and allocable to the Fuss Intellectual Property.  Further, said funds of Bensch should be imposed with a constructive trust or equitable lien to satisfy the full and entire compensatory judgment against all other persons and entities and Doe Unitholders receiving funds for Plaintiff's intellectual property, in the event that any such person or entity is not subject to the venue and jurisdiction of this Court.  Because Bensch was the active and primary tortfeasor, a trust or lien should be imposed on Bensch's funds and/or stock holdings sufficient to cover the claims against Bensch, and leaving Bensch, if appropriate, to be the party who must seek contribution from other less culpable parties at his expense, not the expense of Plaintiff.

## **COUNT VI – PUNITIVE DAMAGES**

179.

Plaintiff incorporates the above paragraphs as if fully restated herein.

180.

Bensch, and possibly other Defendants to be identified in discovery, shows clear and convincing evidence of intentional misconduct, willful misconduct, malice, fraud, and a specific intent to harm Plaintiff, of converting Plaintiff's property interests in the Fuss Intellectual Property and of committing intentional fraud, deception, concealment, and deceit to effectuate that end of harming Plaintiff to the benefit of Bensch and others.

181.

Pursuant to O.C.G.A. § 51-12-5.1, Plaintiff is entitled to an award of punitive damages and, as to Bensch, and possibly others, said punitive damages being unlimited by the cap based on Bensch's specific intent to harm Plaintiff.

## **COUNT VII – ATTORNEY FEES AND LITIGATION EXPENSES**

182.

Plaintiff incorporates the above paragraphs as if fully restated herein.

183.

Defendants have committed intentional torts against Plaintiff, or put Plaintiff to unnecessary trouble and expense, and have engaged in stubbornly litigious behavior and, as such, Plaintiff is entitled to the award of attorney fees and litigation expenses pursuant to O.C.G.A. § 13-6-11.

184.

DISCOVERY SERVED WITH COMPLAINT: Pursuant to Uniform Superior Court Rule 5.2, by signature below, undersigned counsel certifies that he has attached and served the following discovery with the Complaint:

a. Exhibit 11 – Plaintiff's First Interrogatories to Defendant Bensch; and

b. Exhibit 12 – Plaintiff's First Request for Production of Documents to Defendant Bensch.

WHEREFORE, Plaintiff prays for the following relief against each and all Defendants herein:

1.     That process and summons issue and that each Defendant be served with process, summons, and a copy of this Complaint as provided by law;

2.     That the Doe Unitholders be identified in discovery by Bensch and others without delay, and that the pleadings be amended to name said parties specifically, and that they be served with process, summons, and a copy of this Complaint as provided by law;

3.     That this case be tried before a fair and impartial jury of twelve;

4.      That judgment be had for Plaintiff against Defendants on Count 1, for Conversion, against Bensch and all other Defendants actively participating or knowingly benefitting therefrom, as their interest appears, based on their knowledge and participation in this tort, as a jury so decides, and that Plaintiff be awarded all general compensatory damages for the conversion, as determined to be the value of Plaintiff's property interest in the Fuss Intellectual Property at the time of the conversion, or at the time of trial, whichever is greater, as elected by Plaintiff and determined by a jury, plus all costs and fees and punitive damages allowed by law;

5.      That judgment be had for Plaintiff against Defendants on Count 2, for Fraud, Deceit, Fraudulent Concealment, Intentional Misrepresentation, against Bensch and all other Defendants actively participating or knowingly benefitting therefrom, as their interest appears, based on their knowledge and participation in these torts, as a jury so decides, and that Plaintiff be awarded all general compensatory damages for these torts as determined to be the value of Plaintiff's property interest in the Fuss Intellectual Property at the time of the torts, as determined by a jury, plus all costs and fees and punitive damages allowed by law;

6.      That, in the alternative to Counts 1 and 2,  that judgment be had for Plaintiff against Bensch, and all other Defendants aiding and assisting in the breach, on Count 3, for breach of contract and/or quantum meruit/implied in fact contract, and Plaintiff be awarded money, as a remedy for the breach of contract or claim in quantum meruit, as determined by a jury, against Bensch and all other Defendants, and that Plaintiff recover from Bensch and any other Defendants the damages in an amount equal to the value of the Fuss Intellectual Property as a component of the category of USD 92,000,000 for the Intellectual

Property in the Agreement of Merger and Acquisition, or as otherwise determined as damages by the jury;

7.      That, in the alternative to Counts 1, 2, and 3, and as an equitable remedy, that Plaintiff receive an award, judgment, decree, or order on Count 4 (which is denominated as a Count for reference, but remains a remedy in equity) so as to prevent Defendants' unjust enrichment, such that Plaintiff receives and Defendants, each and all, disgorge their unjust gain of funds in the amount from the Purchase Price of the Agreement of Merger and Acquisition, that should have been allocated to the Fuss Intellectual Property, as a component within and subset of, the category of property and payment allocation for Intellectual Property, namely, USD 92,000,000, as that sum should have been allocated and attributed to Plaintiff as the rightful legal and equitable owner of the Fuss Intellectual Property, all in an amount lesser than the USD 92,000,000 but equal to the value of the Fuss Intellectual Property at the time of the closing, and paid by Defendants in the amount of their proportionate share, as determined by a jury, but, in the event a Defendant with less culpability than Bensch is not able to be added to this case, that any share attributable to that Defendant be equitably imposed against Bench because he had unclean hands and was the most culpable actor engaged in the unjust enrichment from the entire transaction, so as to justify Bensch having to remedy any harm that his active wrongdoing caused, which would include covering the portion that might have been recovered by another person who is not subject to the venue or jurisdiction of this Court, or should said person not be in a position to disgorge that person's share of the unjustly received funds;

8.      That in addition to the other counts, that Plaintiff have an Order or Decree of the Court, imposing on Bensch and other Defendants, and their funds, on Count 5, a Constructive Trust, Equitable Lien, and that an Accounting, at law or equity, be required,

such that Bensch and all other Defendants be ordered and required to identify the recipients of, and account for the amounts received by persons or entities of the Purchase Price, and their share of same, and that their name and contact information be provided, and that a constructive trust and equitable lien attach to said funds, so as to deem the holders of said funds holding same under a constructive trust for the benefit of their rightful legal and equitable owner of the Fuss Intellectual Property; and that Plaintiff receive an additional constructive trust and equitable lien against Bensch's funds, over and above his actual share of receipt, for that portion of funds received by any and all other Defendants, including Doe Unitholders, who are not or cannot be located or made subject to the jurisdiction and venue of this Court, such that Bensch as the active and primary wrongdoer have imposed a trust and lien on his funds sufficient to pay over all such sums rightfully, legally, or equitably belonging to Plaintiff for all Defendants including Doe Unitholders, leaving Bensch the obligation to pursue his remedy, if any, against others;

9.      That judgment be had on Count 6, for punitive damages, based on the intentional torts of Count 1 (Conversion) or Count 2 (Fraud, Deceit, Concealment, and Intentional Misrepresentation), because the Defendants acted with intentional misconduct, willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which would raise the presumption of conscious indifference to consequences, and as to Bensch, and possibly other Defendants with his same level of knowledge of the facts, that the award be uncapped to the extent it was done with the specific intent to harm Plaintiff, all in amounts as determined by a fair and impartial jury;

10.      That judgment be had on Count 7, and that Plaintiff recover all attorneys' fees and litigation expenses as allowed by law for the intentional torts of conversion, fraud, or

deceit, or, based on Defendants' bad faith and stubborn litigiousness in this matter, all in amounts as determined by a fair and impartial jury;

11.     That Plaintiff be provided such other and further legal and equitable relief against these Defendants as the Court deems just and proper.

This 17th day of September, 2021.

BLAINE A. NORRIS, PC

_____
BLAINE A. NORRIS
State Bar No. 545832
JOHN R. AUTRY
State Bar No. 029029
Attorneys for Plaintiff

1143 Prince Ave
Athens, GA 30606
(706) 850-9400
(706) 850-9405 Fax
blaine@NorrisInjuryLaw.com
john@NorrisInjuryLaw.com

SMITH TEMPEL BLAHA LLC

s/Matthew Hoots, by BAN w/permission
_____
GREGORY SCOTT SMITH
State Bar No. 658377
MATTHEW T. HOOTS
State Bar No. 101080
Attorneys for Plaintiff

1055 Prince Ave
Athens, GA 30606
(706) 621-5777
mhoots@srtslaw.com
gsmith@srtslaw.com

STATE OF GEORGIA
COUNTY OF _Rockdale_

## VERIFICATION

Ray Scott Fuss hereby, after being first duly sworn, deposes and states on oath the facts set forth in the Complaint for Damages and Equitable Relief, dated September 17, 2021, are true and correct to the best of my personal knowledge, information and belief.

This 17TH day of September, 2021.

Ray Scott Fuss

Sworn to and subscribed before me
this _17th_ day of September, 2021.

Notary Public

LEIGH ANNE BURGESS
MY COMMISSION EXPIRES
FEB
4
2022
ROCKDALE CO., GEORGIA
NOTARY PUBLIC

EXHIBIT 1

**Exhibit 99.1**

*Execution Version*

**AGREEMENT OF MERGER AND ACQUISITION**

**dated as of November 4, 2020**

**by and among**

**APHRIA INC.,**

**PROJECT GOLF MERGER SUB, LLC,**

**SW BREWING COMPANY, LLC,**

**SWBC CRAFT HOLDINGS LP,**

**SWBC CRAFT MANAGEMENT, LLC,**

**SWBC BLOCKER SELLER, LP**

**and**

**CHILLY WATER, LLC**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I BLOCKER SALE** | | 2 |
| | | |
| 1.1. | Purchase and Sale | 2 |
| 1.2. | Consideration | 2 |
| 1.3. | Blocker Sale Closing | 2 |
| 1.4. | Blocker Seller Deliverables at Blocker Closing | 3 |
| 1.5. | Authorization of the Transactions | 3 |
| | | |
| **ARTICLE II THE MERGER** | | 4 |
| | | |
| 2.1. | The Merger | 4 |
| 2.2. | Effective Time of the Merger | 4 |
| 2.3. | Effects of the Merger | 4 |
| 2.4. | Directors and Officers | 5 |
| 2.5. | Closing | 5 |
| 2.6. | Closing Deliveries | 5 |
| 2.7. | Effect on Units; Merger Sub Units | 7 |
| 2.8. | Purchase Price | 8 |
| 2.9. | Pre-Closing Purchase Price Adjustment | 9 |
| 2.10. | Closing Date Stock Issuance | 9 |
| 2.11. | Closing Date Payments | 10 |
| 2.12. | Purchase Price Adjustment | 11 |
| 2.13. | Purchase Price Settlement | 13 |
| 2.14. | Withholding | 15 |
| 2.15. | Earn-Out | 15 |
| 2.16. | Earn-Out Settlement | 16 |
| 2.17. | Earn-Out Covenants | 18 |
| 2.18. | Exchange of Units | 20 |
| 2.19. | Appraisal Right | 20 |
| 2.20. | Tax Treatment; Allocation of the Purchase Price | 20 |
| 2.21. | Paying Agent | 21 |
| | | |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY** | | 21 |
| | | |
| 3.1. | Organization and Qualification | 21 |
| 3.2. | Capitalization; Subsidiaries | 22 |
| 3.3. | Authority | 23 |
| 3.4. | No Violation and Consents | 23 |
| 3.5. | Affiliate Contracts | 24 |
| 3.6. | Title to Assets; Condition and Sufficiency of Assets | 24 |
| 3.7. | Litigation and Compliance with Laws | 25 |
| 3.8. | Intellectual Property | 25 |
| 3.9. | Privacy and Data Protection | 27 |
| 3.10. | Contracts | 27 |
| 3.11. | Financial Statements and Related Matters | 30 |
| 3.12. | No Undisclosed Material Liabilities | 30 |

i

**TABLE OF CONTENTS**
(continued)

| 3.13. | Subsequent Events | 30 |
|---|---|---|
| 3.14. | Insurance | 31 |
| 3.15. | Licenses and Permits | 31 |
| 3.16. | Environmental Matters | 31 |
| 3.17. | Tax Matters. | 32 |
| 3.18. | Labor and Employee Benefits | 34 |
| 3.19. | Real Property | 38 |
| 3.20. | Suppliers; Distributors | 38 |
| 3.21. | Accounts Receivable, Accounts Payable | 39 |
| 3.22. | Regulatory | 39 |
| 3.23. | Payments; Foreign Corrupt Practices Act; U.S. Export and Sanctions Laws | 40 |
| 3.24. | Inventory; Returns | 41 |
| 3.25. | Product Warranties; Recalls | 42 |
| 3.26. | Trade Programs | 42 |
| 3.27. | Bank Accounts | 42 |
| 3.28. | Cares Act | 42 |
| 3.29. | Brokers | 43 |
| 3.30. | Acknowledgement of No Other Representations or Warranties | 43 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BLOCKER, BLOCKER GP AND BLOCKER SELLER 43

| 4.1. | Organization | 43 |
|---|---|---|
| 4.2. | Authority | 44 |
| 4.3. | Capitalization | 44 |
| 4.4. | Blocker Interests | 44 |
| 4.5. | No Violations and Consents | 44 |
| 4.6. | Litigation and Compliance with Laws | 45 |
| 4.7. | Purpose | 46 |
| 4.8. | No Employees | 46 |
| 4.9. | No Broker | 46 |
| 4.10. | Taxes | 46 |
| 4.11. | Acknowledgement of No Other Representations or Warranties | 47 |

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB 47

| 5.1. | Organization | 47 |
|---|---|---|
| 5.2. | Authority | 47 |
| 5.3. | No Violations and Consents | 48 |
| 5.4. | Litigation | 48 |
| 5.5. | Sufficient Funds | 49 |
| 5.6. | R&W Policy | 49 |
| 5.7. | Brokers | 49 |
| 5.8. | Absence of Certain Changes | 49 |
| 5.9. | Restrictions on Payment | 49 |

ii

## TABLE OF CONTENTS
(continued)

| 5.10. | Parent Public Company Reports; Financial Statements; No Undisclosed Liabilities. | 49 |
| 5.11. | Legal Compliance | 50 |
| 5.12. | No Required Vote | 51 |
| 5.13. | Solvency | 51 |
| 5.14. | Investment Intent | 51 |
| 5.15. | Acknowledgement of No Other Representations or Warranties | 52 |

ARTICLE VI COVENANTS     53

| 6.1. | Certain Governmental Matters | 53 |
| 6.2. | Conduct of Business by the Company and its Subsidiaries and the Blocker Pending the Transactions | 54 |
| 6.3. | Access to Information | 58 |
| 6.4. | Further Assurances | 59 |
| 6.5. | Directors & Officers Indemnification and Insurance | 60 |
| 6.6. | Employee Benefit Matters | 60 |
| 6.7. | Intercompany Accounts | 62 |
| 6.8. | Tax Matters | 62 |
| 6.9. | Financing Covenants | 64 |
| 6.10. | Blocker Actions | 65 |
| 6.11. | Securityholders' Representative | 65 |
| 6.12. | Post-Closing Registration | 67 |
| 6.13. | Regulatory | 70 |
| 6.14. | Release | 71 |
| 6.15. | PPP Loan | 71 |
| 6.16. | R&W Policy | 72 |
| 6.17. | Tax Exemption Certificates | 72 |
| 6.18. | Blocker Seller Access to Information | 72 |
| 6.19. | PPP Escrow Agreement | 72 |

ARTICLE VII CONDITIONS TO THE TRANSACTIONS     72

| 7.1. | Conditions to Obligations of Each Party to Effect the Transactions | 72 |
| 7.2. | Additional Conditions to Obligations of Parent and Merger Sub | 73 |
| 7.3. | Additional Conditions to Obligations of the Company and Blocker Seller | 74 |

ARTICLE VIII TERMINATION     74

| 8.1. | Termination | 74 |
| 8.2. | Effect of Termination | 75 |

ARTICLE IX NO SURVIVAL; NO RECOURSE     76

| 9.1. | No Survival | 76 |
| 9.2. | No Recourse | 76 |

ARTICLE X GENERAL PROVISIONS     76

| 10.1. | Cost and Expenses | 76 |

iii

# TABLE OF CONTENTS

(continued)

| | | |
|---|---|---|
| 10.2. | Amendment, Modification and Waiver | 77 |
| 10.3. | Savings Clause | 77 |
| 10.4. | Entire Agreement | 77 |
| 10.5. | Assignment; Successors and Assigns | 77 |
| 10.6. | Parties in Interest | 77 |
| 10.7. | Mutual Drafting; Interpretation; Headings; Disclosure Letter | 78 |
| 10.8. | Governing Law | 79 |
| 10.9. | Venue | 79 |
| 10.10. | Waiver of Jury Trial and Certain Damages | 79 |
| 10.11. | Notices | 80 |
| 10.12. | Public Announcements | 82 |
| 10.13. | Counterparts | 83 |
| 10.14. | Enforcement of Agreement | 83 |
| 10.15. | Limitation on Recourse | 83 |

iv

## AGREEMENT OF MERGER AND ACQUISITION

This Agreement of Merger and Acquisition dated as of November 4, 2020 (this "Agreement"), is entered into by and among Aphria Inc., a corporation existing under the Ontario Business Corporations Act ("Parent"), Project Golf Merger Sub, LLC, Delaware limited liability company ("Merger Sub"), SW Brewing Company, LLC, a Delaware limited liability company (the "Company"), SWBC Craft Holdings LP, a Delaware limited partnership ("Blocker"), SWBC Craft Management, LLC (the "Blocker GP"), SWBC Blocker Seller, LP, a Delaware limited partnership ( "Blocker Seller" and, together with the Blocker GP, collectively, "Blocker Partners"), and Chilly Water, LLC, a Delaware limited liability company ("Securityholders' Representative").

RECITALS:

**WHEREAS**, Parent indirectly owns all of the issued and outstanding membership interests of Merger Sub (the "Merger Sub Units");

**WHEREAS**, the Company owns all of the issued and outstanding membership interests of Cheese Grits, LLC, a Georgia limited liability company ("Cheese Grits"), and immediately prior to the Closing, the Company will enter into that certain Redemption Agreement, substantially in the form attached hereto as Exhibit A whereby, as further reflected on Schedule I thereto, the Company will redeem, immediately prior to the Effective Time, certain Class O Units (the "Redeemed Units") from Class O Members (each a "Redeemed Holder") of the Company in exchange for all of the issued and outstanding membership interests of Cheese Grits, resulting in Cheese Grits no longer being a Subsidiary of the Company (the foregoing, the "Redemption");

**WHEREAS**, the Blocker GP owns all of the issued and outstanding general partner interests of Blocker (the "Blocker GP Interests") and the Blocker Seller owns all of the issued and outstanding limited partner interests of the Blocker (the "Blocker LP Interests" and, together with the Blocker GP Interests, collectively, the "Blocker Interests"), which Blocker, immediately following completion of the transactions set forth on Schedule I (the "Pre-Closing Blocker Reorganization") will own Class T Units of the Company, with the remainder of the outstanding Units owned by the other Persons set forth on Section 3.2(a) of the Disclosure Letter (each, a "Unitholder");

**WHEREAS**, each Blocker Partner desires to sell (the "Blocker Sale") to Parent (or a Subsidiary thereof), and Parent desires to purchase (or cause a Subsidiary to purchase) from each Blocker Partner, all of such Blocker Partner's right, title and interest in and to the Blocker Interests held by such Blocker Partner, on the terms and subject to the conditions hereinafter set forth;

**WHEREAS**, immediately following the closing of the Blocker Sale, on the terms and subject to the conditions hereinafter set forth, Parent and the Company desire to cause Merger Sub to merge (the "Merger," and together with the Blocker Sale, the "Transactions") with and into the Company, with the Company being the surviving limited liability company and becoming an indirectly wholly-owned Subsidiary of Parent;

**WHEREAS**, the respective board of directors, general partner, or other governing body of each of Parent, Merger Sub, the Company, the Blocker, and Blocker Seller deems it advisable and in the best interest of its respective entity and such entity's respective stockholders or members, as applicable, to consummate the Transactions on the terms and conditions set forth in this Agreement;

WHEREAS, the Company has entered into the Bensch Consulting Agreement as of the date hereof, to be effective as of the Closing;

WHEREAS, unless otherwise expressly provided, each other defined term shall have the meaning given thereto in <u>Annex I</u>; and

WHEREAS, the parties hereto desire to make certain representations, warranties, covenants and agreements in connection with the Transactions, and also to prescribe various conditions to the Transactions.

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto hereby agree as follows:

<div align="center">

AGREEMENT

ARTICLE I
BLOCKER SALE

</div>

1.1.　　　<u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement, at the Blocker Closing (as hereafter defined), (a) Blocker Seller shall sell and transfer to Parent (or, if directed in writing by Parent, to Four Twenty Corporation, a Delaware corporation and wholly-owned subsidiary of Parent), and Parent agrees to purchase (or cause Four Twenty Corporation to purchase) from Blocker Seller, Blocker Seller's right, title and interest in and to the Blocker LP Interests, and (b) the Blocker GP shall sell and transfer to Parent, and Parent agrees to purchase from the Blocker GP, the Blocker GP's right, title and interest in and to the Blocker GP Interests.

1.2.　　　<u>Consideration</u>. The aggregate consideration to be paid by Parent (for itself or on behalf of Four Twenty Corporation) to or for the account of Blocker Seller in exchange for the purchase of the Blocker LP Interests shall be the amount payable to the Blocker Seller as set forth in the Payment Schedule. No consideration shall be payable by Parent to or for the account of the Blocker GP in exchange for the purchase of the Blocker GP Interests.

1.3.　　　<u>Blocker Sale Closing</u>. Upon the terms and subject to the conditions of this Agreement, the closing of the purchase and sale of all Blocker Interests (the "<u>Blocker Closing</u>") shall take place at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 or by mutual exchange of electronic signatures as soon as reasonably practicable, but no more than three (3) Business Days, following the satisfaction or waiver of all conditions to the obligations of Parent, Merger Sub, Blocker Seller and the Company to consummate the Transactions contemplated hereby (other than conditions with respect to actions Parent, Merger Sub, Blocker Seller and the Company will take at the Blocker Closing or Closing itself, but subject to such conditions being satisfied at the Blocker Closing or Closing, as applicable) or at such other place and time as is mutually agreed to in writing by Securityholders' Representative and Parent. For all purposes of this Agreement, the Blocker Sale shall be deemed to have taken place immediately prior to the Closing. The term "<u>Blocker Closing</u>" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Blocker Interests to Parent (or its Subsidiary) in exchange for the consideration to be delivered at the Blocker Closing pursuant to and in accordance with <u>Section 2.11(f)</u>.

<div align="center">2</div>

1.4.     <u>Blocker Seller Deliverables at Blocker Closing</u>. At the Blocker Closing, the Blocker Seller shall deliver or cause to be delivered to Parent:

         (a)       a general partner interest and limited partner interest transfer agreement in a form reasonably acceptable to Parent;

         (b)       an IRS Form W-9 for Blocker Seller;

         (c)       a certificate signed by the Blocker GP, dated as of the Closing Date, certifying on behalf of Blocker as to: (A) the Organizational Documents of Blocker; and (B) a certificate of good standing of Blocker, certified by an appropriate authority of the Governmental Authority issuing such certificate in the jurisdiction of Blocker's creation, formation or organization dated not earlier than ten (10) Business Days prior to the Closing Date;

         (d)       a certificate signed by the Blocker GP, dated as of the Closing Date, certifying on behalf of the Blocker that the conditions set forth in <u>Sections 7.2(b)</u> and <u>7.2(c)</u> as they relate to the representations, warranties and covenants of Blocker have been satisfied;

         (e)       the Waiver Agreement, duly executed by SWBC Craft, LLC; and

         (f)       written evidence that the Pre-Closing Blocker Reorganization has been effected.

1.5.     <u>Authorization of the Transactions</u>. Immediately following the execution and delivery of this Agreement, holders of Units holding a majority of the issued and outstanding Units (the "<u>Approving Holders</u>") have executed a written consent in lieu of a meeting, with such written consent including resolutions approving and adopting the Transactions, entry into this Agreement by the applicable parties, and the consummation of the other transactions contemplated hereunder, as required by the Act, and appointing Securityholders' Representative as representative, from and after the Closing, of the Unitholders (other than the Blocker). The parties hereto shall each take, as promptly as practicable, all such other actions as may be necessary or advisable under the Act and applicable Law in connection with this Agreement and the consummation of the Transactions contemplated hereunder.

<div align="center">3</div>

## ARTICLE II
## THE MERGER

2.1.    The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the Delaware Limited Liability Company Act (the "Act"), at the Effective Time, Merger Sub shall be merged with and into the Company, with the Company surviving as an indirect wholly-owned Subsidiary of Parent. Following the consummation of the Merger, the separate limited liability company existence of Merger Sub shall cease and the Company shall continue as the surviving limited liability company (Merger Sub and the Company are sometimes referred to herein as the "Constituent Entities" and the Company following the consummation of the Merger is sometimes referred to herein as the "Surviving Entity").

2.2.    Effective Time of the Merger.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, (i) a certificate of merger substantially in the form attached hereto as Exhibit B (the "Certificate of Merger") shall be filed with the Secretary of State of the State of Delaware, and (ii) the parties shall make all other filings or recordings required by the Act or other applicable Law to effectuate the Merger.

(b)    The Merger shall become effective at the later of (i) the time of the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, and (ii) such time thereafter which the parties hereto shall have agreed upon as is provided in the Certificate of Merger (the date and time when the Merger shall become effective is referred to herein as the "Effective Time").

2.3.    Effects of the Merger.

(a)    Upon the terms and subject to the conditions of this Agreement, at the Effective Time (i) Merger Sub shall be merged with and into the Company and the separate existence of Merger Sub shall cease, (ii) the certificate of formation of the Company, as in effect immediately prior to the Effective Time shall be the certificate of formation of the Surviving Entity unless and until thereafter repealed, changed or amended in accordance with the provisions thereof and applicable Law, and (iii) the LLC Agreement shall become the limited liability company agreement of the Surviving Entity.

(b)    At the Effective Time, the effect of the Merger shall be as provided in the applicable provisions of the Act. Without limiting the generality of the foregoing, at and after the Effective Time:

(i)    the Surviving Entity shall possess all of the rights, privileges, immunities, powers and franchises, and be subject to all the restrictions, disabilities and duties of each of the Constituent Entities;

(ii)    all the rights, privileges, immunities, powers and franchises, and all property, real, personal and mixed, and all debts due on whatever account, including, without limitation, all choses in action, and all and every other interest of or belonging to or due to either Constituent Entity shall be taken and deemed to be transferred to, and vested in, the Surviving Entity without further act or deed; and all property, rights and privileges, immunities, powers and franchises and all and every other interest shall be thereafter as effectually the property of the Surviving Entity as they were of either Constituent Entity prior to the Effective Time; and

4

(iii)        all debts, liabilities, duties and obligations of Merger Sub shall become the debts, liabilities, duties and obligations of the Surviving Entity, and the Surviving Entity shall thenceforth be responsible and liable for all the debts, liabilities, duties and obligations of Merger Sub, and the rights of creditors of Merger Sub shall not be impaired by the Merger, and may be enforced against the Surviving Entity.

2.4.        <u>Directors and Officers</u>. The directors and officers of the Surviving Entity as of the Effective Time shall be the directors and officers of the Surviving Entity as set forth in the LLC Agreement, unless and until removed or until their respective terms of office shall have expired in accordance with the Act, the Surviving Entity's certificate of formation or the LLC Agreement, as applicable.

2.5.        <u>Closing</u>. Unless this Agreement shall have been validly terminated pursuant to <u>Section 8.1</u>, upon the terms and subject to the satisfaction or waiver of the conditions set forth in <u>Article VII</u>, the closing of the Merger (the "<u>Closing</u>") will take place at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 or by mutual exchange of electronic signatures as soon as reasonably practicable, but not more than three (3) Business Days, following the satisfaction or waiver of all conditions to the obligations of Parent, Merger Sub, Blocker Seller and the Company to consummate the Transactions contemplated hereby as set forth in <u>Article VII</u> (other than conditions with respect to actions Parent, Merger Sub, Blocker Seller and the Company will take at the Blocker Closing or Closing itself, but subject to such conditions being satisfied at the Blocker Closing or Closing, as applicable) or at such other place and time as is mutually agreed to in writing by Securityholders' Representative, Blocker Seller and Parent (the date on which the Closing actually occurs is the "<u>Closing Date</u>"). The Closing shall be deemed to occur at the Effective Time.

2.6.        <u>Closing Deliveries</u>.

(a)        At the Closing, the Company shall deliver, or cause to be delivered, to Parent:

(i)        the Certificate of Merger, duly executed by the Company;

(ii)        a certificate of an authorized officer for the Company certifying, on behalf of the Company as to: (A) the Organizational Documents of the Company and each of its Subsidiaries; (B) resolutions of the board of managers of the Company authorizing and approving the execution, delivery and performance by the Company of this Agreement and any agreements, instruments, certificates or other documents executed by the Company or any of its Subsidiaries pursuant to this Agreement; (C) resolutions of the requisite Unitholders authorizing and approving the execution, delivery and performance by the Company of this Agreement and any agreements, instruments, certificates or other documents executed by the Company or any of its Subsidiaries pursuant to this Agreement; and (D) certificate(s) of good standing of the Company and each of its Subsidiaries, certified by an appropriate authority of the Governmental Authority issuing such certificate in the jurisdiction of such Person's creation, formation or organization and in any other jurisdiction where such Person is qualified to do business dated not earlier than five (5) Business Days prior to the Closing Date;

5

(iii)　　　　a certificate signed by an authorized officer of the Company, dated as of the Closing Date, stating that the conditions set forth in Sections 7.2(a) and 7.2(c) as they relate to the representations, warranties and covenants of the Company have been satisfied;

(iv)　　　　one or more payoff letters in customary form, drafts of which shall have been delivered to Parent at least two (2) Business Days prior to the Closing, executed by the lenders or other financing sources of the Company or any of its Subsidiaries set forth on Section 2.6(a)(iv) of the Disclosure Letter (A) setting forth all amounts (including principal and accrued but unpaid interest) necessary to be paid to repay in full any such Indebtedness through the Closing, (B) providing that, upon payment in full of such amounts, all obligations with respect to the Indebtedness of the Company and its Subsidiaries owed to such lender or other financing source will be satisfied and released (other than any obligations that, by their terms, survive payoff of such Indebtedness), and that any and all related Liens on the assets of the Company or any of its Subsidiaries will be terminated and released and (C) draft UCC-3 termination statements or similar documents in form sufficient to evidence the termination of all such Liens;

(v)　　　　invoices setting forth the amount constituting payment in full of each item of the Transaction Expenses and the Person to whom each such amount is payable;

(vi)　　　　the consents, authorizations and approvals of the Governmental Authorities and other Persons set forth in Section 2.6(a)(vi) of the Disclosure Letter;

(vii)　　　　resignations of each manager of the Company and each of its Subsidiaries and each officer of the Company and each of its Subsidiaries listed on Section 2.6(a)(vii) of the Disclosure Letter, in each instance, with such resignations to be effective as of the Closing;

(viii)　　　　a counterpart of the Adjustment Escrow Agreement, duly executed by Securityholders' Representative;

(ix)　　　　a counterpart of the PPP Escrow Agreement, duly executed by Securityholders' Representative;

6

(x)　　　　　all sales tax exemption certificates from United Distributors, Inc. from all states which the Company or its Subsidiaries generated revenue during fiscal years ended December 31, 2017 through December 31, 2019;

(xi)　　　　the Lease Amendment, duly executed by the Company and Cheese Grits;

(xii)　　　　the Waiver Agreement, duly executed by the Company; and

(xiii)　　　　access credentials to all online portals and databases for all Alcohol Beverage Authorities, and all third party compliance companies, with which the Company has an account.

(b)　　　　At the Closing, Parent and Merger Sub shall deliver to the Securityholders' Representative:

(i)　　　　the payments to be delivered by Parent to pursuant to Section 2.11;

(ii)　　　　book-entry credits representing the Stock Consideration, duly transferred by Parent in accordance with Section 2.10;

(iii)　　　　a certificate of an authorized officer of each of Parent and Merger Sub certifying as to: (A) the Organizational Documents of such Person; (B) resolutions of the board of directors of or board of managers, as applicable, of such Person authorizing and approving the execution, delivery and performance by such Person of this Agreement and any agreements, instruments, certificates or other documents executed by such Person pursuant to this Agreement; and (C) a certificate of the secretary of state of the jurisdiction of Parent's or Merger Sub's creation, formation, or organization, as applicable, dated as of a date not earlier than five (5) Business Days prior to the Closing Date, as to the good standing of Parent or Merger Sub, as applicable;

(iv)　　　　a certificate signed by an authorized officer of each of Parent and Merger Sub, dated as of the Closing Date, stating that the conditions set forth in Sections 7.3(a) and 7.3(b) as they relate to the representations, warranties and covenants of Parent and Merger Sub have been satisfied;

(v)　　　　a counterpart of the Adjustment Escrow Agreement, duly executed by Parent; and

(vi)　　　　a counterpart of the PPP Escrow Agreement, duly executed by Parent.

2.7.　　　Effect on Units; Merger Sub Units. At the Effective Time, by virtue of the Merger and without any action on the part of Merger Sub, the Company or the holders of any Units or the holders of Merger Sub Units:

7

(a)         Each Unit (i) held by the Company as treasury Units, (ii) owned by any direct or indirect wholly-owned Subsidiary of the Company, or (iii) that is issued or outstanding and owned directly or indirectly by Parent or Merger Sub or any of their Subsidiaries (excluding, (A) following the Blocker Closing, the Units held by Blocker, which such Units held by Blocker shall be addressed pursuant to <u>Section 2.7(d)</u> and remain outstanding following the Merger, and (B) the Redeemed Units, which shall not be Cancelled Units for purposes of this Agreement, and which shall be addressed pursuant to <u>Section 2.7(e)</u>), in each instance, immediately prior to the Effective Time (the "<u>Cancelled Units</u>") shall be automatically cancelled and retired and shall cease to exist, and no cash, stock or other consideration shall be delivered or deliverable in exchange therefor.

(b)         Each Unit (subject to the last sentence of <u>Section 2.1</u>) that is issued and outstanding immediately prior to the Effective Time, other than the Cancelled Units, the Redeemed Units and Units held by the Blocker, shall automatically be converted into the right for the Unitholder thereof to receive an amount calculated in respect of such Unit in accordance with the Payment Schedule, <u>Section 2.10</u>, <u>Section 2.11(f)</u> (in the case of Class O Units and Class M Units, as adjusted in accordance with <u>Section 2.13</u>), <u>Section 2.15</u> (if any) and <u>Section 6.12(f)</u> (if any); provided, however, that for the avoidance of doubt, the Blocker Members shall not have the right to receive consideration payable under <u>Section 2.10</u>, <u>Section 2.15</u> and <u>Section 6.12(f)</u>. At such time, all such Units shall cease to be outstanding and shall be automatically cancelled and shall cease to exist, and each holder of Units immediately prior to the Effective Time shall thereafter cease to have any rights with respect to such Units, except, in all cases, the right to receive the amounts described in this <u>Section 2.7</u>, without interest.

(c)         Each Merger Sub Unit that is issued and outstanding immediately prior to the Effective Time shall automatically be converted into, and be exchanged for one (1) unit of the Surviving Entity such that, immediately following the Effective Time, Parent will hold indirectly all of the ownership interests of the Surviving Entity (other than the interests of the Surviving Entity held by Blocker).

(d)         Each Unit held by the Blocker shall remain outstanding following the Merger, and no cash, stock or other consideration shall be delivered or deliverable in exchange therefor.

(e)         Each Redeemed Unit (which, for the avoidance of doubt, shall be held by the Company immediately following the consummation of the transactions contemplated by the Redemption Agreement but prior to the Effective Time), (i) shall remain outstanding following the Merger, but shall not entitle the Company to any cash, stock or other consideration in exchange therefor, and (ii) shall entitle the Redeemed Holders solely to their respective portions of (A) the Earn-Out Payments, if any, and (B) the amounts payable pursuant to <u>Section 2.13(a)</u>, <u>Section 2.13(b)</u> and <u>Section 6.11(b)</u>, if any, in each case, attributable to the Redeemed Units as if such Redeemed Holder continued to hold its Redeemed Units on the applicable date of determination, in each case, as set forth in the Payment Schedule.

2.8.       <u>Purchase Price</u>. The aggregate purchase price to be paid by Parent to or for the account of (i) Blocker Seller, in connection with the Blocker Sale, and (ii) Unitholders, in connection with the Merger on the Closing Date shall be an aggregate amount in cash equal to (a) the Enterprise Value, *plus* (b) Estimated Cash, *minus* (c) Estimated Closing Date Indebtedness, *minus* (d) Estimated Transaction Expenses, *minus* (e) the Adjustment Escrow Amount, *minus* (f) the PPP Escrow Amount, *minus* (g) the Securityholders' Representative Expense Amount, *minus* (h) the amount, if any, by which the Target Net Working Capital exceeds the Net Working Capital, *plus* (i) the amount, if any, by which the Net Working Capital exceeds the Target Net Working Capital, *minus* (j) the Closing Stock Value (after giving effect to the foregoing, the "<u>Estimated Purchase Price</u>"). The Estimated Purchase Price shall be payable at Closing in accordance with <u>Section 2.11</u> and the Payment Schedule, subject to adjustment in accordance with <u>Section 2.13</u>.

8

2.9.     Pre-Closing Purchase Price Adjustment. Not less than three (3) Business Days prior to the Closing Date, an authorized officer of the Company shall provide to Parent a written statement containing (i) a balance sheet of the Company and its Subsidiaries as of the Effective Time (the "Estimated Closing Balance Sheet") and, based thereon, the Company's good faith estimate of (A) the Cash (the "Estimated Cash"), (B) the Closing Date Indebtedness (the "Estimated Closing Date Indebtedness"), (C) Net Working Capital (the "Estimated Net Working Capital"), and (D) the Transaction Expenses as of immediately prior to the Effective Time (the "Estimated Transaction Expenses"), and (ii) after taking into account the determinations set forth in clause (i) hereof, the calculation of the Estimated Purchase Price. In preparing the Estimated Closing Balance Sheet and the calculation of the Estimated Purchase Price, all terms of an accounting or financial nature shall (a) be based exclusively on the facts and circumstances as they existed as of immediately prior to the Effective Time and shall exclude the effects of the Transactions, (b) be construed in accordance with GAAP (as modified by the Historical Accounting Practices), applied consistently with the Financial Statements, as modified by (c) the accounting policies and procedures and methodology set forth or reflected in Annex II (collectively, the "Policies and Procedures"); provided that, in the event of a conflict between clause (b) and clause (c), the Policies and Procedures shall control. In addition to the written statement provided pursuant to this Section 2.9, an authorized officer of the Company, with the approval of the Blocker Seller, shall provide to Parent a final Payment Schedule based on the Estimated Purchase Price; provided, that the Blocker Seller agrees that such consent shall not be unreasonably withheld and it shall be deemed unreasonable if Blocker Seller withholds approval of the final Payment Schedule for changes thereto that give effect to the provisions of this Agreement, the Redemption and/or the Company LLC Agreement.

2.10.     Closing Date Stock Issuance. At the Closing, Parent shall deliver to each Unitholder (other than the Blocker Members or with respect to the Redeemed Units) book-entry credits in the name of such Unitholder (other than the Blocker Members or with respect to the Redeemed Units), and for the book-entry credit allocable to SWB Management, LLC, directly to the SWB Members, in accordance with the Payment Schedule representing that number of common shares (the "Stock Consideration") of Parent, without par value per share ("Parent Common Shares") having a value equal to such Unitholder's portion of the Closing Stock Value determined in accordance with the Payment Schedule, which in the aggregate for all Parent Common Shares shall be equal to fifty million dollars ($50,000,000) (the "Closing Stock Value") calculated based on the volume-weighted average trading price of Parent Common Shares on the NASDAQ for the thirty (30) day period immediately ending on the close of trading on the day that the Parent issues a public announcement concerning the Transactions as required under applicable Securities Laws. Following the Closing, the Parent shall distribute the Stock Consideration (subject to compliance with the payment mechanics set forth in Section 6.12, including but not limited to with respect to the requisite Letters of Transmittal with respect to Unitholders receiving consideration in the context of the Merger) to the Unitholders (excluding, for the avoidance of doubt, the Blocker Members), and for the Stock Consideration allocable to SWB Management, LLC, directly to the SWB Members, in accordance with (i) Section 6.12, and (ii) the Payment Schedule.

9

2.11.  <u>Closing Date Payments</u>. On the Closing Date, immediately following acceptance of the Certificate of Merger, Parent shall make, or cause to be made, the following payments:

(a)  an amount in the aggregate equal to the Estimated Closing Date Indebtedness, if any, by wire transfer of immediately available funds to the accounts designated by the lenders and other creditors of the Company set forth in the payoff letters provided by such lenders and other creditors in accordance with <u>Section 2.6(a)(iv)</u>;

(b)  an amount in the aggregate equal to the Estimated Transaction Expenses, by wire transfer of immediately available funds to the accounts provided by the Company to the Parent at least two (2) Business Days prior to the Closing Date; <u>provided</u>, <u>however</u>, that (1) any Estimated Transaction Expenses paid pursuant to this <u>Section 2.11(b)</u> to the Company or its Subsidiaries and ultimately payable to an employee of the Company or any of its Subsidiaries (other than those payable pursuant to subsection (2) hereof) shall thereafter be paid by the Company or such Subsidiary to the applicable Person (net of withholding Taxes) through the Company's or such Subsidiary's payroll system not later than the next regular payroll date of the Company, (2) with respect to the Sale Bonus (as defined in the Bates Agreement) which may become payable to Patrick Bates pursuant to the Bates Agreement on October 13, 2021 (which, for the avoidance of doubt, constitutes a Transaction Expenses), (i) to the extent the Sales Bonus becomes payable to Patrick Bates in accordance with the Bates Agreement, such amounts shall thereafter be paid by the Company or such Subsidiary to the applicable Person (net of withholding Taxes) through the Company's or such Subsidiary's payroll system not later than the next regular payroll date of the Company, and (ii) to the extent that it is ultimately determined that Patrick Bates is not entitled to the Sale Bonus in accordance with the terms of the Bates Agreement such amounts shall thereafter be paid by wire transfer of immediately held funds to the Securityholders' Representative, on behalf of and for the benefit of the Unitholders (other than the Blocker Members), for further distribution to such Unitholders in accordance with the Payment Schedule, subject to <u>Section 2.18</u>, and (3) any Taxes withheld from any payment under clause (1) or (2) shall be held and remitted to the applicable Governmental Authority in accordance with applicable Law;

(c)  an amount equal to the Adjustment Escrow Amount by wire transfer of immediately available funds to the Adjustment Escrow Agent to be held in an account (the "<u>Adjustment Escrow Account</u>") in accordance with the terms of the Adjustment Escrow Agreement to be used solely for the purposes of making the payments, if any, required by <u>Section 2.13(a)</u>;

10

(d)          an amount equal to the PPP Escrow Amount by wire transfer of immediately available funds to the PPP Escrow Agent to be held in an account (the "<u>PPP Escrow Account</u>") in accordance with the terms of the PPP Escrow Agreement to be used solely for the purposes of making the payments, if any, required by <u>Section 2.13</u>(<u>b</u>);

(e)          an amount equal to the Securityholders' Representative Expense Amount by wire transfer of immediately available funds to the Securityholders' Representative into an account designated by the Securityholder's Representative, for purposes of satisfying costs, expenses and/or Liabilities of the Unitholders (other than the Blocker Members) hereunder or otherwise incurred in its capacity as the Securityholders' Representative and otherwise in accordance with this Agreement; and

(f)          an amount equal to the Estimated Purchase Price shall be paid by wire transfer of immediately available funds to (i) for amounts allocable to Blocker Seller pursuant to <u>Section 1.2</u>, directly to Blocker Seller (as satisfaction of the payment required by <u>Section 1.2</u>) in accordance with the Payment Schedule pursuant to wiring instructions provided by Blocker Seller at least two (2) Business Days prior to the Closing Date, (ii) for amounts allocable to SWBC Craft, LLC, directly to SWBC Craft, LLC in accordance with the Payment Schedule pursuant to wiring instructions provided by SWBC Craft, LLC at least two (2) Business Days prior to the Closing Date and (iii) for amounts allocable to the other Unitholders (other than the Blocker Members), the Securityholders' Representative, on behalf of and for the benefit of such Unitholders, for further distribution to such Unitholders in accordance with the Payment Schedule, subject to <u>Section 2.18</u>.

2.12.    <u>Purchase Price Adjustment</u>.

(a)          As promptly as possible and in any event within ninety (90) days after the Closing Date, Parent shall prepare and deliver to Securityholders' Representative (i) a balance sheet of the Company and its Subsidiaries as of the Effective Time (the "<u>Final Closing Balance Sheet</u>"), and (ii) based on the Final Closing Balance Sheet, Parent's good faith calculation of the Company's (A) Cash (the "<u>Final Cash</u>"), (B) the Closing Date Indebtedness (the "<u>Final Closing Date Indebtedness</u>"), (C) the Transaction Expenses as of immediately prior to the Effective Time (the "<u>Final Transaction Expenses</u>") and (D) the Net Working Capital (the "<u>Final Net Working Capital</u>" together with the Final Cash, Final Closing Date Indebtedness, and Final Transaction Expenses, the "<u>Final Calculations</u>"), and (E) the calculation of the Final Purchase Price based thereon. In preparing the Final Balance Sheet, all terms of an accounting or financial nature shall (a) be based exclusively on the facts and circumstances as they existed as of immediately prior to the Effective Time and shall exclude the effects of the Transactions, (b) be construed in accordance with GAAP (as modified by the Historical Accounting Practices), applied consistently with the Financial Statements, as modified by (c) the Policies and Procedures; provided that, in the event of a conflict between clause (b) and clause (c), the Policies and Procedures shall control. Parent shall provide Securityholders' Representative with reasonable supporting detail with respect to the calculation of each of the components of the Final Purchase Price. Parent and the Securityholders' Representative shall provide each other reasonable access to the appropriate personnel of the other parties and all supporting financial statements, worksheets and other documentation used to determine the calculation of each of the components of the Final Purchase Price, and such schedules and data with respect to the determination of such amounts as each party and its representatives reasonably request for the purposes of their review of the Final Calculations.

<center>11</center>

(b)        Before 11:59 p.m. ET on date that is thirty (30) days after the Final Closing Balance Sheet and the Final Calculations are delivered to Securityholders' Representative pursuant to <u>Section 2.12(a)</u> (the "<u>30-Day Period</u>"), the Securityholders' Representative shall deliver to Parent either (i) a written acknowledgement signed by Securityholders' Representative accepting the Final Closing Balance Sheet and the Final Calculations in their entirety (the "<u>Acknowledgement</u>"), or (ii) a written notice (the "<u>Adjustment Report</u>") containing a written explanation of those items in the Final Closing Balance Sheet and the Final Calculations which Securityholders' Representative disputes, in which case the items identified by Securityholders' Representative shall be deemed to be in dispute. During the 30-Day Period, Parent and the Surviving Entity covenant and agree that Securityholders' Representative shall be permitted access to the appropriate personnel of Parent and the Surviving Entity and all supporting financial statements, worksheets and other documentation used by Parent and the Surviving Entity to determine the Final Closing Balance Sheet and the Final Calculations as well as any relevant work papers as Securityholders' Representative may reasonably request to enable Securityholders' Representative and its representatives to evaluate the Final Closing Balance Sheet and the Final Calculations, provided that such access does not unreasonably interfere with the day-to-day operations of Parent's business. If Securityholders' Representative (i) delivers an Acknowledgement within the 30-Day Period or (ii) fails to deliver an Acknowledgement or an Adjustment Report to Parent within the 30-Day Period, Securityholders' Representative shall be deemed to have accepted and agreed to the Final Closing Balance Sheet and the Final Calculations as delivered pursuant to <u>Section 2.12(a)</u>, and such Final Closing Balance Sheet and Final Calculations shall be final and binding upon all parties and the Final Purchase Price shall be as set forth therein. In the event that Securityholders' Representative timely delivers an Adjustment Report to Parent, then Parent and Securityholders' Representative will use all commercially reasonable efforts to resolve the disputed matter(s) within the thirty (30)-day period following the delivery of the Adjustment Report. If Securityholders' Representative and Parent fail to agree on Securityholders' Representative's proposed adjustments contained in the Adjustment Report within thirty (30) days after Parent receives the Adjustment Report, then Parent and Securityholders' Representative shall jointly submit the disputed matter(s) to RSM US LLP (provided, that if such Person is unable or unwilling to serve in such capacity, Parent and Securityholders' Representative shall work in good faith to jointly select an alternative nationally recognized independent accounting) (the "<u>Independent Auditor</u>"). The Independent Auditor's function will be to resolve each element of the dispute that has not been resolved by Parent and Securityholders' Representative as an accounting expert and not as an arbitrator. The Independent Auditor shall resolve any such dispute in accordance with the Policies and Procedures and the applicable definitions set forth herein (i.e., not on the basis of an independent review). The Independent Auditor shall not have any power or authority to alter, modify, add to, or subtract from any term or provision of this Agreement. Parent and Securityholders' Representative will furnish, or cause to be furnished, to the Independent Auditor such work papers, documentation and other reports and information relating to the disputed matter(s) as the Independent Auditor may request or as either Securityholders' Representative or Parent believes relevant and each party shall be afforded the opportunity to discuss the disputed matter with the Independent Auditor (provided that no ex parte communications shall be permitted). The Independent Auditor shall make a final written determination of the disputed matter(s) (the "<u>Auditor's Determination</u>") in reliance upon supporting documentation provided to the Independent Auditor by Securityholders' Representative and Parent within twenty (20) Business Days of submission of the disputed matter(s) to the Independent Auditor. In resolving any disputed item, the Independent Auditor may not revise any element of the Final Closing Balance Sheet and Final Calculations that is not contested by the parties. The Auditor's Determination shall be furnished to Securityholders' Representative and Parent as soon as practicable after the disputed items(s) have been referred to the Independent Auditor and, absent manifest error or Fraud and subject to the following sentence, shall be nonappealable and incontestable by each party and each of their respective Affiliates and successors and not subject to collateral attack for any reason. With respect to each disputed amount, the Auditor's Determination must be an amount between or equal to one or the other of Securityholders' Representative's position as set forth in the Adjustment Report and Parent's position as set forth in the Final Closing Balance Sheet and the Final Calculations. The fees, costs and expenses of the Independent Auditor and the American Arbitration Association incurred in resolving the disputed matter(s) pursuant to this <u>Section 2.12(b)</u> shall be borne by Parent, on the one hand, and Securityholders' Representative, on the other hand, in inverse proportion to the respective percentages of the dollar value of disputed items determined in favor of Parent, on the one hand, and Securityholders' Representative, on the other hand, as determined by the Independent Auditor and set forth in the Auditor's Determination. Notwithstanding the foregoing, each of Parent and Securityholders' Representative will be responsible for paying the fees, costs and expenses of their respective attorneys, accountants and other representatives in connection with any such dispute.

12

(c)        The term "Final Closing Balance Sheet" as used herein shall mean the Final Closing Balance Sheet as ultimately determined pursuant to this Section 2.12. The term "Final Calculations" as used herein shall mean the Final Calculations as ultimately determined pursuant to this Section 2.12. The date on which the Final Closing Balance Sheet and the Final Calculations are finally determined pursuant to this Section 2.12 shall hereinafter be referred to as the "Settlement Date."

2.13.        Purchase Price Settlement.

(a)        No later than five (5) Business Days after the Settlement Date, the following payment (if any) shall be made, by wire transfer of immediately available funds to the account (or accounts) specified in writing by Parent or Securityholders' Representative, as applicable:

(i)        In the event the Final Purchase Price is less than the Estimated Purchase Price (such amount, the "Downward Adjustment Amount"), Parent and Securityholders' Representative shall cause the Adjustment Escrow Agent to pay Parent an amount equal to the Downward Adjustment Amount from the Adjustment Escrow Amount; provided, that if the Downward Adjustment Amount is greater than the Adjustment Escrow Amount, then the Securityholders' Representative shall pay to the Parent from the Securityholders' Representative Expense Amount an amount equal to the Downward Adjustment Amount *minus* the amount paid to Parent from the Adjustment Escrow Amount. Notwithstanding anything contained herein to the contrary, to the extent that the Downward Adjustment Amount is greater than the sum of the Adjustment Escrow Amount plus the amount available from the Securityholders' Representative Expense Amount to satisfy the full Downward Adjustment Amount, then Parent and the Surviving Entity shall have the express right to offset any such deficiency against any amount otherwise payable or deliverable following the Closing pursuant to Section 2.13(b) or Section 2.15. For the avoidance of doubt, any amount set off for purposes of Section 2.13(b) or Section 2.15 in accordance with this Section 2.13(a)(i) shall be deemed to have been paid to the Securityholders' Representative and the Unitholders for purposes of Section 2.13(b) or Section 2.15, as applicable. After taking into account the payment of the Downward Adjustment Amount, if any, Parent and Securityholders' Representative shall cause all remaining funds from the Adjustment Escrow Amount (including any interest accrued thereon), if any, to be released by the Adjustment Escrow Agent to the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule).

13

(ii)　　　In the event the Final Purchase Price is greater than the Estimated Purchase Price (such amount, the "Upward Adjustment Amount"), then (a) Parent shall pay the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule) an amount equal to the Upward Adjustment Amount, and (b) Parent and Securityholders' Representative shall cause the Adjustment Escrow Agent to release the entire Adjustment Escrow Amount (including any interest accrued thereon) to the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule).

(iii)　　　In the event the Final Purchase Price is equal to the Estimated Purchase Price, no adjustment payment shall be made pursuant to this Section 2.13(a), and Parent and Securityholders' Representative shall cause the Adjustment Escrow Agent to release the entire Adjustment Escrow Amount (including any interest accrued thereon) to the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule).

For the avoidance of doubt, recovery from the Adjustment Escrow Account and the Securityholders' Representative Expense Amount and subject to the set off right contained in Section 2.13(a)(i), in each instance (as provided in clause (i) above) shall be the sole and exclusive remedy available to Parent, Merger Sub, the Surviving Entity and their respective Affiliates for any Downward Adjustment Amount and no Unitholders or any of their respective Affiliates shall have any Liability or obligation under this Agreement for any portion of the Downward Adjustment Amount in excess of the amount of the then remaining Adjustment Escrow Funds and the Securityholders' Representative Expense Amount and any reduction to the Earn-Out Payments made pursuant to the set off rights in accordance with Section 2.13(a)(i).

(b)　　　Subject in all instances to the set off right contained in Section 2.13(a)(i), no later than five (5) Business Days after the CARES Act Determination Date, the following payment (if any) shall be made, by wire transfer of immediately available funds to the account (or accounts) specified in writing by Parent or Securityholders' Representative, as applicable:

14

(i)        In the event that there is CARES Unforgiven Debt, Parent and Securityholders' Representative shall cause the PPP Escrow Agent to pay Parent an amount equal to such CARES Unforgiven Debt from the PPP Escrow Amount. After taking into account the payment made pursuant to the previous sentence, if any, Parent and Securityholders' Representative shall cause all remaining funds from the PPP Escrow Amount (including any interest accrued thereon) to be released by the PPP Escrow Agent to the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule).

(ii)        In the event that there is no CARES Unforgiven Debt, no adjustment payment shall be made pursuant to this Section 2.13(b), and Parent and Securityholders' Representative shall cause the PPP Escrow Agent to release the entire PPP Escrow Amount (including any interest accrued thereon) to the Securityholders' Representative (for further distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule).

2.14.    Withholding. Each of Parent, Merger Sub and the Company shall be entitled to, after good faith consultation with Securityholders' Representative, deduct and withhold from the amounts payable or otherwise deliverable pursuant to this Agreement such amounts as required to be deducted or withheld therefrom under the Code or under any applicable provision of state, local or foreign Tax Law; provided, however, that other than with respect to compensatory payments or withholding applied for failure to comply with the provisions of Section 6.8(a) of this Agreement, the payor that determines that it has an obligation to deduct and withhold from any payment shall provide advance notice of such determination and each such payor and payee shall use commercially reasonable efforts to minimize any such Taxes. To the extent such amounts are so deducted or withheld and timely remitted to the appropriate tax authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. The applicable withholding agent will promptly pay or cause to be paid any amounts withheld pursuant to this Section 2.14 for applicable Taxes to the appropriate tax authority.

2.15.    Earn-Out.

(a)        Subject in all instances to the set off right contained in Section 2.13(a)(i), as additional consideration for the Merger (but not the Blocker Sale), Unitholders (other than the Blocker Members) shall be entitled, subject to satisfaction of the conditions set forth in this Section 2.15, to receive subsequent payments in cash (the "Earn-Out Payments"), and Parent and the Surviving Entity shall be jointly and severally obligated to make any such Earn-Out Payments. The Earn-Out Payments, if any, shall be payable in accordance with Section 2.16.

(b)        Subject in all instances to the set off right contained in Section 2.13(a)(i), within five Business Days after the 2022 Adjusted EBITDA is finally determined pursuant to Section 2.16, Parent shall, or shall cause the Surviving Entity to pay to Securityholders' Representative (for distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule) an amount, if any (the "2022 Earn-Out Payment"), equal to the product of (i) eleven (11) and (ii) the difference of (x) 2022 Adjusted EBITDA, minus (y) twenty-four million dollars ($24,000,000); provided, however, that if the calculation pursuant to clause (ii) of this Section 2.15 results in a negative number, no 2022 Earn-Out Payment shall be payable; provided further, that if the calculation pursuant to clause (ii) of this Section 2.15(b) results in a number greater than or equal to the Earn-Out Cap, the 2022 Earn-Out Payment shall be deemed to equal the Earn-Out Cap. For purposes of this Agreement, the term "Earn-Out Cap" shall mean sixty-six million dollars ($66,000,000).

15

(c)        Subject in all instances to the set off right contained in <u>Section 2.13(a)(i)</u>, and the limitations set forth in this <u>Section 2.15(c)</u>, within five Business Days after the 2023 Adjusted EBITDA is finally determined pursuant to <u>Section 2.16</u>, Parent shall, or shall cause the Surviving Entity to, pay to Securityholders' Representative (for distribution to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule) an amount, if any (the "<u>2023 Earn-Out Payment</u>"), equal to the product of (i) eleven (11) and (ii) the difference of (x) 2023 Adjusted EBITDA, <u>*minus*</u> (y) 2022 Adjusted EBITDA; *provided*, *however*, *that* if the calculation pursuant to clause (ii) of this <u>Section 2.15(c)</u> results in a negative number, no 2023 Earn-Out Payment shall be payable; *provided further*, *that* in no event shall the sum (the "<u>Aggregate Earn-Out Payment</u>") of (A) the amount paid pursuant to <u>Section 2.15(b)</u>, and (B) the amount payable pursuant to this <u>Section 2.15(c)</u>, exceed, in the aggregate, the Earn-Out Cap, and therefore, if the amount calculated pursuant to this <u>Section 2.15(c)</u> would otherwise cause the Aggregate Earn-Out Payment to exceed, in the aggregate, the Earn-Out Cap, the amount payable pursuant to this <u>Section 2.15(c)</u> shall be reduced to such amount such that the Aggregate Earn-Out Payment equals the Earn-Out Cap. Notwithstanding anything contained herein to the contrary, in the event that the payment made pursuant to <u>Section 2.15(b)</u> was equal to the Earn-Out Cap, no subsequent payment shall be due or payable pursuant to this <u>Section 2.15(c)</u>.

2.16.    <u>Earn-Out Settlement</u>.

(a)        By no later than February 28, 2023, Parent shall prepare and deliver to Securityholders' Representative a calculation (the "<u>2022 Adjusted EBITDA Calculation</u>") of the Adjusted EBITDA of the Company and its Subsidiaries during the period from January 1, 2022 through December 31, 2022 (the "<u>2022 Adjusted EBITDA</u>"). The parties shall provide reasonable access to the appropriate personnel of the other parties and all supporting financial statements, worksheets and other documentation used to determine the 2022 Adjusted EBITDA Calculation.

(b)        By no later than February 28, 2024, Parent shall prepare and deliver to Securityholders' Representative a calculation (the "<u>2023 Adjusted EBITDA Calculation</u>") of the Adjusted EBITDA of the Company and its Subsidiaries during the period from January 1, 2023 through December 31, 2023 (the "<u>2023 Adjusted EBITDA</u>"). The parties shall provide reasonable access to the appropriate personnel of the other parties and all supporting financial statements, worksheets and other documentation used to determine the 2023 Adjusted EBITDA Calculation. For the avoidance of doubt, notwithstanding anything contained herein to the contrary, in the event that the payment made pursuant to <u>Section 2.15(b)</u> was equal to the Earn-Out Cap, Parent shall have no obligation to deliver the 2023 Adjusted EBITDA Calculation and no subsequent adjustment shall be made pursuant to <u>Section 2.16(d)</u>.

16

(c)        Within fifteen (15) days (the "2022 15-Day Period") after the date on which the 2022 Adjusted EBITDA Calculation is received by Securityholders' Representative, Securityholders' Representative shall deliver to Parent either (i) a written acknowledgement signed by Securityholders' Representative accepting the 2022 Adjusted EBITDA Calculation in its entirety (the "2022 EBITDA Acknowledgement"), or (ii) a written notice (the "2022 EBITDA Adjustment Report") containing a detailed written explanation of those items in the 2022 Adjusted EBITDA Calculation which Securityholders' Representative disputes, in which case (subject to the following sentence) the items identified by Securityholders' Representative shall be deemed to be in dispute. If (i) the 2022 Adjusted EBITDA Calculation reports 2022 Adjusted EBITDA such that the payment to be made pursuant to Section 2.15(b) is equal to or in excess of the Earn-Out Cap, (ii) Securityholders' Representative delivers a 2022 EBITDA Acknowledgement within the 2022 15-Day Period or (iii) Securityholders' Representative fails to deliver a 2022 EBITDA Acknowledgement or a 2022 EBITDA Adjustment Report to Parent within the 2022 15-Day Period, Securityholders' Representative shall be deemed to have accepted and agreed to the 2022 Adjusted EBITDA Calculation, as delivered pursuant to Section 2.16(a), and such 2022 Adjusted EBITDA Calculation shall be final and binding upon Securityholders' Representative (on behalf of the Unitholders and Blocker Seller) and Parent and the 2022 Adjusted EBITDA shall be as set forth therein.

(d)        Within fifteen (15) days (the "2023 15-Day Period") after the date on which the 2023 Adjusted EBITDA Calculation is received by Securityholders' Representative, Securityholders' Representative shall deliver to Parent either (i) a written acknowledgement signed by Securityholders' Representative accepting the 2023 Adjusted EBITDA Calculation in its entirety (the "2023 EBITDA Acknowledgement"), or (ii) a written notice (the "2023 EBITDA Adjustment Report," and together with the 2022 EBITDA Adjustment Report, the "EBITDA Adjustment Reports") containing a detailed written explanation of those items in the 2023 Adjusted EBITDA Calculation which Securityholders' Representative disputes, in which case (subject to the following sentence) the items identified by Securityholders' Representative shall be deemed to be in dispute. If (i) the 2023 Adjusted EBITDA Calculation reports 2023 Adjusted EBITDA that, when taken together with the amount paid pursuant to Section 2.15(b), would exceed the Earn-Out Cap, (ii) Securityholders' Representative delivers a 2023 EBITDA Acknowledgement within the 2023 15-Day Period or (iii) Securityholders' Representative fails to deliver a 2023 EBITDA Acknowledgement or a 2023 EBITDA Adjustment Report to Parent within the 2023 15-Day Period, Securityholders' Representative shall be deemed to have accepted and agreed to the 2023 Adjusted EBITDA Calculation, as delivered pursuant to Section 2.16(b), and such 2023 Adjusted EBITDA Calculation shall be final and binding upon Securityholders' Representative (on behalf of the Unitholders and Blocker Seller) and Parent and the 2023 Adjusted EBITDA shall be as set forth therein.

(e)        In the event that the Securityholders' Representative timely delivers an EBITDA Adjustment Report to Parent, then Parent and Securityholders' Representative will use all commercially reasonable efforts to resolve the disputed matter(s) within the fifteen (15) day period following the delivery of the applicable EBITDA Adjustment Report. If Securityholders' Representative and Parent fail to agree on Securityholders' Representative's proposed adjustments contained in the applicable EBITDA Adjustment Report within such fifteen (15) day period, then Parent and Securityholders' Representative shall jointly submit the disputed matter(s) to the Independent Auditor. Parent and Securityholders' Representative will furnish, or cause to be furnished, to the Independent Auditor such work papers, documentation and other reports and information relating to the disputed matter(s) as the Independent Auditor may request or as either Securityholders' Representative or Parent believe relevant and each party shall be afforded the opportunity to discuss the disputed matter with the Independent Auditor. The Independent Auditor shall make the final determination of the disputed matter(s) (the "Auditor's EBITDA Determination") (A) in reliance upon the supporting documentation provided to the Independent Auditor by Securityholders' Representative and Parent, (B) in writing, and (C) in accordance with Section 2.16(f). Securityholders' Representative and Parent each agree to use its respective commercially reasonable efforts to cooperate with the Independent Auditor and to cause the Independent Auditor to resolve any dispute no later than 30 days after submission of the dispute to the Independent Auditor in accordance with this Section 2.16(e). The Auditor's EBITDA Determination shall be furnished to Securityholders' Representative and Parent as soon as practicable after the disputed items(s) have been referred to the Independent Auditor and, absent manifest error or fraud and subject the following sentence, shall be nonappealable and incontestable by Securityholders' Representative, Unitholders, Blocker Seller, Parent and any of their respective Affiliates and successors and not subject to collateral attack for any reason. The fees, costs and expenses of the Independent Auditor incurred in resolving the disputed matter(s) pursuant to this Section 2.16(e) shall be borne by Parent, on the one hand, and Securityholders' Representative (on behalf of the Unitholders (other than the Blocker Members)), on the other hand, in inverse proportion to the respective percentages of the dollar value of disputed items determined in favor of such Person.

(f)         In determining each of the 2022 Earn-Out Payment and 2023 Earn-Out Payment, all terms of an accounting or financial nature shall be construed in accordance with (i) Policies and Procedures and (ii) the calculation of Adjusted EBITDA reflected in <u>Annex III</u>. Following receipt thereof from Parent, Securityholders' Representative shall distribute the 2022 Earn-Out Payment and 2023 Earn-Out Payment, if any, to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule.

2.17.     <u>Earn-Out Covenants</u>.

(a)         <u>Conduct of the Business During Earn-Out Period</u>. From the date hereof until the earlier of (x) payment of Earn-Out Payments in an amount equal to the Earn-Out Cap and (y) December 31, 2023 (such period, the "<u>Earn-Out Period</u>"), Parent covenants and agrees as follows:

(i)         Parent will, and will cause the Surviving Entity to, use commercially reasonable efforts to support the business and interest of the operations of the Surviving Entity and its Subsidiaries and to act in good faith in connection with its ownership and operation of the Surviving Entity and neither Parent nor any of its Affiliates (including after the Effective Time, the Surviving Entity and its Subsidiaries) shall take any action intended to interfere with the ability of the Surviving Entity and its Subsidiaries to achieve the 2022 Earn-Out Payment and 2023 Earn-Out Payment in an aggregate amount equal to the Earn-Out Cap.

<div align="center">18</div>

(ii)             Parent shall, and shall cause the Surviving Entity and its Subsidiaries to, cause the business activities and operations of the Surviving Entity and its Subsidiaries to be accounted for separately from the Parent's and its other Subsidiaries' and to maintain such books and records with respect thereto as shall be necessary to carry out the provisions of this Agreement.

(iii)            Parent agrees to provide the Surviving Entity and its Subsidiaries access to funding, personnel, compensation for employees, and other working capital in accordance with the budget proposed by the chief executive officer or equivalent of the Company and approved by the board of directors of Parent.

(iv)            Except as required by GAAP, Parent shall not, and cause the Surviving Entity and its Subsidiaries not to, make any change in any method of accounting or accounting practice or policy of the Company without the consent of the Securityholders' Representative.

(v)             Parent agrees to not change the nature of the business conducted by the Company in a manner materially different than the business conducted by the Company and its Subsidiaries prior to the date of this Agreement which change would reasonably be expected to interfere with the Unitholders' ability to achieve the 2022 Earn-Out Payment or the 2023 Earn-Out Payment.

(vi)            Parent covenants and agrees not to enter into, or permit the Surviving Entity to enter into, any Contract that expressly restricts payment of the Earn-Out Payments.

(b)            <u>Acceleration</u>. If an Acceleration Event occurs during the Earn-Out Period, then, notwithstanding the actual Adjusted EBITDA during the Earn-out Period, the Company shall pay to the Securityholders' Representative (on behalf of the Unitholders (other than the Blocker Members)) an amount equal to (x) the Earn-Out Cap minus (y) the sum of all previously paid Earn-Out Payments. All such payments shall be made to the Securityholders' Representative by wire transfer of immediately available funds to the account designated in writing by the Securityholders' Representative within five (5) Business Days after the occurrence of such Acceleration Event (the "<u>Acceleration Payment Date</u>").

(c)            <u>Payment Default</u>. Notwithstanding anything to the contrary contained herein, if Parent shall fail to pay the Earn-out Payment within three (3) Business Days after the Earn-Out Payment Date or the Acceleration Payment Date, as applicable, then interest shall begin to accrue on any unpaid Earn-Out Payment or accelerated Earn-Out Payments, as the case may be, from and as of the date such payment or payments were due and payable, at eight percent (8%) per annum, and until such payment or payments, together with such accrued default interest, are paid in full.

19

2.18.    Exchange of Units.

(a)    The Securityholders' Representative shall facilitate payments made to or on behalf of the Unitholders (other than the Blocker Members) as a result of the Closing. Immediately following acceptance of the Certificate of Merger, Parent will (i) pay to Blocker Seller the amount required pursuant to Section 2.11(f), to be paid to Blocker Seller (for purposes of consideration required to be paid in connection with the Blocker Closing) (ii) pay to SWBC Craft, LLC the amount required pursuant to Section 2.11(f) for the benefit of SWBC Craft, LLC and (iii) deposit with the Securityholders' Representative the amount required pursuant to Section 2.11(f) for the benefit of the Unitholders (other than the Blocker Members) (whose Units have been converted pursuant to Section 2.7 into the right to receive such amount), in the case of the Unitholders subject to Section 2.18(b) below. Such amounts, once paid or deposited with the Securityholders' Representative, as applicable, shall, pending its disbursement to such Persons, be held in trust for the benefit of such Persons and shall not be used for any other purposes, other than the Securityholders' Representative Expense Amount which may be used for Downward Adjustment Amount or otherwise to pay expenses on behalf of the Unitholders.

(b)    As soon as practicable after the date hereof, the Securityholders' Representative shall mail to each Unitholder (other than any Blocker Member) as of immediately prior to the Effective Time a letter of transmittal (substantially in the form attached hereto as Exhibit C) (the "Letter of Transmittal"). Upon delivery of a duly completed and validly executed Letter of Transmittal to the Securityholders' Representative, the relevant Unitholder shall be entitled to receive the applicable consideration payable hereunder, without interest, in exchange for each Unit held by such Unitholder as of immediately prior to the Effective Time. Until the delivery of a duly completed and validly executed Letter of Transmittal as contemplated by this Section 2.18(b), each Unit (other than a Cancelled Unit or any Unit held by any Blocker Member) shall be deemed at any time after the Effective Time to represent only the right to receive upon such delivery the applicable consideration payable hereunder, without interest.

(c)    None of Parent, Merger Sub, or the Surviving Entity or their respective representatives shall be liable to any Person in respect of any consideration to the extent actually received by the Securityholders' Representative.

2.19.    Appraisal Right. No appraisal rights shall be available with respect to the Merger or the other Transactions contemplated by this Agreement.

2.20.    Tax Treatment; Allocation of the Purchase Price.

(a)    Within sixty (60) days of the final determination of Final Purchase Price, Parent shall provide to Securityholders' Representative a schedule allocating the purchase price for Tax purposes (including the applicable Liabilities of the Company) among the assets of the Company (the "Purchase Price Allocation Schedule"). The Purchase Price Allocation Schedule will be prepared in accordance with the applicable provisions of the Code and the methodologies set forth on Annex IV.

20

(b)         If within thirty (30) days of receiving the Purchase Price Allocation Schedule, the Securityholders' Representative has not objected, the Purchase Price Allocation Schedule shall be final and binding. If within thirty (30) days the Securityholders' Representative objects to the Purchase Price Allocation Schedule, the Securityholders' Representative and Parent shall cooperate in good faith to resolve their differences, provided that if after thirty (30) days, the Securityholders' Representative and Parent are unable to agree, they shall retain the Independent Auditor to resolve their dispute, provided that the Independent Auditor shall utilize the methodologies for determining fair market value as set forth on Annex IV. The determination of the Independent Auditor shall be final and binding on all parties.

(c)         The parties hereto shall make appropriate adjustments to the Purchase Price Allocation Schedule to reflect changes in the purchase price. The parties hereto agree for all Tax reporting purposes to report the transactions in accordance with the agreements herein and the Purchase Price Allocation Schedule, as adjusted pursuant to the preceding sentence, and to not take any position during the course of any audit or other proceeding inconsistent with the agreements as to Tax treatment herein or with such schedule unless required by a determination of the applicable Governmental Authority that is final.

2.21.    Paying Agent. Prior to the Closing, Securityholders' Representative may select a nationally recognized bank or trust company to act as the paying agent for the Transactions (the "Paying Agent"), and, in such case, Securityholders' Representative and Parent shall engage the Paying Agent and enter into a paying agent agreement on customary terms related to the nature of engagement thereof (the "Paying Agent Agreement"). In the event that a Paying Agent is engaged pursuant to this Section 2.21, (i) all payments and other disbursements to be made to the Unitholders (other than the Blocker Members) under this Agreement, including without limitation, those payments and disbursements to be made under Sections 2.10, 2.11, 2.13, 2.16 and 6.12(f) shall instead be made to the Paying Agent, and (ii) the facilitation of payments and delivery of the Letter of Transmittal pursuant to Section 2.18 shall be made by the Paying Agent, and in each case, in accordance with the terms of the Paying Agent Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the letter delivered by the Company to Parent concurrently with the execution of this Agreement (the "Disclosure Letter"), the Company hereby represents and warrants to Parent and Merger Sub as of the date hereof as follows:

3.1.    Organization and Qualification. The Company is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Each of the Subsidiaries of the Company is a legal entity duly formed or organized, validly existing and in good standing, as applicable, under the Laws of the jurisdiction of its respective formation or organization. The Company and its Subsidiaries each have requisite limited liability company or other legal entity, as the case may be, power and authority to own, lease and operate their respective properties and assets and to carry on their respective businesses as they are now being conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole. The Company and its Subsidiaries are each duly qualified to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its properties or assets or the conduct of their respective businesses requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, result in a Material Adverse Effect. The Company has made available to Parent true and correct copies of each of its and its Subsidiaries' Organizational Documents, each as in effect as of the date hereof and together with all amendments and modifications thereto.

21

3.2.    Capitalization; Subsidiaries.

(a)    The issued and outstanding Units constitute all of the issued and outstanding equity interests of the Company. All of the Units were duly authorized and validly issued and are free of preemptive and similar rights. No Units were issued in violation of any applicable Laws in all material respects, any Contract to which the Company is a party or bound by, or any preemptive or similar rights of any Person. Section 3.2(a) of the Disclosure Letter sets forth a list of each Unitholder, along with the number and class of Units owned by each Unitholder as of the date hereof. The number of issued and outstanding Units of the Company as of immediately prior to the Effective Time will be as set forth in Section 3.2(a) of the Disclosure Letter, subject to such changes therein as will occur as a result of the Pre-Closing Blocker Reorganization and the Redemption.

(b)    Except as set forth in the Company's or its Subsidiaries' respective Organizational Documents or as set forth in Section 3.2(a) of the Disclosure Letter, there are no (i) outstanding securities of the Company or its Subsidiaries convertible into or exchangeable for one or more units of equity or voting interests in, the Company or its Subsidiaries, (ii) options, warrants or other rights or securities issued or granted by either the Company or its Subsidiaries relating to or based on the value of the equity securities of the Company or its Subsidiaries, (iii) Contracts that are binding on the Company or its Subsidiaries that obligate the Company or any of its Subsidiaries to issue, acquire or sell, redeem, exchange or convert any equity interests in the Company or its Subsidiaries, or (iv) outstanding restricted equity interests, restricted share units, unit appreciation rights, performance shares, performance units, deferred stock units, contingent value rights, "phantom" stock or similar rights issued or granted by the Company or its Subsidiaries that are linked to the value of the Units, and all such interests shall, from and after the Merger, represent solely the right to receive consideration in accordance with this Agreement. Except with respect to the Pre-Closing Blocker Restructuring, there are no outstanding contractual obligations of the Company or either of its Subsidiaries to repurchase, redeem, exchange, convert or otherwise acquire or sell any membership interests of the Company or its Subsidiaries.

(c)    Section 3.2(c) of the Disclosure Letter sets forth a true and correct list of each Subsidiary of the Company as of the date hereof, together with its jurisdiction of organization or formation and the holders of ownership interests in such Subsidiary. Except as set forth in Section 3.2(c) of the Disclosure Letter, the Company or one or more of its Subsidiaries owns, directly or indirectly, all of the issued and outstanding equity interests of each of the Company's Subsidiaries, free and clear of any Liens except for transfer and other restrictions under applicable federal and state securities Laws or Permitted Liens, and all of such outstanding equity securities have been duly authorized and validly issued and are free of preemptive and similar rights. Other than with respect to the Subsidiaries, the Company and its Subsidiaries do not own any equity interest or other voting security in any Person. After giving effect to the Redemption, Cheese Grits will not be a Subsidiary of the Company for purposes of this Agreement.

22

(d)          Except as set forth in <u>Section 3.2(d)</u> of the Disclosure Letter, neither the Company nor any of its Subsidiaries is a party to any Contract with respect to the voting of, that restricts the transfer of or that provides registration rights in respect of, any membership interests or other voting securities or equity interests of the Company or any of its Subsidiaries.

3.3.      <u>Authority</u>. The Company (a) has the respective rights and powers to enter into, and perform its obligations under each agreement delivered in connection herewith to which it is a party and (b) has taken all requisite action to authorize (i) the execution, delivery and performance of each such agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Transactions and other transactions contemplated by this Agreement and each such other agreement delivered in connection herewith to which it is a party. All requisite consent from the Unitholders has been obtained and will be valid at Closing. Each agreement delivered in connection herewith to which the Company is a party is duly executed by the Company and, assuming the due authorization, execution and delivery of such agreements by each other party thereto, is binding upon, and legally enforceable against, the Company in accordance with its terms, except as such enforceability may be subject to, and limited by, applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally, and general equitable principles (regardless of whether enforcement is considered a proceeding at law or in equity) (the "<u>Bankruptcy and Equity Exception</u>").

3.4.      <u>No Violation and Consents</u>.

(a)          Except as set forth in <u>Section 3.4(a)</u> of the Disclosure Letter, the consummation by the Company of the transactions contemplated by this Agreement will not: (i) (x) conflict with or violate any provision of the Company's Organizational Documents, or (y) conflict with or violate any provision of the Organizational Documents of any Subsidiary of the Company; (ii) assuming that all consents, approvals and authorizations described in <u>Section 3.4(a)</u> have been obtained and all filings and notifications described in <u>Section 3.4(a)</u> have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law applicable to the Company or any of its Subsidiaries, or any of their respective properties or assets; or (iii) require any consent, notice or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, modification, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien (other than Permitted Liens) upon any of the respective properties or assets (including rights) of the Company or any of its Subsidiaries, pursuant to any Contract to which the Company or any of its Subsidiaries is a party (or by which any of their respective properties or assets (including rights) are bound) or any Permit held by the Company or any of its Subsidiaries.

<center>23</center>

(b)       The consummation by the Company of the transactions contemplated by this Agreement will not require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority with respect to the Company or any of its Subsidiaries or any of their respective properties or assets, other than (i) such filings as may be required in connection with the payment of any transfer and gain taxes, (ii) compliance with, and such filings, consents, approvals, authorizations and/or registrations as set forth on <u>Section 3.4</u>(a) of the Disclosure Letter, (iii) compliance with applicable federal or state securities or "blue sky" Laws, (iv) such consents, approvals, authorizations, permits, filings, registrations or notifications as may be required as a result of the identity of Parent or its Affiliates and (v) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, (A) prevent or materially delay consummation of the Transactions and the other transactions contemplated by this Agreement or (B) reasonably be expected to be materially adverse to the Company taken as a whole.

3.5.      <u>Affiliate Contracts</u>. Except as set forth in <u>Section 3.5</u> of the Disclosure Letter, neither the Company nor any of its Subsidiaries is party to any Contract with any of the Company's or its Subsidiaries' respective directors, officers or Affiliates (other than the Company and its Subsidiaries) that is material to the Company and its Subsidiaries, except for Contracts (i) providing for employment and benefit arrangements, including employment agreements, incentive compensation and equity arrangements or (ii) entered into in the Ordinary Course on terms no less favorable to the Company or its Subsidiaries than would be obtained in a comparable arm's length transaction with a Person that is not a director, officer or Affiliate of the Company or its Subsidiaries.

3.6.      <u>Title to Assets; Condition and Sufficiency of Assets</u>.

(a)       The Company and its Subsidiaries have good and valid title to, or otherwise has the right to use pursuant to a valid and enforceable lease, license or similar Contract, all of its machinery, equipment and other material tangible assets (collectively, the "<u>Assets</u>"), in each case free and clear of any Lien other than Permitted Liens, except as would not reasonably be expected, individually or in the aggregate, to be materially adverse to the Company taken as a whole. The Assets owned and leased by the Company and each Subsidiary constitute all of the material tangible assets, together with the Company's and each Subsidiaries' non-tangible assets and rights, necessary to permit the continued operation of the Business of the Company and its Subsidiaries in substantially the same manner as conducted on the date hereof and during the twelve-month period ended on the Balance Sheet Date.

(b)       The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of each the Company and any of its Subsidiaries are structurally sound, are, in all material respects, in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by each of the Company and any of its Subsidiaries, together with all other properties and assets of the Company and any of its Subsidiaries, are, in all material respects, sufficient for the continued conduct of the Business of each of the Company and any of its Subsidiaries after the Closing in substantially the same manner as conducted prior to the Closing.

3.7. <u>Litigation and Compliance with Laws</u>. Except as set forth in <u>Section 3.7</u> of the Disclosure Letter:

  (a)  To the Company's Knowledge, neither the Company nor any of its Subsidiaries is, in any material respect, in conflict with, or in default, breach or violation of, (i) any Law applicable to the Company or any of its Subsidiaries, as applicable, or (ii) any Permit.

  (b)  As of the date of this Agreement, there is no Action pending or, to the Company's Knowledge, threatened against either the Company or any of its Subsidiaries, or any property or asset of the Company or any of its Subsidiaries, at law or in equity by or before any Governmental Authority, the outcome of which, if adversely decided, would reasonably be expected to result in damages in excess of $100,000. Neither the Company nor any of its Subsidiaries nor any material property or asset of the Company or any of its Subsidiaries is subject to any continuing Order of, consent decree, settlement agreement or other similar written agreement with, or, to the Company's Knowledge, continuing investigation by, any Governmental Authority, or any Order, writ, judgment, injunction, decree, determination or award of any Governmental Authority that would (A) prevent or materially delay consummation of the Transactions and the other transactions contemplated by this Agreement or (B) reasonably be expected to be materially adverse to the Company taken as a whole.

  (c)  As of the date hereof, there is no Action to which the Company or any of its Subsidiaries is a party pending or, to the Knowledge of the Company, threatened seeking to prevent, hinder, modify, delay or challenge the Transactions or any of the other transactions contemplated by this Agreement.

3.8. <u>Intellectual Property</u>.

  (a)  Set forth on <u>Section 3.8(a)</u> of the Disclosure Letter is a complete and accurate list of all Company Intellectual Property that is (i) Registered Intellectual Property as of the date hereof and that has not otherwise lapsed, been abandoned, expired or been cancelled ("<u>Company Registered Intellectual Property</u>") (including the jurisdictions where such Company Registered Intellectual Property is registered or where applications have been filed, all application and registration numbers, and all application filing and registration dates), or (ii) general categories of trade secrets (including recipes and formulae) and unregistered trademarks, in each case, that are Company Intellectual Property and that are material to the conduct of the Businesses of the Company and any of its Subsidiaries. Each item of Company Registered Intellectual Property is valid and enforceable, and each item of Company Registered Intellectual Property is subsisting. No loss or expiration of any Company Owned Intellectual Property is threatened in writing, pending or reasonably foreseeable.

<p style="text-align:center">25</p>

(b)　　　　Except as set forth on <u>Section 3.8(b)</u> of the Disclosure Letter, the Company and its Subsidiaries collectively own or have the rights to use, pursuant to a written, enforceable license agreement, all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the businesses of the Company and any of its Subsidiaries. Immediately subsequent to the Closing, subject to obtaining any required consents listed on <u>Section 3.4(a)</u> of the Disclosure Letter, the Company Intellectual Property will be exclusively owned by one of the Company and its Subsidiaries and all other Intellectual Property that is material to or necessary for the conduct of the businesses of the Company and its Subsidiaries as currently conducted and currently proposed to be conducted immediately subsequent to the Closing will be available for use by the Company and its Subsidiaries on terms and conditions substantially similar to those under which the Company and its Subsidiaries used such Intellectual Property immediately prior to the Closing, without the payment of additional fees.

(c)　　　　The Company's and its Subsidiaries' conduct of each of their respective Businesses as currently conducted do not infringe, violate, or misappropriate the Intellectual Property Rights of any third party. No Action has been filed or threatened in writing against either the Company or any of its Subsidiaries between January 1, 2015 and the date hereof that alleges either the Company or any of its Subsidiaries infringes or misappropriates the Intellectual Property Rights of any third party.

(d)　　　　Except as set forth in <u>Section 3.8(d)</u> of the Disclosure Letter, to the Company's Knowledge, no Person is misappropriating, infringing, diluting or violating any Company Intellectual Property. The Company or its Subsidiaries have not, since January 1, 2015, made any claim of any interference, infringement, misappropriation or other violation Company Intellectual Property, and to the Knowledge of the Company, no grounds for any such claim exists.

(e)　　　　Except as set forth on <u>Section 3.8(e)</u> of the Disclosure Letter, the Company or one of its Subsidiaries has secured from each employee, contractor or other Person who is or was involved in the creation or development of any Company Intellectual Property, a written agreement containing (A) a present, affirmative assignment of all Intellectual Property developed by such employee, contractor or Person rights in such Company Intellectual Property for or on behalf of, or during their employment by the Company of any of its Subsidiaries to the Company or any of its Subsidiaries and a waiver of all moral rights therein, and (B) a confidentiality provision protecting the Trade Secrets and other confidential information of the Company or a Subsidiary. No employee, contractor or other Person has any claim, right (whether or not currently exercisable) or interest to or in any Company Intellectual Property. No funding, facilities or personnel of any governmental authority or any university, college, research institute or other educational institution (other than refundable tax credits) have been or are being used, directly or indirectly, to develop or create, in whole or in part, any Company Intellectual Property, and to the Knowledge of the Company, no employee, contractor or other Person who was involved in, or who contributed to, the creation or development of any Company Intellectual Property performed services for any governmental authority, university, college, research institute or other educational institution during a period of time during which such employee, contractor or other Person was also performing services for the Company or its Subsidiaries.

<div align="center">26</div>

(f)　　　　The Company and its Subsidiaries have acted in a commercially reasonable and prudent manner with respect to the protection and preservation of the confidentiality of the Trade Secrets that are Company Intellectual Property.

(g)　　　　To the Company's Knowledge, the IT Systems of the Company and any of its Subsidiaries are adequate, in all material respects, for the operation of the business of each the Company and any of its Subsidiaries as currently conducted and currently proposed to be conducted immediately following the Closing. The Company and its respective Subsidiaries have taken steps to provide for the back-up and recovery of material data and have disaster recovery plans and procedures.

3.9.　　　Privacy and Data Protection. Except as set forth on Section 3.9(a) of the Disclosure Letter, the Company and each of its Subsidiaries have taken commercially reasonably security measures in accordance with normal industry practice to protect the IT Systems against intrusion. Except as set forth on Section 3.9(a) of the Disclosure Letter, since January 1, 2017, (i) the IT Systems have not suffered a material failure, and (ii) there have not been any security breaches relating to the IT Systems that have resulted in a third Person obtaining access to any material confidential information or proprietary information relating to the Businesses of either the Company or any of its Subsidiaries or personal identifiable information of the customers of either the Company or any of its Subsidiaries. The Company and each of its Subsidiaries are in material compliance with any posted privacy policies and any Laws relating to personal data or other information.

3.10.　　　Contracts.

(a)　　　　Section 3.10(a) of the Disclosure Letter sets forth a true and correct list, and the Company has made available to Parent true and correct copies, in each case as of the date hereof, of each Contract and all amendments and modifications thereto to which the Company or any of its Subsidiaries is a party or by which it is bound or to which any of their respective assets are subject that:

(i)　　　　is a limited liability company agreement, limited partnership agreement or joint venture agreement or Organizational Document or similar Contract that is material to the Business and operations of the Company and its Subsidiaries;

(ii)　　　　(A) pursuant to which the Company or any of its Subsidiaries spent, in the aggregate, more than $250,000 with respect to any such agreement or Contract during the fiscal year ended December 31, 2019, (B) is reasonably expected to spend more than $250,000 by the Company or any of its Subsidiaries in the current fiscal year or (C) with any of the Material Suppliers;

(iii)　　　　(A) that generated more than $250,000 in revenues for the Company or any of its Subsidiaries in the fiscal year ended December 31, 2019, (B) is reasonably expected to generate more than $250,000 in revenues for the Company or any of its Subsidiaries in the current fiscal year or (C) with any of the Material Distributors;

27

(iv)      contains covenants of the Company or any of its Subsidiaries (w) purporting to limit, in any material respect, either the type of Business in which the Company or any of its Subsidiaries or any of their Affiliates may engage or the geographic area in which any of them may so engage, (x) obligating the Company or any of its Subsidiaries to sell any product exclusively to a single party, or to obtain any product or service exclusively from a single party, or (y) imposing any minimum requirements, so–called "take or pay" penalties or other similar obligations or penalties upon the Company or any of its Subsidiaries;

(v)      that relates to the creation, incurrence, assumption or guarantee of Indebtedness in excess of $100,000 (individually or in the aggregate), whether unsecured or secured;

(vi)      contains a put, call or similar right pursuant to which the Company or any of its Subsidiaries could be required to purchase or sell, as applicable, any equity interests of any Person or assets;

(vii)      related to any interest rate, derivatives or hedging transaction;

(viii)      provides for the employment or service of any employee or service provider of the Company or any of its Subsidiaries with aggregate cash payments in any calendar year in excess of $100,000 or that is not terminable "at will" or that imposes further Liability or executory obligations on the Company or any of its Subsidiaries following the termination date other than accrued salary and other similar liability required by Law;

(ix)      any collective bargaining Contract or other Contract with any labor union, works council, trade or labor organization or employee association representing or purporting to represent any employee of the Company or any of its Subsidiaries;

(x)      granting a "most favored nation" provision in favor of any customer or licensee of the Company or any of its Subsidiaries;

(xi)      to which any Governmental Authority is a party or under which any Governmental Authority has any rights or obligations;

(xii)      concerns the sale, disposition, assignment, transfer or acquisition (whether by merger, purchase of stock, purchase of assets or otherwise) of material tangible assets or properties by the Company or any of its Subsidiaries (in a single transaction or a series of related transactions), or any merger or business combination with respect to the Businesses of the Company or any of its Subsidiaries;

(xiii)      pursuant to which the Company or any of its Subsidiaries obtains or grants any licenses or other rights with respect to material Company Intellectual Property (each such Contract, a "Material Company Intellectual Property Contract");

28

(xiv)    pursuant to which the Company or any of its Subsidiaries is granted a license to any software (excluding in each case licenses for commercially available off-the-shelf software licensed pursuant to a non-negotiated license having an annual value of less than $25,000), or pursuant to which any software has been customized for the Company or any of its Subsidiaries;

(xv)    that requires the Company or any of its Subsidiaries to provide any funds to or make any investment in (in each case, in the form of a loan, capital contribution or similar transaction) any Person in excess of $100,000;

(xvi)    that grants any rights of first refusal, rights of first negotiation or other similar rights to any Person with respect to the sale of any material business or assets of the Company or any of its Subsidiaries, taken as whole;

(xvii)    related to a lease or sublease interest in any Leased Real Property;

(xviii)    that relates to material Intellectual Property Rights not owned by the Company or any of its Subsidiaries and used by the Company or any of its Subsidiaries, other than confidentiality and non-disclosure agreements entered into in the Ordinary Course, intellectual property assignments entered into with employees and contractors in the Ordinary Course;

(xix)    providing for the settlement of any Action pending before any Governmental Authority, or any other Action, against the Company or any of its Subsidiaries, pursuant to which the Company or any of its Subsidiaries has existing obligations; or

(xx)    Contract with any professional employer organization, staffing agency, temporary employee agency or similar company or service.

Each Contract of a type described in clause (a) of this Section 3.10 is referred to herein as a "Company Material Contract."

(b)    Neither the Company nor any of its Subsidiaries is in (or has received any written claim of) breach of or default under the terms of any Company Material Contract, and, to the Knowledge of the Company, no event has occurred that with notice or lapse of time or both would constitute a breach or default thereunder by the Company or any of its Subsidiaries, where such breach or default would, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole. To the Knowledge of the Company, no other parties to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default has had or would reasonably be expected to be materially adverse to the Company taken as a whole. As of the date of this Agreement, each Company Material Contract is a valid and binding agreement of the Company or any Subsidiary thereof, and, to the Knowledge of the Company, the other parties thereto and is in full force and effect, except, for such failures as would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole, subject to the Bankruptcy and Equity Exception.

29

3.11.　　Financial Statements and Related Matters.

(a)　　　　Section 3.11(a) of the Disclosure Letter contains true, correct and complete copies of (i) audited consolidated financial statements of the Company and its Subsidiaries, as of and for the periods ended December 31, 2018 and December 31, 2019 (collectively, the "Annual Financial Statements") and the related consolidated balance sheets, statements of income, statements of retained earnings and other comprehensive income, and statements of cash flows, and (ii) unaudited interim consolidated financial statements of the Company and its Subsidiaries at and for the nine-month period ended September 30, 2020 (the "Balance Sheet Date") (the "Interim Financial Statements") and the related consolidated balance sheet and statement of income (the Annual Financial Statements and the Interim Financial Statements, collectively, the "Financial Statements"). The Financial Statements have been prepared in accordance with GAAP and all applicable rules and regulations as modified by the Historical Accounting Practices, and, in the case of the Interim Financial Statements, subject to normal year-end adjustments and the absence of notes. The Financial Statements accurately and fairly present in all material respects the consolidated financial position, results of operations and cash flows of the Company and its Subsidiaries at the dates and for the periods indicated therein and are consistent with the books and records of the Company (except as expressly noted therein).

(b)　　　　The Company and its Subsidiaries (i) make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect, in all material respects, the transactions and dispositions of assets of the Company and any of its Subsidiaries and (ii) maintain a system of internal accounting controls sufficient, in all material respects, to provide reasonable assurances (A) all transactions are executed in accordance with management's general or specific authorization and (B) access to the property and assets of the Company and any of its Subsidiaries is permitted only in accordance with management's general or specific authorization.

3.12.　　No Undisclosed Material Liabilities. Except for Liabilities (a) disclosed, accrued or reserved against in the Financial Statements, (b) incurred in the Ordinary Course since the Balance Sheet Date that would not reasonably be expected, individually or in the aggregate, to be material to the Company taken as a whole, (c) set forth in Section 3.12 of the Disclosure Letter and (d) obligations of future performance under Contracts neither the Company nor any of its Subsidiaries has any material Liability of any kind that would be required to be set forth on the face of a balance sheet prepared in accordance with GAAP.

3.13.　　Subsequent Events. Except as set forth on Section 3.13 of the Disclosure Letter or otherwise contemplated by this Agreement:

(a)　　　　Since May 31, 2020, the Business of the Company and each of its Subsidiaries has been conducted and carried on in all material respect in the Ordinary Course; and

(b)　　　　Since May 31, 2020, there has been no Material Adverse Effect; and

<div align="center">30</div>

(c)      Since the Balance Sheet Date, neither the Company nor any of its Subsidiaries has taken any action that if taken after the date hereof would require Parent's consent pursuant to Section 6.2.

3.14.      Insurance. Section 3.14 of the Disclosure Letter sets forth and describes all material policies of insurance and self-insurance arrangements which are currently maintained by or on behalf of the Company and any of its Subsidiaries. Each such policy of insurance is in full force and effect in accordance with its terms. Each such policy is, and during the past three (3) years, each such policy (or a reasonably equivalent policy) has been, in full force and effect (and all premiums due and payable thereon have been paid in full on a timely basis), and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any policy is not willing or able to perform its obligations thereunder has been received by the Company or any of its Subsidiaries, except, in each case, as would not reasonably be expected, individually or in the aggregate, to be materially adverse to the Company taken as a whole. Section 3.14 of the Disclosure Letter sets forth any pending insurance claims under insurance policies maintained by or on behalf of the Company or any of its Subsidiaries that have been denied insurance coverage.

3.15.      Licenses and Permits. Section 3.15 of the Disclosure Letter sets forth a true and correct list of all local, state and federal licenses, franchises, permits, certifications, approvals, operating authorities, state operating licenses or registrations and other interstate, intrastate, national or international regulatory licenses and other Governmental Authority authorizations held by the Company and its Subsidiaries material to the conduct of the Business (collectively, "Permits"). The Permits are valid and in effect and none of the Permits will be terminated as a result of this Agreement and the transaction contemplated hereunder. There has been no violation, cancellation, revocation or default of any Permit, except as would not reasonably be expected to be materially adverse to the Company taken as a whole. All applications required to have been filed for the renewal of the Permits listed in Section 3.15 of the Disclosure Letter and all other filings required to have been made with respect to such Permits have been duly filed on a timely basis with the appropriate Governmental Authority. The Company has filed to renew all Permits that expire within forty-five (45) days of the Closing Date unless filing for renewal within such timeframe is not permitted by the applicable Governmental Authority.

3.16.      Environmental Matters. Except as could not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole:

(a)      The Company and each of its Subsidiaries is each, and has been in compliance with those Environmental Laws applicable to their respective operations as currently or formerly conducted (including possessing and complying with any Environmental Permits required for their respective operations as presently conducted), and there are no administrative or judicial proceedings pending or threatened against the Company or any of its Subsidiaries and neither the Company nor any of its Subsidiaries have received any written notice, demand, letter or claim, in either case, alleging that the Company or its Subsidiaries is in violation of, or liable under, any Environmental Law and, to the Knowledge of the Company, no such notice, demand or claim has been threatened.

31

(b)        Neither the Company nor any of its Subsidiaries has received any notification, notice, demand or claim alleging liability on the part of the Company or any of its Subsidiaries as a result of the presence, Release or exposure to Hazardous Substances and, to the Knowledge of the Company, neither the Company nor any of its Subsidiaries has been responsible for the Release of Hazardous Substances at, on or under any of the Real Property in a quantity or condition that, in either case, would reasonably be expected to result in a Liability under Environmental Laws on the part of the Company or any of its Subsidiaries.

(c)        Neither the Company nor any of its Subsidiaries is subject to any Governmental Order, settlement or agreement that relates to any violation of, noncompliance with or Liability under any Environmental Law, and has not received any written notice of Liability, violation or noncompliance under any Environmental Law from a Governmental Authority or any other person, which remains unresolved.

(d)        The Company has provided or otherwise made available to Parent and Merger Sub: any and all material environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, and other similar documents with respect to the Business of each of the Company and any of its Subsidiaries or any other real property currently or formerly owned, leased or operated by the Company in connection with the Business related to compliance with Environmental Laws or concerning Hazardous Substances.

3.17.    Tax Matters.

(a)        The Company and its Subsidiaries have complied with all Laws relating to Taxes. The Company and its Subsidiaries have timely filed (or caused to be timely filed) all income and other material Tax Returns required to be filed by it with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, and such Tax Returns are true, correct and complete in all material respects. Neither the Company nor any of its Subsidiaries have requested or filed or caused to be requested or filed any extension of time within which to file any Tax Return, which Tax Return has not since been filed.

(b)        Except as set forth in Section 3.17(b) of the Disclosure Letter, the Company and its Subsidiaries have (i) timely paid (or caused to be paid) all Taxes required by it to be paid (whether or not shown or required to be shown due on any Tax Return); and (ii) made adequate provision on its books and records in accordance with GAAP for all unpaid Taxes not yet due and owing.

(c)        No Tax audits or other proceedings are in progress, pending, or to the Knowledge of the Company threatened with regard to any Taxes or Tax Returns of or with respect to the Company or any of its Subsidiaries. Neither the Company nor its Subsidiaries has received in the past five (5) years a notice from any Governmental Authority that the Company or any of its Subsidiaries is required to pay Taxes or file Tax Returns in a jurisdiction in which the Company or any of its Subsidiaries does not file Tax Returns or pay Taxes. Neither the Company nor any of its Subsidiaries has commenced a voluntary disclosure proceeding in any state or local or non-U.S. jurisdiction that has not been fully resolved or settled.

32

(d)        Neither the Company nor any of its Subsidiaries has a request for a private letter ruling, a request for administrative relief, a request for technical advice, a request for a change of any method of accounting, or any other similar request that is in progress or pending with any Governmental Authority with respect to Taxes or Tax Returns of the Company or any of its Subsidiaries. No power of attorney granted by the Company or any of its Subsidiaries with respect to any Taxes is currently in force. Neither the Company nor any of its Subsidiaries has executed or filed with any Governmental Authority any agreement or other document extending or having the effect of extending the period for assessment, reassessment or collection of any Taxes.

(e)        The Company and each of its Subsidiaries has timely and properly withheld (i) all required amounts from payments to its employees, agents, contractors, nonresidents, equityholders, lenders, and other Persons and (ii) all sales, use, ad valorem, and value added Taxes. The Company and each of its Subsidiaries have timely remitted all withheld Taxes to the proper Governmental Authority in accordance with all applicable Laws.

(f)        Neither the Company nor any of its Subsidiaries has ever been a member of an Affiliated Group. Neither the Company nor any of its Subsidiaries are liable for Taxes of any other Person as a result of successor liability, transferee liability, joint or several liability (including pursuant to Treasury Regulation Section 1.1502-6 or any similar provision of state, local, or non-U.S. Laws), or otherwise. Neither the Company nor any of its Subsidiaries is a party to any tax sharing agreements (other than an agreement entered into in the Ordinary Course and not primarily related to Taxes).

(g)        Neither the Company nor any of its Subsidiaries is required to pay, gross up, or otherwise indemnify any employee or contractor for any Taxes, including potential Taxes imposed under Code Section 409A.

(h)        Neither the Company nor any of its Subsidiaries has are required to include any material item of income in, or exclude any material item of deduction for any period after the Closing Date as a result of (i) an installment sale transaction occurring on or before the Closing governed by Code Section 453 (or any similar provision of state, local or non-U.S. Laws); (ii) a transaction occurring on or before the Closing reported as an open transaction for U.S. federal income Tax purposes (or any similar doctrine under state, local, or non-U.S. Laws); (iii) any advance payments, prepaid amounts or "deferred revenue"; (iv) a change in method of accounting with respect to a Pre-Closing Period (or an impermissible method used in a Pre-Closing Period); (v) an agreement entered into with any Government Authority (including a "closing agreement" under Code Section 7121) on or prior to the Closing Date; or (vi) the application of Code Section 263A (or any similar provision of state, local, or non-U.S. Laws).

(i)        Neither the Company nor any of its Subsidiaries use the cash method of accounting for income Tax purposes or are party to any "long-term contracts" that are subject to a method of accounting provided for in Code Section 460.

(j)        There are no Liens for Taxes other than Permitted Liens upon any of the assets of the Company or any of its Subsidiaries.

33

(k)         Neither the Company nor any of its Subsidiaries has engaged in any transaction that could affect the Tax Liability for any taxable year not closed by the applicable statute of limitations which is a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2) (irrespective of the effective dates).

(l)         Neither the Company nor any of its Subsidiaries has an office, fixed place of business, or "permanent establishment" (within the meaning of an applicable Tax treaty) in any country other than the United States.

(m)         The Company and its Subsidiaries have complied in all material respects with the terms of any Tax holidays, Tax credit programs, and other similar Tax benefits to which they were entitled and chose to participate in.

3.18.    Labor and Employee Benefits.

(a)         Except as set forth on Section 3.18(a) of the Disclosure Letter, no employee of the Company or any of its Subsidiaries is, or has in the five (5) years preceding the date of this Agreement been, represented by any union or covered by any collective bargaining agreement. Except as set forth on Section 3.18(a) of the Disclosure Letter, no labor organization or group of employees of the Company or any of its Subsidiaries has made a demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Company, threatened to be brought or filed, with the National Labor Relations Board or any other labor relations Governmental Authority. In the five (5) years preceding the date of this Agreement, there has not been, nor to the Knowledge of the Company has there been any threat of, any strike, slowdown, work stoppage, lockout or other similar labor disruption or dispute affecting the Company, its Subsidiaries, or any of their employees, independent contractors or consultants. Neither the Company nor any of its Subsidiaries currently has any duty to recognize or bargain with any union or other Person purporting to act as the exclusive bargaining representative of any employees, independent contractors or consultants of the Company or any of its Subsidiaries. The Company is not, and in the five (5) years preceding the date of this Agreement has not been, the subject of any actual or, to the Knowledge of the Company, threatened Action asserting that the Company has committed an unfair labor practice.

(b)         The Company and its Subsidiaries have complied in all material respects with the Immigration Reform and Control Act of 1986 and all regulations promulgated thereunder ("IRCA") and similar laws with respect to the completion, maintenance and other documentary requirements of Forms I-9 (Employment Eligibility Verification Forms) and similar employee verification forms for all employees of the Company and any of its Subsidiaries and the re-verification of the employment status of any and all employees of the Company and any of its Subsidiaries whose employment authorization documents indicated a limited period of employment authorization. Neither the Company nor any of its Subsidiaries has received any written notice of any inspection or investigation relating to its alleged noncompliance with or violation of applicable immigration Laws, nor has it been warned, fined or otherwise penalized by reason of any failure to comply with applicable immigration Laws.

34

(c)          The Company and each of its Subsidiaries has maintained and currently maintains adequate insurance as required by applicable Laws with respect to workers' compensation claims. Neither the Company nor any of its Subsidiaries is aware of any facts or circumstances that are reasonably likely to result in an increase in liability to the Company or any of its Subsidiaries under any workers' compensation Laws after the Closing Date. To the Knowledge of the Company, there are no workers' compensation claims that are reasonably likely to have a material adverse effect on the accident cost experience of the Company or any of its Subsidiaries.

(d)          Except as set forth on Section 3.18(d) of the Disclosure Letter, since March 1, 2020, neither the Company nor any of its Subsidiaries has instituted a furlough, salary reduction, or layoff in response to the coronavirus disease 2019 (COVID-19). If applicable, the Company has complied with the WARN Act, and it has no plans to undertake any action in the future that would trigger the WARN Act. During the preceding ninety (90)-day period, no employees of any of the Company have suffered an "employment loss," as defined under the WARN Act. The Company and its Subsidiaries have complied in all material respects with all applicable Laws (including the U.S. Families First Coronavirus Response Act), and have made commercially reasonable efforts to comply in all material respects with all applicable guidance published by a Governmental Authority, in each case, concerning workplace and employee health and safety practices related to the COVID-19 pandemic. The Company has provided to Parent all inspection reports issued under the Occupational Safety and Health Administration or any similar Governmental Authority ("OSHA"). The Company and each of its Subsidiaries have complied in all material respects with any Orders issued to such entity under OSHA or any other applicable occupational health and safety Law and there are no appeals of any Orders that are currently outstanding.

(e)          Except as would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole, (i) each of the Company and its Subsidiaries is and has been in the five (5) years preceding the date of this Agreement in compliance with all applicable Laws relating to the employment of labor, including all applicable Laws relating to wages, hours, collective bargaining, employment discrimination, safety and health and (ii) there are no Actions, complaints, charges or claims against the Company or any of its Subsidiaries filed or, to the Knowledge of the Company, threatened in writing to be brought or filed, with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any individual by the Company or any or its Subsidiaries. The Company and its Subsidiaries have used commercially reasonable efforts to investigate any employment discrimination and sexual harassment allegations of, or against, any employee, officer, or director of the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries has taken any corrective action or entered into any Contract to settle any allegation of sex-based discrimination, sexual assault, sexual harassment or other misconduct against any director, officer, or manager of the Company or any of its Subsidiaries.

(f)          The Company has provided Parent a true, accurate and complete list of (i) all employees of the Company or any of its Subsidiaries, specifying each employee's name; title; department; hire date; status (full-time/part-time/seasonal/temporary); principal place of employment; classification as exempt or non-exempt under the Fair Labor Standards Act (the "FLSA") or applicable Law; current year annual base salary or hourly wage; current year target incentive compensation (bonus and/or commission, as applicable); and full, prior year actual incentive compensation (bonus and/or commission, as applicable) and (ii) all Persons currently engaged by the Company or any of its Subsidiaries as independent contractors or consultants, specifying each Person's name; start date; end date (if applicable); location; full, prior year total compensation (or, if prior year not available, current year to date total compensation); current year to date total compensation; and compensation rate. As of the date hereof, all compensation, including wages, commissions and bonuses, payable to all employees, independent contractors and consultants for services performed on or prior to the date hereof have been paid in full (or accrued in full on the Interim Financial Statements). All employees of the Company or its Subsidiaries who have been classified as exempt under the FLSA or similar Laws have been properly classified and treated as such, and all current and former employees of the Company and any of its Subsidiaries have been properly compensated for all time worked in accordance with the FLSA and similar Laws, and all Persons who have provided services to the Company or any of its Subsidiaries as independent contractors or consultants have been properly classified as independent contractors, rather than employees, of the Company or its Subsidiaries, for purposes of all applicable Laws and Benefit Plans.

35

(g)        Section 3.18(g) of the Disclosure Letter set forth a complete list of each Benefit Plan. With respect to each Benefit Plan, the Company has made available to Parent a true and correct copy of: (i) each such Benefit Plan and all amendments thereto; (ii) each trust, insurance or material administrative services agreement relating to each such Benefit Plan; (iii) the most recent summary plan description of each such Benefit Plan and any material modifications thereto, if applicable; (iv) all material written contracts relating to each Benefit Plan, including administrative service contracts and group insurance contracts; (v) all material communications with any Governmental Authority in connection with any Benefit Plan during the last three (3) years; and (vi) the most recent determination, advisory or opinion letter, if applicable, issued by the IRS with respect to any Benefit Plan intended to be qualified under Section 401(a) of the Code. The Company does not have any commitment to (A) establish or enter into any new Benefit Plan, or (B) to modify or amend any Benefit Plan or the terms and conditions of any Benefit Plan.

(h)        Each Benefit Plan is and has been administered, operated and maintained in compliance with its terms and in all material respects with all applicable Laws, including ERISA and the Code. With respect to any Benefit Plan, there has been no (i) "prohibited transaction," as defined in Section 406 of ERISA or Code Section 4975 that are not otherwise exempt under Section 408 of ERISA, (ii) failure to comply with any provision of ERISA, the Code, other applicable Law, or any agreement, or (iii) nondeductible contribution, which, in the case of any of (i), (ii), or (iii), would subject the Company, its Subsidiaries or any ERISA Affiliate to material Liability either directly or indirectly (including, without limitation, through any obligation of indemnification or contribution) for any damages, penalties, or Taxes, or any other Losses or expense. No Action (other than those relating to routine claims for benefits) is pending or, to the Company's Knowledge, threatened with respect to any Benefit Plan, nor is there any basis for such Action. The Company has not been informed that any Benefit Plan is the subject of an examination or audit by a Governmental Authority. All payments, distributions, reimbursements or contributions required to have been made (under the provisions of any agreements or other governing documents or applicable Law) with respect to all Benefit Plans have been paid, made or accrued.

36

(i)　　　None of the Company, its Subsidiaries or any ERISA Affiliate has ever maintained, sponsored, contributed to, or has any obligation to contribute to, (i) a "defined benefit plan" as defined in Section 3(35) of ERISA, (ii) a pension plan subject to Title IV of ERISA, Section 412 of the Code, or Section 302 of ERISA, (iii) a "multiple employer plan" within the meaning of Section 413(c) of the Code, (iv) a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the Code, or (v) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA. Neither the Company nor its Subsidiaries is under any obligation to provide, nor does any Benefit Plan provide or has ever provided, health care or other welfare benefits with respect to any Person after termination of such Person's employment with, or service to, the Company or its Subsidiaries (other than as required by Part 6 of Subtitle B of Title I of ERISA or other applicable state Laws).

(j)　　　Except as set forth in Section 3.18(j) of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation of the Transactions contemplated hereby or any termination of employment or service in connection therewith will (i) cause any payment (including severance, change of control, retention, golden parachute, bonus or otherwise) to become due to any Person, (ii) result in any forgiveness of Indebtedness, (iii) increase any benefits otherwise payable by the Company, (iv) result in the acceleration of the time of payment or vesting of any benefits, or (v) result in "parachute payments" as defined in Section 280G(b)(2) of the Code (whether or not such payment is considered to be reasonable compensation for services rendered). None of the Company or its Subsidiaries has any obligation to reimburse, "gross-up", make similar "make-whole" payments to, or otherwise indemnify any Person for any Taxes imposed under Section 4999 of the Code.

(k)　　　With respect to each group health plan benefiting any current or former employee of the Company or its Subsidiaries that is subject to Section 4980B of the Code, the Company and each of its Subsidiaries have complied in all material respects with the continuation coverage requirements of Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA. The Company, its Subsidiaries and each ERISA Affiliate have complied and are in compliance in all material respects with the requirements of the Patient Protection and Affordable Care Act, including the Health Care and Education Reconciliation Act of 2010, as amended, and including any guidance issued thereunder ("PPACA"), in all material respects. Neither the Company nor any of its Subsidiaries has incurred, or is reasonably expected to incur or to be subject to, any Tax, penalty or other Liability that may be imposed under PPACA. Except as set forth in Section 3.18(k) of the Disclosure Letter, no health and welfare Benefit Plan is self-funded or self-insured.

(l)　　　Each Benefit Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in form and operation in compliance in all material respects with Section 409A of the Code and applicable guidance thereunder. No payment to be made under any Benefit Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code. None of the Company or its Subsidiaries has any obligation to reimburse, "gross-up", make similar "make-whole" payments to, or otherwise indemnify any Person for any Taxes imposed under Section 409A of the Code.

37

(m)  Except as set forth in Section 3.18(m) of the Disclosure Letter, there are no (i) employment Contracts or agreements for a specified duration, or (ii) agreements providing for retention (in connection with the transactions contemplated hereby), severance or other benefits in the event of termination of any employee of the Company or any of its Subsidiaries.

3.19.  Real Property.

(a)  After giving effect to the Redemption, neither the Company nor any of its Subsidiaries will own any real property.

(b)  Section 3.19(b) of the Disclosure Letter lists the common street address for all real property (the "Leased Real Property") in which the Company and any of its Subsidiaries holds a lease interest as of the date hereof, and lists the Contract pursuant to which such lease exists (including each amendment or guaranty related thereto). Except as would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole, the Company and its Subsidiaries collectively holds a valid leasehold interest in all such Leased Real Property. True and complete copies of the Contracts underlying such leases have been made available to Parent.

(c)  Except as provided in Section 3.19(c) of the Disclosure Letter, or as would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Company taken as a whole, to the Knowledge of the Company, as of the date hereof, neither the Company nor any of its Subsidiaries has received any written notice to the effect that any condemnation or rezoning proceedings are pending or threatened, with respect to any of the Leased Real Property.

3.20.  Suppliers; Distributors.

(a)  Suppliers. Section 3.20(a) of the Disclosure Letter sets forth the ten (10) largest suppliers of the Company and its Subsidiaries (based on dollar amounts of products and services supplied to the Company and its Subsidiaries) (the "Material Suppliers"), in each case, (i) for the twelve months ended December 31, 2019, and (ii) for the nine months ended September 30, 2020, and the amounts for which such Material Suppliers invoiced the Company and its Subsidiaries during such periods. Except as set forth in Section 3.20(a) of the Disclosure Letter, (w) all Material Suppliers continue to be suppliers of the Company or any of its Subsidiaries; (x) neither the Company nor any of its Subsidiaries has received any written notice that any Material Supplier will reduce materially its business with the Company or any of its Subsidiaries from the levels achieved during the twelve months ended December 31, 2019; (y) no Material Supplier has terminated its relationship with the Company or any of its Subsidiaries or, to the Company's Knowledge, threatened to do so; and (z) neither the Company nor any of its Subsidiaries is involved in any material claim or dispute with any Material Supplier.

38

(b)        Distributors. Section 3.20(b) of the Disclosure Letter sets forth the twenty (20) largest distributors of the Company and its Subsidiaries (based on dollar amounts of the purchase orders such distributors provided to the Company and its Subsidiaries) (the "Material Distributors"), in each case, for (i) the twelve months ended December 31, 2019, and (ii) the nine months ended September 30, 2020, and the total dollar amounts for which the Company and its Subsidiaries received purchase orders from such Material Distributors during such periods. Except as set forth in Section 3.20(b) of the Disclosure Letter: (w) all Material Distributors continue to be distributors of the Company or any of its Subsidiaries; (x) neither the Company nor any of its Subsidiaries has received any written notice that any Material Distributor will reduce materially or has threatened to reduce its business with the Company or any of its Subsidiaries from the levels achieved during the twelve months ended December 31, 2019; (y) no Material Distributor has terminated its relationship with the Company or any of its Subsidiaries or, to the Company's Knowledge, threatened to do so; and (z) neither the Company nor any of its Subsidiaries is involved in any material claim or dispute, with any Material Distributor in excess of $100,000.

3.21.    Accounts Receivable, Accounts Payable.

(a)        All accounts receivable and other receivables constitute valid claims in favor of the Company and its Subsidiaries arising from bona fide arm's length transactions of the Company or any of its Subsidiaries, arising in the Ordinary Course. The reserves, allowances and discounts with respect to such accounts receivable are adequate and consistent in extent with reserves, allowances and discounts previously maintained by the Company and its Subsidiaries in the Ordinary Course, and there are no claims, defenses, counterclaims, refusals to pay or other rights of set off against any thereof other than such as has arisen or will arise in the Ordinary Course and for which reserves have been established to the extent required by GAAP. No Person has any Lien on any such accounts receivable or any part thereof, and no material agreement, for deduction, free goods, discount or other deferred price or quantity adjustment has been made with respect to any such accounts receivable.

(b)        To the Company's Knowledge, there is no contest, claim, defense, or right of setoff (i) with any obligor of any of the accounts receivable; or (ii) as to the amount or validity of such accounts receivable.

(c)        Since January 1, 2019, neither the Company nor any of its Subsidiaries has (i) collected its accounts receivable other than in the Ordinary Course; (ii) accelerated or otherwise altered its collection practices; or (iii) written off or written down any of its accounts receivable.

(d)        Except as set forth on Section 3.21(d) of the Disclosure Letter, the Company and its Subsidiaries have paid their respective accounts payable in the Ordinary Course, have not delayed payments on any such accounts payable and have not altered the payment terms thereunder.

3.22.    Regulatory.

(a)        A complete and accurate list of all brand names under which all Company Products are currently branded or marketed (the "Brands"), the Company Product associated with each Brand and a brief description of such Company Product is set forth on Section 3.22(a) of the Disclosure Letter.

39

(b)          Except as set forth on Section 3.22(b) of the Disclosure Letter, neither the Company nor any of its Subsidiaries holds or has ever held or applied for under the laws of the United States or any of its jurisdictions a local, municipal or state (i) alcohol beverage retail license or (ii) Permit relating to the sale, manufacture, production, distribution or marketing of cannabis or any product derived from cannabis.

(c)          (x) The Company has received depletion reports and sales reports relating to each Material Distributor for (i) the twelve months ended December 31, 2019, and (ii) the nine months ended September 30, 2020, and (y) the Company has made available to Parent true and correct copies of each of such depletion report and sales report actually received from each Material Distributor for (i) the twelve months ended December 31, 2019, and (ii) the nine months ended September 30, 2020.

(d)          Neither the Company nor any of its Subsidiaries manufactures, produces, distributes, sells or markets, or, since January 1, 2018, has ever manufactured, produced, distributed, sold or marketed, Company Products in the United States except in material compliance with applicable Law and the Permits.  Except as set forth on Section 3.22(d) of the Disclosure Letter, no investigations, accusations, inquiries or claims of a Governmental Authority relating to the manufacture, production, distribution, sale or marketing of any Company Products are presently pending or, to the Knowledge of the Company, threatened.

(e)          Since January 1, 2018, neither the Company nor any of its Subsidiaries has ever manufactured, produced, sold or marketed any Company Products with a label that violates applicable Law or the Permits. Since January 1, 2018, neither the Company nor any of its Subsidiaries has ever received written notice of investigations, accusations, inquiries or claims by any Governmental Authority or other person relating to a claim that the Company has marketed the Products as "all natural" or made other health related claims.

(f)          A complete list of all agreements between any Person and the Company or any of its Subsidiaries that relate to any profit sharing, marketing promotions or sponsorships relating to any Company Products in excess of $50,000, the Company or any of its Subsidiaries is set forth on Section 3.22(f) of the Disclosure Letter, all of which are in material compliance with applicable Law and the Permits.

3.23.    Payments; Foreign Corrupt Practices Act; U.S. Export and Sanctions Laws.

(a)          Neither the Company, its Subsidiaries nor, to the Company's Knowledge, any of their directors, officers, agents, employees, consultants, resellers, distributors or other Persons associated with or acting on behalf of the Company or its Subsidiaries has, directly or indirectly paid, promised, offered, or agreed to pay, or authorized the payment of, any fee, commission or other sum of money or item of value, however characterized, to any Person, Governmental Authority or other party that is illegal or improper under any applicable Law, including the United States Foreign Corrupt Practices Act of 1977 (15 United States Code Section 78dd-1, et. seq.) ("FCPA") and the UK Anti-Bribery Act of 2010, and any other applicable Law regarding corruption, bribery, ethical business conduct, money laundering, political contributions, gifts, hospitalities, or expense reimbursements to public officials and private persons, books and records, and financial controls (the "Anti-Corruption Laws"), paid, provided, authorized, promised, offered, solicited, or accepted any unlawful bribe, corrupt payment, rebate, payoff, influence payment, kickback or any other illegal benefit or advantage of a financial or other nature; (iii) made any unlawful contribution, gift, entertainment or other unlawful expense in violation of any applicable Law, (iv) made any unlawful payment or offered anything of value to any foreign or domestic political parties or campaigns, (v) violated or is in violation of any provision of the FCPA, the UK Anti-Bribery Act of 2010, or any Anti-Corruption Laws, or (vi) established or maintained any fund or account that has not been accurately recorded in the books and records of the Company and its Subsidiaries. The Company, its Subsidiaries and, to the Company's Knowledge, their respective directors, officers, agents, employees, consultants, resellers, and distributors are not the subject of any allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA, the UK Anti-Bribery Act of 2010, or any Anti-Corruption Law.

40

(b)　　　　Neither the Company nor any of its Subsidiaries is the subject of any allegation, voluntary disclosure, investigation, prosecution, or other enforcement action pending or threatened against the Company and/or its Subsidiaries under any Export Control and Sanctions Laws. Neither the Company nor any of its Subsidiaries has received any correspondence, notice, request for information or administrative subpoena from a Governmental Authority regarding a potential violation by the Company or any of its Subsidiaries of any Export Control and Sanctions Laws.

(c)　　　　To the Knowledge of the Company, neither the Company nor any of its Subsidiaries has participated in or is participating in an international boycott within the meaning of Section 999 of the Code.

3.24.　　Inventory; Returns.

(a)　　　　The inventories of each of the Company and its Subsidiaries, including all raw materials, work in process, parts, supplies and finished goods merchandise of each the Company and its Subsidiaries (the "Inventory") are of good and merchantable material, of a quality and quantity usable or saleable in the Ordinary Course, are fit for their intended purpose and are not, in any material respect, adulterated, misbranded, mispackaged, mispack or mislabeled within the meaning of, or in violation of, any applicable Laws, and are carried on the books and records of the Company in accordance with GAAP.

(b)　　　　Neither the Company nor any of its Subsidiaries has any Contract or understanding with any customer that involves any "guaranteed sales" (or other similar program) of products of the Company or any of its Subsidiaries by that customer to third parties that could result in uncontested returns of such products from such customer or otherwise obligate the Company or any of its Subsidiaries to accept returned products of the Company or any of its Subsidiaries, and none of the Company's or any of its Subsidiaries' customers has asserted any claim against the Company or any of its Subsidiaries for guaranteed or uncontested returns during the past two (2) years with respect to any product or item manufactured, distributed or sold by or on behalf of the Company or any of its Subsidiaries.

41

3.25.    Product Warranties; Recalls.

(a)         Except as set forth on Section 3.25(a) of the Disclosure Letter, no claims of a customer, distributor, Governmental Authority or other Person based upon any alleged defects, nonconformance, impurity, contamination, misbranding, adulteration or unsuitability of any of the products of the Company or any of its Subsidiaries are presently pending or, to the Knowledge of the Company, threatened. Except as set forth in Section 3.25(a) of the Disclosure Letter, neither the Company nor any of its Subsidiaries has given or made any express warranties to third parties with respect to any products or items manufactured, distributed or sold by or on behalf of the Company or any of its Subsidiaries, except for warranties arising by operation of Law.

(b)         Except as set forth on Section 3.25(b) of the Disclosure Letter, (i) there have been no recalls of any Company Products, whether ordered by a Governmental Authority or undertaken voluntarily by the Company or any of its Subsidiaries, (ii) there have been no voluntary withdrawals, post-sale warnings or similar actions conducted with respect to any Company Products, and (iii) to the Knowledge of the Company, none of the Company Products have been produced, adulterated, misbranded, mispackaged, mispacked or mislabeled in violation of applicable Law. Other than as set forth on Section 3.25(b) of the Disclosure Letter, neither the Company nor any of its Subsidiaries has made, nor, to the Knowledge of the Company, has any other party made, any investigation of, or decision concerning whether or not to undertake any of the foregoing nor, to the Knowledge of the Company, is there a basis for any such recall.

3.26.    Trade Programs. Section 3.26 of the Disclosure Letter contains a description of all existing programs, practices or arrangements that relate to trade discounts, trade promotions, allowances, marketing, promotional sales, demo and sampling commitments, coupons, reward programs, gift certificates, or gift cards related to the operations of the Company's and any of its Subsidiaries' business as conducted from January 1, 2018 through the date of this Agreement. Except as set forth on Section 3.26 of the Disclosure Letter, to the Knowledge of the Company, no investigations, accusations, inquiries or claims of a Governmental Authority relating to any trade program are presently pending or threatened.

3.27.    Bank Accounts. Section 3.27 of the Disclosure Letter sets forth a correct and complete list of each bank, trust company, savings institution, brokerage firm, mutual fund or other financial institution with which the Company or any of its Subsidiaries has an account, safe deposit or lock box and the names and identification of all Persons authorized to draw on it or to have access to it.

3.28.    Cares Act.

(a)         The Company has obtained a "Paycheck Protection Program" loan through the U.S. Small Business Administration under the CARES Act with a face amount of $441,162 (collectively with any interest accrued thereon, the "PPP Loan"). At the time of submission of the application and at the time the PPP Loan was funded, the Company satisfied, in all material respects, all of the applicable criteria for the PPP Loan set forth in the Small Business Act (15 U.S.C. 636(a)) and the CARES Act. The application materials and supporting documentation with respect to the PPP Loan delivered by the Company to the financial institutions providing the PPP Loan were true and correct in all material respects.

42

(b)        Except as set forth on <u>Section 3.28(b)</u> of the Disclosure Letter, neither the Company nor any of its Subsidiaries has elected to defer any Taxes payable by the Company or any of its Subsidiaries pursuant to Section 2302 of the CARES Act. All Taxes payable by the Company or any of its Subsidiaries which have been so deferred have been properly accrued for and are reflected on the Financial Statements.

3.29.    <u>Brokers</u>. Except for Arlington Capital Services LLC, neither the Company nor any of its Subsidiaries has any Liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

3.30.    <u>Acknowledgement of No Other Representations or Warranties</u>. The Company acknowledges and agrees that, (i) except for the representations and warranties contained in <u>Article V</u>, neither Parent, Merger Sub nor any of their respective Affiliates or Representatives makes or has made, nor is the Company relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied, concerning Parent, Merger Sub or any of their respective businesses, operations, assets, Liabilities, results of operations, condition (financial or otherwise) or prospects or the transactions contemplated by this Agreement, and (ii) the Company hereby disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Parent, Merger Sub or any of their respective Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Company by any Representative of Parent or Merger Sub) except for the representations and warranties expressly set forth in <u>Article V</u>. Notwithstanding anything in this Agreement to the contrary, the Company and its Subsidiaries make no representations or warranties to Parent or Merger Sub regarding any projections or the future or probable profitability, success, business, opportunities, relationships and operations of the Company and its Subsidiaries. Subject to all of the foregoing provisions of this Section, each of Blocker, the Company, Parent and Merger Sub retains all of its rights and remedies with respect to claims based on Fraud.

<div align="center">

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BLOCKER, BLOCKER GP AND BLOCKER SELLER**

</div>

Except as set forth in the Disclosure Letter, each of Blocker, Blocker Seller and Blocker GP hereby represents and warrants to Parent and Merger Sub as of the date hereof as follows:

4.1.    <u>Organization</u>. Blocker is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization. Blocker has the requisite power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Blocker to consummate the Blocker Sale.

<div align="center">

43

</div>

4.2.    <u>Authority</u>. Each of Blocker, Blocker Seller and Blocker GP (a) has the right and power to enter into, and perform its obligations under, this Agreement and each other agreement delivered in connection herewith to which it is a party and (b) has taken all requisite action to authorize (i) the execution, delivery and performance of this Agreement and each such other agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Blocker Sale and other Transactions contemplated by this Agreement and each such other agreement delivered in connection herewith to which it is a party. This Agreement has been duly executed and delivered by Blocker and, assuming the due authorization, execution and delivery of this Agreement by each other parties hereto, is binding upon, and legally enforceable against, Blocker in accordance with its terms, subject to the Bankruptcy and Equity Exception.

4.3.    <u>Capitalization</u>. All of the limited partner interests of Blocker as of the date hereof are issued and outstanding and held (beneficially and of record) by Blocker Seller, and all of the general partner interests of Blocker as of the date hereof are issued and outstanding and held (beneficially and of record) by the Blocker GP. All outstanding Blocker Interests have been duly authorized, validly issued, and are not subject to preemptive rights. There are no options, warrants, convertible, exercisable or exchangeable securities or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued membership interests of Blocker or obligating Blocker to issue or sell any membership interests of, or other interest convertible, exercisable or exchangeable for any equity interest in, Blocker.

4.4.    <u>Blocker Interests</u>. Blocker Seller is the sole record and beneficial owner of the Blocker LP Interests, free and clear of any Lien other than transfer restrictions under applicable federal and state securities laws and the Organizational Documents of Blocker or other Permitted Liens. The Blocker GP is the sole record and beneficial owner of the Blocker GP Interests, free and clear of any Lien other than transfer restrictions under applicable federal and state securities laws and the Organizational Documents of Blocker or other Permitted Liens. No other Person owns or holds any equity interests or rights in Blocker and no Person other than Parent has any right to acquire any Blocker Interests.

4.5.    <u>No Violations and Consents</u>.

(a)      None of the execution, delivery or performance of this Agreement by Blocker Seller, Blocker GP and Blocker or the consummation by Blocker Seller, Blocker GP and Blocker of the Transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the charter, bylaws or any equivalent Organizational Document or governing documents of Blocker Seller, Blocker GP or Blocker; (ii) assuming that all consents, approvals and authorizations described in <u>Section 4.5(b)</u> have been obtained and all filings and notifications described in <u>Section 4.5(b)</u> have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law applicable to Blocker Seller, Blocker GP or Blocker or any of their respective properties or assets; or (iii) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien (other than Permitted Liens) upon any of the properties or assets of Blocker or its assets pursuant to, any Contract to which Blocker, Blocker GP or Blocker Seller is a party (or by which any of its properties or assets is bound) or any Permit held by it except, with respect to clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Blocker to consummate the Blocker Sale.

44

(b)           None of the execution, delivery or performance of this Agreement by Blocker, Blocker GP or Blocker Seller or the consummation by Blocker, Blocker GP or Blocker Seller of the Transactions contemplated by this Agreement will require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority, other than (i) such filings as may be required in connection with the payment of any transfer and gain Taxes, (ii) compliance with, and such filings, consents, approvals, authorizations and/or registrations as set forth on Section 4.5(b) of the Disclosure Letter and (iii) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Blocker, Blocker GP or Blocker Seller to consummate the Blocker Sale.

4.6.     Litigation and Compliance with Laws.

(a)           Neither Blocker, Blocker GP nor Blocker Seller is in material conflict with, or in material default, breach or violation of any Law applicable to such Person.

(b)           As of the date of this Agreement, there is no Action pending or, to the knowledge of Blocker, threatened against Blocker, or any property or asset of such Person, at law or in equity by or before any Governmental Authority. Neither Blocker, Blocker GP, Blocker Seller nor any material property or asset of such Person is subject to any continuing Order of, consent decree, settlement agreement or other similar written agreement with, or, to Blocker's, Blocker GP's, or Blocker Seller's knowledge, continuing investigation by, any Governmental Authority, or any Order, writ, judgment, injunction, decree, determination or award of any Governmental Authority that would (A) prevent or materially delay consummation of the Blocker Sale and the other Transactions contemplated by this Agreement or (B) reasonably be expected to be materially adverse to Blocker, Blocker GP or Blocker Seller taken as a whole.

(c)           As of the date hereof, there is no Action to which Blocker, Blocker GP or Blocker Seller is a party pending or, to the knowledge of Blocker, Blocker GP or Blocker Seller, threatened seeking to prevent, hinder, modify, delay or challenge the Blocker Sale or any of the other Transactions contemplated by this Agreement.

(d)           As of the date hereof, there are no Actions pending or, to the knowledge of Blocker, Blocker GP or Blocker Seller, threatened against Blocker, Blocker GP or Blocker Seller with respect to this Agreement, or in connection with the Transactions contemplated hereby.

45

4.7.     <u>Purpose</u>. Blocker (i) was formed solely for the purpose of holding the direct or indirect equity interests in the Company held directly or indirectly by it (the "<u>Company Ownership</u>"), (ii) has not conducted any business or engaged in any activities other than those related to the Company Ownership and activities incidental thereto (including the negotiation, execution and consummation of this Agreement and the Transactions contemplated hereby, and all other acts, actions and activities incidental thereto, including the Pre-Closing Blocker Restructuring), (iii) has no assets other than the Company Ownership and cash and cash equivalents and (iv) has no material Liabilities other than those incidental to its formation or existence or the Company Ownership or incurred in connection with this Agreement and the Transactions contemplated hereby (including the Pre-Closing Blocker Restructuring).

4.8.     <u>No Employees</u>. Blocker does not currently have any employees, and Blocker has never had any employees.

4.9.     <u>No Broker</u>. Neither Blocker, Blocker GP nor Blocker Seller has entered into any agreement or arrangement entitling any broker, finder, investment banker or financial advisor to any broker's or finder's fee or commission in connection with the transactions contemplated by this Agreement for which either Parent, Merger Sub, the Company, its Subsidiaries or their Affiliates would be responsible.

4.10.     <u>Taxes</u>.

(a)     Blocker is currently, and has been at all times since formation, been treated as a corporation for U.S. federal and state income tax purposes.

(b)     Blocker (i) has duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed by it as of the date hereof; (ii) has timely paid all material Taxes (whether or not shown as due on such filed Tax Returns) that Blocker is otherwise obligated to pay; (iii) has duly and timely paid all material Taxes required to be withheld from any payment to a shareholder, partner, employee or any other Person; (iv) with respect to all Tax Returns filed by or with respect to Blocker, has not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency (other than any such extension obtained in connection with an extension to file a Tax Return); and (v) to the actual knowledge of the Blocker, does not have any deficiency, audit, examination, investigation or other proceeding in respect of Taxes or Tax matters pending or, as of the date of this Agreement, proposed or threatened in writing which, if resolved in the favor of the Taxing authority, would result in a material Tax deficiency.

(c)     Blocker does not have any liability for the Taxes of any other person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor or by contract (other than any contract the principal purpose of which does not relate to Taxes).

(d)     There are no Liens on the assets of Blocker as a result of unpaid Taxes (other than for current Taxes not yet due and payable).

(e)     Blocker is not, and has not been, a party to, or a promoter of, a "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b).

46

4.11.    Acknowledgement of No Other Representations or Warranties. Blocker and Blocker GP acknowledge and agree that, (i) except for the representations and warranties contained in Article V, neither Parent, Merger Sub nor any of their respective Affiliates or Representatives makes or has made, nor is Blocker or Blocker GP relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied, concerning Parent, Merger Sub or any of their respective businesses, operations, assets, Liabilities, results of operations, condition (financial or otherwise) or prospects or the transactions contemplated by this Agreement, and (ii) Blocker and Blocker GP hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Parent, Merger Sub or any of their respective Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Blocker by any Representative of Parent or Merger Sub) except for the representations and warranties expressly set forth in Article V. Notwithstanding anything in this Agreement to the contrary, neither Blocker nor either Blocker Partner makes any representations or warranties to Parent or Merger Sub regarding any projections or the future or probable profitability, success, business, opportunities, relationships and operations of Blocker. Subject to all of the foregoing provisions of this Section, each of Blocker, each Blocker Partner, the Company, Parent and Merger Sub retains all of its rights and remedies with respect to claims based on Fraud.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as set forth in the letter delivered by Parent to the Company concurrently with the execution of this Agreement (the "Parent Disclosure Letter"), Parent and Merger Sub jointly and severally represent and warrant to the Company, Blocker GP and Blocker Seller as of the date hereof as follows:

5.1.    Organization. Parent is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization. Parent has the requisite power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Parent taken as a whole. Merger Sub is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware, and has all requisite limited liability company power to effect the transactions contemplated hereby. Merger Sub was formed for the specific purpose of consummating the transactions contemplated hereby, and Merger Sub has not conducted any operations or business nor does Merger Sub have any Liabilities or obligations other than in connection with the negotiation of this Agreement or any other Transaction Document and the consummation of the transaction contemplated hereby.

5.2.    Authority. Each Parent and Merger Sub (a) has the respective right and power to enter into, and perform its obligations under, this Agreement and each other agreement delivered in connection herewith to which it is a party and (b) has taken all requisite action to authorize (i) the execution, delivery and performance of this Agreement and each such other agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Merger and other transactions contemplated by this Agreement and each such other agreement delivered in connection herewith to which it is a party. This Agreement has been duly executed and delivered by Parent and Merger Sub and, assuming the due authorization, execution and delivery of this Agreement by each other parties hereto, is binding upon, and legally enforceable against, Parent and Merger Sub in accordance with its terms, subject to the Bankruptcy and Equity Exception.

47

5.3.   No Violations and Consents.

(a)      None of the execution, delivery or performance of this Agreement by Parent or Merger Sub or the consummation by Parent or Merger Sub of the transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the charter, bylaws or any equivalent organizational or governing documents of Parent or Merger Sub; (ii) assuming that all consents, approvals and authorizations described in Section 5.3(b) have been obtained and all filings and notifications described in Section 5.3(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law applicable to Parent or Merger Sub or any of its properties or assets; or (iii) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien upon any of the properties or assets of Parent or Merger Sub pursuant to, any Contract to which Parent or Merger Sub is a party (or by which any of its properties or assets is bound) or any Permit held by it except, with respect to clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Parent or Merger Sub to consummate the Merger.

(b)      None of the execution, delivery or performance of this Agreement by Parent or Merger Sub or the consummation by Parent or Merger Sub of the transactions contemplated by this Agreement will require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority, other than (i) such filings as may be required in connection with the payment of any transfer and gain Taxes, (ii) compliance with, and such filings, consents, approvals, authorizations and/or registrations as set forth on Section 5.3(b) of the Parent Disclosure Letter and (iii) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Parent or Merger Sub to consummate the Merger.

5.4.   Litigation.

(a)      As of the date hereof, there is no Action to which Parent or Merger Sub is a party pending or, to the Knowledge of Parent, threatened against Parent or Merger Sub that would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby. As of the date hereof, neither Parent nor Merger Sub is subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to (A) prevent or materially delay consummation of the Transactions and the other transactions contemplated by this Agreement or (B) be materially adverse to the Parent taken as a whole.

48

(b)     Except as set forth in the Public Company Reports, none of Parent or any of its Subsidiaries, or their respective officers, directors or employees (in their capacity as such) are (a) subject to any outstanding injunction, judgment, order, decree, ruling or charge, or (b) party to any action, suit, Proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency or any federal, state, local, or foreign jurisdiction nor, to the Knowledge of Parent, is any such action, suit, Proceeding, hearing, or investigation threatened, in each case that is required to be disclosed in the Public Company Reports and has not been disclosed.

5.5.     Sufficient Funds. Parent and Merger Sub has, and at the Closing will have, sufficient cash on hand or other sources of immediately available funds to enable it to make payment of all amounts payable by them hereunder and consummate the Transactions contemplated by this Agreement. Neither Parent nor any of its Subsidiaries has incurred any obligation, commitment, restriction or Liability of any kind which would reasonably be expected to impair or adversely affect Parent or Merger Sub's ability to make any such payment.

5.6.     R&W Policy. The R&W Policy obtained by the Parent in connection with the transactions contemplated by this Agreement provides that the insurer thereunder expressly waives, and agrees not to pursue, directly or indirectly, any subrogation rights against the Unitholders or Blocker Seller with respect to any claim made by any insured thereunder other than in the case of Fraud.

5.7.     Brokers. Except for Jefferies, LLC, neither Parent nor Merger Sub has entered into any agreement or arrangement entitling any broker, finder, investment banker or financial advisor to any broker's or finder's fee or commission in connection with the transactions contemplated by this Agreement for which either Blocker, the Company, its Subsidiaries or their Affiliates would be responsible.

5.8.     Absence of Certain Changes. Except to the extent arising out of or relating to the transactions contemplated by this Agreement or as otherwise disclosed in any of the Public Company Reports (a) since May 31, 2020, the business of Parent has been operated in the Ordinary Course in all material respects and (b) since May 31, 2020, there has been no Parent Material Adverse Effect.

5.9.     Restrictions on Payment. No Contract that the Parent or any of its Affiliates is party to contains a specific prohibition against payment of an Earn-Out Payment.

5.10.     Parent Public Company Reports; Financial Statements; No Undisclosed Liabilities.

(a)     Parent has filed or furnished, as applicable, its Form 40-F and Annual Information Form for the fiscal year ended May 31, 2020, its audited financial statements and Management's Discussion and Analysis Form for the year ended May 31, 2020, and its unaudited financial statements and Management's Discussion and Analysis for the three months ended August 31, 2020, and all exhibits described therein for the fiscal quarter ended August 31, 2020 (collectively, the "Public Company Reports"). As of its respective date, and, if amended, as of the date of the last such amendment, each Public Company Report complied in all material respects with the applicable requirements of the Securities Laws, and any rules and regulations promulgated thereunder applicable to the Public Company Report. As of its respective date, and, if amended, as of the date of the last such amendment, no Public Company Report contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. As of the date hereof, there are no outstanding or unresolved comments from any comment letters received by Parent from the SEC or CSA relating to reports, statements, schedules, registration statements or other filings made by Parent with the SEC or CSA.

49

(b)         The consolidated financial statements included or incorporated by reference into the Public Company Reports (including the notes thereto) have been prepared in accordance with IFRS applied on a consistent basis, except as required by the implementation of new IFRS, throughout the periods covered thereby and present fairly in all material respects the consolidated financial condition of Parent as of such dates and the results of operations, stockholders' equity, and cash flows of Parent for such periods.

(c)         Parent has implemented and maintains a system of internal controls over financial reporting that are sufficient to provide reasonable assurance regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with IFRS, including policies and procedures that provide reasonable assurance that (a) transactions are executed only in accordance with authorizations of management and directors, (b) transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS. To Parent's Knowledge, there are not (i) any significant deficiencies or material weaknesses in the design or operation of Parent's internal control over financial reporting which would have a Parent Material Adverse Effect or (ii) any Fraud, whether or not material, that involves management or other employees who have a significant role in Parent's internal control over financial reporting.

(d)         Except for Liabilities (a) disclosed, accrued or reserved against in the consolidated financial statements included or incorporated by reference into the Public Company Reports, (b) incurred in the Ordinary Course since the latest document filed as part of the Public Company Report that would not reasonably be expected, individually or in the aggregate, to be material to the Parent taken as a whole, (c) set forth in Section 5.10(d) of the Parent Disclosure Letter, neither the Parent, Merger Sub nor any of their respective Subsidiaries has any material Liability of any kind.

5.11.    Legal Compliance.

(a)         Parent and each of its Subsidiaries is in compliance in all material respects with all Laws and orders applicable to Parent or any of its Subsidiaries or any assets owned or used by Parent or any of its Subsidiaries which are material to the business and operations of Parent and its Subsidiaries.

50

(b)             Neither Parent, its Subsidiaries, or, to Parent's Knowledge, any representatives acting on their behalf, have, directly or indirectly, corruptly offered, promised, paid, authorized or given money or anything of value to any Governmental Authority or official thereof, for the purpose of: (i) influencing any act or decision of any Government Authority or official thereof; (ii) inducing any Governmental Authority or official thereof to do or omit to do an act in violation of a lawful duty; (iii) securing any improper business advantage; (iv) inducing any Governmental Authority or official thereof to influence the act or decision of a Governmental Authority or any official thereof; or (v) for any other corrupt, improper, or illegal purpose, each in order to obtain or retain business for Parent or any of its Subsidiaries in violation of applicable anti-corruption Laws

5.12.     No Required Vote. No vote of the holders of any equity interests in Parent is required for Parent to consummate the transactions contemplated by this Agreement, including without limitation the issuance of any Parent Common Shares.

5.13.     Solvency. Immediately after giving effect to the transactions contemplated by this Agreement, and assuming the representations set forth in Article III and Article IV are true and correct in all material respects:

(a)             the fair saleable value (determined on a going concern basis) of the assets of the Parent and its Subsidiaries (including, following the Closing, the Surviving Entity and its Subsidiaries) shall be greater than the total amount of their liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed);

(b)             each of the Parent and its Subsidiaries (including, following the Closing, the Surviving Entity and its Subsidiaries) shall be able to pay their debts and obligations in the ordinary course of business as they become due;

(c)             each of the Parent and its Subsidiaries (including, following the Closing, the Surviving Entity and its Subsidiaries) shall have adequate capital to carry on their businesses and all businesses in which they are about to engage; and

(d)             In completing the transactions contemplated by this Agreement, the Parent does not intend to hinder, delay or defraud any present or future creditors of Parent, the Surviving Entity or any of their respective Subsidiaries.

5.14.     Investment Intent. Parent is acquiring the Units solely for the purpose of investment and not with a view to, or for sale in connection with, any distribution of the Units in violation of the Securities Act or other applicable Securities Laws. Parent acknowledges that the Units have not been registered under the Securities Act or other applicable Securities Laws and that the Units may not be transferred or sold except pursuant to the registration provisions of the Securities Act or other applicable Securities Laws or pursuant to an applicable exemption from such registration provisions. Purchaser has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Units and is capable of bearing the economic risks of such investment.

51

5.15. Acknowledgement of No Other Representations or Warranties.

(a)     Parent and Merger Sub acknowledges and agrees that, except for the representations and warranties contained in Article III and Article IV, as applicable, (i) neither the Company, its Subsidiaries nor any of their respective Affiliates or Representatives makes or has made, nor is Parent or Merger Sub relying on, and Parent and Merger Sub expressly disclaims any reliance on, any representation or warranty, either express or implied, of any kind whatsoever, including without limitation any representation or warranty concerning (x) the Company, its Subsidiaries, or any of their respective Affiliates; (y) any of the Company's, its Subsidiaries', or any of their Affiliates' respective businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects; or (z) the transactions contemplated by this Agreement, (ii) neither Blocker, either Blocker Partner nor any of their respective Affiliates or Representatives makes or has made, nor is Parent or Merger Sub relying on, and Parent and Merger Sub expressly disclaims any reliance on, any representation or warranty, either express or implied, of any kind whatsoever, including without limitation any representation or warranty concerning (x) the Company, its Subsidiaries, Blocker, the Blocker Partners or any of their respective Affiliates; (y) any of the Company's, its Subsidiaries', Blocker's, the Blocker Partners' or any of their respective Affiliates' respective businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects; or (z) the transactions contemplated by this Agreement; and (iii) the Company, its Subsidiaries, Blocker, the Blocker Partners, and each of their respective Affiliates and Representatives hereby disclaim all liability and responsibility for, and Parent and Merger Sub expressly disclaim any reliance on, any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by the Company, its Subsidiaries, Blocker, the Blocker Partners, and each of their respective Affiliates and Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Parent or Merger Sub by any Representative of the Company, its Subsidiaries, Blocker, the Blocker Partners or any of their respective Affiliates).

(b)     Without limiting the generality of clause (a) above, Parent and Merger Sub acknowledges and agrees that (i) it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Company and its Subsidiaries, Blocker, the Blocker Partners and the transactions contemplated by this Agreement, (ii) in connection with its investigation of the Company and its Subsidiaries, Blocker, the Blocker Partners, Parent and Merger Sub has received from or on behalf of the Company and its Subsidiaries, Blocker and the Blocker Partners certain projections, including projected statements of operating revenues and income from operations of the Company and its Subsidiaries, Blocker and the Blocker Partners and certain business plan information of the Company and its Subsidiaries, Blocker and the Blocker Seller Partners, (iii) there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Parent and Merger Sub is familiar with such uncertainties, and that each Parent and Merger Sub is taking full responsibility for making its own evaluation of the adequacy and accuracy and completeness of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), (iv) neither the Company, Blocker, the Blocker Seller Partners, the Company's Subsidiaries nor any of their respective Affiliates, or Representatives make any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and Parent and Merger Sub have not relied thereon, and (v) Parent and Merger Sub will have no claim against the Company, its Subsidiaries, Blocker, the Blocker Partners or any other Person with respect thereto.

(c)     Notwithstanding the foregoing, each of Blocker, the Blocker Partners, the Company, its Subsidiaries, Parent and Merger Sub retains all of its rights and remedies with respect to claims based on Fraud.

52

## ARTICLE VI
## COVENANTS

6.1.    Certain Governmental Matters.

(a)        Without in any way limiting the other provisions of this Section 6.1, Parent and the Company agree to make or cause to be made, in consultation and cooperation with the other and as promptly as practicable and advisable after the date hereof, (i) an appropriate filing of a Notification and Report Form pursuant to the HSR Act, which filing shall be made within five (5) Business Days of the date hereof, (ii) an appropriate filing with the Toronto Stock Exchange ("TSX") pursuant to the Toronto Stock Exchange Company Manual (the "TSX Manual") within five (5) Business Days of the date hereof requesting that the TSX approve the issuance of the Stock Consideration as contemplated herein, subject only to the satisfaction of the customary listing conditions of the TSX (which shall not include the requirement to obtain any approval of the equityholders of Parent prior to Closing) and (ii) all other necessary registrations, declarations, notices and filings relating to the Transactions with any Governmental Authority with regulatory jurisdiction over enforcement of any applicable Competition Laws ("Governmental Competition Authority") with respect to the Transactions and to respond as promptly as practicable to any inquiries received and requests made by a Governmental Competition Authority for any additional information and documentary material pursuant to the HSR Act, the TSX Manual and any other Competition Law, and in each case, request "early termination" or any equivalent process, if available. From and after the date hereof and until all governmental approvals required in connection with the Transactions have been obtained, Parent shall not, and shall cause its Affiliates not to, operate its business in such manner or take any action, that could reasonably be expected to significantly increase the risk of not obtaining any such governmental approval or clearance or the expiration or termination of any applicable waiting period. Parent shall be responsible for all filing fees paid pursuant to this Section 6.1.

(b)        Each of the Company and Parent shall (i) keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Competition Authority, and shall respond to any such inquiry or request as promptly as practicable, (ii) cooperate and consult with each other in connection with the making of all filings, notifications and any other material actions pursuant to this Section 6.1, including, subject to applicable Laws relating to the exchange of information, by permitting counsel for the other party to review in advance, and consider in good faith the views of the other party in connection with, any proposed written communication to any Governmental Competition Authority, (iii) provide counsel for the other party with copies of all filings and submissions made by such party and all correspondence and other written communications between such party (and its advisors) and any Governmental Competition Authority and any other information supplied by such party or its Affiliates to a Governmental Competition Authority or received from such a Governmental Competition Authority in connection with the Acquisition; provided, however, that materials may be withheld or redacted before being provided to the other party as necessary to (x) comply with contractual arrangements or (y) address reasonable privilege or confidentiality concerns, and (iv) furnish to the other party such information and assistance as such party reasonably may request in connection with the preparation of any submissions to, or agency Action by, any Governmental Competition Authority. Upon and subject to the terms of this Section 6.1, each party agrees to cooperate and use reasonable best efforts to assist in any defense by any other party to the Transactions before any Governmental Competition Authority reviewing the Transactions, including by responding as promptly as practicable to any requests for information by such Governmental Competition Authority or such assistance as may be reasonably requested by the other party to this Agreement in such defense.

53

(c)    If any objections are asserted by any Governmental Competition Authority with respect to the Transactions under any applicable Competition Law or which would otherwise prevent, materially impede or materially delay the consummation of the Merger, or if any Action is instituted by any Governmental Competition Authority or any private party challenging the Transactions as violative of any applicable Competition Law, or an Order is issued enjoining the Transactions, each of the Company and Parent shall use its reasonable best efforts to resolve any such objections or Actions so as to permit consummation of the Transactions by the Closing as soon as practicable.

(d)    Each of the Company and Parent shall use their reasonable best efforts to cause the expiration or termination of the applicable waiting periods under the applicable Competition Law as soon as practicable. Nothing in this Agreement, including this Section 6.1, obligates Parent or any of its Subsidiaries or Affiliates to offer, negotiate, accept or agree to any divestiture, sale, license or other disposition, or holding separate, of any assets, businesses, entities, or operations, or to the imposition of any restraints, conditions, modifications, limitations or other constraints on the operation of any assets, businesses, entities, or operations. The Company and Parent shall not extend, directly or indirectly, any such waiting period or enter into any agreement with a Governmental Competition Authority to delay or to not consummate the Acquisition on the Closing Date, except with the prior written consent of the other party to this Agreement, which consent shall not be unreasonably withheld or delayed. The Company and Parent shall not have any substantive contact with any Governmental Competition Authority in respect of any filing or Action contemplated by this Section 6.1 unless it consults with the other party in advance and, to the extent permitted by such Governmental Competition Authority, gives the other party the opportunity to participate.

6.2.    Conduct of Business by the Company and its Subsidiaries and the Blocker Pending the Transactions. The Company and the Blocker agree that, between the date of this Agreement and the Closing, and in the case of the Blocker, subject to Section 6.10, except (i) as set forth in Section 6.2 of the Disclosure Letter, (ii) as contemplated or required by any other provision of this Agreement (including effecting the Pre-Closing Blocker Reorganization or the Redemption), or (iii) as required by applicable Law or by any Governmental Authority of competent jurisdiction, unless Parent and Merger Sub otherwise agrees in writing (which agreement shall not be unreasonably withheld, delayed or conditioned), the Company and each of its Subsidiaries and the Blocker shall each use reasonable best efforts to conduct their operations in all material respects in the Ordinary Course. Without limiting the foregoing, except (i) as set forth in Section 6.2 of the Disclosure Letter, (ii) as contemplated or required by any other provision of this Agreement (including effecting the Pre-Closing Blocker Reorganization or the Redemption), (iii) as required by applicable Law or by any Governmental Authority of competent jurisdiction, (iv) as required to comply with COVID-19 Measures or (v) as reasonably undertaken to respond to the effects of COVID-19 or COVID-19 Measures with the prior consultation with Parent, neither the Company nor any of its Subsidiaries nor the Blocker shall, between the date of this Agreement and the Closing, as applicable, unless Parent and Merger Sub otherwise agrees in writing (which agreement shall not be unreasonably withheld, delayed or conditioned):

(a)    amend their Organizational Documents, except for non-material amendments made solely for administrative purposes;

54

(b)        (i) issue or authorize the issuance of or sell any units, membership interest, shares of capital stock or other ownership interests, or any notes, bonds or other securities of the Company or any of its Subsidiaries or the Blocker (including any option, warrant or other right to acquire the same), in any instance, convertible into, exchangeable for or exercisable for ownership interests of the Company or any of its Subsidiaries or the Blocker or split, subdivide, combine or reclassify any ownership interests of the Company or any of its Subsidiaries or the Blocker, (ii) purchase, redeem or otherwise acquire, or offer to purchase redeem or otherwise acquire, any ownership interests of the Company or any or its Subsidiaries or the Blocker or any other security convertible into, exchangeable for or exercisable for ownership interests of the Company or any of its Subsidiaries or the Blocker, or (iii) declare, set aside, or make any other distributions using membership interests or property of the Company or its Subsidiaries with respect to, or enter into any Contract relating to the declaration of any such distribution with respect to, the ownership interests in the Company or any of its Subsidiaries or the Blocker (for the avoidance of doubt, the Company and its Subsidiaries and the Blocker shall be permitted to make cash distributions or dividends);

(c)        (i) sell, pledge, dispose of, transfer, lease, license or encumber (except for Permitted Liens) any material personal property, equipment or assets (except as set forth in clause (ii) below) of the Company or any of its Subsidiaries or the Blocker, except solely in the case of the Company and its Subsidiaries (and not the Blocker) (A) in the Ordinary Course or (B) pursuant to existing Contracts set forth in Section 6.2(c) of the Disclosure Letter, or (ii) sell, pledge, dispose of, transfer, lease, license or create or impose any Liens on any material assets or property except for (A) the execution of covenants, restrictions and other similar instruments in the Ordinary Course that, individually or in the aggregate, do not, and would not reasonably be expected to, materially impair the existing use and operation of, the property or asset affected by the applicable instrument, (B) in connection with the incurrence of any Indebtedness permitted to be incurred by the Company or any of its Subsidiaries pursuant to Section 6.2 or (C) the execution of licenses in the Ordinary Course;

55

(d)      merge or consolidate the Company or any of its Subsidiaries or the Blocker with any Person or adopt a plan of complete or partial liquidation or resolutions providing for a complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries or the Blocker;

(e)      acquire (including by merger, consolidation or acquisition of stock or assets) any interest in any Person (or equity interests thereof) or any assets, real property, personal property, equipment, business or other rights (whether by merger, stock purchase, asset purchase or otherwise), except solely in the case of the Company and its Subsidiaries (and not the Blocker) for acquisitions of inventory, personal property, equipment and vehicles either (i) in the Ordinary Course, substantially consistent with past practice or in accordance with the capital improvement plans made available to Parent and Merger Sub prior to the date hereof, or (ii) is less than $100,000;

(f)      incur, assume, refinance or guarantee any Indebtedness for borrowed money or issue any debt securities, or assume or guarantee any Indebtedness for borrowed money of any Person, in any such case in excess of $100,000 in the aggregate, except Indebtedness that (i) is prepayable at any time without penalty or premium or borrowings under the Existing Credit Facility or (ii) will be repaid at Closing;

(g)      make any loans, advances or capital contributions to, or investments in, any other Person that would reasonably be expected to adversely affect the Company or any of its Subsidiaries or the Blocker following Closing;

(h)      other than (x) in the Ordinary Course with past practice, (y) to the extent required by Law or the terms of any Benefit Plan as set forth in <u>Section 6.2(h)</u> of the Disclosure Letter, or (z) as specifically contemplated by this Agreement: (i) materially increase the level of compensation or benefits payable or to become payable to its directors, officers or employees; or (ii) enter into any severance agreement with any director, officer, or employee of the Company or any of its Subsidiaries or the Blocker;

(i)      make any tax election inconsistent with past practice with respect to the Company or any of its Subsidiaries or the Blocker, file any material Tax Return materially inconsistent with past practice, make or change any material Tax election inconsistent with past practice, settle or compromise any material Tax Contest or assessment by any Governmental Authority, adopt or change any accounting method with respect to Taxes, enter into any closing agreement with a taxing authority or surrender any right to claim a refund of a material amount of Taxes, in each instance, (X) that would reasonably be expected to materially adversely impact Parent, the Company or any of its Subsidiaries or the Blocker from a Tax perspective following the Closing and (Y) that is not otherwise required by applicable Law;

(j)      make any material change in financial accounting policies or procedures, other than as required by GAAP, applicable Law or any Governmental Authority of competent jurisdiction;

(k)      except as set forth in <u>Section 6.2(k)</u> of the Disclosure Letter, make any capital expenditures or enter into any Contract for any renovation, construction or capital expenditure; *provided, however*, that notwithstanding the foregoing, the Company and its Subsidiaries shall be permitted to make (i) capital expenditures required by Law or any lender of the Company or any of its Subsidiaries, (ii) emergency capital expenditures in any amount that the Company or its Subsidiaries determines is necessary in its reasonable judgment to maintain its ability to operate its businesses in the Ordinary Course, and (iii) capital expenditures in any amount not exceeding $100,000 in the aggregate for all projects of the Company and its Subsidiaries;

56

(l)       grant or announce any increase in the salaries, bonuses or other benefits payable by the Company or any of its Subsidiaries or the Blocker to any of the directors, officers, employees, consultants or independent contractors, other than as required by Law;

(m)       fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire;

(n)       pay, discharge, settle or satisfy any suit, Action or claim, other than settlements of any suit, Action or claim, or threatened suit, Action or claim, that (i) require payments by the Company or any of its Subsidiaries or the Blocker (net of insurance proceeds) in an amount not to exceed $25,000 individually or $50,000 in the aggregate and (ii) do not require any other actions or impose any other material restrictions on the business of the Company or any of its Subsidiaries or the Blocker;

(o)       issue, deliver, sell, grant, pledge or otherwise encumber or subject to any Lien any ownership interests, any other voting securities or any securities convertible into, exchangeable for, exercisable for, or any rights, warrants or options to acquire, any such ownership interests, voting securities or convertible securities, or any "phantom" units, "phantom" unit rights, or unit appreciation rights, including pursuant to contracts as in effect on the date hereof;

(p)       adopt a plan or agreement of a complete or partial liquidation or dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries or the Blocker;

(q)       delay or postpone the payment of accounts payable or other Liabilities beyond their due date or accelerate the collection of any accounts receivable except in the Ordinary Course;

(r)       (i) adopt, enter into, terminate or amend (A) any Benefit Plan, except as required by Law or as specifically contemplated by this Agreement, (B) any other agreement, plan or policy involving the Company or any of its Subsidiaries or the Blocker and one or more of their respective current or former employees or members of the board of directors that is not terminable at will, or (C) any retention or bonus agreement involving the Company or any of its Subsidiaries or the Blocker and one or more of their respective current or former employees or members of the board of directors, (ii) take any action to accelerate the vesting or payment of any compensation or benefit under any Benefit Plan, or (iii) loan or advance any money or other property (other than reimbursement of reimbursable expenses or any advances of such expenses pursuant to the Company's or any of its Subsidiaries' credit cards or otherwise in the Ordinary Course) to any current or former member of the board of directors or officer of the Company or any of its Subsidiaries or the Blocker;

57

(s)       fail to use commercially reasonable efforts to maintain current insurance coverages, or fail to enforce the rights of the Company or any of its Subsidiaries under any such existing coverage;

(t)       amend or modify in any respect or terminate any Material Contract other than in accordance with its terms, or, enter into any Contract that if entered into on or prior to the date hereof would constitute a Material Contract;

(u)       enter into any collective bargaining agreement or announce, implement or effect any reduction in labor force or lay-off;

(v)       sell, assign, transfer or exclusively license any material Company Intellectual Property, or permit the lapse of any right, title or interest to any material Company Intellectual Property, including any Registered Intellectual Property, or terminate, cancel or amend any Material Company Intellectual Property Contract other than in the Ordinary Course;

(w)       amend, modify or terminate, or allow to lapse, any material Permit; or

(x)       authorize or enter into any Contract to do any of the foregoing.

Notwithstanding the foregoing or anything else to the contrary, nothing contained in this Agreement shall give Parent or Merger Sub, directly or indirectly, the right to control or direct the operations of the Company or any of its Subsidiaries or the Blocker prior to the Closing, and the Company or the Blocker (in each case, in its sole discretion) may at any time or from time to time prior to the Closing use any cash on hand for any purpose (including making distributions or dividends, redeeming Units as permitted under the Company's Organizational Documents or repaying any Indebtedness). Prior to the Closing, the Company and each of its Subsidiaries and the Blocker shall exercise, consistent with the terms and conditions of this Agreement, complete unilateral control and supervision over its business operations.

6.3.      Access to Information. From the date of this Agreement to the Closing, the Company and each of its Subsidiaries shall: (a) provide to Parent, Merger Sub and their respective Representatives reasonable access during normal business hours in such a manner as not to interfere unreasonably with the operation of any business conducted by the Company and its Subsidiaries, upon reasonable prior written notice to the Company or its Subsidiaries, as applicable, to the officers, employees, properties, offices and other facilities of the Company and its Subsidiaries and to the books and records thereof; (b) provide to Parent, Merger Sub and their respective Representatives non-exclusive access credentials to online portals and databases for all Alcohol Beverage Authorities, and all third party compliance companies, with which the Company has, or has had, and account, solely for the purpose of providing required information regarding Parent or Merger Sub in connection with the Transactions, and in no event, shall Parent, Merger Sub or their respective Representatives make any representations regarding the Company or its Subsidiaries in such portals and databases; and (c) furnish promptly such information concerning the business, properties, Contracts, assets and Liabilities of the Company and its Subsidiaries as Parent, Merger Sub or their Representatives may reasonably request; provided, however, that the Company and its Subsidiaries shall not be required to afford such access or furnish such information to the extent that the Company and its Subsidiaries believe in good faith that doing so would: (i) result in the loss of attorney-client privilege; (ii) violate any obligations of the Company or any of its Subsidiaries with respect to confidentiality to any third party or otherwise breach, contravene or violate any then effective Contract to which the Company or any of its Subsidiaries is party; or (iii) breach, contravene or violate any applicable Law in any material respect (provided that the Company and its Subsidiaries shall use commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in the events set out in clauses (i) through (iii)). Parent and Merger Sub shall, and shall cause each of their respective Representatives, to hold all information provided or furnished pursuant to this Section 6.3 confidential in accordance with the terms of the Confidentiality Agreement.

58

6.4.    Further Assurances.

(a)          Subject to the terms and conditions of this Agreement, each party shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby and to cause the conditions set forth in Article VII to be satisfied as promptly as practicable, including using their respective reasonable best efforts to (i) promptly obtain all actions or non-actions, consents, Permits, waivers, approvals, authorizations and Orders from Governmental Authorities necessary or advisable in connection with the consummation of the transactions contemplated hereby, (ii) as promptly as practicable, make and not withdraw (without Parent's and the Company's consent) all registrations and filings with any Governmental Authority necessary or advisable in connection with the consummation of the transactions contemplated by this Agreement, and promptly make any further filings pursuant thereto that may be necessary or advisable, (iii) defend all lawsuits or other legal, regulatory, administrative or other proceedings to which it or any of its Affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect to each such lawsuit or other proceeding, (iv) seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the parties to consummate the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect thereto, (v) seek to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby and (vi) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby; provided, that the efforts standard of this Section 6.4(a) shall not replace any efforts standard expressly provided for in any other provision of this Agreement.

(b)          Each of the parties hereto shall give prompt notice to the other parties, of (a) any notice or other communication received by such party from any Governmental Authority in connection with this Agreement, and the transactions contemplated hereby or from any Person alleging that the consent of such Person is or may be required in connection with this Agreement, and the other transactions contemplated hereby, and (b) any Actions, suits, claims, investigations or proceedings commenced or, to such party's knowledge, threatened against, relating to or involving or otherwise affecting such party or which relate to this Agreement, and the transactions contemplated hereby.

<div align="center">59</div>

6.5.     <u>Directors & Officers Indemnification and Insurance</u>.

(a)     Contemporaneously with the Closing, the Company shall purchase, with all of the cost thereof being a Transaction Expense, a "tail" policy of directors' and officers' liability insurance coverage, providing coverage for a period of six (6) years following the Closing Date, with respect to any Person who is on the date hereof or at the Closing an officer or manager of the Company or any of its Subsidiaries in connection with such Person's service as a manager or officer of the Company or any of its Subsidiaries at any time prior to the Closing. For a period of six (6) years after the Closing, Parent will not, and will not permit the Surviving Entity or its Subsidiaries, to take any action to amend (in a manner adverse to the beneficiary thereof) or terminate such policy and shall take all commercially reasonable steps, to cause the Surviving Entity and its Subsidiaries to maintain in effect such policy and shall not amend, repeal or modify (in a manner adverse to the beneficiary thereof) any provision in each of the Company's and its Subsidiaries' Organizational Documents relating to the exculpation or indemnification of any pre-Closing officers or managers. The provisions of this <u>Section 6.5</u> are intended to be for the benefit of, and will be enforceable by, each indemnified party, his or her heirs and his or her representatives and are in addition to, and not in substitution for, any other right to indemnification or contribution that any such Person may have by contract or otherwise.

(b)     In the event that any Person incurs Losses that are or would have been subject to coverage under an officers' and directors' liability insurance policy pursuant to <u>Sections 6.5(a)</u> and such policy terminated (but not due to a temporal expiration) or affords lesser coverage than is required by <u>Sections 6.5 (a)</u>, in each case, as a result of the Parent's failure to fulfill its obligations pursuant to <u>Section 6.5(a)</u>, the Parent and the Surviving Entity, jointly and severally, shall pay to such Persons such amounts and provide any other coverage or benefits as such Persons would have received pursuant to such policy.

(c)     The provisions of this <u>Section 6.5</u> are intended to be for the benefit of, and will be enforceable by, each such Person entitled to indemnification, his or her heirs and his or her representatives.

6.6.     <u>Employee Benefit Matters</u>.

(a)     During the one-year period following the Closing Date (or such shorter period of employment, as the case may be), Parent shall, and shall cause the Surviving Entity or the applicable Subsidiary to, provide each employee of the Surviving Entity or any of its Subsidiaries who is employed at the Closing Date and who remains employed with the Surviving Entity or any of its Subsidiaries immediately following the Closing (each, an "<u>Affected Employee</u>") with (i) a base salary or hourly wage rate that is at least equal to the base salary or hourly wage rate provided to the Affected Employee immediately prior to the Closing Date, (ii) bonus opportunities (including annual and long-term incentive opportunities) that, with respect to each Affected Employee, are comparable in the aggregate to those opportunities in effect for such Affected Employee immediately prior to the Closing Date, and (iii) retirement, health and welfare benefits that, with respect to each Affected Employee, are comparable in the aggregate to such benefits provided to such Affected Employee immediately prior to the Closing Date.

60

(b) Parent shall, or shall cause the Surviving Entity or the applicable Subsidiary to, provide each Affected Employee who incurs a termination of employment during the one-year period following the Closing Date with severance benefits that are no less favorable than the severance benefits to which such Affected Employee would have been entitled with respect to such termination under the severance policies, practices and guidelines of the Company or any of its Subsidiaries as in effect immediately prior to the Closing Date or, if greater, the severance benefits provided to similarly situated employees of Parent. In addition, during the one-year period following the Closing Date, Parent shall, or shall cause the Surviving Entity or the applicable Subsidiary to, honor all employment and severance agreements that are in effect with an Affected Employee immediately prior to the Closing Date.

(c) Parent shall, or shall cause the Surviving Entity or the applicable Subsidiary to, give each Affected Employee credit (for purposes of eligibility to participate and vesting, but not benefit accrual and excluding defined benefit pension, equity, and retiree benefits) for service with the Company or any of its Subsidiaries prior to the Closing Date (to the same extent such service credit was granted under the applicable Benefit Plans) under the comparable employee benefit plans, programs and policies of Parent, the Surviving Entity and any of their Subsidiaries in which such Affected Employees became participants, as if such service had been performed with Parent, except to the extent that such service crediting would result in duplication of benefits for the same period of service.

(d) Parent shall, or shall cause the Surviving Entity or the applicable Subsidiary to, use commercially reasonable efforts to (i) waive any preexisting condition limitations otherwise applicable to Affected Employees and their eligible dependents under any plan maintained by Parent or any of its Affiliates (including the Surviving Entity) that provides health benefits in which Affected Employees may be eligible to participate following the Closing, other than any limitations that were in effect with respect to such Affected Employees as of the Closing Date under the analogous Benefit Plan; (ii) honor any deductible, co-payment and out-of-pocket maximums incurred by a Affected Employee and his or her eligible dependents under the health Benefit Plans in which such Affected Employee participated immediately prior to the Closing Date during the portion of the plan year prior to the Closing Date in satisfying any deductibles, co-payments or out-of-pocket maximums under health plans maintained by Parent or any of its Affiliates (including the Company) in which such Affected Employee is eligible to participate after the Closing Date in the same plan year in which such deductibles, co-payments or out-of-pocket maximums were incurred; and (iii) waive any waiting period limitation or evidence of insurability requirement that would otherwise be applicable to an Affected Employee and his or her eligible dependents on or after the Closing Date, in each case to the extent such Affected Employee or eligible dependent had satisfied any similar limitation or requirement under an analogous Benefit Plan prior to the Closing Date.

(e) All provisions contained in this Agreement with respect to employee benefit plans or employee compensation are included for the sole benefit of the respective parties hereto and shall not create any right in any other Person (including Affected Employees, participants or beneficiaries in any Benefit Plan, retirees, or dependents or beneficiaries of employees or retirees).

61

(f)        Nothing contained in this <u>Section 6.6</u>, express or implied (i) shall be construed to establish, amend, or modify, or limit the ability of Parent, the Surviving Entity or any of their Affiliates to amend modify or terminate, any benefit or compensation plan, program, agreement, contract or arrangement at any time assumed, established, sponsored or maintained by any of them, subject to the terms thereof, or (ii) shall limit the ability of Parent, the Surviving Entity or their Affiliates from terminating the employment of any employee (including any Affected Employee) at any time and for any or no reason subject to the terms of any existing contracts.

6.7.        <u>Intercompany Accounts</u>. The Company shall cause all Intercompany Accounts relating to the business of the Company and any of its Subsidiaries to be settled or terminated prior to Closing, except otherwise related to the Lease Agreement.

6.8.        <u>Tax Matters</u>.

(a)        <u>FIRPTA Certificate</u>. Prior to the Closing, the Securityholders' Representative shall deliver to Parent and Merger Sub a properly completed and executed IRS Form W-9 from each Unitholder certifying that such Unitholder is not a foreign person for purposes of Code Section 1445 and 1446(f).

(b)        <u>Transfer Taxes</u>. Parent shall, and with Securityholders' Representative's good faith cooperation and assistance, prepare, execute and file, or cause to be prepared, executed and filed, all Tax Returns, questionnaires, applications or other documents regarding any real property transfer, sales, use, transfer, value added, stock transfer and stamp Taxes, any transfer, recording, registration and other fees and any similar Taxes which, in each case, become payable in connection with any transaction contemplated by this Agreement, the ancillary agreements and the other transactions contemplated hereby and thereby (together, with any related interests, penalties or additions to Tax, the "<u>Transfer Taxes</u>").

(c)        <u>Straddle Periods</u>. For purposes of this Agreement, in the case of any Taxes that are payable for a Straddle Period, the portion of such Tax which relates to the portion of such Straddle Period ending on the Closing Date shall (A) in the case of any Taxes other than Taxes based upon or related to income, receipts, sales, use, or payroll, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction (1) the numerator of which is the number of calendar days in the Straddle Period ending on the Closing Date and (2) the denominator of which is the number of calendar days in the entire Straddle Period and (B) in the case of any Tax based upon or related to income, receipts, sales, or payroll, be deemed equal to the amount which would be payable if the relevant Straddle Period ended as of the close of the Closing Date. For purposes of this <u>Section 6.8(c)</u>, to the maximum extent permitted by Law, (A) any item determined on an annual or periodic basis (including amortization and depreciation deductions) for income Tax purposes shall be allocated to the portion of the Straddle Period ending on the Closing Date based on the relative number of days in such portion of the Straddle Period as compared to the number of days in the entire Straddle Period; (B) any Tax or item of income, gain, loss, deduction or credit resulting from a Parent Closing Date Transaction shall be allocated to the portion of the Straddle Period beginning on the day after the Closing Date; and (C) any item of deduction attributable to any Transaction Expenses and other items incurred by the Unitholders shall be allocated to the portion of the Straddle Period ending on the Closing Date. Notwithstanding the foregoing or anything to the contrary in this Agreement, the parties agree that for purposes of determining income, profit, loss, deduction, or any other items allocable to any Tax period of the Company, such items will be determined using the interim closing of the books method under Code Section 706 and Treasury Regulations Section 1.706-4 (or any similar or corresponding provision of state or local law), using the "calendar day" convention, effective as of the end of the Closing Date.

62

(d)     <u>Tax Returns</u>. Parent shall furnish to Securityholders' Representative's as soon as reasonably practicable after the Closing Date, and in any event within one-hundred twenty (120) days after the Closing Date, all information concerning the Company and its Subsidiaries required for the preparation of U.S. federal, state, local or foreign income Tax Returns with respect to any taxable periods (or portions thereof) through the Closing Date. Parent shall prepare and file all Tax Returns of the Company and its Subsidiaries that are due after the Closing Date. With respect to any such Tax Return which is an IRS Form 1065 (or any similar state or local income Tax Return) or any other Tax Return the results or operations of which reflected on such Tax Return are also reflected on the Tax Returns of the Unitholders (or their owners) or Blocker that relates to a Pre-Closing Period or Straddle Period (a "<u>Flow-Through Return</u>"), such Tax Return shall be prepared on a basis consistent with existing procedures and practices and accounting methods. At least thirty (30) days prior to the due date of a Flow-Through Return, Parent shall provide a draft of such Flow-Through Return to Securityholders' Representative for Securityholders' Representative's review and comment. Parent shall cause the Company or applicable Subsidiary of the Company to incorporate any reasonable comments made by the Securityholders' Representative in the Flow-Through Return actually filed. Parent shall not, and shall not allow the Company or any Subsidiary of the Company to, amend any Flow-Through Return or otherwise initiate (or agree to) any other Securityholders' Representative Tax Matter without the prior written consent of the Securityholders' Representative.

(e)     <u>Contest Provisions</u>. Securityholders' Representative shall have the right to control the conduct and resolution of any audit or other proceeding in respect of any Taxes or Tax Returns of the Company and any of its Subsidiaries (a "<u>Tax Contest</u>"), related to any Flow-Through Return, provided that Securityholders' Representative shall in good faith allow Parent to make comments to Securityholders' Representative regarding the conduct of or positions taken in such Tax Contest and shall not settle any such Tax Contest without the prior written consent of Parent, which consent will not be unreasonably withheld, conditioned or delayed. Parent shall control all other Tax Contests of the Company and any of its Subsidiaries, provided that Parent shall in good faith allow Securityholders' Representative to make comments to Parent regarding the conduct of or positions taken in such Tax Contest and shall not settle any such Tax Contest without the prior written consent of Securityholders' Representative, which consent will not be unreasonably withheld, conditioned or delayed. Parent shall not (and shall cause its Affiliates not to) take any Parent Closing Date Transaction (including, for the avoidance of doubt, any action to liquidate Blocker on the Closing Date after the Closing). Parent shall not, and shall not allow the Company or any of its Subsidiaries, to make an election under Code Section 6226 with respect to a Pre-Closing Tax Period or Straddle Period without the prior written consent of the Securityholders' Representative.

<div align="center">63</div>

     (f)     <u>Cooperation</u>.

     (i)     From and after the Closing, Securityholders' Representative, on the one hand, and Parent, the Company and each of their Affiliates, on the other hand, shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of any Tax Return and any Tax Contest audit, litigation or other proceeding with respect to Taxes attributable to the Company and any of its Subsidiaries for periods (or portions thereof) through the Closing Date. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Tax Return, Tax Contest audit, litigation or other proceeding or any tax planning and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

     (ii)     Parent shall (A) retain all books and records with respect to Tax matters pertinent to the Company and any of its Subsidiaries and their respective businesses relating to any periods (or portions of any Straddle Period) ending on or before the Closing Date until the expiration of the statute of limitations (including any extensions thereof) applicable to such taxable periods, and abide (and cause the Company and any of its Subsidiaries to abide) by all record retention agreements entered into with any Governmental Authority, and (B) provide Securityholders' Representative with reasonable written notice prior to transferring, destroying or discarding any such books and records and, if Securityholders' Representative so requests, Parent will allow Securityholders' Representative to take possession of such books and records.

     (g)     Parent shall not take (or cause any of its Affiliates to take (including, following the Closing, the Blocker or the Company) any action on the Closing Date after the Closing outside of the ordinary course of business that would increase any Taxes of the Unitholders or the Blocker (including, for the avoidance of doubt, liquidating the Blocker or distributing any interests in the Company out of the Blocker).

<div align="center">64</div>

6.9.    Financing Covenants. Blocker, the Company and its Subsidiaries agree that from the date hereof until the earlier of the Closing or the valid termination of this Agreement, to the extent that Parent and Merger Sub desires to seek financing in connection with the transactions contemplated hereby, Blocker and the Company shall provide, and shall cause its Subsidiaries to provide, and shall cause their respective employees, agents and representatives to provide, reasonable cooperation to Parent and Merger Sub in connection with obtaining any such financing ("Financing"). Parent shall, promptly upon request by Blocker or the Company, reimburse the Company and its Subsidiaries and Blocker for all out-of-pocket costs incurred by such Person or their respective Representatives in connection with such cooperation and shall indemnify and hold harmless the Company and its Subsidiaries and their respective Representatives for, from and against any and all Losses actually suffered or incurred by them in connection therewith. Notwithstanding anything to the contrary contained in this Section 6.9, (i) Blocker, the Company and its Subsidiaries shall not be required, under the provisions of this Section 6.9 or otherwise in connection with the Financing (x) to pay any commitment or other similar fee prior to the Closing that is not advanced by the Parent or Merger Sub or (y) to incur any expense unless such expense is reimbursed by the Parent on the earlier of the Closing or termination of this Agreement in accordance with Article VIII, and (ii) (w) neither the Blocker, the Company nor any of their respective Subsidiaries shall be required to incur any Liability in connection with the Financing prior to the Closing, (x) the pre-Closing board of managers of the Company and Blocker and the directors, managers or members of the Subsidiaries of the Company shall not be required to adopt resolutions approving the agreements, documents and instruments pursuant to which the Financing is obtained, (y) neither the Blocker, the Company nor any of their respective Subsidiaries shall be required to execute prior to the Closing any definitive financing documents, including any credit or other agreements, pledge or security documents, or other certificates, legal opinions or documents in connection with the Financing, and (z) neither the Blocker, the Company nor any of their respective Subsidiaries shall be required to take any corporate actions prior to the Closing to permit the consummation of the Financing. Each of Parent and Merger Sub acknowledges and agrees that it is not a condition to the Closing under this Agreement for Parent and/or Merger Sub to consummate any Financing or to receive any proceeds thereof. Notwithstanding anything to the contrary contained in this Agreement, the Company and Blocker shall be deemed to have complied with their obligations under this Section 6.9 unless the Financing has not been obtained by Parent or Merger Sub primarily as a result of the Company's or Blocker's willful and material breach of their respective obligations under this Section 6.9.

6.10.    Blocker Actions. The Blocker Partners will (a) cause Blocker to perform its obligations under this Agreement and to consummate the Blocker Sale on the terms and conditions set forth in this Agreement and (b) ensure that Blocker prior to the Closing shall not conduct any business, incur or guarantee any indebtedness or any other material Liabilities or make any investments, in each case other than those activities incident to its continued existence and the Company Ownership or its obligations under this Agreement or the Blocker Sale (including effecting the Pre-Closing Blocker Reorganization). The Blocker Partners shall not sell, transfer, convey or assign the Blocker Interests to any other Person prior to the Blocker Closing. Notwithstanding anything to the contrary contained herein, during the period from the date of this Agreement until the Closing, Blocker shall be permitted to make cash distributions or dividends and take any actions contemplated by the Pre-Closing Blocker Reorganization.

6.11.    Securityholders' Representative.

(a)    Prior to entry into this Agreement, the Company and the Unitholders (other than the Blocker Members) shall appoint Chilly Water, LLC to act as the representative for the benefit of each Unitholder (other than the Blocker Members) as the exclusive agent and attorney-in-fact to act on behalf of each Unitholder (other than the Blocker Members), in connection with the transactions contemplated hereby.

65

(b)        The Securityholders' Representative shall have the authority to act for and on behalf of the Unitholders (other than the Blocker Members), including, without limitation, (i) to give and receive notices and communications, (ii) to act on behalf of such Persons with respect to the Adjustment Escrow Account, the PPP Escrow Account, the Earn-Out Payments and any other matters arising under this Agreement or the other Transaction documents, (iii) to authorize delivery to Parent and Merger Sub of any funds and property in its possession or in the possession of the Adjustment Escrow Agent or PPP Escrow Agent in satisfaction of claims by Parent and Merger Sub, (iv) to object to such deliveries, (v) to agree to, negotiate, enter into settlements and compromises of, and commence, prosecute, participate in, settle, dismiss or otherwise terminate, as applicable, lawsuits and claims, mediation and arbitration proceedings, and to comply with orders of courts and awards of courts, mediators and arbitrators with respect to such suits, claims or proceedings, (vi) subject to the restrictions in Section 6.11(f), to use the Securityholders' Representative Expense Amount to satisfy costs, expenses and/or Liabilities of the Securityholders' Representative or the Unitholders (other than the Blocker Members) in connection with matters related to this Agreement and/or the Transaction documents and satisfy a portion of the Downward Adjustment Amount in accordance with Section 2.13(a)(i), with any balance of the Securityholders' Representative Expense Amount not used for such purposes to be disbursed and paid to the Unitholders (other than the Blocker Members) in accordance with the Payment Schedule at such time as the Securityholders' Representative determines in its sole discretion that no additional such costs, expenses and/or Liabilities shall become due and payable, (vii) appoint the Paying Agent and enter into the Paying Agent Agreement and (viii) to take all actions necessary or appropriate in the judgment of the Securityholders' Representative for the accomplishment of the foregoing. The Securityholders' Representative shall for all purposes be deemed the sole authorized agent of the Unitholders (other than the Blocker Members) from and after Closing until such time as the agency is terminated. Any successor in the position of Securityholders' Representative may be filled by Securityholders' Representative, and any such replacement shall acknowledge and agree to be treated the "Securityholders' Representative" for purposes of this Agreement and any other Transaction Document. Notices or communications to or from the Securityholders' Representative shall constitute notice to or from each of the Unitholder (other than the Blocker Members) during the term of the agency. The Securityholders' Representative undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and no other covenants or obligations shall be implied under this Agreement against the Securityholders' Representative; *provided*, *however*, that the foregoing shall not act as a limitation on the powers of the Securityholders' Representative determined by it to be reasonably necessary to carry out the purposes of its obligations.

(c)        The Securityholders' Representative shall have reasonable access to information about the Company, Blocker, Parent, Merger Sub and the Surviving Entity necessary or appropriate for it to fulfill its obligations under this Agreement and the reasonable assistance of the Surviving Entity's, Blocker's and Parent's officers and employees for purposes of performing its duties and exercising its rights hereunder, provided that the Securityholders' Representative shall treat confidentially and not disclose any nonpublic information from or about the Surviving Entity, Blocker or Parent to anyone (except on a need to know basis to agents or representatives of Securityholders' Representative who first agree to treat such information confidentially) other than in connection with the enforcement of any rights hereunder or any other proceeding brought in connection herewith.

66

(d)         A decision, act, consent or instruction of the Securityholders' Representative shall constitute a decision, act, consent or instruction of all of the Unitholders (other than the Blocker Members) and shall be final, binding and conclusive upon each such Person. Parent may rely upon any such decision, act, consent or instruction of the Securityholders' Representative as being the decision, act, consent or instruction of every such Unitholder (other than the Blocker Members) and shall have no Liability to any such Person for any actions taken in reliance upon any such decision, act, consent or instruction of the Securityholders' Representative.

(e)         The Securityholders' Representative will not be liable for any act taken or omitted to be taken as Securityholders' Representative while acting in good faith, and any act taken or omitted to be taken pursuant to the reasonable advice of counsel will be conclusive evidence of such good faith. The Securityholders' Representative shall be entitled to rely, and shall be fully protected in relying, upon any statements furnished to it by the Surviving Entity, Parent, Merger Sub and any third party or any other evidence deemed by the Securityholders' Representative to be reliable, and the Securityholders' Representative shall be entitled to act on the advice of counsel selected by it. The Securityholders' Representative shall be fully justified in failing or refusing to take any action under this Agreement or any related document or agreement if it shall have received such advice or concurrence as it deems appropriate with respect to such inaction, or if it shall not have been expressly indemnified to its satisfaction against any and all Liability and expense that the Securityholders' Representative may incur by reason of taking or continuing to take any such action.

(f)         Notwithstanding anything contained herein to the contrary, the Securityholders' Representative covenants and agrees that, prior to the payment of any amounts required to be paid pursuant to <u>Section 2.13(a)(i)</u> from the Securityholders' Representative Expense Amount, the Securityholders' Representative shall not use any portion of the Securityholders' Representative Expense Amount to pay costs, fees or expenses or otherwise distribute any portion of the Securityholders' Representative Expense Amount to any Person (other than the Unitholders (other than the Blocker Members)) other than those costs, fees and expenses reasonably incurred in connection with the Securityholders' Representative discharging its duties hereunder.

(g)         Notwithstanding anything contained herein to the contrary, the Securityholders' Representative shall not have the authority to act for and on behalf of the Blocker Members, and all decisions, acts, consents or instructions required by any of the Blocker Members or Blocker Partners herein shall be made by the Blocker Seller.

6.12.    <u>Post-Closing Registration</u>.

(a)         <u>Registration</u>. Parent covenants with respect to the Registrable Shares (as hereinafter defined) for the benefit of the Unitholders (other than the Blocker Members):

67

(i)          Parent will use commercially reasonable efforts, to within ninety (90) days following the Closing, prepare and file with the SEC a shelf registration statement on Form F-3 or Form F-10 (or, if Form F-3 or Form F-10 is not then available to Parent, on such form of registration statement as is then available to effect a registration of the Registrable Shares for resale) (the "<u>Registration Statement</u>"), that would permit the resale of all of the Parent Common Shares constituting the Stock Consideration (as may be adjusted by <u>Section 6.12(f)</u>, the "<u>Registrable Shares</u>") under the Securities Act; it being understood that if such Registration Statement is a shelf registration statement, the prospectus contained therein need not name the Unitholders nor otherwise identify the Registrable Shares if such prospectus is supplemented with such information by the filing of a prospectus supplement thereto (a "<u>Prospectus Supplement</u>") following the effectiveness of such Registration Statement, and if the Parent fails to file the Registration Statement within such ninety (90) day period, Parent shall continue to use commercially reasonable efforts to do so until such Registration Statement has been filed. Parent shall, subject to the Unitholders' provision of the required information for such filing(s), use commercially reasonable efforts to, within ninety (90) days following the Closing, file a Prospectus Supplement to the Registration Statement, with the SEC to permit the sale of the Registrable Shares pursuant to the Registration Statement; provided, that if the Parent fails to file a Prospectus Supplement to the Registration Statement within such ninety (90) day period, Parent shall continue to use commercially reasonable efforts to do so until such Prospectus Statement has been filed.

(ii)          Parent shall use commercially reasonable efforts to cause the Registration Statement to be declared and remain effective and available for resale of the Registrable Shares and to file with the SEC such amendments and supplements as may be necessary to keep the prospectus included in the Registration Statement (including the Prospectus Supplement) (the "<u>Prospectus</u>") current and in compliance in all material respects, including filing any post-effective amendments or prospectus supplements thereto, with the Securities Act and the rules and regulations of the SEC promulgated thereunder until the sooner to occur of the following events (i) the expiration of the thirty six month period following the date the Registration Statement is declared effective, or (ii) the sale of all the Registrable Shares by the Unitholders; *provided*, the Unitholders (or their designees), upon receipt from Parent of notice that an event has occurred which requires a post-effective amendment to the Registration Statement, a supplement to the Prospectus or a supplemental filing with the SEC to be incorporated by reference therein, shall promptly discontinue the sales of the Registrable Shares until the Unitholders (or their designees) receive copies of a supplemental or amended prospectus from Parent or notice from Parent that the existing prospectus has become available for such sale, which Parent shall provide as soon as practicable after such notice of discontinuance.

(b)          <u>Expenses</u>. Parent shall pay all expenses associated with effecting the registration of the Registrable Shares pursuant to this <u>Section 6.12</u>, including filing and printing fees, Parent's counsel and accounting fees and expenses, and listing fees, but excluding discounts, commissions, fees of underwriters, selling brokers, dealer managers or similar securities industry professionals with respect to the Registrable Shares being sold and excluding the fees and disbursements of counsel to any Unitholders (other than the Blocker Members).

(c)          <u>Covenants Regarding Registrable Shares</u>.

68

(i)            Securityholders' Representative covenants and agrees (on behalf of the Unitholders) with Parent that it will, and will cause the Unitholders (other than the Blocker Members) to, cooperate with Parent in connection with the preparation of the Prospectus Supplement prior to and after the Closing Date for so long as Parent is obligated to keep the Registration Statement effective, and will provide to Parent, in writing, for use in the Prospectus Supplement, all information reasonably requested by Parent regarding Unitholder (or its designee) and its plan of distribution and such other information as may be reasonably necessary to enable Parent to prepare the Prospectus Supplement and to maintain the currency and effectiveness thereof. If the Unitholders (other than the Blocker Members) breaches their respective covenants under this Section 6.12(c), Parent may exclude the Registrable Shares held by such Unitholder (or its designee) from the Registration Statement until such time as the breach is cured.

(ii)           Parent covenants and agrees that it shall continue, for so long as Parent is obligated to keep the Registration Statement effective, to file or furnish with the SEC in a timely manner all Exchange Act filings that Parent is required to file or furnish under the Exchange Act.

(d)           Indemnification. In connection with any registration of the Registrable Shares pursuant to the provisions of this Section 6.12, Parent shall indemnify and hold harmless the Unitholders (other than the Blocker Members) to the extent that companies generally indemnify and hold harmless selling shareholders in connection with public offerings under the Securities Act, and the Unitholders (other than the Blocker Members) shall indemnify and hold harmless Parent to the extent that selling shareholders generally indemnify and hold harmless public companies in connection with public offerings under the Securities Act.

(e)           Information by Shareholder. Each Unitholder (or its designee) (other than the Blocker Members) shall promptly furnish to Parent such information regarding Unitholder (or its designee) (other than the Blocker Members) and the plan of distribution for the Registrable Shares proposed by the Unitholder (or its designee) (other than the Blocker Members) as Parent may request in writing and as shall be required in connection with any registration, qualification or compliance referred to herein.

(f)           Downside Protection.

(i)            Until the date on which the Registerable Shares are registered for resale pursuant to this Section 6.12 (the "Trigger Date"), in the event that the Registerable Value is less than the Closing Stock Value, then Parent shall issue to the Unitholders (other than the Blocker Members or with respect to the Redeemed Units), and for the Parent Common Shares allocable to SWB Management, LLC, directly to the SWB Members, in accordance with the Payment Schedule, and include in the Registrable Shares, an additional number of Parent Common Shares, equal to the quotient of (X) the difference of (1) the Closing Stock Value, *minus* (2) Registerable Value, divided by (Y) the Pre-Registration Price; provided, that in no event shall the aggregate value of the Stock Consideration after giving effect to the additional number of Parent Common Shares issuable under this Section 6.12(f)(i) be greater than the Closing Stock Value (based on the Pre-Registration Price), and in the event that in calculating the Pre-Registration Price in accordance with Section 6.12(f)(ii) issuing the additional Parent Common Shared hereunder would result in the Stock Consideration being greater than the Closing Stock Value, then the Parent shall only be obligated to issue the number of Parent Common Shares pursuant to this Section 6.12(f)(i) that will result in the Unitholders (other than the Blocker Members or with respect to the Redeemed Units) holding Stock Consideration in an amount equal to the Closing Stock Value (based on the Pre-Registration Price).

69

(ii)        For purposes of this Agreement, (A) "<u>Registerable Value</u>" means the aggregate value of the number of Parent Common Shares included in the Stock Consideration (prior to giving effect to any adjustment to the number of Parent Common Shares in accordance with this <u>Section 6.12(f)</u>), measured as the product of (i) number of Parent Common Shares in the Stock Consideration (prior to giving effect to any adjustment to the number of Parent Common Shares in accordance with this <u>Section 6.12(f)</u>), *multiplied* by (ii) the Pre-Registration Price, and (B) "<u>Pre-Registration Price</u>" means the lesser of (i) the volume-weighted average trading price of Parent Common Shares on the NASDAQ for the thirty (30) day period immediately ending on the close of trading the day prior to the Trigger Date, and (ii) the closing price of Parent Common Shares on the NASDAQ on the day prior to the Trigger Date.

6.13.    <u>Regulatory</u>.

(a)        From and after the date hereof, the Company shall (i) in good faith use commercially reasonable efforts to the extent reasonably requested by the Parent to keep the Permits valid and effective and to obtain any updates, transfers, renewals and/or acquisitions of Permits, waivers, approvals, clearances, authorizations, filings or consents from or with any Alcohol Beverage Authorities that may be necessary, proper or advisable, as determined in Parent's reasonable discretion, in connection with the Transactions contemplated by this Agreement and (ii) provide such other information and communications to Alcohol Beverage Authorities as any Alcohol Beverage Authorities may reasonably request.

(b)        Without limiting the generality of <u>Section 6.14(b)</u>, the Company shall promptly, following the date hereof, reasonably cooperate in making such filings as are required to obtain any necessary, proper or advisable, as determined in Parent's reasonable discretion, Permit, waiver, approval, clearance, authorization, filing or consent issued, granted, given or otherwise made available by or under any Alcohol Beverage Authorities to consummate the Transactions contemplated by this Agreement and to operate the Business after Closing including, without limitation, all federal permits and/or brewer's notices required by the TTB, together with any state licenses and local permits relating to the manufacturing, distribution, sale and marketing of Company Products.

(c)        Contemporaneous with Closing, the Company shall provide written notice to all Distributors identified on <u>Schedule 3.20(c)</u> of the Disclosure Letter regarding the occurrence of the Transactions contemplated by this Agreement.

70

(d)          The Company shall promptly make available to Parent true and correct copies of each of depletion report and sales report that the Company or its Subsidiaries receives from each Material Distributor between the date hereof and the Closing Date.

6.14.    Release.

(a)          Effective upon the Closing, each Blocker Partner hereby irrevocably and unconditionally releases and forever discharges Blocker, the Company, and each of their respective past, present, and future Subsidiaries, successors and assigns and any of their respective officers, directors, managers, equityholders, employees, agents, counsel, consultants, advisors or other representative authorized to represent or act on behalf of such Person (the "Released Parties"), from any and all claims, charges, complaints, causes of action, damages, Contracts, and Losses of any kind or nature whatsoever ("Released Claims"), whether known or unknown, absolute or contingent, matured or unmatured and whether at law or in equity, arising from conduct occurring at or prior to the Closing relating to or arising out of such Blocker Partner's ownership of Blocker Interests, and Blocker's ownership of the Units. Notwithstanding the foregoing, nothing contained in this Section 6.14(a) shall operate to release any obligations of the Released Parties with respect to, or obligate the Blocker Partners to refrain from making, claims or commencing any proceedings arising under, or in connection with, this Agreement.

(b)          Effective upon the Closing, each of Blocker and the Company hereby irrevocably and unconditionally releases and forever discharges each Blocker Partner and each of its past, present, and future Affiliates, successors and assigns and any of their respective officers, directors, managers, equityholders, employees, agents, counsel, consultants, advisors or other representative authorized to represent or act on behalf of such Person (the "Blocker Seller Released Parties"), from any and all Released Claims, whether known or unknown, absolute or contingent, matured or unmatured and whether at law or in equity, arising from conduct occurring at or prior to the Closing relating to or arising out of the Transactions. Notwithstanding the foregoing, nothing contained in this Section 6.14(b) shall operate to release any obligations of the Blocker Seller Released Parties with respect to, or obligate Blocker or the Company to refrain from making, claims or commencing any proceedings arising under, or in connection with, this Agreement.

6.15.    PPP Loan. After the Closing, Parent shall, cause the Surviving Entity to, (a) use its reasonable best efforts to comply with Sections 1102 and 1106 of the CARES Act to obtain forgiveness of the PPP Loan to the extent provided thereunder, (b) unless filed by the Company prior to the Closing, to file an application for forgiveness of the PPP Loan and take all other actions reasonably necessary to obtain forgiveness thereof; (c) permit the Securityholders' Representative to participate in Parent's and the Company's efforts to cause the PPP Loan to be forgiven (and, in the furtherance of this clause (c), permit the Securityholders' Representative to contact, or engage in discussions with, the lender with respect to such loan, the Small Business Administration or other third parties for the purpose of facilitating or encouraging such forgiveness); (d) respond to Securityholders' Representative's questions and other inquiries with respect to the status of such efforts (including by providing to Securityholders' Representative all documentation reasonably related to such efforts); and (e) otherwise update Securityholders' Representative as to the status of such efforts.

71

6.16.    <u>R&W Policy</u>. Parent shall not amend, modify, terminate or waive any provision set forth in the R&W Policy in a manner adverse to the Unitholders or the Blocker Partners, including any amendment, modification, termination or waiver resulting in the elimination of a full waiver of subrogation (other than for Fraud), without the prior written consent of the Securityholders' Representative and Blocker Seller. Parent and Merger Sub agree that the provisions in this Agreement related to the R&W Policy and the limits imposed on Parent's, Merger Sub's and the Surviving Entity's rights and remedies with respect to the Transactions and this Agreement were specifically bargained for between sophisticated parties and were specifically taken into account in the determination of the amounts payable hereunder.

6.17.    <u>Tax Exemption Certificates</u>. The Company shall use commercially reasonable efforts to obtain all sales tax exemption certificates from all states from which the Company or its Subsidiaries generated revenue during the fiscal years ended December 31, 2017 through December 31, 2019. Each of Parent and Merger Sub acknowledges and agrees that it is not a condition to the Closing under this Agreement for the Company to obtain all such sales tax exemption certificates.

6.18.    <u>Blocker Seller Access to Information</u>. The Blocker Seller shall have reasonable access to information about the Company, Blocker, Parent, Merger Sub and the Surviving Entity necessary or appropriate for it to fulfill its obligations and exercise its rights under this Agreement and the reasonable assistance of the Surviving Entity's, Blocker's and Parent's officers and employees for purposes of performing its duties and exercising its rights hereunder, provided that the Blocker Seller shall treat confidentially and not disclose any nonpublic information from or about the Surviving Entity, Blocker or Parent to anyone (except on a need to know basis to agents or representatives of the Blocker Seller who first agree to treat such information confidentially) other than in connection with the enforcement of any rights hereunder or any other proceeding brought in connection herewith.

6.19.    <u>PPP Escrow Agreement</u>. The Parent and Securityholders' Representative shall negotiate in good faith to enter into the PPP Escrow Agreement, which shall provide that upon the CARES Determination Date, the Parent and Securityholders' Representative shall deliver joint written instructions to the PPP Escrow Agent instructing the PPP Escrow Agent to release the PPP Escrow Amount in accordance with <u>Section 2.13(b)</u> herein.

<div align="center">

**ARTICLE VII**
**CONDITIONS TO THE TRANSACTIONS**

</div>

7.1.    <u>Conditions to Obligations of Each Party to Effect the Transactions</u>. The obligations of each party to consummate the Transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

       (a)      The applicable waiting period and any extensions thereof under the HSR Act shall have expired or been terminated.

       (b)      No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof, and no Action instituted by a Governmental Authority and seeking such an Order shall be pending.

<div align="center">72</div>

(c)        The requisite Unitholders shall have executed a written consent in lieu of a meeting approving and adopting the Transactions.

(d)        The TSX shall have approved Parent's issuance of the Stock Consideration.

7.2.    <u>Additional Conditions to Obligations of Parent and Merger Sub</u>. The obligations of Parent and Merger Sub to effect the Transactions contemplated by this Agreement are also subject to the satisfaction or waiver by Parent of each of the following additional conditions:

(a)        <u>Company Representations and Warranties</u>. (i) Each of the representations and warranties of the Company contained in this Agreement (except for the representations and warranties of the Company set forth in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.4(a)(i)</u> and <u>3.29</u>)) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifiers contained within such representations and warranties) as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date), except for any failure of such representations and warranties to be true and correct that, individually or in the aggregate, does not cause a Material Adverse Effect; (ii) the representations and warranties of the Company set forth in <u>Sections 3.1</u>, <u>3.2</u> and <u>3.29</u> shall be true and correct in all material respects as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date); and (iii) the representation and warranties of the Company set forth in <u>Section 3.2(a)</u> and <u>(b)</u> shall be true and correct in all but de minimis respects as of the Closing Date.

(b)        <u>Blocker Representations and Warranties</u>. (i) Each of the representations and warranties of the Blocker contained in this Agreement (except for the representations and warranties of the Blocker set forth in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4</u>, and <u>4.9</u>) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifiers contained within such representations and warranties) as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date), except for any failure of such representations and warranties to be true and correct that, individually or in the aggregate, does not cause a Material Adverse Effect; (ii) the representations and warranties of the Blocker, as applicable, set forth in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4</u>, and <u>4.9</u> shall be true and correct in all material respects as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date); and (iii) the representations and warranties of the Company set forth in <u>Section 4.3</u> shall be true and correct in all but de minimis respects as of the Closing Date.

(c)        <u>Agreements and Covenants</u>. The Company and Blocker shall each have performed or complied in all material respects with all agreements and covenants required of it by this Agreement to be performed or complied with by them on or prior to the Closing.

73

(d)        <u>All Necessary Documents</u>. Parent shall have received those documents to be delivered pursuant to <u>Section 1.4</u> and <u>Section 2.6(b)</u>.

(e)        <u>No Material Adverse Effect</u>. From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

7.3.        <u>Additional Conditions to Obligations of the Company and Blocker Seller</u>. The obligations of the Company and the Blocker Partners to effect the Transactions contemplated by this Agreement are also subject to the satisfaction or waiver by the Company of each of the following additional conditions:

(a)        <u>Representations and Warranties</u>. (i) Each of the representations and warranties of Parent and Merger Sub contained in this Agreement (except for the representations and warranties of Parent and Merger Sub set forth in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.5</u>, <u>5.6</u>, <u>5.7</u>, <u>5.12</u>, <u>5.13</u> and <u>5.14</u>) shall be true and correct in all respects (without regard to materiality qualifiers contained within such representations and warranties) as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date), except for any failure of such representations and warranties to be true and correct that, individually or in the aggregate, does not cause a Parent Material Adverse Effect; and (ii) the representations and warranties of Parent and Merger Sub set forth in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.5</u>, <u>5.6</u>, <u>5.7</u>, <u>5.12</u>, <u>5.13</u> and <u>5.14</u> shall be true and correct in all material respects as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date).

(b)        <u>Agreements and Covenants</u>. Parent and Merger Sub shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Parent and Merger Sub on or prior to the Closing.

(c)        <u>All Necessary Documents</u>. The Securityholders' Representative shall have received those documents to be delivered pursuant to <u>Section 2.6(b)</u>.

<div align="center">

**ARTICLE VIII**
**TERMINATION**

</div>

8.1.        <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing only as follows:

(a)        at any time, Parent, Merger Sub and the Company may terminate this Agreement by mutual written consent;

(b)        at any time after January 31, 2021 (the "<u>Outside Date</u>"), by the Company, on the one hand, or Parent and Merger Sub, on the other hand, by written notice to the other, if the Closing shall not have occurred on or before the Outside Date; provided, that the right to terminate this Agreement under this <u>Section 8.1(b)</u> shall not be available to the Company, if the Company, or to Parent and Merger Sub, if Parent or Merger Sub, as applicable, has breached its obligations under this Agreement in any manner that shall have principally caused the failure of the Closing to have occurred on or before such date; provided, however, that the parties agree that the no party shall have the right to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> during the pendency of any Actions pursuant to <u>Section 10.14</u>;

<div align="center">74</div>

(c)     By the Company, on the one hand, or Parent and Merger Sub, on the other hand, by written notice to the other, if any Governmental Authority of competent jurisdiction shall have issued any Order permanently enjoining, restraining or prohibiting the Transactions, and such Order shall have become final and non-appealable, if applicable; provided, that the right to terminate this Agreement under this Section 8.1(c) shall not be available to the Company, if the Company's, or to Parent and Merger Sub, if Parent's or Merger Sub's, as applicable, breach of its obligations under this Agreement has been the principal cause of, or principally resulted in, such Order, restraint or prohibition;

(d)     By Parent and Merger Sub, by written notice to the Company, if the Company or Blocker Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.1 or Section 7.2 would be incapable of being satisfied and such breach is not cured by the earlier of (i) the date that is twenty (20) days after written notice to the Company by Parent and Merger Sub and (ii) the Outside Date; provided, however, that no cure period will be required for any such breach that by its nature cannot be cured; provided, further, however, that Parent and Merger Sub shall not be permitted to terminate this Agreement pursuant to this Section 8.1(d) if Parent or Merger Sub has breached or failed to perform any of their respective representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.1 or Section 7.3 would be incapable of being satisfied by the Outside Date; or

(e)     By the Company, by written notice to Parent and Merger Sub, if Parent or Merger Sub has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.1 or Section 7.3 would be incapable of being satisfied and such breach is not cured by the earlier of (i) the date that is twenty (20) days after written notice to the Parent and Merger Sub by the Company and (ii) the Outside Date; provided, however, that no cure period will be required for any such breach that by its nature cannot be cured; provided, further, however, that the Company shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) if the Company has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.1 or Section 7.2 would be incapable of being satisfied by the Outside Date.

8.2.    Effect of Termination. In the event of termination of this Agreement by the Company, on the one hand, or Parent and Merger Sub, on the other hand, as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no Liability or obligation on the part the Parent or Merger Sub, or the Blocker, Blocker Seller or the Company and its Subsidiaries or any of their respective Representatives, in either case, relating to, based on or arising under or out of this Agreement, the transactions contemplated hereby or the subject matter hereof (including the negotiation and performance of this Agreement), in each case whether based on contract, tort, equity or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any Laws or otherwise and whether by or through attempted piercing of the corporate veil, by or through any claim by or on behalf of a party hereto or another Person or otherwise, except (i) with respect to this Section 8.2, Article X (other than Section 10.14), and Annex I (and such provisions shall remain in full force and effect following such termination), (ii) the Confidentiality Agreement shall continue in full force and effect in accordance with its terms, and (iii) any Liability of any party hereto for (x) Fraud or (y) any willful breach of this Agreement (which, for the avoidance of doubt, shall be deemed to include any failure by the Parent and Merger Sub to consummate the transactions contemplated by this Agreement if they are obligated to do so hereunder) prior to such termination.

75

## ARTICLE IX
## NO SURVIVAL; NO RECOURSE

9.1.       No Survival. The parties hereto, intending to modify any applicable statute of limitations, agree that (i) the representations and warranties of the Company, Blocker, Parent, Merger Sub and Blocker Seller contained in this Agreement (including the Schedules and Exhibits attached hereto and the certificates delivered pursuant hereto) shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, shall any claim be made by, any party or its Affiliates with respect thereto, (ii) after the Closing, there shall be no Liability on the part of, nor shall any claim be made by, any Person (including any party or any of their respective Affiliates) in respect of any covenant or agreement to be performed prior to the Closing, and (iii) all covenants and agreements contained in this Agreement that contemplate performance thereof following the Closing or otherwise expressly by their terms survive the Closing will survive the Closing in accordance with their terms. The Parent and Merger Sub further acknowledge and agree that Parent's and its Affiliates' (including, after the Effective Time, the Surviving Entity's and its Subsidiaries') sole and exclusive remedy (other than in the case of Fraud) for breaches of any representations and warranties and losses relating thereto shall be the R&W Policy.

9.2.       No Recourse. Each of Parent and Merger Sub hereby acknowledges and agrees that, following the Closing, none of the Unitholders or the Blocker Partners nor any of their respective Affiliates shall have any Liability or obligation arising under this Agreement or as a result of the consummation of the transactions contemplated hereby under any Law, in equity, contract, tort or otherwise, other than with respect to any covenant or agreement contained in this Agreement or any certificate or other document delivered pursuant to this Agreement that contemplates performance following the Closing or otherwise expressly by their terms survive the Closing.

## ARTICLE X
## GENERAL PROVISIONS

10.1.       Cost and Expenses. Except as otherwise expressly provided for herein, each party will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the Blocker Sale, the Merger and the other Transactions contemplated by this Agreement and, for the avoidance of doubt, the Company shall be liable for all Transaction Expenses.

76

10.2.    <u>Amendment, Modification and Waiver</u>. This Agreement may be amended, modified or supplemented at any time only by written agreement signed by the parties hereto (other than Merger Sub), and any failure of the Company or Blocker (in each case prior to the Closing) or the Blocker Partners to comply with any term or provision of this Agreement may be waived by Parent and Merger Sub, and any failure of Parent or Merger Sub or the Company or Blocker (post-Closing) to comply with any term or provisions of this Agreement may be waived by the Securityholders' Representative and the Blocker Seller, at any time by an instrument in writing signed by or on behalf of such other party, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

10.3.    <u>Savings Clause</u>. If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof. Upon such declaration that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement, as needed, so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

10.4.    <u>Entire Agreement</u>. This Agreement (together with the Annexes, Exhibits, Disclosure Letter and the other documents delivered pursuant hereto or referenced herein) and the Confidentiality Agreement constitute the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

10.5.    <u>Assignment; Successors and Assigns</u>. The respective rights and obligations of the parties hereto shall not be assignable without the prior written consent of (a) Parent, in the event of an assignment by the Company (prior to the Closing), the Blocker (prior to the Closing), or the Blocker Partners, or (b) the Securityholders' Representative, in the event of an assignment by Parent, Merger Sub, the Company (following the Closing) or the Blocker (following the Closing); *provided, however*, that Parent may assign all or part of its respective rights under this Agreement without such written consent to Four Twenty Corporation, a Delaware corporation, a Subsidiary or to its lenders as security for any reason including for obligations arising in connection with the financing of the Transactions contemplated hereby; <u>provided</u>, that no such assignment will relieve Parent of any of its obligations hereunder. Any assignment or transfer in violation of the preceding sentence shall be void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

10.6.    <u>Parties in Interest</u>. Except for (i) current and former managers, officers, directors and controlling Persons of the Company and its Subsidiaries pursuant to <u>Section 6.5</u>, (ii) the Unitholders pursuant to <u>Section 6.12</u>, and (iii) those Persons referenced <u>Section 10.15</u>, each of which is an intended third party beneficiary hereof, the parties hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person, other than the parties hereto, any rights or remedies hereunder, including, the right to rely upon the representations and warranties set forth herein. The parties hereto further agree that the rights of third-party beneficiaries under <u>Section 6.5</u> and <u>Section 6.12</u> shall not arise unless and until the Closing occurs. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. Any inaccuracies in such representations and warranties may be subject to waiver by the parties hereto in accordance with <u>Section 10.2</u> without notice or liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the Knowledge of any of the parties hereto. Consequently, Persons, other than the parties hereto, may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

<div align="center">77</div>

10.7.    Mutual Drafting; Interpretation; Headings; Disclosure Letter.

(a)    Each party hereto has participated in the drafting of this Agreement, which each party acknowledges is the result of extensive negotiations between the parties. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision. For purposes of this Agreement, whenever the context requires: (i) the singular number shall include the plural, and vice versa; (ii) the masculine gender shall include the feminine and neuter genders; (iii) the feminine gender shall include the masculine and neuter genders; and (iv) the neuter gender shall include masculine and feminine genders. As used in this Agreement, the words "include" and "including," and words of similar meaning, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation." Except as otherwise indicated, all references in this Agreement to "Sections," "Annexes" and "Exhibits," are intended to refer to Sections of this Agreement and the Annexes and Exhibits to this Agreement. All references in this Agreement to "$" are intended to refer to U.S. dollars. The term "or" shall not be deemed to be exclusive. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. References herein to "as of the date hereof," "as of the date of this Agreement" or words of similar import shall be deemed to mean "as of immediately prior to the execution and delivery of this Agreement." The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(b)    The information in the Disclosure Letter constitutes (i) exceptions or qualifications to representations, warranties, covenants and obligations of the Company, Blocker and the Blocker Partners as set forth in this Agreement or (ii) descriptions or lists of assets and Liabilities and other items referred to in this Agreement. The Disclosure Letter shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, or required to be disclosed by, the Company, Blocker and the Blocker Partners. The Company, Blocker and the Blocker Partners may, at their respective options, include in the Disclosure Letter items that are not material, and such inclusion, or any references to dollar amounts, shall not be deemed to constitute an admission of any liability by the Company, Blocker and the Blocker Partners or any other Person to any third party or otherwise imply that such items are material, to establish any standard of materiality or to define further the meaning of such terms (including Material Adverse Effect) for purposes of this Agreement. Any disclosure contained in any section of the Disclosure Letter shall be deemed to be disclosed with respect to any other Section of this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Section of this Agreement. The Disclosure Letter constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein. Capitalized terms used in the Disclosure Letter that are not defined therein shall have the meanings given them in this Agreement.

78

10.8.    Governing Law. The validity, interpretation and effect of this Agreement shall be governed exclusively by the Laws of the State of Delaware, excluding the "conflict of laws" rules thereof.

10.9.    Venue. Each of the parties irrevocably agrees that any legal Action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement (including claims asserted for breach of contract, tort, or otherwise and regardless of whether such claims arise in law or in equity) must be brought by any other party or its successors or assigns in the Court of Chancery of the State of Delaware or, only if such court does not have jurisdiction, any other state or federal court located in the State of Delaware, and in each case any appellate courts therefrom, and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally. Each of the parties agrees not to commence any Action, suit, or proceeding arising out of or related to this Agreement or any of the transactions contemplated by this Agreement except in the courts described above in Delaware, except for Actions in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court in Delaware as described herein. Each of the parties further agrees that notice as provided in Section 10.11 shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient provided, however, that nothing in this Section 10.9 shall affect the right of any party to serve legal process in any other manner permitted by Law. Each of the parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any Action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) that (i) the Action in any such court is brought in an inconvenient forum, (ii) the venue of such Action is improper, or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each party hereto agrees that a final, non-appealable judgment in any Action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

10.10.    Waiver of Jury Trial and Certain Damages. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THE FOREGOING WAIVER, (III) IT MAKES THE FOREGOING WAIVER VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

79

10.11.    Notices.

(a)    All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered (i) by hand (including by reputable overnight courier), (ii) by mail (certified or registered mail, return receipt requested), (iii) by facsimile transmission (followed by delivery of an original via overnight courier service) or (iv) by E-mail (followed by delivery of an original via overnight courier service) to the respective parties at the following addresses:

If to the Company:

SweetWater Brewing Company, LLC
195 Ottley Drive
Atlanta, GA 30324
Attention: Fredrick M. Bensch, Chief Executive Officer
E-mail: REDACTED - PERSONAL INFORMATION

with a copy to (for information purposes only):

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
Facsimile: (212) 294-4700
Attention: Jennifer Kurtis, Esq.; Ryan Walden, Esq.
E-mail: jkurtis@winston.com; rwalden@winston.com

If to Blocker and the Blocker Partners:

c/o TSG Consumer Partners
600 Montgomery St.
San Francisco, CA 94111
Attention: REDACTED - PERSONAL INFORMATION
Email: REDACTED - PERSONAL INFORMATION

80

with a copy to (for information purposes only):

    Ropes & Gray LLP
    Prudential Tower
    800 Boylston Street
    Boston, MA 02119
    Attention: Paul Van Houten
    Email: Paul.VanHouten@ropesgray.com

If to Securityholders' Representative:

    c/o SweetWater Brewing Company, LLC
    195 Ottley Drive
    Atlanta, GA 30324
    Attention: Fredrick M. Bensch, Chief Executive Officer
    E-mail: REDACTED - PERSONAL INFORMATION

with a copy to (for information purposes only):

    Winston & Strawn LLP
    200 Park Avenue
    New York, NY 10166-4193
    Facsimile: (212) 294-4700
    Attention: Jennifer Kurtis, Esq.; Ryan Walden, Esq.
    E-mail: jkurtis@winston.com; rwalden@winston.com

    and

    Ropes & Gray LLP
    Prudential Tower
    800 Boylston Street
    Boston, MA 02119
    Attention: Paul Van Houten
    Email: Paul.VanHouten@ropesgray.com

If to Parent or Merger Sub:

    c/o Aphria, Inc.
    PO Box 20009
    269 Erie Street South
    Leamington, Ontario, N8H 3C4, Canada
    Attention: Christelle Gedeon, Chief Legal Officer
    Email  REDACTED   PERSONAL INFORMATION

81

with copies to (for information purposes only):

> DLA Piper LLP (US)
> 1251 Avenue of the Americas, 27th Floor
> New York, NY 10020
> Attention: Christopher Giordano
> Jon Venick
> Email: Christopher.Giordano@us.dlapiper.com
> Jon.Venick@us.dlapiper.com

(b)　　　　Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)　　　　All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 10.11 if delivered personally or courier, shall be effective upon delivery; if sent by facsimile, shall be delivered upon receipt of proof of transmission.

10.12.　Public Announcements. The initial press release or public announcement issued by the parties concerning this Agreement and the transactions contemplated hereby shall be in a form agreed to by Parent, Securityholders' Representative and the Blocker Seller and thereafter the parties shall consult with each other (and obtain the other party's prior consent) before issuing any press release or otherwise making any public statements with respect to the transactions contemplated by this Agreement, in each case except (a) based on the reasonable advice of counsel, such press release or public statement is required by applicable Law, stock exchange rule or regulation, or (b) any press release or other public statement that is consistent with previous press releases, public disclosures or public statements made by a party hereto in accordance with this Agreement, in each case under this clause (b) to the extent such disclosure is still accurate, and in each case under clause (a) and (b), provided the other party with an opportunity to review and comment on such press release or public statement prior to its issuance, distribution or publication. Notwithstanding the provisions of this Section 10.12, on and after the Closing Date, the Blocker Partners and their Affiliates will be permitted (i) to disclose to their respective and prospective members, limited partners and partners (who may disclose to their direct and indirect investors) the fact that the Closing has occurred, the consideration paid hereunder, other items directly relating to such consideration and other types of information that are customary for private equity funds to provide to their respective and prospective members, limited partners and partners and (ii) to disclose in connection with normal fund raising and related marketing or informational or reporting activities, including on their websites and in their marketing materials, any such information permitted to be disclosed pursuant to clause (i) above and any information previously provided as part of a press release or public announcement issued or made with the prior written consent of the Parent, the Securityholders' Representative, and the Blocker Seller which disclosure may be accompanied by the logo of the Company.

82

10.13.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. A copy transmitted via facsimile or e-mail as a portable document format (.pdf) of this Agreement, bearing the signature of any party shall be deemed to be of the same legal force and effect as an original of this Agreement bearing such signature(s) as originally written of such one or more parties.

10.14.    <u>Enforcement of Agreement</u>. The parties agree that irreparable damage may occur in the event that the parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with the specific terms thereof or otherwise breach such provisions, and that money damages may not be an adequate remedy, even if available. The parties hereto accordingly agree that, prior to the valid termination of this Agreement pursuant to Article VIII, the Company, the Blocker Partners and the Parent shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the parties' obligations to consummate the transactions contemplated hereby and the Parent's obligation to pay, and the right of the Blocker Seller and Unitholders to receive, the consideration payable hereunder) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

10.15.    <u>Limitation on Recourse</u>. Notwithstanding anything to the contrary in this Agreement or otherwise, no claim arising in whole or in part out of or related to this Agreement, the negotiation, interpretation, construction, validity or enforcement of this Agreement or the Transactions (whether sounding in contract, tort, statute or otherwise) shall be brought or maintained by or on behalf of any party hereto or any of its Affiliates or their respective successors or permitted assigns against any Person not a party to this Agreement. Without limitation of the foregoing, except for claims against a party to this Agreement, no claim described in the immediately preceding sentence shall be brought or maintained against any past, present or future officer, director, employee, agent, direct or indirect general or limited partner, manager, management company, direct or indirect member, stockholder, equityholder, or controlling Person, Representative or Affiliate, or any heir, executor, administrator, successor or assign of any of the foregoing, of Parent, Merger Sub, the Company or any of its Subsidiaries, Blocker, Blocker Partners or the Securityholders' Representative, as applicable, and no recourse shall be had against any of them in respect of any such claim, including in connection with any alleged misrepresentation or inaccuracy in or breach of or omission in any of the representations, warranties, covenants or agreements of any such party set forth or contained in this Agreement or any exhibit or schedule hereto or any certificate delivered hereunder.

*[Signature Page Follows]*

83

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized all as of the date first written above.

<div align="center">

**APHRIA, INC.**

</div>

By:   *(signed) "Carl A. Merton"*
      Name: Carl A. Merton
      Title: Chief Financial Officer

<div align="center">

**PROJECT GOLF MERGER SUB, LLC**

</div>

By:   Four Twenty Corporation,
      *its Sole Member*

      *(signed) "Carl A. Merton"*
      Name: Carl A. Merton
      Title: Authorized Representative

<div align="center">

*[Signature Page to Agreement of Merger and Acquisition]*

</div>

**SW BREWING COMPANY, LLC**

By: *(signed) "Fredrick Bensch"*
      Name: Fredrick Bensch
      Title: Chief Executive Officer

**SWBC CRAFT HOLDINGS LP**

By: SWBC Craft Management, LLC,
    *its General Partner*

    *(signed) "SWBC Craft Management, LLC"*
    Name: [Redacted]
    Title: Authorized Representative

**SWBC BLOCKER SELLER, LP**

By: SWBC Craft Management, LLC,
    *its General Partner*

    *(signed) "SWBC Craft Management, LLC"*
    Name: [Redacted]
    Title: Authorized Representative

**SWBC CRAFT MANAGEMENT, LLC**

By: *(signed) "SWBC Craft Management, LLC"*
      Name: [Redacted]
      Title: Manager

**CHILLY WATER, LLC**

By: *(signed) "Fredrick Bensch"*
      Name: Fredrick Bensch
      Title: Member

*[Signature Page to Agreement of Merger and Acquisition]*

## ANNEX I

### DEFINITIONS

For purposes of this Agreement:

"<u>2022 15-Day Period</u>" has the meaning set forth in <u>Section 2.16(c)</u>.

"<u>2022 Adjusted EBITDA</u>" has the meaning set forth in <u>Section 2.16</u>.

"<u>2022 Adjusted EBITDA Calculation</u>" has the meaning set forth in <u>Section 2.16(a)</u>.

"<u>2022 Earn-Out Payment</u>" has the meaning set forth in <u>Section 2.15(b)</u>.

"<u>2022 EBITDA Acknowledgement</u>" has the meaning set forth in <u>Section 2.16(c)</u>.

"<u>2022 EBITDA Adjustment Report</u>" has the meaning set forth in <u>Section 2.16(c)</u>.

"<u>2023 15-Day Period</u>" has the meaning set forth in <u>Section 2.16(d)</u>.

"<u>2023 Adjusted EBITDA</u>" has the meaning set forth in <u>Section 2.16(b)</u>.

"<u>2023 Adjusted EBITDA Calculation</u>" has the meaning set forth in <u>Section 2.16(b)</u>.

"<u>2023 Earn-Out Payment</u>" has the meaning set forth in <u>Section 2.15(c)</u>.

"<u>2023 EBITDA Acknowledgement</u>" has the meaning set forth in <u>Section 2.16(d)</u>.

"<u>2023 EBITDA Adjustment Report</u>" has the meaning set forth in <u>Section 2.16(d)</u>.

"<u>30-Day Period</u>" has the meaning set forth in <u>Section 2.12(b)</u>.

"<u>Acceleration Event</u>" means any of the following:

         (a)      a direct or indirect sale or transfer (in a single transaction or through a series of related transactions, pursuant to a merger, equity sale or otherwise) to any third party of: (A) securities representing greater than 50% of the outstanding voting power, or economic interest in (whether by way of a sale of securities, merger or otherwise) the Company or any of its Subsidiaries; or (B) all or substantially all of the assets or business line or business group of the Company or any of its Subsidiaries, taken as a whole;

         (b)      a material breach by Parent or the Surviving Entity of the covenants or representations contained in <u>Section 2.17(a)</u> of this Agreement; or

         (c)      prior to the expiration of the Earn-Out Period, (i) the employment of Fredrick M. Bensch with the Parent or the Company is terminated without Cause (as such term is defined in the Bensch Consulting Agreement) or (ii) Mr. Bensch terminates his employment for Good Reason (as defined in the Bensch Consulting Agreement).

<div align="center">I-1</div>

"Acceleration Payment Date" has the meaning set forth in Section 2.17(b).

"Acknowledgement" has the meaning set forth in Section 2.12(b).

"Act" has the meaning set forth in Section 2.1.

"Action" means any action, administrative enforcement, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, investigation, audit or other proceeding.

"Adjustment Escrow Account" has the meaning set forth in Section 2.11(c).

"Adjustment Escrow Agent" means Citibank, N.A.

"Adjustment Escrow Amount" means $1,000,000.

"Adjustment Escrow Agreement" means that certain escrow agreement substantially in the form attached hereto as Exhibit D for purposes of the Adjustment Escrow Amount, to be entered into at the Closing by and between Parent, Securityholders' Representative and Adjustment Escrow Agent.

"Adjustment Report" has the meaning set forth in Section 2.12(b).

"Affected Employee" has the meaning set forth in Section 6.6(a).

"Affiliate" means as to any Person, any other Person which, directly or indirectly, is controlled by, controls, or is under common control with, such first-mentioned Person.

"Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law)

"Aggregate Earn-Out Payment" has the meaning set forth in Section 2.15(c).

"Agreement" has the meaning set forth in the caption.

"Alcohol Beverage Authorities" means the United States Alcohol and Tobacco Tax and Trade Bureau (the "TTB"), the Georgia Department of Revenue, City of Atlanta and any other local, state or federal Governmental Agency responsible for regulating the manufacturing, distribution, sale and/or marketing of alcohol beverages.

"Annual Financial Statements" has the meaning set forth in Section 3.11(a).

"Anti-Corruption Laws" has the meaning set forth in Section 3.23(a).

"Approving Holders" has the meaning set forth in Section 1.5.

"Assets" has the meaning set forth in Section 3.6.

I-2

"<u>Auditor's Determination</u>" has the meaning set forth in <u>Section 2.12(b)</u>.

"<u>Auditor's EBITDA Determination</u>" has the meaning set forth in <u>Section 2.16(e)</u>.

"<u>Balance Sheet Date</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>Bankruptcy and Equity Exception</u>" has the meaning set forth in <u>Section 3.3</u>.

"<u>Bates Agreement</u>" means that certain Employment Agreement dated November 1, 2020 by and between SweetWater Brewing Company, LLC and Patrick Bates.

"<u>Benefit Plan</u>" means any (a) "employee pension benefit plan" (as defined in Section 3(2) of ERISA), (b) any "employee welfare benefit plan" (as defined in Section 3(1) of ERISA), and (c) any other material plan, agreement or arrangement providing for employment, severance, compensation, change of control or retention pay or benefits, stock options, stock purchase, phantom stock, stock appreciation or other forms of equity-based or phantom equity-based incentive compensation, health, fringe, and other benefit plans, programs, or arrangements that are maintained or contributed to by the Company or any of its Subsidiaries or to which the Company or any of its Subsidiaries is required to contribute on behalf of an employee of the Company or any of its Subsidiaries or for which the Company or any of its Subsidiaries have any Liability (actual or contingent) by virtue of having an ERISA Affiliate.

"<u>Bensch Consulting Agreement</u>" means that certain consulting agreement substantially in the form attached hereto as <u>Exhibit E</u> entered into on the date hereof by and between Class V, Inc. and the Surviving Entity.

"<u>Blocker</u>" has the meaning set forth in the caption.

"<u>Blocker Closing</u>" has the meaning set forth in <u>Section 1.3</u>.

"<u>Blocker GP</u>" has the meaning set forth in the caption.

"<u>Blocker GP Interests</u>" has the meaning set forth in the recitals.

"<u>Blocker LP Interests</u>" has the meaning set forth in the recitals.

"<u>Blocker Interests</u>" has the meaning set forth in the recitals.

"<u>Blocker Members</u>" means Blocker and SWBC Craft, LLC.

"<u>Blocker Partners</u>" has the meaning set forth in the caption.

"<u>Blocker Sale</u>" has the meaning set forth in the recitals.

"<u>Blocker Seller</u>" has the meaning set forth in the caption.

I-3

"Blocker Seller Released Parties" has the meaning set forth in Section 6.14(b).

"Brands" has the meaning set forth in Section 3.22(a).

"Business" means any business conducted, engaged in, or currently conducted or engaged in by the Company or any of its Subsidiaries.

"Business Day" means any day, except for a Saturday or Sunday or a day on which banks are required or authorized by Law to close in New York, New York or a day on which the Delaware Secretary of State is authorized or required by Law to close.

"Canadian Securities Laws" means, collectively, the Ontario Securities Act and the applicable securities laws of the other provinces and territories of Canada, the regulations made and forms prescribed thereunder together with all applicable published rules, instruments, policy statements and blanket orders and rulings of the Canadian securities regulatory authorities.

"Cancelled Units" has the meaning set forth in Section 2.7(a).

"CARES Act" means The Coronavirus Aid, Relief, and Economic Security Act, Pub.L. 116–136 (03/27/2020).

"CARES Act Determination Date" means the date which the lender of the CARES Debt (and, to the extent required, any Governmental Authority (including the United States Small Business Administration)) has finally determined that all or a portion of the CARES Debt is ineligible for forgiveness pursuant to the provisions of the CARES Act, thus resulting in such CARES Debt being deemed CARES Unforgiven Debt for purposes of Section 2.13(b).

"CARES Debt" means the PPP Loan.

"CARES Unforgiven Debt" means that amount of the CARES Debt that has been finally determined by the lender of the CARES Debt (and, to the extent required, any Governmental Authority (including the United States Small Business Administration)) to be ineligible for forgiveness pursuant to the provisions of the CARES Act.

"Cash" means all cash (excluding, for the avoidance of doubt, restricted cash and any security deposits, bonds or other similar instruments serving as collateral with respect to any property or assets leased by the Company, and any deposits or reserves associated with any self-insurance, including but not limited to any deposits or reserves associated with any workers compensation policies or claims), cash equivalents and marketable securities held by the Company and its Subsidiaries, calculated as of immediately prior to the Effective Time. "Cash" shall (i) be calculated net of issued but uncleared checks, drafts and overdrafts as of immediately prior to the Effective Time, and (ii) include checks and other wire transfers and drafts deposited for the account of the Company as of immediately prior to the Effective Time, including but not limited to credit card and debit card receipts, but solely to the extent received prior to the final determination of the Final Purchase Price.

I-4

"CERCLA" has the meaning set forth in clause (i) of the definition of Hazardous Material.

"Certificate of Merger" has the meaning set forth in Section 2.2(a).

"Cheese Grits" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Closing Date Indebtedness" means the aggregate amount of Indebtedness calculated as of immediately prior to the Effective Time (other than with respect to the inclusion of Transaction Tax Deductions in the calculation of the Pre-Closing Income Tax Liability Amount, which shall be calculated as of immediately after the Effective Time); provided, however, that Closing Date Indebtedness shall not include (a) any amount taken into account in the calculation of Closing Date Working Capital, or (b) any Transaction Expenses.

"Closing Date Working Capital" means the Net Working Capital calculated as of immediately prior to the Effective Time.

"Closing Stock Value" has the meaning set forth in Section 2.10.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Company's Knowledge" or "Knowledge of the Company" or similar phrase means the actual knowledge of Fredrick M. Bensch, Patrick Bates and JD Usry.

"Company" has the meaning set forth in the caption.

"Company Intellectual Property" means all of the Intellectual Property Rights owned or purported to be owned by or exclusively licensed to the Company or any of its Subsidiaries.

"Company LLC Agreement" means Second Amended and Restated Limited Liability Company Agreement of the Company, dated as of October 21, 2020, as amended and in effect from time to time.

"Company Material Contract" has the meaning set forth in Section 3.10(a).

"Company Ownership" has the meaning set forth in Section 4.7.

"Company Products" means any and all products and services that currently are manufactured, produced, marketed, offered, sold, licensed, provided or distributed by the Company or any of its Subsidiaries.

"Company Registered Intellectual Property" has the meaning set forth in Section 3.8(a).

I 5

"<u>Competition Laws</u>" shall mean Laws that are designed or intended to prohibit, restrict or regulate actions, including transactions, acquisitions and mergers, having the purpose or effect of creating or strengthening a dominant position, monopolization, lessening of competition or restraint of trade.

"<u>Confidentiality Agreement</u>" means the Confidentiality Agreement dated as of December 2, 2019, by and between Parent and the Company.

"<u>Constituent Entities</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Contract</u>" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, purchase order, commitment, arrangement or undertaking, written or oral, or other document or instrument to which or by which such Person is a party or otherwise subject or bound or to which or by which any asset, property or right of such Person is subject or bound.

"<u>control</u>" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by Contract or otherwise.

"<u>COVID-19</u>" means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof or resulting epidemics, pandemic or disease outbreaks.

"<u>COVID-19 Measures</u>" means, collectively, any quarantine, shelter in place, stay at home, workforce reduction, social distancing, shut down, closure, sequester or any other Law, directive, policy, guideline or recommendation by any Governmental Authority in connection with or in response to COVID-19 and applicable to the Company, its Subsidiaries or their respective businesses.

"<u>CSA</u>" means the Canadian Securities Administrators.

"<u>Disclosure Letter</u>" has the meaning set forth in the introductory paragraph in <u>Article III</u>.

"<u>Downward Adjustment Amount</u>" has the meaning set forth in <u>Section 2.13(a)(i)</u>.

"<u>Earn-Out Cap</u>" has the meaning set forth in <u>Section 2.15(b)</u>.

"<u>Earn-Out Payments</u>" has the meaning set forth in <u>Section 2.15(a)</u>.

"<u>Earn-Out Period</u>" has the meaning set forth in <u>Section 2.17(a)</u>.

"<u>EBITDA Adjustment Report</u>" has the meaning set forth in <u>Section 2.16</u>.

"<u>Effective Time</u>" has the meaning set forth in <u>Section 2.2(b)</u>.

"<u>Enterprise Value</u>" means three hundred million dollars ($300,000,000).

I-6

"Environment" means soil, land surface or subsurface strata, waters (including, navigable waters, oceans, streams, ponds, reservoirs, drainage basins, wetlands, surface or ground water), sediments, ambient air (including indoor), noise, plant life, animal life, and all other environmental media or natural resources.

"Environmental Laws" means any and all applicable Laws, Permits, approvals, authorizations and other requirements having the force and effect of Law, whether local, state, territorial or national, in force and effect as of the Closing Date and relating to: (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials; (ii) the use, treatment, storage, disposal, handling, manufacturing, transportation or shipment of Hazardous Materials; (iii) the regulation of storage tanks; or (iv) relating to pollution or the protection of human health, safety or the Environment, including the following statutes as now written and amended, including any and all regulations promulgated thereunder and any and all state and local counterparts: CERCLA, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §11001 et seq., and the Safe Drinking Water Act, 42 U.S.C. §300f et seq.

"Environmental Permits" means any Permit required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and rulings promulgated thereunder.

"ERISA Affiliate" means any member of the Company's controlled group of companies within the meaning of Code Section 414(b), (c), (m) or (o).

"Estimated Cash" has the meaning set forth in Section 2.9.

"Estimated Closing Balance Sheet" has the meaning set forth in Section 2.9.

"Estimated Closing Date Indebtedness" has the meaning set forth in Section 2.9.

"Estimated Net Working Capital" has the meaning set forth in Section 2.9.

"Estimated Purchase Price" has the meaning set forth in Section 2.8.

"Estimated Transaction Expenses" has the meaning set forth in Section 2.9.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Act Document" means all of the documents Parent is required to file or furnish under the Exchange Act.

I-7

"Existing Credit Facility" means that certain Credit Agreement dated October 21, 2020 by and among the Company and its Subsidiaries, the Lenders (defined herein), and Truist Bank, in its capacities as Administrative Agent, Issuing Bank and Swing Line Lender.

"Final Calculations" has the meaning set forth in Section 2.12(a).

"Final Cash" has the meaning set forth in Section 2.12(a).

"Final Closing Balance Sheet" has the meaning set forth in Section 2.12(a).

"Final Closing Date Indebtedness" has the meaning set forth in Section 2.12(a).

"Final Net Working Capital" has the meaning set forth in Section 2.12(a).

"Final Purchase Price" means Enterprise Value, *plus* (b) Final Cash (as finally determined pursuant to Section 2.12), *minus* (c) Final Closing Date Indebtedness (as finally determined pursuant to Section 2.12), *minus* (d) Final Transaction Expenses (as finally determined pursuant to Section 2.12), *minus* (e) the Adjustment Escrow Amount, *minus* (f) the PPP Escrow Amount, *minus* (g) the Securityholders' Representative Expense Amount, *minus* (h) the amount, if any, by which the Target Net Working Capital exceeds the Final Net Working Capital (as finally determined pursuant to Section 2.12), *plus* (i) the amount, if any, by which the Final Net Working Capital (as finally determined pursuant to Section 2.12) exceeds the Target Net Working Capital, *minus* (j) the Closing Stock Value.

"Final Transaction Expenses" has the meaning set forth in Section 2.12(a).

"Financial Statements" has the meaning set forth in Section 3.11(a).

"Financing" has the meaning set forth in Section 6.9.

"Flow-Through Return" has the meaning set forth in Section 6.8(d).

"FLSA" has the meaning set forth in Section 3.18(f).

"Fraud" means, with respect to any Person, the intentional common law fraud (as determined pursuant to Delaware state Law) of such Person effected by such Person in the making of a representation and warranty (a) in the case of the Company, set forth in Article III hereof, (b) in the case of Blocker or the Blocker Seller, set forth in Article IV hereof, or (c) in the case of Parent or Merger Sub, set forth in Article V hereof.

"GAAP" means generally accepted accounting principles as applied in the United States.

"Governmental Competition Authority" has the meaning set forth in Section 6.1(a).

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including quasi governmental authorities established to perform such functions, as well as any arbitrator or arbitral body or body exercising, or entitled to exercise, any administrative, executive, judicial, adjudicative, legislative, police, regulatory or taxing authority or power of any nature including, without limitation, any and all Alcohol Beverage Authorities, the United States Food and Drug Administration and the United States Federal Trade Commission.

I-8

"Governmental Competition Authority" has the meaning set forth in Section 6.1(a).

"Hazardous Material" means (i) all substances, wastes, pollutants, contaminants and materials (collectively, "Substances") regulated, defined or designated as hazardous, extremely or imminently hazardous, dangerous or toxic, under Environmental Laws, including the following federal statutes and their state counterparts, as well as these statutes' implementing regulations: the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. ("CERCLA") the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S. C. Section 136 et seq; the Atomic Energy Act, 42 U.S.C. Section 22011 et seq; and the Hazardous Materials Transportation Act, 42 U.S.C. Section 1801 et seq; (ii) all Substances with respect to which any Governmental Authority may require investigation, monitoring, reporting, or remediation; (iii) mercury, (iv) petroleum and petroleum products and by products including crude oil and any fractions thereof; and (v) radon, radioactive substances, asbestos, urea formaldehyde, and polychlorinated biphenyls.

"Historical Accounting Practices" means the Company's historical accounting practices as set forth on Annex V.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"IFRS" means International Financial Reporting Standards as in effect from time to time

"Indebtedness" means, as to the Company, whether matured, unmatured, liquidated, unliquidated, contingent or otherwise, without duplication, all (a) all indebtedness for borrowed money, or issued in substitution for or exchange of indebtedness for borrowed money, or for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), including the current portion of such indebtedness, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course, but solely to the extent that such amounts are otherwise included in the calculation of the Final Purchase Price), (d) all capital lease obligations (excluding, for the avoidance of doubt, operating leases, including the Lease Agreement), (e) contractual obligations relating to interest rate protection, swap agreements and collar agreements, (f) deferred rent Liabilities, (g) all obligations under conditional sale or other title retention agreements, (h) the Pre-Closing Income Tax Liability Amount, (i) any indebtedness secured by a Lien on a Person's assets, (j) any and all amounts related to the forgiveness of any loans or other obligations owed to the Company or any of its Subsidiaries in connection with the transactions contemplated by this Agreement, in all cases, arising on or prior to the Effective Time, (k) any incentive compensation (solely to the extent arising from the consummation of the Transactions) or paid time off owed by the Company or any of its Subsidiaries for employees attributable to any period at or prior to the Closing, plus the employer portion of any employment Taxes due in connection with any such payments, the execution of this agreement or as a result of the consummation of the transactions contemplated by this Agreement, to the extent not paid prior to Closing or otherwise included in the calculation of the Purchase Price, (l) any deposits for events at the taproom that may or could become payable upon cancellation at any time from and after the Closing, (m) any accrued interest on any of the foregoing, (n) any prepayment or other similar fees, expenses or penalties on or relating to the repayment or assumption of any of the foregoing, and (o) all guarantees of any of the items set forth in clauses (a) - (n) above. For the avoidance of doubt, "Indebtedness" shall not include (i) amounts actually included as Transaction Expenses or in calculating Net Working Capital, or (ii) the CARES Debt.

I-9

"Independent Auditor" has the meaning set forth in Section 2.12(b).

"Intellectual Property Rights" means any and all intellectual property and proprietary rights throughout the world including each of the following: (i) all United States and foreign patents and utility models and applications therefor (including provisional applications) and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations in part thereof (collectively, "Patents"); (ii) all Trade Secrets and similar rights in confidential information, know-how and materials; (iii) copyrights and all other rights corresponding thereto in any works of authorship, including Software (collectively, "Copyrights"); (iv) all trademark rights and similar rights in trade names, logos, trademarks and service marks together with all of the goodwill associated with the foregoing (collectively, "Trademarks"); (v) all rights in databases and data collections (including knowledge databases, customer lists and customer databases); (vi) all rights to Uniform Resource Locators, Web site addresses and domain names; and (vii) any registrations of or applications to register any of the foregoing.

"Intercompany Accounts" means all accounts payable of the Company or any of its Subsidiaries representing amounts owed by the Company or any of its Subsidiaries to divisions or Affiliates of the Company or any of its Subsidiaries and accounts receivable owed to the Company or any of its Subsidiaries by divisions or Affiliates of such Company or any of its Subsidiaries.

"Interim Financial Statements" has the meaning set forth in Section 3.11(a).

"Inventory" has the meaning set forth in Section 3.24(a).

"IRCA" has the meaning set forth in Section 3.18(b).

"IRS" means the Internal Revenue Service.

"IT Systems" means electronic data processing, information, recordkeeping, communications, telecommunications, account management, inventory management and other computer systems (including all Software, databases, firmware, hardware and related documentation) and Internet websites.

I-10

"<u>Law</u>" means any law, statute, code, regulation, ordinance, rule, common law, Order or governmental requirement enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"<u>Lease Agreement</u>" means that certain Lease Agreement dated as of October 20, 2020 by and between SweetWater Brewing Company, LLC and Cheese Grits, LLC.

"<u>Lease Amendment</u>" means that that certain amendment to the Lease Agreement substantially in the form attached hereto as <u>Exhibit F</u>, by and between SweetWater Brewing Company, LLC and Cheese Grits, LLC.

"<u>Leased Real Property</u>" has the meaning set forth in <u>Section 3.18(a)(b)</u>.

"<u>Letter of Transmittal</u>" has the meaning set forth in <u>Section 2.18(b)</u>.

"<u>Liability</u>" or "<u>Liabilities</u>" means any and all liabilities and obligation of any kind or nature whatsoever, whether known or unknown, express or implied, primarily or secondarily, direct or indirect, secured or unsecured, liquidated or unliquidated, absolute, accrued, contingent or otherwise and whether due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required by GAAP to be accrued on the financial statements of such Person.

"<u>Lien</u>" means any mortgage, lien, charge, restriction, pledge, security interest, option, lease or sublease, claim, right of any third party, easement, encroachment or encumbrance or other charges or rights of others of any kind or nature, except Permitted Liens.

"<u>LLC Agreement</u>" shall mean the LLC Agreement of the Company adopted by the Company at the direction of Parent at Closing.

"<u>Losses</u>" means all Actions, Orders, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, Taxes, Liens and losses (including costs of investigation, all reasonable accounting, consultant and attorneys' fees, court costs, costs of expert witnesses and other expenses relating to any of the foregoing).

"<u>Material Adverse Effect</u>" means any event, development, change, effect or occurrence that is, or would reasonably be expected to, (a) be materially adverse to the business operations or financial condition of the Company and its Subsidiaries taken as a whole or (b) materially and adversely affect the ability of the Company to perform its obligations hereunder or to consummate the transactions contemplated hereby; <u>provided, however</u>, that, solely for purposes of clause (a) above, a "<u>Material Adverse Effect</u>" shall not include changes to the assets, operations or financial condition of the Company to the extent resulting from (i) the announcement or disclosure of the transactions contemplated herein, including effects related to the identity of Parent, (ii) any hurricane, earthquake or other natural disasters, acts of god, or pandemics, including effects related to COVID-19 pandemic, COVID-19 Measures or any changes thereto or worsening thereof, (iii) changes in general economic, regulatory or political conditions in North America, (iv) changes in GAAP, (v) changes in the North American debt or securities markets, (vi) national or international political or social conditions, including, without limitation, the occurrence or escalation or any military action or any act of terrorism, (vii) changes in currency exchange rates or commodities prices, (viii) changes in Law or other binding directives issues by any Governmental Authority, (ix) compliance with the terms of this Agreement, (x) general business or economic conditions affecting the industry in which the Company or any of its Subsidiaries operates, (xi) any matter referenced in the Disclosure Letter, (xii) any act or omission of the Company taken with the prior consent of, or at the request of, Parent or (xi) any failure of the Company to meet projections or forecasts (provided that the underlying causes of such failure shall be considered in determining whether there is or has been a Material Adverse Effect); <u>provided, further</u>, that any event, development, change, effect, omission, occurrence, or circumstance referred to in clauses (ii) through (viii) and (x), immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur solely to the extent that such event, development, change, effect, omission, occurrence, or circumstance has a disproportionate effect on the Company compared to other participants in the industries in which the Company conducts its business.

I-11

"Material Company Intellectual Property Contract" has the meaning set forth in Section 3.10(a)(xiii).

"Material Distributors" has the meaning set forth in Section 3.20(b).

"Material Suppliers" has the meaning set forth in Section 3.20(a).

"Merger" has the meaning set forth in the recitals.

"Merger Sub" has the meaning set forth in the caption.

"Merger Sub Units" has the meaning set forth in the recitals.

"NASDAQ" means the Nasdaq Stock Market.

"Net Working Capital" means, as of any date of determination, an amount excess of (a) the sum of the line items identified as "Total Working Capital Assets" of the Company and its Subsidiaries set forth on Annex VI, over (b) the sum of the line items identified as "Total Working Capital Liabilities" of the Company and its Subsidiaries set forth on Annex VI, in each case, as of immediately prior to the Closing and determined in accordance with the Policies and Procedures. For the avoidance of doubt, Net Working Capital shall be calculated without giving effect to the Transactions.

"Object Code" means computer Software in binary form that is intended to be directly executable by a computer after suitable processing and linking but without the intervening steps of compilation or assembly.

"Ontario Securities Act" means the Securities Act (Ontario), as amended, and the regulations and rules made thereunder.

I-12

"Order" means any decree, order, judgment, writ, award, injunction, stipulation or consent of or by, or settlement agreement with, a Governmental Authority.

"Ordinary Course" means the ordinary course of business of the Company and any of its Subsidiaries, consistent with past practice and custom.

"Organizational Documents" means the articles of incorporation, articles or certificate of incorporation, bylaws, articles or certificate of formation, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto, as applicable.

"OSHA" has the meaning set forth in Section 3.18(d).

"Outside Date" has the meaning set forth in Section 8.1(b).

"Parent" has the meaning set forth in the caption.

"Parent Closing Date Transaction" means any transaction engaged in by the Company or any of its Subsidiaries on the Closing Date, which occurs after the Closing or at the direction of Parent that is not contemplated by this Agreement and is outside the ordinary course of business, including any transaction engaged in by the Company or any of its Subsidiaries in connection with the financing of any obligations of Parent or the Company or any of its Subsidiaries to make a payment under this Agreement.

"Parent Common Shares" has the meaning set forth in Section 2.10.

"Parent Disclosure Letter" has the meaning set forth in the introductory paragraph in Article V.

"Parent Material Adverse Effect" means any event, development, change, effect or occurrence that is, or would reasonably be expected to, (a) be materially adverse to the business operations or financial condition of the Parent taken as a whole or (b) materially and adversely affect the ability of the Parent to perform its obligations hereunder or to consummate the transactions contemplated hereby; provided, however, that, solely for purposes of clause (a) above, a "Parent Material Adverse Effect" shall not include changes to the business, operations or financial condition of the Company to the extent resulting from (i) the announcement or disclosure of the transactions contemplated herein, including effects related to the identity of Company, (ii) any hurricane, earthquake or other natural disasters, acts of god, or pandemics, including effects related to the COVID-19 pandemic or any changes thereto or worsening thereof, (iii) changes in general economic, regulatory or political conditions in North America, (iv) changes in GAAP, (v) changes in the North American debt or securities markets, (vi) national or international political or social conditions, including, without limitation, the occurrence or escalation or any military action or any act of terrorism, (vii) changes in currency exchange rates or commodities prices, (viii) changes in Law or other binding directives issues by any Governmental Authority, (ix) compliance with the terms of this Agreement, (x) general business or economic conditions affecting the industry in which the Parent operates, (xi) any matter referenced in the Disclosure Letter, (xii) any act or omission of the Parent taken with the prior consent of, or at the request of, Company or (xi) any failure of the Parent to meet projections or forecasts (provided that the underlying causes of such failure shall be considered in determining whether there is or has been a Parent Material Adverse Effect); provided, further, that any event, development, change, effect, omission, occurrence, or circumstance referred to in clauses (ii) through (viii) and (x), immediately above shall be taken into account in determining whether a Parent Material Adverse Effect has occurred or could reasonably be expected to occur solely to the extent that such event, development, change, effect, omission, occurrence, or circumstance has a disproportionate effect on the Parent compared to other participants in the industries in which the Parent conducts its business.

I-13

"Parent's Knowledge" or "Knowledge of Parent" or similar phrase means the knowledge of Irwin Simon, Carl Merton and Denise Faltischek, in each case, with the assumption that such Persons shall have made reasonable and diligent inquiry on the matters presented.

"Paying Agent" has the meaning set forth in Section 2.21.

"Paying Agent Agreement" has the meaning set forth in Section 2.21.

"Payment Schedule" means that certain schedule attached hereto as Annex VII, as updated prior to the Closing in accordance with this Agreement, setting forth the number and type of Units owned by each Unitholder and the Blocker Seller, the percentage interest of each Unitholder and the Blocker Seller and a breakdown of the consideration payable hereunder (including the Earn-Out Payments, Adjustment Escrow Amount and PPP Escrow Amount) payable to and Stock Consideration issuable to each Unitholder and the Blocker Seller under the scenarios illustrated therein. For the avoidance of doubt, the Payment Schedule attached as Annex VII hereto as of the date hereof contains estimated calculations of the amounts set forth thereon for illustrative purposes only, and the payments required pursuant to this Agreement shall be calculated based on the calculations set forth in the final Payment Schedule delivered pursuant to Section 2.9.

"Permit" has the meaning set forth in Section 3.15.

"Permitted Liens" means (a) Liens for Taxes, assessments or other charges by Governmental Authorities not yet due and payable or the amount or validity of which are being contested in good faith or for which appropriate reserves have been established in accordance with GAAP, (b) mechanic's, workmen's, repairmen's, carrier's, warehousemen's or other like Liens for amounts not yet due and payable or the amount or validity of which are being contested in good faith or for which appropriate reserves have been established on the Financial Statements in accordance with GAAP, (c) Liens securing the obligations of the Company under or in respect of Indebtedness under the existing credit facilities all of which will be paid off at the Closing, (d) Liens created, imposed or promulgated by Law or by any Governmental Authority not resulting in a Material Adverse Effect, (e) Liens to secure landlords, lessors, or renters under Leases incurred in the Ordinary Course, (f) Liens arising from non-exclusive licenses of Intellectual Property Rights, (g) Liens arising by operation of Law in the nature of zoning restrictions and (h) Liens created by or imposed on Parent or Merger Sub.

I-14

"Person" means any natural person, corporation, limited liability company, partnership, firm, joint venture, joint-stock company, trust, association, unincorporated entity or organization of any kind, Governmental Authority or other entity of any kind.

"Policies and Procedures" has the meaning set forth in Section 2.9.

"PPACA" has the meaning set forth in Section 3.18(k).

"PPP Escrow Account" has the meaning set forth in Section 2.11(d).

"PPP Escrow Agent" means Truist Bank.

"PPP Escrow Amount" means $441,162.

"PPP Escrow Agreement" means that certain escrow agreement in a customary form reasonably acceptable to the Parent and the Company for purposes of the PPP Escrow Amount, to be entered into at the Closing by and between Parent, Securityholders' Representative and PPP Escrow Agent.

"PPP Loan" has the meaning set forth in Section 3.28.

"Pre-Closing Blocker Reorganization" has the meaning set forth in the Recitals.

"Pre-Closing Income Tax Liability Amount" means the excess, if any (but not less than $0), of the aggregate income Tax liabilities, over the aggregate income Tax assets (including Tax refunds and credits, estimated payments and prepayments of income Taxes, and applicable Transaction Tax Deductions) of the Company on a combined basis, in each case, attributable to any Pre-Closing Period for which the applicable Tax Return was not yet filed as of the Closing Date. The calculation of the Pre-Closing Income Tax Liability Amount shall (a) exclude any deferred income Tax liabilities or deferred income Tax assets and any assets or liabilities to the extent accounted for through Net Working Capital, (b) assume that the Tax period of the Company that includes the Closing Date ends on the Closing Date and (c) exclude any Taxes arising from a Parent Closing Date Transaction.

"Pre-Closing Period" means any Tax period ending on or before the Closing Date.

"Pre-Registration Price" has the meaning set forth in Section 6.12(f)(ii).

"Prospectus" has the meaning set forth in Section 6.12(a)(ii).

"Prospectus Supplement" has the meaning set forth in Section 6.12(a)(i).

"Public Company Reports" has the meaning set forth in Section 5.10(a).

"Purchase Price Allocation Schedule" has the meaning set forth in Section 2.20(b).

I 15

"R&W Policy" means that certain representations and warranties insurance policy, dated as of the date hereof, a copy of which is attached hereto as Exhibit G.

"Redeemed Holder" has the meaning set forth in the Recitals.

"Redeemed Units" has the meaning set forth in the Recitals.

"Redemption" has the meaning set forth in the Recitals.

"Registerable Value" has the meaning set forth in Section 6.12(f)(ii).

"Registered Intellectual Property" means all United States, international and foreign: (i) Patents; (ii) Trademarks; (iii) Copyrights; and (iv) any other Intellectual Property Rights, in each case, that are the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded by any state, government or other public legal authority.

"Registrable Shares" has the meaning set forth in Section 6.12(a)(i).

"Registration Statement" has the meaning set forth in Section 6.12(a)(i).

"Release" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping.

"Released Claims" has the meaning set forth in Section 6.14(a).

"Released Parties" has the meaning set forth in Section 6.14(a).

"Representatives" means, with respect to any Person, the directors, officers, employees, advisors (including investment bankers, financial advisors, legal counsel, accountants and consultants), financing sources and other agents and representatives of such Person and its Affiliates.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Securities Laws" means the Securities Act, the Securities Exchange Act, the Canadian Securities Laws, and all other applicable securities Laws promulgated by the SEC, CSA or any other relevant Governmental Authority.

"Securityholders' Representative" has the meaning set forth in the caption.

"Securityholders' Representative Expense Amount" means $500,000.

I-16

"Securityholders' Representative Tax Matter" means (i) amending a Flow-Through Return; (ii) making or revoking an election on any Flow-Through Return filed after the Closing Date that adversely affects any Flow-Through Return or the income Taxes of the Company or any Subsidiary of the Company for a Pre-Closing Period or Pre-Closing Period portion of a Straddle Period; (iii) extending or waiving the applicable statute of limitations with respect to an income Tax of the Company or any Subsidiary of the Company for a Pre-Closing Period or Pre-Closing Portion of a Straddle Period; (iv) filing any ruling request with any Governmental Authority that relates to Flow-Through Returns or income Taxes of the Company or any Subsidiary of the Company for a Pre-Closing Period or Pre-Closing Period portion of a Straddle Period or (v) entering or pursuing a voluntary disclosure agreement with a Governmental Authority with respect to filing Flow-Through Returns or paying income Taxes for a Pre-Closing Period or Pre-Closing Period portion of a Straddle Period.

"Settlement Date" has the meaning set forth in Section 2.12(c).

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, program interfaces, models and methodologies, whether in Source Code or Object Code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and (iv) all user documentation, including user manuals and training materials, relating to any of the foregoing.

"Source Code" means computer Software and code, in form other than Object Code or machine readable form, including related programmer comments and annotations, help text, data and data structures, instructions and procedural, object-oriented and other code, which may be printed out or displayed in human readable form.

"Straddle Period" means any taxable period that includes (but does not end on) the date of Closing.

"Stock Consideration" has the meaning set forth in Section 2.10.

"Subsidiary" of any Person means another Person (a) at least 50% of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is owned or controlled directly or indirectly by such first Person and/or by one or more of its Subsidiaries or (b) of which such first Person and/or one of its Subsidiaries serves as a general partner (in the case of a partnership) or a manager or managing member (in the case of a limited liability company) or similar function. Notwithstanding anything to the contrary set forth herein, in light of the Redemption, no representations, warranties, covenants or agreements are made herein with respect to Cheese Grits and Cheese Grits shall not be deemed a Subsidiary of the Company for any purpose.

"Substances" has the meaning set forth in clause (i) of the definition of Hazardous Material.

"Surviving Entity" has the meaning set forth in Section 2.1.

I-17

"SWB Members" means the members of SWB Management, LLC as set forth in that certain Limited Liability Company Agreement of SWB Management, LLC dated December 31, 2016 by and among SWB Management, LLC, Class V, Inc., the Company and each of the Persons party thereto.

"Target Working Capital" means $4,362,420.

"Taxes" means all taxes, charges, fees, duties (including custom duties), levies, or other assessments, including net income, gross income, capital gains, gross receipts, net receipts, gross proceeds, net proceeds, ad valorem, profits, real property, personal property (whether tangible or intangible), gaming, sales, use, franchise, capital, excise, estimated, value added, stamp, lease, transfer, occupational, equalization, license, payroll, employment, environmental, disability, severance, withholding, unemployment, or other taxes, charges or fees assessed by any Governmental Authority, including any interest, penalties, or additions to tax attributable thereto.

"Tax Contest" has the meaning set forth in Section 6.8(e).

"Tax Return" means any return, report or similar statement filed or required to be filed with any taxing authority with respect to any Tax, including any information return, claim for refund, amended return or declaration of estimated Tax.

"Trade Secrets" means, where protectable as a trade secret by applicable Law, any and all inventions (whether or not patentable, reduced to practice or made the subject of a pending patent application), invention disclosures and improvements, all proprietary information, know-how and technology, confidential or proprietary information and all documentation therefor.

"Transaction Expenses" means all (i) costs, fees and expenses (including attorneys' fees, accountants' fees, investment banking fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the Blocker Sale and the other transactions contemplated by this Agreement payable by, in each instance, Blocker, the Company or any of their respective Subsidiaries, (ii) any (A) amounts (including transaction or change-in-control bonuses or similar payments) payable by the Company to any Person solely in connection with, or conditioned in any way upon, the consummation of the transactions contemplated by this Agreement, (B) amounts payable to any employee, officer, director or consultant of either Company pursuant to the incentive plans or any employment agreement or other Contract with any of the aforementioned Persons solely as a result of the consummation of the transactions contemplated hereby (including, for the avoidance of doubt, the amounts payable pursuant to the Bates Agreement), and (C) any severance (and other post termination) obligation of the Company to any Person whose employment has been terminated prior to the Closing (including payments under any non-competition or consulting agreements or arrangements or any COBRA or similar payments), any deferred compensation or other similar payment, in each instance, plus the employer portion of any employment Taxes due and payable in connection with (w) any such payments, (y) the execution of this Agreement or (z) as a result of the consummation of the transactions contemplated by this Agreement, (iii) 50% of any and all fees of the Adjustment Escrow Agent under the Escrow Agreement, (iv) any and all Transfer Taxes, including, for the avoidance of doubt, all Transfer Taxes associated with the transactions contemplated by the Redemption, (v) any and all costs, fees, expenses and premiums necessary to obtain the tail pursuant to Section 6.5(a), (vi) any and all fees of the Paying Agent under the Paying Agent Agreement, and (vii) any and all fees of the PPP Escrow Agent under the PPP Escrow Agreement.

I-18

"Transaction Tax Deductions" means the aggregate amount of Tax deductions arising from (i) any compensatory payments made or accrued by the Company or any of its Subsidiaries (or Merger Sub or Parent on behalf of the Company or any of its Subsidiaries) in connection with the transactions contemplated by this Agreement, (ii) any pay down, prepayment or satisfaction of any portion of the Closing Date Indebtedness by the Company or any of its Subsidiaries (or Merger Sub or Parent on behalf of the Company or any of its Subsidiaries) or otherwise in accordance with this Agreement, (iii) the Transaction Expenses and (iv) any other deductible payments that are attributable to the transactions contemplated by this Agreement and economically borne by the Unitholders. For this purpose, seventy percent (70%) of any Transaction Tax Deductions that are success-based fees shall be treated as deductible in accordance with IRS Revenue Procedure 2011-29.

"Transactions" has the meaning set forth in the recitals.

"Transfer Taxes" has the meaning set forth in Section 6.8(a).

"Trigger Date" has the meaning set forth in Section 6.12(f)(i).

"TSX" has the meaning set forth in Section 6.1(a).

"TSX Manual" has the meaning set forth in Section 6.1(a).

"Unitholder" has the meaning set forth in the recitals.

"Units" has the meaning set forth in the Company LLC Agreement.

"Upward Adjustment Amount" has the meaning set forth in Section 2.13(a)(ii).

"Waiver Agreement" means that certain Waiver Agreement substantially in the form attached hereto as Exhibit H, by and between the Company and SWBC Craft, LLC

<center>I-19</center>

## ANNEX II

### Policies and Procedures

Together with the calculation detailed in Annex VI, the following will apply (i) for purposes of calculating the Estimated Net Working Capital pursuant to <u>Section 2.9</u> of the Agreement and (ii) for purposes of calculating the Final Net Working Capital pursuant to <u>Section 2.12</u> of the Agreement.

1. Except as otherwise provided herein, as contemplated by Annex VI or as contemplated by the Historical Accounting Practices, Net Working Capital, Estimated Net Working Capital and Final Closing Working Capital will be calculated in accordance with GAAP, applied consistently with the conventions, procedures, methodologies, and principles used in preparing the Financial Statements.

2. Net Working Capital, Estimated Net Working Capital and Final Net Working Capital will be calculated without giving effect to any of the transactions contemplated by this Agreement.

3. "**Current Assets**" will include only (i) accounts receivable (net of allowance for doubtful accounts), (ii) inventory and (iii) other current assets (including, but not limited to, prepaid expenses, prepaid hops, prepaid insurance and prepaid point-of-sale and marketing costs).

4. For the avoidance of doubt, Current Assets will not include (i) cash and cash equivalents, (ii) any income Tax assets (whether current or deferred), (iii) prepaid Transaction Expenses, and (iv) intercompany and related company accounts receivable.

5. "**Current Liabilities**" will include, (i) accounts payable, (ii) accrued expenses (including accrued payroll, accrued bonuses or other compensation and fees and any payroll taxes with respect thereto), (iii) accrued property tax, (iv) accrued utility payments, (v) accrued freight, (vi) accrued excise and sales and use tax and (vii) deposit liabilities.]

6. For the avoidance of doubt, Current Liabilities will not include (i) any Transaction Expenses, (ii) Indebtedness (including the current portion of capital lease obligations), (iii) intercompany and related company accounts payable, and (iv) income Tax liabilities (whether current or deferred) or other deferred Tax liabilities.

## ANNEX III

### Calculation of Adjusted EBITDA

### ADJUSTED EBITDA DEFINITION

"**Adjusted EBITDA**" means on a consolidated basis for any period of computation:

    (i)    the sum (without duplication) of the following, which calculations shall be calculated in a manner consistent with and apply the same accounting methods, policies, practices, classifications and estimation methodologies used in the sample calculation detailed below under Section (II), consistently applied:

        a.    the aggregate net income (or loss) as determined in accordance with GAAP, of the Company and its Subsidiaries ("**Net Income**");

        b.    plus, the amount of interest expense deducted in determining Net Income;

        c.    plus, the amount of all income taxes (and other payments in lieu of income taxes) deducted in determining Net Income (including payments under tax-sharing arrangements with Parent or its Affiliates);

        d.    plus, the amount of depreciation and amortization deducted in determining Net Income;

        e.    minus, the amount of interest income added in determining Net Income; and

        f.    minus, the amount of income tax benefit added in determining Net Income.

    (ii)  Notwithstanding the foregoing, in determining Adjusted EBITDA for purposes of this Agreement:

        a.    Adjusted EBITDA shall exclude:

                i.    non-cash share-based compensation;

                ii.    non-recurring expenses;

                iii.    brand income rights income; and

                iv.    non-recurring income and gains

        b.    For greater clarity, the calculation of Adjusted EBITDA shall not include any add backs or adjustments related to COVID-19 or the pandemic.

**Sample Calculation of Adjusted EBITDA**

| | |
|---|---:|
| net in-come | $20,466,465 |
| plus interest expense | $ 0 |
| plus income taxes | $ 0 |
| plus depreciation and amortization | $ 3,803,085 |
| minus interest income | $ 0 |
| minus income tax benefit | $ 0 |
| exclude: | |
|     non-cash share-based compensation | $ 72,240 |
|     non-recurring expenses | $ 73,345 |
|     brand income rights income | $ (1,764,243) |
|     non-recurring income and gains | $ 0 |
| Adjusted EBITDA | $22,650,892 |

## ANNEX IV

**Purchase Price Allocation**

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

## ANNEX V

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

## ANNEX VI

**Sample Calculation of Working Capital**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

## ANNEX VII

**Payment Schedule**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

**EXHIBIT A**

**Redemption Agreement**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

## EXHIBIT B

**Certificate of Merger**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

---

**EXHIBIT C**

**Letter of Transmittal**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

**EXHIBIT D**

**Adjustment Escrow Agreement**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

---

## EXHIBIT E

**Bensch Consulting Agreement**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

## EXHIBIT F

**Lease Amendment**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

---

**EXHIBIT G**

**R&W Policy**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

---

## EXHIBIT H

**Waiver Agreement**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

**SCHEDULE I**

**Redemption / Pre-Closing Blocker Reorganization**

(See attached)

REDACTED - COMMERCIALLY SENSITIVE INFORMATION

# EXHIBIT 2



EXHIBIT 3



EXHIBIT 4

Scott Fuss
Petroglyph Studio
477 Womack Road
Covington, Georgia 30209
770•786•3541

Date of Invoice:
1-27-96

Invoice to:
Matt Patterson
Sweetwater Brewing Company
900 Wendell Court
Atlanta, GA 30336

Description:
Concept , design and illustrate:
Sweetwater Brewing Company Logo (color and black & white versions)                    $500.00
Sweetwater Bottle Logo
Sculpt dimensional "Leaping Trout" tap handle

Sub. $500.00

Ttl. $500.00

004•01•96

EXHIBIT 5

I _Reds de Gersch_ acknowledge receipt of the following items which are the the copywritten materials and the property of Ray Scott Fuss and/or Scott Fuss doing business as Petroglyph Studio.

I agree to return the following materials to Ray Scott Fuss on or no later than the mutually agreed upon date of  Dec  2002  .

*Sweetwater Brewing Company label items:(see attached copies of originals for reference)*

One (1) original, black and white pencil concept sketch of "Sweetwater Brewing Company" label design/illustration on tissue. Image area approximately 7"x10".

One (1) original, color concept illustration of "Sweetwater Brewing Company" label design and associated logotype on vellum. Image area approximately 7"x10".

One (1) original, black and white pencil, preliminary sketch of men in boat for "Sweetwater Brewing Company" label illustration. Image area approximately 4"x6".

One (1) composite layout composed of computer laser print out and original pencil preliminary sketch on white bond paper for "Sweetwater Brewing Company" label illustration. Image area approximately 8"x10.5".

One (1) original prisma color pencil illustration on vellum of rainbow trout leaping from water with fisherman in background for "Sweetwater Brewing Company" label. Image area approximately 8"x10.5".

*Sweetwater Brewing Company logo items:(see attached copies of originals for reference)*

One (1) original, black and white pencil concept sketch of "Sweetwater Brewing Company" logo and associated logotype. Two (2) images on same tissue. Image area approximately 6"x7".

One (1) original, black and white pencil sketch of "Sweetwater Brewing Company" logo and associated logotype on tissue. Image area approximately 3"x7".

One (1) original, black and white illustration of "Sweetwater Brewing Company" logo on vellum. Scroll banner with Rainbow Trout in background. Image area 5"x10.5".

One (1) original, prisma color pencil illustration of "Sweetwater Brewing Company" logo on vellum. Scroll banner with Rainbow Trout in background. Image area 5"x10.5".

10/25/02

10-25-02

Notary Public, Newton County, Georgia
My Commission Expires Oct. 16, 2004

# EXHIBIT 6

## ASSIGNMENT

This Assignment is between Sweetwater Brewing Company, LLC ("Assignee"), a Georgia limited liability company and Scott Fuss, an individual residing in the State of Georgia (collectively, "Assignor").

Whereas, Assignor was retained by Assignee to author a three-dimensional visual work comprising a representation of a trout, photographs of which are attached hereto, including, but not limited to all two-dimensional representations thereof (collectively, the "Work"); and

Whereas, Assignee is desirous of acquiring the entire right, title, and interest in and to the Work in any and all forms of media now known or which may hereinafter become known.

Now, Therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby sells, assigns, transfers to Assignee, its successors and assigns, the entire right, title, and interest in and to the Work and any prior versions thereof, including, but not limited to, all worldwide copyrights, now existing and in the future; all other intellectual property associated with the Work, including, but not limited to, trademark and service mark rights, and patent rights; all rights of action against third parties Assignor had, has, or may have; together with the exclusive, unlimited, and perpetual right throughout the world to secure statutory copyrights and renewals, reissues, and extensions of such copyrights; which interests and rights shall be held and enjoyed by Assignee to the full end of the term for which such copyrights or any renewal or extension thereof is or may be granted.

Assignor further agrees that, at the time of the execution of this Assignment, Assignor possesses full title to the Work and that Assignor has the unencumbered right and authority to make this assignment. Assignor agrees to waive all moral rights relating to the Work, including without limitation any and all rights of identification of authorship, any and all rights of approval, restriction or limitation on use or subsequent modifications and any and all rights to prevent any changes to the Work.

Assignor further agrees to execute any additional papers that may be requested to confirm the right of the Assignee to secure copyright, trademark, service mark, or similar protection for the Work in all countries and to vest in the Assignee complete title to the Work, without further compensation, but at the expense of Assignee.

In Witness Whereof, we have set our hands and seals on this _____ day of _____, 2003.

ASSIGNEE                                         ASSIGNOR

_____                 _____

Fredrick Bensch
Manager of Class V, Inc., which          Scott Fuss
is Manager of Sweetwater Brewing Company, LLC

Show as portfolio piece. ←

EXHIBIT 7

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Kayn Leigh Clayett*

Acting United States Register of Copyrights and Director

**Registration Number**

## VA 2-084-616

**Effective Date of Registration:**
September 26, 2017

---

**Copyright Registration for One Work by One Author**
Registration issued pursuant to 37 CFR §202.3

## Title

**Title of Work:** Sweetwater leaping rainbow trout

## Completion/Publication

**Year of Completion:** 1996
**Date of 1st Publication:** April 20, 1997
**Nation of 1st Publication:** United States

## Author

- **Author:** Ray Scott Fuss
  **Author Created:** 2-D artwork
  **Citizen of:** United States
  **Year Born:** 1962
  **Anonymous:** Yes

## Copyright Claimant

**Copyright Claimant:** Ray Scott Fuss
818 Benton Dairy Road, Covington, GA, 30014, United States

## Rights and Permissions

**Name:** Ray Scott Fuss
**Email:** starrsvillescott@hotmail.com
**Telephone:** (770)787-0806
**Alt. Telephone:** (770)712-6639

## Certification

**Name:** Ray Scott Fuss

Page 1 of 2

EXHIBIT 8

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn A. Temple*

Acting United States Register of Copyrights and Director

**Registration Number**

## VAu 1-326-605

**Effective Date of Registration:**
March 07, 2018

---

## Title

| | |
|---|---|
| **Title of Work:** | Trout banner |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 1996 |

## Author

| | |
|---|---|
| • **Author:** | Ray Scott Fuss |
| **Author Created:** | 2-D artwork |
| **Work made for hire:** | No |
| **Citizen of:** | United States |
| **Domiciled in:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Ray Scott Fuss |
| | 818 Benton Dairy Road, Covington, GA, 30014, United States |

## Rights and Permissions

| | |
|---|---|
| **Name:** | Ray Scott Fuss |
| **Email:** | starrsvillescott@hotmail.com |
| **Telephone:** | (770)787-0806 |
| **Alt. Telephone:** | (770)712-6639 |

## Certification

| | |
|---|---|
| **Name:** | Ray Scott Fuss |
| **Date:** | March 07, 2018 |

Page 1 of 1

# EXHIBIT 9

.ıll LTE 🔋

‹ 146

F

**Freddy Bench** ›

Painting I did for the Ga. DNR Weekend for Wildlife fundraiser to support Ga's non-game wildlife. Bid high, win it and I'll deliver it to ya!

Mon, Nov 9, 3:04 PM

Congratulations on the sale of Sweetwater Brewing Co. to Aphira. That's big news!

Along those lines, when you have a chance, give me a shout to discuss my holdings of original artwork and the associated copyrights.

Thanks! Scott

Tue, Nov 10, 5:08 PM

Hi Scott- appreciate that. Ok if I get back to you on this after thanksgiving. Beyond buried at this point as I'm sure you can image.
Best

Tue, Nov 10, 6:42 PM

Absolutely- have a good one

iMessage

3:48 ✈

**ıll LTE** 🔋

‹ 146

F

Freddy Bench ›

Hi Scott- appreciate that. Ok if I get back to you on this after thanksgiving. Beyond buried at this point as I'm sure you can image.
Best

Tue, Nov 10, 6:42 PM

Absolutely- have a good one.

Shoot me a date/time. I'm available November 25-30.

**Great**
I'm out of town with family for thanksgiving - fly back on the 30th. Does 2nd work? Wide open right now.
Thx

That will work. I'll listen out. Have a good trip. Thanks

10-4
Got it on the calendar

Wed, Dec 2, 10:15 AM

What time would you like to talk today? Anytime after 1:00 is good

iMessage

3:48

**LTE**



Freddy Bench ›

Absolutely- have a good one.

Shoot me a date/time. I'm available November 25-30.

Great
I'm out of town with family for thanksgiving - fly back on the 30th.  Does 2nd work? Wide open right now.
Thx

That will work. I'll listen out. Have a good trip. Thanks

10-4
Got it on the calendar

Wed, Dec 2, 10:15 AM

What time would you like to talk today? Anytime after 1:00 is good for me.

Hi Scott
Are you free in next hour?

Yes

Delivered

iMessage

EXHIBIT 10



Aphria Inc.

CONDENSED INTERIM CONSOLIDATED FINANCIAL STATEMENTS
FOR THE THREE AND NINE MONTHS ENDED FEBRUARY 28, 2021 AND FEBRUARY 29, 2020

(Unaudited, expressed in Canadian Dollars, unless otherwise noted)

Aphria Inc.
Condensed Interim Consolidated Statements of Financial Position
(Unaudited - in thousands of Canadian dollars)

| | Note | February 28, 2021 | May 31, 2020 |
|---|---|---|---|
| **Assets** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | | $  267,134 | $  497,222 |
| Accounts receivable | | 81,890 | 55,796 |
| Prepaids and other current assets | 4 | 34,732 | 42,983 |
| Inventory | 5 | 313,794 | 264,321 |
| Biological assets | 6 | 27,065 | 28,341 |
| Current portion of convertible notes receivable | 11 | 6,089 | 14,626 |
| | | 730,704 | 903,289 |
| Capital assets | 8 | 644,711 | 587,163 |
| Intangible assets | 9 | 669,703 | 363,037 |
| Promissory notes receivable | | 3,000 | -- |
| Long-term investments | 12 | 11,292 | 27,016 |
| Goodwill | 10 | 745,908 | 617,934 |
| | | $ 2,805,318 | $ 2,498,439 |
| **Liabilities** | | | |
| **Current liabilities** | | | |
| Bank indebtedness | 14 | $  -- | $  537 |
| Accounts payable and accrued liabilities | 15 | 168,230 | 153,652 |
| Income taxes payable | | 21,246 | 6,410 |
| Current portion of lease liabilities | | 1,756 | 1,315 |
| Current portion of long-term debt | 16 | 25,759 | 8,467 |
| | | 216,991 | 170,381 |
| **Long-term liabilities** | | | |
| Lease liabilities | | 45,004 | 5,828 |
| Long-term debt | 16 | 233,356 | 129,637 |
| Convertible debentures | 17 | 622,796 | 270,783 |
| Contingent consideration | 10 | 76,196 | -- |
| Deferred tax liability, net | 13 | 44,625 | 83,468 |
| | | 1,238,968 | 660,097 |
| **Shareholders' equity** | | | |
| Share capital | 18 | 2,079,173 | 1,846,938 |
| Warrants | 19 | 360 | 360 |
| Share-based payment reserve | | 29,661 | 27,721 |
| Accumulated other comprehensive loss | | (6,047) | (1,269) |
| Deficit | | (595,182) | (61,215) |
| | | 1,507,965 | 1,812,535 |
| Non-controlling interests | 21 | 58,385 | 25,807 |
| | | 1,566,350 | 1,838,342 |
| | | $ 2,805,318 | $ 2,498,439 |

Nature of operations (Note 1),
Commitments and contingencies (Note 32),
Subsequent events (Note 34)

Approved on behalf of the Board:
"Renah Persofsky"                    "Irwin Simon"
Signed:  Director                    Signed:  Director

*The accompanying notes are an integral part of these condensed interim consolidated financial statements*

2

Aphria Inc.
Condensed Interim Consolidated Statements of Income (Loss) and Comprehensive Income (Loss)
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

| | Note | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|---|
| | | 2021 | 2020 | 2021 | 2020 |
| Net revenue | 22 | $ 153,638 | $ 144,424 | $ 459,859 | $ 391,136 |
| Cost of goods sold | 23 | 115,872 | 108,733 | 335,008 | 297,403 |
| Gross profit before fair value adjustments | | 37,766 | 35,691 | 124,851 | 93,733 |
| Fair value adjustment on sale of inventory | | 45,044 | 16,383 | 102,600 | 36,060 |
| Fair value adjustment on growth of biological assets | 6 | (38,967) | (40,267) | (124,209) | (86,912) |
| Gross profit | | 31,689 | 59,575 | 146,460 | 144,585 |
| Operating expenses: | | | | | |
| General and administrative | 24 | 26,095 | 27,920 | 82,239 | 72,301 |
| Share-based compensation | 25 | 36,271 | 5,126 | 54,127 | 17,645 |
| Selling | | 7,632 | 5,089 | 22,383 | 12,731 |
| Amortization | | 13,792 | 5,352 | 24,848 | 16,256 |
| Marketing and promotion | | 4,041 | 4,185 | 15,421 | 16,611 |
| Research and development | | 158 | 710 | 586 | 1,992 |
| Transaction costs | | 12,013 | 2,478 | 37,637 | 3,904 |
| | | 100,002 | 50,860 | 237,241 | 141,440 |
| Operating loss | | (68,313) | 8,715 | (90,781) | 3,145 |
| Finance income (expense), net | 26 | (10,025) | (7,352) | (23,302) | (17,615) |
| Non-operating income (expense), net | 27 | (276,507) | 9,848 | (383,626) | 34,719 |
| (Loss) income before income taxes | | (354,845) | 11,211 | (497,709) | 20,249 |
| Income taxes (recovery) | 13 | 6,151 | 5,514 | (11,020) | 6,040 |
| Net (loss) income | | (360,996) | 5,697 | (486,689) | 14,209 |
| Other comprehensive (loss) income | | | | | |
| Other comprehensive (loss) income | | (5,836) | (734) | (4,778) | (2,729) |
| Comprehensive (loss) income | | $ (366,832) | $ 4,963 | $ (491,467) | $ 11,480 |
| Total comprehensive income (loss) attributable to: | | | | | |
| Shareholders of Aphria Inc. | | (385,279) | 5,893 | (538,745) | 12,944 |
| Non-controlling interests | 21 | 18,447 | (930) | 47,278 | (1,464) |
| | | $ (366,832) | $ 4,963 | $ (491,467) | $ 11,480 |
| Weighted average number of common shares - basic | | 316,670,951 | 257,517,234 | 299,130,624 | 253,477,710 |
| Weighted average number of common shares - diluted | | 316,670,951 | 257,955,708 | 299,130,624 | 254,010,666 |
| (Loss) income per share - basic | 29 | $ (1.14) | $ 0.02 | $ (1.63) | $ 0.06 |
| (Loss) income per share - diluted | 29 | $ (1.14) | $ 0.02 | $ (1.63) | $ 0.06 |

*The accompanying notes are an integral part of these condensed interim consolidated financial statements*

**Aphria Inc.**
Condensed Interim Consolidated Statements of Changes in Equity
(Unaudited - in thousands of Canadian dollars, except share amounts)

| | Number of common shares | Share capital (Note 18) | Warrants (Note 19) | Share-based payment reserve | Accumulated other comprehensive loss | Retained earnings | Non-controlling interests (Note 21) | Total |
|---|---|---|---|---|---|---|---|---|
| Balance at May 31, 2019 | 250,989,120 | $ 1,655,273 | $ 1,336 | $ 36,151 | $ (119) | $ 12,103 | $ 28,409 | $ 1,733,153 |
| Share issuance - January 2020 bought deal | 14,044,944 | 99,727 | -- | -- | -- | -- | -- | 99,727 |
| Share issuance - options exercised | 1,105,901 | 6,783 | -- | (2,681) | -- | -- | -- | 4,102 |
| Share issuance - RSUs exercised | 667,529 | 4,428 | -- | -- | -- | -- | -- | 4,428 |
| Share issuance - DSUs exercised | 60,342 | 392 | -- | -- | -- | -- | -- | 392 |
| Share issuance - warrants exercised | 766,372 | 1,150 | -- | -- | -- | -- | -- | 1,150 |
| Cancelled shares | (500,000) | (615) | -- | -- | -- | 615 | -- | -- |
| Expired warrants | -- | -- | (976) | -- | -- | 976 | -- | -- |
| Share-based payments | -- | -- | -- | 9,693 | -- | -- | -- | 9,693 |
| Nuovera Malta Ltd. acquisition | -- | -- | -- | -- | -- | -- | 82 | 82 |
| Comprehensive income (loss) for the period | -- | -- | -- | -- | (2,729) | 15,673 | (1,464) | 11,480 |
| Balance at February 29, 2020 | 267,134,208 | $ 1,767,138 | $ 360 | $ 43,163 | $ (2,848) | $ 29,285 | $ 27,027 | $ 1,864,125 |

| | Number of common shares | Share capital (Note 18) | Warrants (Note 19) | Share-based payment reserve | Accumulated other comprehensive income (loss) | Deficit | Non-controlling interests (Note 21) | Total |
|---|---|---|---|---|---|---|---|---|
| Balance at May 31, 2020 | 286,520,265 | $ 1,846,938 | $ 360 | $ 27,721 | $ (1,269) | $ (61,215) | $ 25,807 | $ 1,838,342 |
| Share issuance - legal settlement | 2,259,704 | 12,963 | -- | -- | -- | -- | -- | 12,963 |
| Share issuance - equity financing | 17,432,879 | 128,448 | -- | -- | -- | -- | -- | 128,448 |
| Share issuance - SweetWater acquisition | 9,823,183 | 85,675 | -- | -- | -- | -- | -- | 85,675 |
| Share issuance - options exercised | 232,539 | 1,929 | -- | (1,751) | -- | -- | -- | 178 |
| Share issuance - RSUs exercised | 526,849 | 3,220 | -- | -- | -- | -- | -- | 3,220 |
| Share-based payments | -- | -- | -- | 3,691 | -- | -- | -- | 3,691 |
| Dividend paid to non-controlling interest | -- | -- | -- | -- | -- | -- | (14,700) | (14,700) |
| Comprehensive income (loss) for the period | -- | -- | -- | -- | (4,778) | (533,967) | 47,278 | (491,467) |
| **Balance at February 28, 2021** | 316,795,419 | $ 2,079,173 | $ 360 | $ 29,661 | $ (6,047) | $ (595,182) | $ 58,385 | $ 1,566,350 |

*The accompanying notes are an integral part of these condensed interim consolidated financial statements*

4

**Aphria Inc.**
Condensed Interim Consolidated Statements of Cash Flows
(Unaudited - in thousands of Canadian dollars)

| | Note | For the nine months ended February 28, 2021 | 2020 |
|---|---|---|---|
| **Cash used in operating activities:** | | | |
| Net (loss) income for the period | | $ (486,689) | $ 14,209 |
| Adjustments for: | | | |
| Future income taxes | 13 | (37,974) | 2,040 |
| Fair value adjustment on sale of inventory | | 102,600 | 36,060 |
| Fair value adjustment on growth of biological assets | 6 | (124,209) | (86,912) |
| Unrealized foreign exchange loss (gain) | | 24,744 | 3,136 |
| Amortization | 8,9 | 54,820 | 34,832 |
| Loss on promisorry notes receivable | | -- | 12,000 |
| Unrealized loss on convertible notes receivable | 11 | 3,786 | 7,569 |
| Transaction costs associated with business acquisitions | | 31,199 | -- |
| Other non-cash items | | (641) | (544) |
| Share-based compensation | 25 | 54,127 | 17,645 |
| Loss on long-term investments | 28 | 5,272 | 28,144 |
| Loss (gain) on convertible debentures | | 352,013 | (86,430) |
| Change in non-cash working capital | 30 | (43,831) | (102,941) |
| | | (64,783) | (121,192) |
| **Cash provided by (used in) financing activities:** | | | |
| Share capital issued, net of cash issuance costs | | 127,163 | 99,727 |
| Proceeds from warrants and options exercised | | 178 | 5,252 |
| Proceeds from long-term debt | | 127,471 | 79,400 |
| Repayment of long-term debt | | (6,536) | (9,730) |
| Repayment of lease liabilities | | (1,824) | (912) |
| (Decrease) increase in bank indebtedness | | (537) | 6,948 |
| Dividend paid to non-controlling interest | | (14,700) | -- |
| | | 231,215 | 180,685 |
| **Cash used in investing activities:** | | | |
| Proceeds from disposal of marketable securities | | -- | 19,861 |
| Investment in capital and intangible assets | | (42,075) | (104,397) |
| Proceeds from disposal of capital and intangible assets | | 8,193 | 1,673 |
| Promissory notes advances | | (3,000) | -- |
| Repayment of convertible notes receivable | 11 | 5,000 | -- |
| Investment in long-term investments and equity investees | | -- | (605) |
| Proceeds from disposal of long-term investments and equity investees | 28 | 10,452 | 26,177 |
| Net cash paid on business acquisitions | | (354,396) | (34,722) |
| | | (375,826) | (92,013) |
| **Effect of foreign exchange on cash and cash equivalents** | | (20,694) | (3,175) |
| Net decrease in cash and cash equivalents | | (230,088) | (35,695) |
| Cash and cash equivalents, beginning of period | | 497,222 | 550,797 |
| **Cash and cash equivalents, end of period** | | $ 267,134 | $ 515,102 |
| **Cash and cash equivalents are comprised of:** | | | |
| Cash in bank | | $ 35,218 | $ 514,899 |
| Short-term deposits | | 231,916 | 203 |
| **Cash and cash equivalents** | | $ 267,134 | $ 515,102 |

*The accompanying notes are an integral part of these condensed interim consolidated financial statements*

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

## 1.   Nature of operations

Aphria Inc. (the "Company" or "Aphria") is a leading global cannabis company inspiring and empowering the worldwide community to live their very best life. The Company exists under the laws of the *Business Corporations Act* (Ontario), is licensed to produce and sell medical and adult-use cannabis, cannabis-derived extracts, and derivative cannabis products in Canada under the provisions of *The Cannabis Act*.

Broken Coast Cannabis Ltd. ("Broken Coast") is a wholly-owned subsidiary of the Company licensed to produce and sell cannabis under *The Cannabis Act*.

1974568 Ontario Ltd. ("Aphria Diamond") is a 51% majority-owned subsidiary of the Company. Aphria Diamond is licensed to produce cannabis under the provisions of *The Cannabis Act*.

SweetWater Brewing Company, LLC ("SweetWater") is a wholly-owned subsidiary operating in the beverage alcohol industry in the United States.

The registered office of the Company is located at 1 Adelaide Street East, Suite 2310, Toronto, Ontario.

The Company's common shares are listed under the symbol "APHA" on the Toronto Stock Exchange ("TSX") in Canada and the National Association of Securities Dealers Automated Quotations Exchange ("NASDAQ") in the United States.

These condensed interim consolidated financial statements were approved by the Company's Board of Directors on April 9, 2021.

## 2.   Basis of preparation

(a)   Statement of compliance

The Company's condensed interim consolidated financial statements have been prepared in accordance with IAS 34, "Interim Financial Reporting". These condensed interim consolidated financial statements do not include all notes of the type normally included within the annual financial report and should be read in conjunction with the audited financial statements of the Company for the year ended May 31, 2020, which have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board and Interpretations of the IFRS Interpretations Committee.

(b)   Basis of measurement

These condensed interim consolidated financial statements have been prepared on the going concern basis, under the historical cost convention except for certain financial instruments that are measured at fair value and biological assets that are measured at fair value less costs to sell, as detailed in the Company's accounting policies.

(c)   Functional currency

All figures presented in the consolidated financial statements are reflected in Canadian dollars; however, the functional currency of the Company includes the Canadian dollar, United States dollar and the Euro.

Foreign currency transactions are translated to the respective functional currencies of the Company's entities at the exchange rates in effect on the date of the transactions. Monetary assets and liabilities denominated in foreign currencies are translated to the functional currency at the foreign exchange rate applicable at the statement of financial position date. Non-monetary items carried at historical cost denominated in foreign currencies are translated to the functional currency at the date of the transactions. Non-monetary items carried at fair value denominated in foreign currencies are translated to the functional currency at the date when the fair value was determined. Realized and unrealized exchange gains and losses are recognized through profit and loss.

On consolidation, the assets and liabilities of foreign operations reported in their functional currencies are translated into Canadian dollars, the Group's presentation currency, at period-end exchange rates. Income and expenses, and cash flows of foreign operations are translated into Canadian dollars using average exchange rates. Exchange differences resulting from translating foreign operations are recognized in other comprehensive income and accumulated in equity. The Company and all of its subsidiaries'

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

functional currency is Canadian dollars, with the exception of SweetWater and CC Pharma GmbH whose functional currency is the United States Dollar and Euro respectively.

(d)     Basis of consolidation

Subsidiaries are entities controlled by the Company. Control exists when the Company has the power, directly and indirectly, to govern the financial and operating policies of an entity and be exposed to the variable returns from its activities. The financial statements of subsidiaries are included in the consolidated financial statements from the date that control commences until the date that control ceases. The following is a list of the Company's operating subsidiaries:

| Subsidiaries | Jurisdiction of incorporation | Ownership interest |
|---|---|---|
| Broken Coast Cannabis Ltd. | British Columbia, Canada | 100% |
| SweetWater Brewing Company, LLC | Georgia, United States of America | 100% |
| ARA – Avanti Rx Analytics Inc. | Ontario, Canada | 100% |
| FL Group S.r.l. | Italy | 100% |
| ABP, S.A. | Argentina | 100% |
| Aphria Germany GmbH | Germany | 100% |
| Aphria RX GmbH | Germany | 100% |
| CC Pharma GmbH | Germany | 100% |
| CC Pharma Research and Development GmbH | Germany | 100% |
| Aphria Wellbeing GmbH | Germany | 100% |
| Marigold Projects Jamaica Limited | Jamaica | 95%[1] |
| ASG Pharma Ltd. | Malta | 100% |
| ColCanna S.A.S. | Colombia | 90% |
| CC Pharma Nordic ApS | Denmark | 75% |
| 1974568 Ontario Ltd. | Ontario, Canada | 51% |

Intragroup balances, and any unrealized gains and losses or income and expenses arising from transactions with jointly controlled entities are eliminated to the extent of the Company's interest in the entity.

The Company treats transactions with non-controlling interests that do not result in a loss of control as transactions with equity owners of the Company. A change in ownership interest results in an adjustment between the carrying amounts of the controlling and non-controlling interests to reflect their relative interests in the subsidiary. Any difference between the amount of the adjustment to non-controlling interests and any consideration paid or received is recognized in a separate reserve within equity attributable to the owners of the Company.

3.    Significant accounting policies

These condensed interim consolidated financial statements have been prepared following the same accounting policies used in the preparation of the audited financial statements of the Company for the year ended May 31, 2020. For comparative purposes, the Company has reclassified certain immaterial items on the condensed interim consolidated statements of financial position and the condensed interim consolidated statements of income (loss) and comprehensive income (loss) to conform with the current period's presentation.

---

[1] The Company holds 49% of the issued and outstanding shares of Marigold Projects Jamaica Limited through wholly-owned subsidiary Marigold Acquisitions Inc. The Company holds rights through a licensing agreement to 95% of the results of operations of Marigold Projects Jamaica Limited.

**Aphria Inc.**
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

### 4.   Prepaids and other current assets

Prepaids and other current assets are comprised of:

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| Sales tax receivable | $  3,677 | $  11,670 |
| Prepaid assets | 27,064 | 23,365 |
| Other | 3,991 | 7,948 |
|  | $  34,732 | $  42,983 |

### 5.   Inventory

Inventory is comprised of:

|  | Capitalized cost | Fair value adjustment | February 28, 2021 | May 31, 2020 |
|---|---|---|---|---|
| Cannabis | $  111,519 | $  100,715 | $  212,234 | $  151,715 |
| Cannabis trim | 6,920 | -- | 6,920 | 4,023 |
| Cannabis oil | 23,373 | 1,095 | 24,468 | 43,082 |
| Cannabis vapes | 7,288 | 319 | 7,607 | 7,551 |
| Packaging and other inventory items | 28,427 | -- | 28,427 | 22,609 |
| Beverage alcohol inventory | 5,647 | -- | 5,647 | -- |
| Distribution inventory | 28,491 | -- | 28,491 | 35,341 |
|  | $  211,665 | $  102,129 | $  313,794 | $  264,321 |

The Company's capitalized cost (decreased) increased by $(3,377) and $25,890 for the three and nine months ended February 28, 2021. The (decrease) increase in capitalized costs is made up of the following: cannabis related inventory increased by $7,473 and $27,093, beverage alcohol inventory increased by $(975) and $5,647 and distribution inventory increased (decreased) by $(9,875) and $(6,850) for the three and nine months ended February 28, 2021.

### 6.   Biological assets

Biological assets are comprised of:

|  | Amount |
|---|---|
| Balance at May 31, 2019 | $  18,725 |
| Changes in fair value less costs to sell due to biological transformation | 115,255 |
| Production costs capitalized | 131,561 |
| Transferred to inventory upon harvest | (237,200) |
| Balance at May 31, 2020 | $  28,341 |
| Changes in fair value less costs to sell due to biological transformation | 124,209 |
| Production costs capitalized | 94,157 |
| Transferred to inventory upon harvest | (219,642) |
| Balance at February 28, 2021 | $  27,065 |

The Company values cannabis plants at cost, which approximates fair value from the date of initial clipping from mother plants until half-way through the flowering cycle of the plants. Measurement of the biological transformation of the plant at fair value less costs to sell begins in the fourth week prior to harvest and is recognized evenly until the point of harvest. The number of weeks in the growing cycle is between twelve and sixteen weeks from propagation to harvest. The Company has determined the fair value less costs to sell of cannabis to be between $2.40 and $2.90 per gram, upon harvest for greenhouse produced cannabis (May 31, 2020 – $3.00 per gram) and between $3.50 and $4.00 per gram (May 31, 2020 - $4.00 per gram), upon harvest for indoor produced cannabis. The Company has determined the fair value increment on cannabis trim to be $nil per gram (May 31, 2020 - $0.01 per gram).

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

The fair value of biological assets is determined using a valuation model to estimate expected harvest yield per plant applied to the estimated price per gram less processing and selling costs. Only when there is a material change from the expected fair value used for cannabis does the Company make any adjustments to the fair value used. During the period, the Company amended the fair value based on an expected lower average selling price with the release of the Company's economy brands, which the Company is using to create demand for lower potency harvested cannabis.

In determining the fair value of biological assets, management has made the following estimates in this valuation model:

- The harvest yield is between 20 grams and 60 grams per plant;
- The selling price is between $1.50 and $6.50 per gram of cannabis;
- Processing costs include drying and curing, testing, post-harvest overhead allocation, packaging and labelling costs between $0.30 and $0.80 per gram;
- Selling costs include shipping, order fulfilment, patient acquisition and patient maintenance costs between $0.00 and $1.50 per gram;

Sales prices used in the valuation of biological assets is based on the average selling price of all cannabis products and can vary based on different strains being grown as well as the proportion of sales derived from wholesale compared to retail. Selling costs vary depending on methods of selling and are considered based on the expected method of selling and the determined additional costs which would be incurred. Expected yields for the cannabis plant is also subject to a variety of factors, such as strains being grown, length of growing cycle, and space allocated for growing. Management reviews all significant inputs based on historical information obtained as well as based on planned production schedules.

Management has quantified the sensitivity of the inputs and determined the following:

- Selling price per gram – a decrease in the average selling price per gram by 5% would result in the biological asset value decreasing by $674 (May 31, 2020 - $682) and inventory decreasing by $12,215 (May 31, 2020 - $9,895)
- Harvest yield per plant – a decrease in the harvest yield per plant of 5% would result in the biological asset value decreasing by $404 (May 31, 2020 - $439)

These inputs are level 3 on the fair value hierarchy and are subject to volatility in market prices and several uncontrollable factors, which could significantly affect the fair value of biological assets in future periods.

7.  **Related party transactions**

Key management personnel compensation for the three and nine months ended February 28, 2021 and February 29, 2020 was comprised of:

|  | For the three months ended February 28, | | For the nine months ended February 28, | |
| --- | --- | --- | --- | --- |
|  | 2021 | 2020 | 2021 | 2020 |
| Salaries | $ 1,548 | $ 1,769 | $ 8,528 | $ 4,930 |
| Stock options vested during the period | 145 | 252 | 1,317 | 1,370 |
| Deferred share units vested in the period | 212 | 220 | 1,577 | 806 |
| Deferred share units revalued in the period | 4,039 | (149) | 4,289 | (491) |
| Restricted share units vested in the period | 2,043 | 331 | 7,183 | 474 |
| Restricted share units revalued in the period | 19,486 | (42) | 24,971 | (24) |
|  | $ 27,473 | $ 2,381 | $ 47,865 | $ 7,065 |

Directors and officers of the Company control 0.10% or 332,377 of the voting shares of the Company.

As at February 28, 2021, a balance paid to an officer and director of the Company of $nil (May 31, 2020 - $801) is included within prepaid and other current assets.

During the period, the Company issued 150,000 deferred share units to directors of the Company under the terms of the Company's Omnibus Long-Term Incentive Plan, all of which vest over one year.

**Aphria Inc.**
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

During the period, the Company issued 866,190 restricted share units to officers and directors of the Company under the terms of the Company's Omnibus Long-Term Incentive Plan, all of which vest over two years.

During the period, the Company issued 50,000 stock options to officers of the Company, under the terms of the Company's Omnibus Long-Term Incentive Plan, all of which vest over three years.

8.  Capital assets

| | Land | Production facility | Equipment | Leasehold improvements | Construction in process | Right-of-use assets | Total capital assets |
|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | |
| At May 31, 2019 | $ 33,153 | $ 232,468 | $ 79,627 | $ 1,236 | $ 174,182 | $ -- | $ 520,666 |
| IFRS 16 Adjustment | -- | -- | -- | -- | -- | 8,606 | 8,606 |
| Additions | -- | 4,480 | 21,034 | 1,240 | 101,284 | 677 | 128,715 |
| Transfers | 72 | 37,491 | 108,730 | 16,081 | (162,414) | 40 | -- |
| Disposals | -- | -- | (7,157) | -- | (5,559) | -- | (12,716) |
| Impairment | (15) | (3,433) | (46) | (119) | (2,147) | (840) | (6,600) |
| Effect of foreign exchange | -- | 14 | 22 | -- | 114 | 107 | 257 |
| At May 31, 2020 | 33,210 | 271,020 | 202,210 | 18,438 | 105,460 | 8,590 | 638,928 |
| Business Acquisition | -- | -- | 13,502 | 523 | 2,017 | 39,992 | 56,034 |
| Additions | 314 | 3,755 | 5,419 | 434 | 28,576 | 1,449 | 39,947 |
| Transfers | -- | 48,659 | 13,518 | -- | (62,177) | -- | -- |
| Effect of foreign exchange | 3 | (37) | (272) | (11) | 29 | (777) | (1,065) |
| **At February 28, 2021** | **$ 33,527** | **$ 323,397** | **$ 234,377** | **$ 19,384** | **$ 73,905** | **$ 49,254** | **$ 733,844** |
| | | | | | | | |
| **Accumulated depreciation** | | | | | | | |
| At May 31, 2019 | $ -- | $ 7,660 | $ 8,919 | $ 189 | $ -- | $ -- | $ 16,768 |
| Amortization | -- | 13,584 | 19,508 | 450 | -- | 1,455 | 34,997 |
| At May 31, 2020 | -- | 21,244 | 28,427 | 639 | -- | 1,455 | 51,765 |
| Amortization | -- | 13,397 | 21,501 | 840 | -- | 1,630 | 37,368 |
| **At February 28, 2021** | **$ --** | **$ 34,641** | **$ 49,928** | **$ 1,479** | **$ --** | **$ 3,085** | **$ 89,133** |
| | | | | | | | |
| **Net book value** | | | | | | | |
| At May 31, 2019 | $ 33,153 | $ 224,808 | $ 70,708 | $ 1,047 | $ 174,182 | $ -- | $ 503,898 |
| At May 31, 2020 | $ 33,210 | $ 249,776 | $ 173,783 | $ 17,799 | $ 105,460 | $ 7,135 | $ 587,163 |
| **At February 28, 2021** | **$ 33,527** | **$ 288,756** | **$ 184,449** | **$ 17,905** | **$ 73,905** | **$ 46,169** | **$ 644,711** |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

9.  Intangible assets

| | Customer relationships | Corporate website | Licences, permits & applications | Non-compete agreements | Intellectual property, trademarks & brands | Total intangible assets |
|---|---|---|---|---|---|---|
| **Cost** | | | | | | |
| At May 31, 2019 | $ 33,030 | $ 905 | $ 275,880 | $ 3,330 | $ 98,530 | $ 411,675 |
| Additions | 112 | 557 | 2,893 | 2 | 1,944 | 5,508 |
| Impairment | -- | -- | (19,363) | -- | -- | (19,363) |
| Effect of foreign exchange | (540) | (5) | 68 | (55) | (358) | (890) |
| At May 31, 2020 | 32,602 | 1,457 | 259,478 | 3,277 | 100,116 | 396,930 |
| Business acquisition | 201,547 | -- | -- | 13,003 | 119,628 | 334,178 |
| Additions | -- | 97 | 2,410 | -- | 1,070 | 3,577 |
| Disposals | -- | -- | -- | -- | (8,193) | (8,193) |
| Effect of foreign exchange | (3,484) | 7 | 96 | (204) | (1,859) | (5,444) |
| At February 28, 2021 | $ 230,665 | $ 1,561 | $ 261,984 | $ 16,076 | $ 210,762 | $ 721,048 |
| | | | | | | |
| **Accumulated depreciation** | | | | | | |
| At May 31, 2019 | $ 6,003 | $ 417 | $ 859 | $ 1,490 | $ 10,850 | $ 19,619 |
| Amortization | 6,040 | 437 | 176 | 1,348 | 6,273 | 14,274 |
| At May 31, 2020 | 12,043 | 854 | 1,035 | 2,838 | 17,123 | 33,893 |
| Amortization | 7,558 | 218 | 387 | 538 | 8,751 | 17,452 |
| At February 28, 2021 | $ 19,601 | $ 1,072 | $ 1,422 | $ 3,376 | $ 25,874 | $ 51,345 |
| | | | | | | |
| **Net book value** | | | | | | |
| At May 31, 2019 | $ 27,027 | $ 488 | $ 275,021 | $ 1,840 | $ 87,680 | $ 392,056 |
| At May 31, 2020 | $ 20,559 | $ 603 | $ 258,443 | $ 439 | $ 82,993 | $ 363,037 |
| At February 28, 2021 | $ 211,064 | $ 489 | $ 260,562 | $ 12,700 | $ 184,888 | $ 669,703 |

Included in Licences, permits & applications is $254,216 of indefinite lived intangible assets. During the period, the Company disposed of $8,193 of trademarks for proceeds of $8,193.

10.  Business Acquisition

*Acquisition of SW Brewing Company, LLC*

On November 25, 2020, the Company, through its wholly-owned subsidiary Four Twenty Corporation, completed the purchase of all the shares of SW Brewing Company, LLC which is the holding company of 100% of the common shares of SweetWater. The purchase price consisted of cash consideration of $255,543 USD ($332,283 CAD), share consideration of 9,823,183 shares, and additional cash consideration of up to $66,000 USD contingent on SweetWater achieving specified EBITDA targets. The fair value of the shares on the date the Company closed the acquisition was $85,796, the fair value of the contingent consideration on the date the Company closed the acquisition was $58,959 USD ($76,664 CAD). During the quarter, the Company completed their review of the opening net working capital in accordance with the purchase agreement. Based on this review, the Company recorded an adjustment to the purchase price of $1,016 USD ($1,321 CAD) associated with the adjustment to the opening working capital acquired.

The Company is in the process of assessing the fair value of the net assets acquired and, as a result, the fair value of the net assets acquired may be subject to adjustments pending completion of final valuations and post-closing adjustments. The table below summarizes preliminary estimated fair value of the assets acquired and the liabilities assumed at the effective acquisition date.

**Aphria Inc.**
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

|  | Amount |
|---|---|
| **Consideration** |  |
| Cash | $ 332,283 |
| Shares | 85,675 |
| Contingent consideration | 76,664 |
| **Total consideration** | **$ 494,622** |
|  |  |
| **Net assets acquired** |  |
| Current assets |  |
| Cash and cash equivalents | 9,086 |
| Accounts receivable | 4,954 |
| Prepaids and other current assets | 686 |
| Inventory | 6,261 |
| Long-term assets |  |
| Capital assets | 56,034 |
| Customer relationships | 201,547 |
| Intellectual property, trademarks & brands | 119,628 |
| Non-compete agreements | 13,003 |
| Goodwill | 130,293 |
| **Total assets** | **541,492** |
| Current liabilities |  |
| Accounts payable and accrued liabilities | 6,878 |
| Current portion of lease liabilities | 564 |
| Long-term liabilities |  |
| Lease liabilities | 39,428 |
| **Total liabilities** | **46,870** |
| **Total net assets acquired** | **$ 494,622** |

Revenue and net income and comprehensive net income for the Company would have been higher by approximately $40,000 and $16,000 for the nine months ended February 29, 2021 if the acquisition had taken place on June 1, 2020. In connection with this transaction, the Company expensed transaction costs of $20,870.

The contingent consideration from the acquisition of SweetWater is a fair value measurement and as such is carried at fair value. The fair value has been determined by discounting future expected cash outflows at a discount rate of 5%. The inputs into the future expected cash outflows are level 3 on the fair value hierarchy and are subject to volatility and uncertainty, which could significantly affect the fair value of the contingent consideration in future periods. As at February 28, 2021, the fair value of the contingent consideration was $76,196, expected to be paid in December 2023.

Goodwill is comprised of:

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| CannWay Pharmaceuticals Inc. acquisition | $ 1,200 | $ 1,200 |
| Broken Coast Cannabis Ltd. acquisition | 146,091 | 146,091 |
| Nuuvera Corp. acquisition | 377,221 | 377,221 |
| LATAM Holdings Inc. acquisition | 87,188 | 87,188 |
| CC Pharma GmbH acquisition | 6,146 | 6,146 |
| SweetWater acquisition | 130,293 | -- |
| Effect of foreign exchange | (2,231) | 88 |
|  | $ 745,908 | $ 617,934 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

During the period ended February 28, 2021, the Company completed its quarterly assessment of indicators of impairment of the Company's cash-generating units ("CGUs"). The Company determined there were no indicators of impairment and therefore was not required to estimate the recoverable amount of the CGUs.

## 11.  Convertible notes receivable

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| HydRx Farms Ltd. (d/b/a Scientus Pharma) | $  -- | $  6,000 |
| 10330698 Canada Ltd. (d/b/a Starbuds) | 2,000 | 4,728 |
| High Tide Inc. | 4,089 | 3,898 |
|  | 6,089 | 14,626 |
| Deduct - current portion | (6,089) | (14,626) |
|  | $  -- | $  -- |

### HydRx Farms Ltd. (d/b/a Scientus Pharma)

On August 14, 2017, Aphria purchased $11,500 in secured convertible debentures of Scientus Pharma ("SP"). The convertible debentures bore interest at 8%, paid semi-annually, matured in two years and included the right to convert the debentures into common shares of SP at $2.75 per common share at any time before maturity. During the period, the Company settled the note receivable for $5,000.

### 10330698 Canada Ltd. (d/b/a Starbuds)

On December 28, 2018, Aphria purchased $5,000 in secured convertible debentures of Starbuds. The convertible debentures bear interest at 8.5% per annum accruing daily until maturity on December 28, 2020. The debentures are secured against the assets of Starbuds. The debentures and any accrued and unpaid interest are convertible into common shares for $0.50 per common share and matured on December 28, 2020. Starbuds is currently in default under the convertible debentures.

As at February 28, 2021, the fair value of the Company's secured convertible debentures was $2,000 (May 31, 2020 - $4,728), which includes $465 (May 31, 2020 - $216) of accrued interest. The remaining change resulted in a fair value gain (loss) for the three and nine months ended February 28, 2021 of $(3,384) and $(2,977) (2020 - $172 and (853)).

### High Tide Inc.

On April 10, 2019, Aphria purchased $4,500 in unsecured convertible debentures of High Tide Inc. ("High Tide"). The convertible debentures bear interest at 10% per annum, payable annually up front in common shares of High Tide based on the 10-day volume weighted average price (the "Debentures"). The debentures mature on April 10, 2021 and are convertible into common shares of High Tide at a price of $0.75 at the option of the holder. In addition to the debentures, the Company received 6,000,000 warrants in High Tide as part of the purchase of the unsecured convertible debentures (Note 12).

As at February 28, 2021, the fair value of the unsecured convertible debentures was $4,089 (May 31, 2020 - $3,898), which resulted in a fair value gain (loss) for the three and nine months ended February 28, 2021 of $66 and $191 (2019 - $12 and (162)).

### Convertible notes receivable

The gain (loss) on convertible notes receivable recognized in the results of operations amounts to $(3,318) and $(3,786) for the three and nine months ended February 28, 2021 (2020 - $(630) and $(7,569)).

The fair value was determined using the Black-Scholes option pricing model using the following assumptions: the risk-free rate of 1.25%; expected life of the convertible note; volatility of 70% based on comparable companies; forfeiture rate of nil; dividend yield of nil; and, the exercise price of the respective conversion feature.

**Aphria Inc.**
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

## 12. Long-term investments

| | Cost May 31, 2020 | Fair value May 31, 2020 | Investment | Divesture/ Transfer | Subtotal February 28, 2021 | Change in fair value | Fair value February 28, 2021 |
|---|---|---|---|---|---|---|---|
| **Level 1 on fair value hierarchy** | | | | | | | |
| Tetra Bio-Pharma Inc. | 19,057 | 5,784 | - | - | 5,784 | (673) | **5,111** |
| Aleafia Health Inc. | 10,000 | 3,320 | - | (3,320) | - | - | **-** |
| Rapid Dose Therapeutics Inc. | 5,189 | 1,730 | - | (1,730) | - | - | **-** |
| Fire & Flower Inc. | 389 | 237 | - | (237) | - | - | **-** |
| High Tide Inc. | 450 | 165 | - | - | 165 | 561 | **726** |
| Althea Group Holdings Ltd. | 2,206 | 4,266 | - | (4,266) | - | - | **-** |
| | 37,291 | 15,502 | - | (9,553) | 5,949 | (112) | **5,837** |
| **Level 3 on fair value hierarchy** | | | | | | | |
| Resolve Digital Health Inc. | 718 | - | - | - | - | - | **-** |
| Resolve Digital Health Inc. | 282 | - | - | - | - | - | **-** |
| Green Acre Capital Fund I | 2,000 | 2,373 | - | - | 2,373 | (173) | **2,200** |
| Weekend Holdings Corp. | 1,890 | 1,379 | - | - | 1,379 | (745) | **634** |
| IBBZ Krankenhaus GmbH | 1,956 | 1,993 | - | (1,993) | - | - | **-** |
| Greenwell Brands GmbH | 152 | 155 | - | (155) | - | - | **-** |
| HighArchy Ventures Ltd. | 9,995 | 4,997 | - | - | 4,997 | (2,997) | **2,000** |
| Schroll Medical ApS | 605 | 617 | - | - | 617 | 4 | **621** |
| | 17,598 | 11,514 | - | (2,148) | 9,366 | (3,911) | **5,455** |
| | 54,889 | 27,016 | - | (11,701) | 15,315 | (4,023) | **11,292** |

**Tetra Bio-Pharma Inc.**
The Company owns 26,900,000 common shares and 6,900,000 warrants at a cost of $19,057, with a fair value of $5,111 as at February 28, 2021. Each warrant is exercisable at $1.29 per warrant expiring November 1, 2021.

**Aleafia Health Inc. (formerly Emblem Corp.) ("Aleafia")**
During the period, the Company sold 5,823,831 common shares in Aleafia, for proceeds of $3,066 resulting in a loss of $254 (Note 28).

**Rapid Dose Therapeutics Inc. ("RDT")**
During the period, the Company sold 6,918,500 common shares in RDT for proceeds of $1,360 resulting in a loss of $370 (Note 28).

**Fire & Flower Inc.**
During the period, the Company sold 334,525 common shares, for proceeds of $252 resulting in a gain of $15 (Note 28).

**High Tide Inc.**
The Company owns 943,396 common shares and 6,000,000 warrants in High Tide Inc. at a cost of $450, with a fair value of $726 as at February 28, 2021. Each warrant is exercisable at $0.85 per warrant expiring April 18, 2021.

**Althea Group Holdings Ltd. ("Althea")**
During the period, the Company sold 12,250,000 common shares of Althea for proceeds of $5,022 AUD ($4,800 CAD), resulting in a gain of $534 (Note 28).

**Resolve Digital Health Inc. ("Resolve")**
The Company owns 2,200,026 common shares and 2,200,026 warrants in Resolve at a total cost of $1,000, with a fair value of $nil as at February 28, 2021. The Company determined the fair value of its investment based on its net realizable value. Each warrant is exercisable at $0.65 per warrant expiring December 1, 2021.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

**Green Acre Capital Fund I**
The Company invested $2,000 to Green Acre Capital Fund I. The Company determined the fair value of its investment, based on its proportionate share of net assets, to be $2,200 as at February 28, 2021. The Company has received $1,560 return of capital since its initial contribution.

**Weekend Holdings Corp.**
The Company owns 2,040,218 shares in Weekend Holdings Corp. for a total cost of $1,420 USD ($1,890 CAD), with a fair value of $500 USD ($634 CAD) as at February 28, 2021. The Company determined the fair value of its investment based on its net realizable value. The Company recognized a loss from the change in fair value of $745.

**IBBZ Krankenhaus GmbH Klinik Hygiea ("Krankenhaus")**
During the period, the Company sold its 25.1% interest in Krankenhaus, which is the owner and operator of Berlin-based Schöneberg Hospital, for proceeds of €400 ($600 CAD), resulting in a loss of $1,393 (Note 28).

**Greenwell Brands GmbH ("Greenwell")**
During the period, the Company sold 1,250 common shares of Greenwell for proceeds of €250 ($374 CAD), resulting in a gain of $219 (Note 28).

**HighArchy Ventures Ltd. ("HighArchy")**
The Company owns 9,453,168 shares, and has an option to re-acquire control of 10,536,832 shares in HighArchy for a total cost of $9,995, with a fair value of $2,000 as at February 28, 2021. The Company determined the fair value of its investment based on its net realizable value.

**Schroll Medical ApS**
The Company has contributed capital of €403 ($605 CAD) and owns 3,000 shares in Schroll Medical ApS. The Company determined that the fair value of its investment, based on the most recent financing at the same price, is equal to its carrying value. The Company recognized a gain from the change in fair value of $4 due to changes in the foreign exchange rate.

13.  **Income taxes and deferred income taxes**

A reconciliation of income taxes at the statutory rate with the reported taxes is as follows:

|  | For the nine months ended February 28, | |
|---|---|---|
|  | 2021 | 2020 |
| Net (loss) income before income taxes (recovery) | $ (497,709) | $ 20,249 |
| Statutory rate | 26.5% | 26.5% |
| Expected income tax (recovery) at combined basic federal and provincial tax rate | (131,893) | 5,366 |
| Effect on income taxes of: | | |
| Foreign tax differential | (417) | (110) |
| Permanent differences | 45 | (224) |
| Non-deductible share-based compensation and other expenses | 14,344 | 4,537 |
| Non-taxable portion of loss (gains) | 51,496 | (4,759) |
| Other | 442 | 538 |
| Tax assets not recognized | 54,963 | 692 |
|  | $ (11,020) | $ 6,040 |
| Income tax expense (recovery) is comprised of: | | |
| Current | $ 27,143 | $ 4,000 |
| Future | (38,163) | 2,040 |
|  | $ (11,020) | $ 6,040 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

The following table summarized the movement in deferred tax:

|  | Amount |
|---|---|
| Balance at May 31, 2019 | $ 87,633 |
| Future income tax recovery | (3,682) |
| Income tax recovery on share issuance costs | (483) |
| Balance at May 31, 2020 | $ 83,468 |
| Future income tax recovery | (38,163) |
| Income tax recovery on share issuance costs | (967) |
| Effect of foreign exchange | 287 |
| **Balance at February 28, 2021** | **$ 44,625** |

The following table summarizes the components of deferred tax:

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| **Deferred tax assets** |  |  |
| Non-capital loss carry forward | $ 95,464 | $ 46,904 |
| Capital loss carry forward | 2,220 | 2,556 |
| Share issuance and financing fees | 5,476 | 6,924 |
| Unrealized loss | 40,783 | -- |
| Other | 8,604 | 2,483 |
| Losses not recognized | (61,075) | (6,112) |
| **Deferred tax liabilities** |  |  |
| Net book value in excess of undepreciated capital cost | (12,798) | (11,523) |
| Intangible assets in excess of tax costs | (94,078) | (95,928) |
| Unrealized gain | -- | (5,592) |
| Biological assets and inventory in excess of tax costs | (29,221) | (23,180) |
| **Net deferred tax liabilities** | **$ (44,625)** | **$ (83,468)** |

## 14. Bank indebtedness

The Company secured an operating line of credit in the amount of $1,000 which bears interest at the lender's prime rate plus 75 basis points. As at February 28, 2021, the Company has not drawn on the line of credit. The operating line of credit is secured by a first charge on the property at 265 Talbot Street West, Leamington, Ontario and a first ranking position on a general security agreement.

The Company's subsidiary, CC Pharma, has two operating lines of credit for €3,500 each, which bear interest at Euro Over Night Index Average plus 1.79% and Euro Interbank Offered Rate plus 3.682%. As at February 28, 2021, a total of €nil ($nil CAD) was drawn down from the available credit of €7,000 (May 31, 2020 - €351 ($537 CAD)). The operating lines of credit are secured by a first charge on the inventory held by CC Pharma.

The Company's subsidiary, Four Twenty Corporation ("420") has a revolving credit facility for $20,000 USD which bears interest at EURIBOR plus an applicable margin. As at February 28, 2021, the Company has not drawn on the credit facility. The revolving credit facility is secured by all of 420 and SweetWater's assets and includes a corporate guarantee by the Company.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

## 15.  Accounts payable and accrued liabilities

Accounts payable and accrued liabilities are comprised of:

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| Trade payables | $ 58,218 | $ 56,749 |
| RSU and DSU accruals | 55,575 | 3,758 |
| Other accruals | 54,437 | 93,145 |
|  | $ 168,230 | $ 153,652 |

## 16.  Long-term debt

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| Credit facility - $80,000 - Canadian prime interest rate plus an applicable margin, 3-year term, with a 10-year amortization, repayable in blended monthly payments, due in November 2022 | $ 78,000 | $ 80,000 |
| Term loan - $25,000 - Canadian Five Year Bond interest rate plus 2.73% with a minimum 4.50%, 5 year term, with a 15-year amortization, repayable in blended monthly payments, due in July 2023 | 17,566 | 18,241 |
| Term loan - $25,000 - 3.95%, compounded monthly, 5 year term with a 15-year amortization, repayable in equal monthly instalments of $188 including interest, due in April 2022 | 21,029 | 21,975 |
| Term loan - $1,250 - 3.99%, 5-year term, with a 10-year amortization, repayable in equal monthly instalments of $13 including interest, due in July 2021 | 740 | 830 |
| Mortgage payable - $3,750 - 3.95%, 5-year term, with a 20-year amortization, repayable in equal monthly instalments of $23 including interest, due in July 2021 | 3,131 | 3,239 |
| Vendor take-back mortgage - $2,850 - 6.75%, 5-year term, repayable in equal monthly instalments of $56 including interest, due in June 2021 | 221 | 701 |
| Term loan - $100,000 USD - EURIBOR Option, 3-year term, with 3-year amortization, repayable in blended quarterly instalments, due in November 2023 | 127,410 | -- |
| Term loan - €5,000 - EURIBOR + 1.79%, 5-year term, repayable in quarterly instalments of €250 plus interest, due in December 2023 | 4,616 | 5,740 |
| Term loan - €5,000 - EURIBOR + 2.68%, 5-year term, repayable in quarterly instalments of €250 plus interest, due in December 2023 | 4,616 | 5,740 |
| Term loan - €1,500 - EURIBOR + 2.00%, 5-year term, repayable in quarterly instalments of €98 including interest, due in April 2025 | 2,307 | 2,296 |
| Term loan - €1,500 - EURIBOR + 2.00%, 5-year term, repayable in quarterly instalments of €98 including interest, due in June 2025 | 2,307 | -- |
|  | 261,943 | 138,762 |
| Deduct    - unamortized financing fees | (2,828) | (658) |
|             - principal portion included in current liabilities | (25,759) | (8,467) |
|  | $ 233,356 | $ 129,637 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

Total long-term debt repayments are as follows:

| Next 12 months | $ 25,759 |
|---|---|
| 2 years | 107,438 |
| 3 years | 124,438 |
| 4 years | 2,462 |
| 5 years | 1,846 |
| Thereafter | -- |
| Balance of obligation | $ 261,943 |

The credit facility of $80,000 was entered into on November 29, 2019 by 51% owned subsidiary Aphria Diamond and is secured by a first charge on the property at 620 County Road 14, Leamington, Ontario, owned by Aphria Diamond, and a guarantee from Aphria Inc. Principal payments started on the credit facility on February 28, 2021.

The term loan of $25,000 was entered into on July 27, 2018 and is secured by a first charge on the property at 223, 231, 239, 265, 269, 271 and 275 Talbot Street West, Leamington Ontario, a first position on a general security agreement, and an assignment of fire insurance to the lender. Principal payments started on the term loan in August 2018. The effective interest rate during the year was 4.68%.

The term loan of $25,000 was entered into on May 9, 2017 and is secured by a first charge on the property at 265 Talbot Street West, Leamington Ontario, a first position on a general security agreement, and an assignment of fire insurance to the lender. Principal payments started on the term loan in March 2018.

The term loan of $1,250 and mortgage payable of $3,750 were entered into on July 22, 2016 and are secured by a first charge on the property at 265 Talbot Street West, Leamington, Ontario and a first position on a general security agreement.

The vendor take-back mortgage payable of $2,850 was entered into on June 30, 2016 in conjunction with the acquisition of the property at 265 Talbot Street West. The mortgage is secured by a second charge on the property at 265 Talbot Street West, Leamington, Ontario.

During the quarter, the Company entered into a term loan for $100,000 USD ($127,410 CAD) through wholly-owned subsidiary 420. The term loan is secured by all of 420 and SweetWater's assets and includes a corporate guarantee by the Company.

During the period, the Company entered into a term loan for €1,500 ($2,332 CAD) through wholly-owned subsidiary CC Pharma. The term loans for €13,500 ($14,772 CAD) are held through wholly-owned subsidiary CC Pharma. These term loans are secured against the distribution inventory held by CC Pharma.

17. Convertible debentures

| | February 28, 2021 | May 31, 2020 |
|---|---|---|
| Opening balance | $ 270,783 | $ 421,366 |
| Debt settlement | -- | (91,169) |
| Fair value adjustment | 352,013 | (59,414) |
| **Closing balance** | **$ 622,796** | $ 270,783 |

The unsecured convertible debentures were entered into in April 2019, in the principal amount of $350,000 USD, are due in five years from issuance (the "Notes"). The Notes bear interest at a rate of 5.25% per annum, payable semi-annually in arrears on June 1 and December 1 of each year, beginning on December 1, 2019. The Notes are an unsecured obligation and ranked senior in right of payment to all indebtedness that is expressly subordinated in right of payment to the Notes. The Notes will rank equal in right of payment with all liabilities that are not subordinated. The Notes are effectively junior to any secured indebtedness to the extent of the value of the assets securing such indebtedness.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

Holders of the Notes may convert all or any portion of their Notes, in multiples of $1 USD principal amount, at their option at any time between December 1, 2023 to the maturity date. The initial conversion rate for the Notes will be 106.5644 common shares of Aphria per $1 USD principal amount of Notes, which will be settled in cash, common shares of Aphria or a combination thereof, at Aphria's election. This is equivalent to an initial conversion price of approximately $9.38 per common share, subject to adjustments in certain events. In addition, holders of the Notes may convert all or any portion of their Notes, in multiples of $1 USD principal amount, at their option at any time preceding December 1, 2023, if:

(a) the last reported sales price of the common shares for at least 20 trading days during a period of 30 consecutive trading days immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day;
(b) during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price per $1 USD principal amount of the Notes for each trading day of the measurement period is less than 98% of the product of the last reported sale price of the Company's common shares and the conversion rate on each such trading day;
(c) the Company calls any or all of the Notes for redemption or;
(d) upon occurrence of specified corporate event.

The Company may not redeem the Notes prior to June 6, 2022, except upon the occurrence of certain changes in tax laws. On or after June 6, 2022, the Company may redeem for cash all or part of the Notes, at its option, if the last reported sale price of the Company's common shares has been at least 130% of the conversion price then in effect for at least 20 trading days during any 30 consecutive trading day period ending on and including trading day immediately preceding the date on which the Company provides notice of redemption. The redemption of Notes will be equal to 100% of the principal amount plus accrued and unpaid interest to, but excluding, the redemption date.

As at February 28, 2021 there was $259,240 USD principal outstanding (May 31, 2020 - $259,240 USD).

## 18.  Share capital

The Company is authorized to issue an unlimited number of common shares. As at February 28, 2021, the Company has issued 316,795,419 shares.

| Common Shares | Number of shares | Amount |
|---|---|---|
| Balance at May 31, 2020 | 286,520,265 | $ 1,846,938 |
| Legal settlement | 2,259,704 | 12,963 |
| Equity financing | 17,432,879 | 128,448 |
| SweetWater acquisition | 9,823,183 | 85,675 |
| Options exercised | 232,539 | 1,929 |
| RSUs exercised | 526,849 | 3,220 |
| | 316,795,419 | $ 2,079,173 |

a) In June 2020 and September 2020, the Company issued 1,658,375 and 601,329 shares as part of legal settlements;
b) In November 2020, the Company completed its at-the-market financing for net proceeds of $128,448 and issued 17,432,879 shares.
c) In November 2020, the Company completed the acquisition of SweetWater (Note 10) in which it issued 9,823,183 shares.
d) Throughout the period, 232,539 shares were issued from the exercise of stock options with exercise prices ranging from $1.64 to $12.77 for a value of $1,929, including any cash consideration; and,
e) Throughout the period, 526,849 shares were issued in accordance with the restricted share unit plan to employees.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

19.  Warrants

The warrant details of the Company are as follows:

| Type of warrant | Expiry date | Number of warrants | Weighted average price | Amount |
|---|---|---|---|---|
| Warrant | September 26, 2021 | 200,000 | $  3.14 | $  360 |
| Warrant | January 30, 2022 | 7,022,472 | 9.26 | -- |
| | | 7,222,472 | $  9.09 | $  360 |

| | February 28, 2021 | | May 31, 2020 | |
|---|---|---|---|---|
| | Number of warrants | Weighted average price | Number of warrants | Weighted average price |
| Outstanding, beginning of the period | 7,222,472 | $  9.09 | 2,292,800 | $  12.25 |
| Exercised during the period | -- | -- | (766,372) | 1.50 |
| Issued during the period | -- | -- | 7,022,472 | 9.26 |
| Expired during the period | -- | -- | (1,326,428) | 19.84 |
| Outstanding, end of the period | 7,222,472 | $  9.09 | 7,222,472 | $  9.09 |

20.  Stock options

The Company adopted a stock option plan under which it is authorized to grant options to officers, directors, employees and consultants enabling them to acquire common shares of the Company. The maximum number of common shares reserved for issuance of stock options that can be granted under the plan is 10% of the issued and outstanding common shares of the Company. The options granted can be exercised for up to a maximum of 10 years and vest as determined by the Board of Directors. The exercise price of each option can not be less than the market price of the common shares on the date of grant.

The Company recognized a share-based compensation expense of $901 and $3,691 during the three and nine months ended February 28, 2021 (2020 - $2,632 and $9,693), related to stock options (Note 25). The total fair value of options granted during the period was $111 (2020 - $6,842).

| | February 28, 2021 | | May 31, 2020 | |
|---|---|---|---|---|
| | Number of options | Weighted average price | Number of options | Weighted average price |
| Outstanding, beginning of the period | 5,882,471 | $  11.95 | 7,814,996 | $  11.05 |
| Exercised during the period | (626,215) | 5.80 | (1,566,331) | 3.86 |
| Issued during the period | 50,000 | 6.00 | 1,894,128 | 7.98 |
| Forfeited during the period | (797,095) | 10.28 | (2,260,322) | 11.10 |
| Expired during the period | (142,000) | 12.22 | -- | -- |
| Outstanding, end of the period | 4,367,161 | $  13.06 | 5,882,471 | $  11.95 |
| Exercisable, end of the period | 3,557,168 | $  13.82 | 3,873,497 | $  12.26 |

In June 2020, the Company issued 50,000 stock options at an exercise price of $6.00 per share, exercisable for 5 years to an officer of the Company. Nil options vested immediately and the remainder vest over 3 years.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

The outstanding option details of the Company are as follows:

| Expiry date | Weighted average exercise price | Number of options | Vested and exercisable |
|---|---|---|---|
| January 2021[2] | $ 21.70 | 10,000 | 10,000 |
| January 2021[2] | $ 22.89 | 80,000 | 80,000 |
| March 2021 | $ 14.39 | 20,000 | 20,000 |
| March 2021 | $ 9.98 | 200,000 | 200,000 |
| May 2021 | $ 20.19 | 858,500 | 858,500 |
| June 2021 | $ 1.40 | 1,668 | 1,668 |
| June 2021 | $ 11.78 | 50,000 | 50,000 |
| October 2022 | $ 6.90 | 37,000 | 37,000 |
| July 2023 | $ 11.51 | 53,333 | 39,999 |
| July 2023 | $ 11.85 | 251,334 | 188,000 |
| September 2023 | $ 19.38 | 130,000 | 103,332 |
| October 2023 | $ 19.70 | 40,000 | 26,666 |
| February 2024 | $ 12.77 | 65,001 | 39,999 |
| February 2024 | $ 13.31 | 1,000,000 | 1,000,000 |
| April 2024 | $ 11.45 | 60,000 | 19,998 |
| June 2024 | $ 9.15 | 300,000 | 100,000 |
| June 2024 | $ 9.70 | 50,000 | 16,666 |
| August 2024 | $ 9.13 | 401,155 | 122,837 |
| October 2024 | $ 6.63 | 300,000 | 300,000 |
| November 2024 | $ 6.26 | 250,000 | 183,333 |
| June 2025 | $ 6.00 | 50,000 | -- |
| March 2028 | $ 12.29 | 119,378 | 119,378 |
| March 2028 | $ 14.38 | 39,792 | 39,792 |
| **Outstanding, end of the period** | **$ 13.06** | **4,367,161** | **3,557,168** |

The Company used the Black-Scholes option pricing model to determine the fair value of options granted using the following assumptions: risk-free rate of 0.39% on the date of grant; expected life of 5 years; volatility of 70% based on comparable companies; forfeiture rate of 35%; dividend yield of nil; and, the exercise price of the respective option.

---

[2] At quarter-end and as a result of its proposed transaction with Tilray, the Company remained in a No Trade Period under its Insider Trading Policy. Under the terms of the Company's Omnibus Long-Term Incentive Program, a No Trade Period freezes any expiry equity awards until the date that is 10 days after the end of the No Trade Period.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

21.  Non-controlling interests

The following tables summarise the information relating to the Company's subsidiaries, CC Pharma Nordic ApS, Aphria Diamond, Marigold Projects Jamaica Limited ("Marigold"), and ColCanna S.A.S. before intercompany eliminations.

Non-controlling interests as at February 28, 2021:

| | CC Pharma Nordic ApS | Aphria Diamond | Marigold | ColCanna S.A.S. | February 28, 2021 |
|---|---|---|---|---|---|
| Current assets | $ 1,050 | $ 49,104 | $ -- | $ 588 | $ 50,742 |
| Non-current assets | $ 120 | 183,563 | -- | 115,663 | 299,346 |
| Current liabilities | $ (1,065) | (39,915) | -- | (78) | (41,058) |
| Non-current liabilities | $ (513) | (90,030) | -- | (34,641) | (125,184) |
| Net assets | (408) | 102,722 | -- | 81,532 | 183,846 |
| Non-controlling interests % | 25% | 49% | 5% | 10% | |
| Non-controlling interests | $ (102) | $ 50,334 | $ -- | $ 8,153 | $ 58,385 |

Non-controlling interests as at May 31, 2020:

| | Aphria Diamond | Marigold | ColCanna S.A.S. | May 31, 2020 |
|---|---|---|---|---|
| Current assets | $ 51,521 | $ -- | $ 754 | $ 52,275 |
| Non-current assets | 176,507 | -- | 115,614 | 292,121 |
| Current liabilities | (15,630) | -- | (378) | (16,008) |
| Non-current liabilities | (176,516) | -- | (33,738) | (210,254) |
| Net assets | 35,882 | -- | 82,252 | 118,134 |
| Non-controlling interests % | 49% | 5% | 10% | |
| Non-controlling interests | $ 17,582 | $ -- | $ 8,225 | $ 25,807 |

Non-controlling interests for the nine months ended February 28, 2021:

| | CC Pharma Nordic ApS | Aphria Diamond | Marigold | ColCanna S.A.S. | February 28, 2021 |
|---|---|---|---|---|---|
| Revenue | $ 586 | $ 138,923 | $ -- | $ -- | $ 139,509 |
| Total expenses (recovery) | $ 994 | $ 42,082 | -- | $ 720 | 43,796 |
| Net comprehensive income | (408) | 96,841 | -- | (720) | 95,713 |
| Non-controlling interests % | 25% | 49% | 5% | 10% | |
| | $ (102) | $ 47,452 | $ -- | $ (72) | $ 47,278 |

Non-controlling interests for the nine months ended February 29, 2020:

| | Aphria Diamond | CannInvest Africa Ltd. | Verve Dynamics | Marigold | ColCanna S.A.S. | February 29, 2020 |
|---|---|---|---|---|---|---|
| Revenue | $ 2,628 | $ -- | $ -- | $ 53 | $ -- | $ 2,681 |
| Total expenses (recovery) | 5,181 | $ 55 | $ 276 | 189 | (145) | 5,556 |
| Net comprehensive loss | (2,553) | (55) | (276) | (136) | 145 | (2,875) |
| Non-controlling interests % | 49% | 50% | 70% | 5% | 10% | |
| | $ (1,251) | $ (28) | $ (193) | $ (7) | $ 15 | $ (1,464) |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

22. Net revenue

Net revenue is comprised of:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Cannabis revenue | $ 69,071 | $ 64,974 | $ 239,293 | $ 140,275 |
| Cannabis excise taxes | (17,336) | (8,858) | (56,156) | (19,216) |
| Net cannabis revenue | 51,735 | 56,116 | 183,137 | 121,059 |
| Beverage alcohol revenue | 15,324 | -- | 16,259 | -- |
| Beverage alcohol excise taxes | (516) | -- | (570) | -- |
| Net beverage alcohol revenue | 14,808 | -- | 15,689 | -- |
| Distribution revenue | 87,095 | 88,308 | 261,033 | 270,077 |
| | $ 153,638 | $ 144,424 | $ 459,859 | $ 391,136 |

23. Cost of goods sold

Cost of goods sold is comprised of:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Cannabis costs | $ 31,463 | $ 31,822 | $ 100,168 | $ 61,905 |
| Beverage alcohol costs | 7,716 | -- | 8,064 | -- |
| Acquisition mark-up on inventory sold | 1,035 | -- | 1,035 | -- |
| Distribution costs | 75,658 | 76,911 | 225,741 | 235,498 |
| | $ 115,872 | $ 108,733 | $ 335,008 | $ 297,403 |

24. General and administrative expenses

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Executive compensation | $ 2,376 | $ 2,355 | $ 8,528 | $ 6,602 |
| Consulting fees | 1,354 | 1,251 | 6,239 | 9,156 |
| Office and general | 4,273 | 5,186 | 14,453 | 11,787 |
| Professional fees | 1,967 | 761 | 4,654 | 4,694 |
| Salaries and wages | 11,021 | 13,324 | 33,544 | 26,935 |
| Insurance | 3,912 | 3,406 | 11,489 | 8,601 |
| Travel and accommodation | 812 | 1,332 | 2,364 | 3,701 |
| Rent | 380 | 305 | 968 | 825 |
| | $ 26,095 | $ 27,920 | $ 82,239 | $ 72,301 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

## 25.  Share-based compensation

Share-based compensation is comprised of:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Stock options vested during the period | $  901 | $ 2,632 | $ 3,691 | $ 9,693 |
| Deferred share units vested in the period | 212 | 220 | 1,577 | 806 |
| Deferred share units revalued in the period | 4,039 | (149) | 4,289 | (491) |
| Restricted share units vested in the period | 2,700 | 2,773 | 9,108 | 7,423 |
| Restricted share units revalued in the period | 28,419 | (350) | 35,462 | 214 |
| | $ 36,271 | $ 5,126 | $ 54,127 | $ 17,645 |

During the period, the Company issued 150,000 deferred share units to directors of the Company under the terms of the Company's Omnibus Long-Term Incentive Plan.

During the period, the Company issued 2,674,986 restricted share units to employees, consultants and officers under the terms of the Company's Omnibus Long-Term Incentive Plan. Nil vested immediately and the remaining vest over two years.

During the period, the Company issued 50,000 stock options to officers of the Company, under the terms of the Company's Omnibus Long-Term Incentive Plan.

As at February 28, 2021, the Company had 345,738 deferred share units and 3,705,813 restricted share units outstanding, of which 308,238 deferred share units and 914,391 restricted share units were vested.

## 26.  Finance Income (expense), net

Finance income (expense), net is comprised of:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Interest income | $  428 | $ 5,294 | $ 1,260 | $ 11,934 |
| Interest expense | (10,453) | (12,646) | (24,562) | (29,549) |
| | $ (10,025) | $ (7,352) | $ (23,302) | $ (17,615) |

## 27.  Non-operating income

Non-operating income is comprised of:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| **Non-operating income (loss):** | | | | |
| Foreign exchange (loss) gain | $ (4,817) | $ 4,736 | $ (29,247) | $ (3,660) |
| Loss on promissory notes receivable | -- | (12,000) | -- | (12,000) |
| Loss on long-term investments | (3,389) | (5,403) | (5,272) | (28,144) |
| Unrealized (loss) gain on convertible debentures | (264,788) | 23,145 | (352,013) | 86,430 |
| Other non-operating items, net | (3,513) | (630) | 2,906 | (7,907) |
| | $ (276,507) | $ 9,848 | $ (383,626) | $ 34,719 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

28.  Gain (loss) on long-term investments

Gain (loss) on long-term investments for the three and nine months ended February 28, 2021 is comprised of:

| Investment | Proceeds | Opening fair value / cost | Gain (loss) on disposal | Change in fair value | Total |
|---|---|---|---|---|---|
| Level 1 on fair value hierarchy | | | | | |
| Aleafia Health Inc. | $ 3,066 | $ 3,320 | $ (254) | $ -- | $ (254) |
| Rapid Dose Therapeutics Inc. | 1,360 | 1,730 | (370) | - | (370) |
| Fire & Flower Inc. | 252 | 237 | 15 | - | 15 |
| Althea Group Holdings Ltd. | 4,800 | 4,266 | 534 | - | 534 |
| Level 3 on fair value hierarchy | | | | | |
| IBBZ Krankenhaus GmbH | 600 | 1,993 | (1,393) | - | (1,393) |
| Greenwell Brands GmbH | 374 | 155 | 219 | - | 219 |
| Long-term investments (Note 12) | - | - | - | (4,023) | (4,023) |
| For the period ended February 28, 2021 | 10,452 | 11,701 | (1,249) | (4,023) | (5,272) |
| Less transactions in previous quarter: | | | | | |
| November 30, 2020 | 3,318 | 3,557 | (239) | (1,644) | (1,883) |
| Three months ended February 28, 2021 | $ 7,134 | $ 8,144 | $ (1,010) | $ (2,379) | $ (3,389) |

29.  Earnings (loss) per share

The calculation of earnings (loss) per share for the three months ended February 28, 2021 was based on the net (loss) income of $(360,996) (2020 – $5,697) and a weighted average number of common shares outstanding of 316,670,951 (2020 – 257,517,234) calculated as follows:

| | 2021 | 2020 |
|---|---|---|
| Basic earnings (loss) per share: | | |
| Net income (loss) for the period | $ (360,996) | $ 5,697 |
| Average number of common shares outstanding during the year | 316,670,951 | 257,517,234 |
| Earnings (loss) per share - basic | $ (1.14) | $ 0.02 |

| | 2021 | 2020 |
|---|---|---|
| Diluted earnings (loss) per share: | | |
| Net income (loss) for the period | $ (360,996) | $ 5,697 |
| Average number of common shares outstanding during the year | 316,670,951 | 257,517,234 |
| "In the money" warrants outstanding during the year | -- | 101,401 |
| "In the money" options outstanding during the year | -- | 337,073 |
| | 316,670,951 | 257,955,708 |
| Earnings (loss) per share - diluted | $ (1.14) | $ 0.02 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

The calculation of earnings (loss) per share for the nine months ended February 28, 2021 was based on the net (loss) of $(486,689) (2020 – $14,209) and a weighted average number of common shares outstanding of 299,130,624 (2020 – 253,477,710) calculated as follows:

|  | 2021 | 2020 |
|---|---|---|
| Basic (loss) earnings per share: |  |  |
| Net income (loss) for the period | $ (486,689) | $ 14,209 |
| Average number of common shares outstanding during the period | 299,130,624 | 253,477,710 |
| Earnings (loss) per share - basic | $ (1.63) | $ 0.06 |

|  | 2021 | 2020 |
|---|---|---|
| Diluted (loss) earnings per share: |  |  |
| Net income (loss) for the period | $ (486,689) | $ 14,209 |
| Average number of common shares outstanding during the period | 299,130,624 | 253,477,710 |
| "In the money" warrants outstanding during the period | -- | 112,563 |
| "In the money" options outstanding during the period | -- | 420,393 |
|  | 299,130,624 | 254,010,666 |
| Earnings (loss) per share - diluted | $ (1.63) | $ 0.06 |

30.  Change in non-cash working capital

Change in non-cash working capital is comprised of:

|  | For the nine months ended February 28, | |
|---|---|---|
|  | 2021 | 2020 |
| Decrease (increase) in: |  |  |
| Accounts receivable | $ (21,140) | $ (53,406) |
| Prepaids and other current assets | 8,238 | (9,564) |
| Inventory, net of fair value adjustment | (19,629) | (87,230) |
| Biological assets, net of fair value adjustment | 1 | (11,735) |
| Increase (decrease) in: |  |  |
| Accounts payable and accrued liabilities | (26,137) | 58,836 |
| Income taxes payable | 14,836 | 158 |
|  | $ (43,831) | $ (102,941) |

31.  Financial risk management and financial instruments

Financial instruments

The Company has classified its financial instruments as described in Note 3 of the Company's audited financial statements for the year ended May 31, 2020.

The carrying values of accounts receivable, prepaids and other current assets, bank indebtedness and accounts payable and accrued liabilities approximate their fair values due to their short periods to maturity.

The Company's long-term debt of $25,121 is subject to fixed interest rates. The Company's long-term debt is valued based on discounting the future cash outflows associated with the long-term debt. The discount rate is based on the incremental premium above market rates for Government of Canada securities of similar duration. In each period thereafter, the incremental premium is held constant while the Government of Canada security is based on the then current market value to derive the discount rate. The fair value of the Company's long-term debt in repayment as at February 28, 2021 was $24,802.

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

**Fair value hierarchy**

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. Cash and cash equivalents are Level 1. The hierarchy is summarized as follows:

| | |
|---|---|
| Level 1 | quoted prices (unadjusted) in active markets for identical assets and liabilities |
| Level 2 | inputs that are observable for the asset or liability, either directly (prices) or indirectly (derived from prices) from observable market data |
| Level 3 | inputs for assets and liabilities not based upon observable market data |

| | Level 1 | Level 2 | Level 3 | February 28, 2021 |
|---|---|---|---|---|
| **Financial assets at FVTPL** | | | | |
| Cash and cash equivalents | $ 267,134 | $ -- | $ -- | $ 267,134 |
| Convertible notes receivable | -- | -- | 6,089 | 6,089 |
| Long-term investments | 5,837 | -- | 5,455 | 11,292 |
| **Financial liabilities at FVTPL** | | | | |
| Convertible debentures | -- | -- | (622,796) | (622,796) |
| Contingent consideration | -- | -- | (76,196) | (76,196) |
| **Outstanding, end of the period** | **$ 272,971** | **$ --** | **$ (687,448)** | **$ (414,477)** |

| | Level 1 | Level 2 | Level 3 | May 31, 2020 |
|---|---|---|---|---|
| Financial assets at FVTPL | | | | |
| Cash and cash equivalents | $ 497,222 | $ -- | $ -- | $ 497,222 |
| Convertible notes receivable | -- | -- | 14,626 | 14,626 |
| Long-term investments | 15,502 | -- | 11,514 | 27,016 |
| Financial liabilities at FVTPL | | | | |
| Convertible debentures | -- | -- | (270,783) | (270,783) |
| Outstanding, end of the period | $ 512,724 | $ -- | $ (244,643) | $ 268,081 |

The following table presents the changes in level 3 items for the three months ended February 28, 2021:

| | Unlisted equity securities | Convertible notes receivable | Convertible debentures | Contingent consideration | Total |
|---|---|---|---|---|---|
| Closing balance May 31, 2020 | $ 11,514 | $ 14,626 | $ (270,783) | $ -- | $ (244,643) |
| Additions | -- | 249 | -- | (76,664) | (76,415) |
| Disposals | (2,148) | (5,000) | -- | -- | (7,148) |
| Unrealized gain (loss) on fair value | (3,911) | (3,786) | (352,013) | 468 | (359,242) |
| **Closing balance February 28, 2021** | **$ 5,455** | **$ 6,089** | **$ (622,796)** | **$ (76,196)** | **$ (687,448)** |

**Aphria Inc.**
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

**Financial risk management**

The Company has exposure to the following risks from its use of financial instruments: credit; liquidity; currency rate; and, interest rate price.

(a)    Credit risk

The maximum credit exposure at February 28, 2021 is the carrying amount of cash and cash equivalents, accounts receivable, prepaids and other current assets, promissory notes receivable and convertible notes receivable. All cash and cash equivalents are placed with major financial institutions.

| | Total | 0-30 days | 31-60 days | 61-90 days | 90+ days |
|---|---|---|---|---|---|
| Trade receivables | 81,890 | 67,971 | 9,838 | 1,945 | 2,136 |
| | | 83% | 12% | 2% | 3% |

(b)    Liquidity risk

As at February 28, 2021, the Company's financial liabilities consist of bank indebtedness and accounts payable and accrued liabilities, which have contractual maturity dates within one-year, long-term debt, and convertible debentures which have contractual maturities over the next five years.

Aphria maintains a debt service charge covenant on certain loans secured by its Aphria One facilities that is measured at year-end only. The Company believes that it has sufficient operating room with respect to its financial covenants for the next fiscal year and does not anticipate being in breach of any of its financial covenants.

The Company manages its liquidity risk by reviewing its capital requirements on an ongoing basis. Based on the Company's working capital position at February 28, 2021, management regards liquidity risk to be low.

(c)    Currency rate risk

As at February 28, 2021, a portion of the Company's financial assets and liabilities held in United States Dollars ("USD") and Euros consist of cash and cash equivalents, convertible notes receivable, and long-term investments. The Company's objective in managing its foreign currency risk is to minimize its net exposure to foreign currency cash flows by transacting, to the greatest extent possible, with third parties in the functional currency. The Company is exposed to currency rate risk in other comprehensive income, relating to foreign subsidiaries which operate in a foreign currency. The Company does not currently use foreign exchange contracts to hedge its exposure of its foreign currency cash flows as management has determined that this risk is not significant at this point in time.

The Company is exposed to unrealized foreign exchange risk through its cash and cash equivalents. As at February 28, 2021, approximately $190,000 USD ($240,000 CAD) of the Company's cash and cash equivalents was in United States dollars. A 1% change in the foreign exchange rate would result in an unrealized gain or loss of approximately $2,400.

(d)    Interest rate price risk

The Company manages interest rate risk by restricting the type of investments and varying the terms of maturity and issuers of marketable securities. Varying the terms to maturity reduces the sensitivity of the portfolio to the impact of interest rate fluctuations.

(e)    Capital management

The Company's objectives when managing its capital are to safeguard its ability to continue as a going concern, to meet its capital expenditures for its continued operations, and to maintain a flexible capital structure which optimizes the cost of capital within a framework of acceptable risk. The Company manages its capital structure and adjusts it in light of changes in economic conditions and the risk characteristics of the underlying assets. To maintain or adjust its capital structure, the Company may

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

issue new shares, issue new debt, or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements.

Management reviews its capital management approach on an ongoing basis and believes that this approach, given the relative size of the Company, is reasonable. There have been no changes to the Company's capital management approach in the year. The Company considers its cash and cash equivalents and marketable securities as capital.

## 32.  Commitments and contingencies

The Company has committed purchase orders outstanding at February 28, 2021 related to capital asset expansion of $1,840, all of which are expected to be paid within the next year.

The following table presents the future undiscounted payment associated with lease liabilities as of February 28, 2021:

|  | Years ending February 28, |
|---|---|
| 2022 | 4,054 |
| 2023 | 3,935 |
| 2024 | 3,885 |
| 2025 | 3,847 |
| 2026 | 3,724 |
| Thereafter | 54,039 |
|  | $ 73,484 |

The Company incurred interest expense associated with its lease liabilities of $662 and $834 (2020 - $80 and $241) for the three and nine months ended February 28, 2021.

From time to time, the Company and/or its subsidiaries may become defendants in legal actions arising out of the ordinary course and conduct of its business.

As of February 28, 2021, the Company was served statements of claims in class action lawsuits against the Company and certain of its officers and former officers. These claims relate to alleged misconduct in connection with the Company's acquisitions of LATAM Holdings Inc. ("LATAM") and Nuuvera Inc., and the Company's June 2018 securities offering. At the present time, the representative claimants have been identified and selected in both the U.S. and Canada. The U.S. claims include alleged violations of Section 10(b) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), Rule 10b-5 under the Exchange Act and Section 20(a) of the Exchange Act. The Canadian claims include alleged statutory and common law misrepresentation and oppression. The Company intends to vigorously defend itself in each of these actions. With respect to the cases commenced in the U.S., the Company pursued a motion to dismiss the U.S. claim. The Company's motion was denied and the claim was maintained against the Company and certain of its former and current senior officers. The Company is currently pursuing a motion to reconsider during which time, the primary action is stayed pending the decision on the motion to reconsider. In the U.S. action, the Company is self-insured for the costs associated with any award or damages arising from such actions and has entered into indemnity agreements with each of the directors and officers and, subject to certain exemptions, will cover any costs incurred by them in connection with any of the class action claims. Canadian insurance coverage may not be sufficient to fully cover any judgments against the Company. As at February 28, 2021, the Company has not recorded any uninsured amount related to this contingency.

As of July 20, 2020, a proposed class action (the "Langevin Class Action") has been commenced against a number of Canadian licensed producers including the Company and its subsidiary, Broken Coast (collectively, the "Defendants") by Lisa Marie Langevin (the "Plaintiff") on behalf of all persons in Canada who purchased cannabis products that were manufactured, sold, promoted, or distributed by the Defendants and consumed prior to the labelled expiry date of such products on or after June 16, 2010, if such products were used for medicinal purposes and on or after October 17, 2018, if such products were used for recreational purposes (the "Proposed Class"). The Plaintiff specifically alleges that (i) the Defendants marketed medicinal and recreational cannabis products with an advertised content of THC and CBD that was "drastically different" (higher and lower percentages) from the actual amount in the cannabis products and (ii) the Plaintiff suggests that the plastic bottles or caps used to store the cannabis products may have absorbed or degraded the THC or CBD content. The Plaintiff seeks recovery of the money the Proposed Class spent on the Defendants' products that did not contain what they were advertised to contain and compensatory damages for those who suffered physical or

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

mental injuries as a result of the Defendants' mislabeling of the products. Amended pleadings were served on the company on December 12, 2020 adding a new plaintiff to the action. The Company intends to vigorously defend itself in each of these actions. Canadian insurance coverage may not be sufficient to fully cover any judgments against the Company. As at February 28, 2021, the Company has not recorded any uninsured amount related to this contingency.

## 33. Segment reporting

Information reported to the Chief Operating Decision Maker ("CODM") for the purpose of resource allocation and assessment of segment performance focuses on the nature of the operations. The Company operates in four segments. 1) cannabis operations, which encompasses the production, distribution and sale of both medical and adult-use cannabis, 2) beverage alcohol operations, which encompasses production, distribution and sale of beverage alcohol products, 3) distribution operations, which encompasses the purchase and resale of products to customers and 4) businesses under development which encompass operations in which the Company has not received final licensing or has not commenced commercial sales from operations. Factors considered in determining the operating segments include the Company's business activities, the management structure directly accountable to the CODM, availability of discrete financial information and strategic priorities within the organizational structure.

Segment net revenue:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Cannabis business | $ 51,735 | $ 55,800 | $ 183,137 | $ 120,569 |
| Distribution business | 87,066 | 88,308 | 259,768 | 270,077 |
| Beverage alcohol business | 14,808 | -- | 15,689 | -- |
| Business under development | 29 | 316 | 1,265 | 490 |
| Total | $ 153,638 | $ 144,424 | $ 459,859 | $ 391,136 |

Segment net income (loss):

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Cannabis business | $ (351,989) | $ 8,038 | $ (465,519) | $ 25,958 |
| Distribution business | (5,412) | 1,704 | (7,830) | 319 |
| Beverage alcohol business | (165) | -- | 134 | -- |
| Business under development | (3,431) | (4,045) | (13,474) | (12,068) |
| Total | $ (360,997) | $ 5,697 | $ (486,689) | $ 14,209 |

Geographic net revenue:

| | For the three months ended February 28, | | For the nine months ended February 28, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| North America | $ 67,196 | $ 55,815 | $ 198,223 | $ 120,584 |
| Europe | 85,191 | 87,221 | 257,296 | 266,072 |
| Latin America | 1,251 | 1,388 | 4,340 | 4,480 |
| Total | $ 153,638 | $ 144,424 | $ 459,859 | $ 391,136 |

Aphria Inc.
Notes to the Condensed Interim Consolidated Financial Statements
For the three and nine months ended February 28, 2021 and February 29, 2020
(Unaudited - in thousands of Canadian dollars, except share and per share amounts)

Geographic capital assets:

|  | February 28, 2021 | May 31, 2020 |
|---|---|---|
| North America | $ 553,218 | $ 519,768 |
| Europe | 85,072 | 61,143 |
| Latin America | 6,421 | 6,252 |
| Total | $ 644,711 | $ 587,163 |

Major customers are defined as customers that each individually account for greater than 10% of the Company's annual revenues. As of February 28, 2021, there was a total of 3 major customers within the cannabis business segment (2020 – nil) that represented over $146,000 in the Company's net revenue.

34. **Subsequent events**

The following event occurred subsequent to February 28, 2021:

a) On April 6th, 2021, the Company renegotiated its supply agreement with the 51% majority-owned subsidiary, Aphria Diamond. Under the terms of the amended agreement, the company maintains the exclusive supply of cannabis products, over a larger offering of cannabis products on more favourable pricing terms than previously agreed between the parties, wherein such favourable pricing is effective as of June 1, 2020. The transaction will be accounted for through equity and adjustments to non-controlling interest amounts in the period the agreement was reached.

EXHIBIT 11

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **RAY SCOTT FUSS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FREDRICK M. BENSCH, a/k/a** | ) | |
| **FREDDY BENSCH; CHEESE GRITS,** | ) | **CIVIL ACTION FILE NO.** |
| **LLC; CLASS V, INC.; SWBC CRAFT** | ) | |
| **LLC; SWB MANAGEMENT, LLC;** | ) | **Exhibit 11 to Complaint** |
| **SWBC CRAFT HOLDINGS, LP; SWBC** | ) | |
| **CRAFT MANAGEMENT, LLC; SWBC** | ) | |
| **BLOCKER SELLER, LP; CHILLY** | ) | |
| **WATER, LLC; JOHN DOE** | ) | |
| **UNITHOLDERS 1–3,** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S FIRST INTERROGATORIES
## TO DEFENDANT FREDRICK M. BENSCH

Plaintiff, by and through counsel, propounds the following Interrogatories pursuant to the Georgia Civil Practice Act to Defendant FREDRICK M. BENSCH, regardless of misnomer(s), name change(s), and/or alias(es). Answers to these Interrogatories must be made separately, fully, in writing, under oath, and served upon the undersigned counsel of record for Plaintiff within thirty (30) days of service or if served with the Complaint within fifteen (15) days of the date an Answer to the Complaint is due.   These Interrogatories seek answers as of the date on which responses are made hereto, except that Defendant is required to supplement and/or amend its responses as provided for by the Georgia Civil Practice Act.

These Interrogatories seek answers as of the date on which responses are made hereto, except that Defendant is required to supplement and/or amend its responses as provided for by the Georgia Civil Practice Act.   The responses can be produced in person or by mail at the office of

1

Blaine A. Norris, PC, 1143 Prince Ave, Athens, GA 30606.  Again, Defendant is under a duty to seasonally supplement or amend Defendant's responses.

If privilege is claimed as to the content of any response solicited by these Interrogatories, Plaintiff requests that each Interrogatory as to which privilege is claimed be answered in a manner such that the Court may determine whether or not the content of the response is entitled to be accorded privileged status.  Additionally, if Defendant has insufficient knowledge to respond to any given of these Interrogatories, but does have knowledge of another Person believed to possess the requisite knowledge to so respond, Plaintiff requests that Defendant identify such Person

## **DEFINITIONS**

(a)  <u>Document</u> - As used herein, "documents" shall mean any tangible thing upon which information is or has been stored, recorded or communicated in the custody, control or possession of you or of which you have knowledge, including without limitation letters, correspondence, e-mail, facsimile transmissions, invoices, contracts, agreements, purchase orders, memoranda, assignments, licenses, minutes,  tapes, stenographical and handwritten notes, microfilm, books, bulletins, circulars, pamphlets, studies, catalogs, manuals, journals, brochures, reports, notices, diaries, notebooks, books of account, ordered invoices, statements, bills, checks (or check stubs or records), vouchers, summaries, books, messages, instructions, pictures, film, videotapes, graphs, statistical compilations,  records and tapes, and other machine readable records and data, sound records, and every draft or copy of a document which is not identical to the original or which draft or copy contains any commentary or notation whatsoever that does not appear on the original.

(b)  <u>Person</u> - As used herein, "person" shall mean a natural person or an artificial person, including partnerships, corporations, proprietorships, unincorporated associations, governmental bodies or any other legally cognizable entities.

2

(c) <u>Date</u> - As used herein, "date" shall mean the exact day, month and year, if known, or, if the exact date is not known, the best available approximation.

(d) <u>Communication</u> - As used herein, "communication" shall include any oral utterance made, heard or overheard, whether in person or by telephone or otherwise, as well as every document and every other mode of intentionally conveyed meaning.

(e) <u>Identify</u> - As used herein, "identify" when used in reference to:

(1) A person who is an <u>individual</u>, shall mean to state his or her full name, present or last known residence address (designating which), and present or last known position or business affiliation (designating which), job title, employment address, business and residence telephone numbers;

(2) A person who is a <u>firm</u>, <u>partnership</u>, <u>corporation</u>, <u>proprietorship</u>, <u>association</u>, <u>financial institution</u>, or <u>other organization or entity</u>, shall mean to state its full name and present or last known address and telephone number (designating which), the legal form of such entity or organization and the identity of its chief executive officer, and the identity of its agent for service of legal process;

(3) An <u>oral communication</u>, shall mean the date, subject matter, communicator, communicate, nature of the communication, place or places where the communication occurred, whether it was recorded or otherwise memorialized, and the identity of any witnesses thereto;

(4) A <u>document</u> shall mean to state the title (if any), the date, author, sender, recipient, the identity of persons signing it, type of document (i.e., a letter, memorandum, book, telegram, invoice, film, tape, etc.) or some other

3

means of identifying it (e.g., invoice number), the names of the persons known to have seen the document or to have received copies, its present location or custodian, and a description of its contents (in lieu of stating the foregoing information, the responding party may attach a legible copy of a document to their responses hereto, specifying the particular interrogatory to which the copy is in response and identifying the present custodian of the original).

If any document which you would have identified in response to any interrogatory was, but is no longer, in your present possession or subject to your control or is no longer in existence, in addition to all of the above information of which you have knowledge, "identify" shall also mean to state whether any such document is or has been missing, lost, destroyed, transferred to other or otherwise disposed, of, and in any such instance to set forth the circumstances surrounding such event, and to state the approximate date of such disposition and, if known, the present location and custodian of such document.

(f) <u>State all Facts</u> - As used herein, "state all facts" means to state all facts discoverable under O.C.G.A. § 9-11-26 known to you or your attorneys, and to identify all persons having knowledge of such facts, identify all documents concerning or relating to such facts, and identify all communications concerning or relating to such facts. When used in reference to an allegation of the pleadings, "state all facts" shall include all facts negating, as well as supporting the allegation.

(g) <u>Or</u> - As used herein, "or" shall mean and/or.

(h) <u>You</u> - As used herein, "you" shall mean Defendant FREDRICK M. BENSCH, regardless of misnomer(s), name change(s), and/or alias(es), listed in the first paragraph

4

hereinabove.

(i)  <u>Fuss Intellectual Property</u> shall mean any combination of the distinctive font for the SweetWater name, the unique aged-looking scrolled banner (with or without the leaping trout behind it) across which the SweetWater literal element commonly appears (the "Trout banner"), the highly detailed fishing scene (the "Fishing Scene") that is dominated by the iconic "SweetWater leaping rainbow trout", and the SweetWater leaping rainbow trout, all of which has been prominently displayed in SweetWater locations and on SweetWater product since their development.

(j)  <u>Virginia Lawsuit</u> shall mean the trademark infringement lawsuit in Virginia brought by SweetWater or Bensch against a Virginia-based restaurant/business that was using at least the marks "Sweetwater Tavern" and "Sweetwater Light" to sell beer, among other goods, in its restaurants and through other nearby retailers.  <u>SweetWater Brewing Co., LLC v. Great American Restaurants, Inc.</u>, 266 F. Supp. 2d. 457 (E. D. Va. 2003).

(k)  <u>Agreement of Merger and Acquisition</u> shall mean that Agreement of Merger and Acquisition, dated as of November 4, 2020, by and among Aphria, Inc., Project Golf Merger Sub, LLC, SW Brewing Company, LLC, SWBC Craft Holdings LP, SWBC Craft Management, LLC, SWBC Blocker Seller, LP and Chilly Water, LLC consisting of the "Entire Agreement" as defined under Article 10.4 of that certain document entitled Agreement of Merger and Acquisition, dated November 4, 2020, which, includes "*This Agreement (together with the Annexes, Exhibits, Disclosure Letter and the other documents delivered pursuant hereto or referenced herein) and the Confidentiality Agreement constitute the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.*"

(l)  Closing or Merger and Acquisition shall mean that event wherein the parties to the Agreement of Merger and Acquisition fulfilled their various duties, obligations, promises, covenants and the like under the Agreement of Merger and Acquisition, including exchange of consideration, in order to complete the Merger and Acquisition of SweetWater Brewing Company ("SweetWater") by Aphria, Inc. ("Aphria").

(M) Consideration shall mean the price, motive, or matter of inducement of a contract, or that which is bargained for and paid in return for a promise, or the benefits to the party making the promise, or the loss or detriment to the party to whom the promise is made, or a performance or a return promise which is bargained for. (Restatement (Second) of Contracts § 71(1). (4); The Law Dictionary, Copyright (c) 2002 Anderson Publishing Co.).

## **INTERROGATORIES**

### 1.

Identify with specificity any Document or other written Communication from you (or from your agents or attorneys on your or SweetWater's behalf) to Aphria (or to its attorneys or agents) before the Closing on the Agreement of Merger and Acquisition that contained, included, or identified by name the name Ray Scott Fuss (or any of the names Ray Fuss, Scott Fuss, or Mr. Fuss, or Fuss).

### 2.

Identify all Persons who aided, assisted, or participated directly in the drafting or preparation of your responses to Plaintiff's First Interrogatories and First Request for Documents to you (including searching for, identifying, and gathering documents).

### 3.

Identify all Persons known by you, or believed by you, to have knowledge or information

related to the Complaint, your Answer and/or Counterclaim, the Fuss Intellectual Property, the 2002 Agreement, the 2003 Assignment, or the listing of Intellectual Property on the Disclosure Letter for the Agreement of Merger and Acquisition.

4.

To the best of your knowledge, based on documents available to you or your attorneys, identify when and by what person the following entities signed the Agreement of Merger and Acquisition:

      a.  Aphria, Inc.;

      b.  Project Golf Merger Sub, LLC, by Four Twenty Corporation;

      c.  SW Brewing Company LLC, by you;

      d.  SWBC Craft Holdings, LP, by SWBC Craft Management, LLC;

      e.  SWBC Blocker Seller, LP, by  SWBC Craft Management, LLC;

      f.  by SWBC Craft Management, LLC, by SWBC Craft Management, LLC; and

      g.  Chilly Water, LLC, by you.

5.

Identify the date you (as an SWB Member, or for Chilly Water LLC, or in any other capacity) received the first payment of money (whether by wire transfer, electronic transfer, draft, or otherwise) under paragraph 2.11(f) for amounts allocable to you, Blocker Seller, SWBC Craft, LLC, or Securityholders' Representative as result of the Closing?

6.

***Identity of SWB Members:***  Identify each SWB Management LLC member, and its percentage of membership interest in SWB Management LLC, as of the date of Closing.

7.

*Identity of Unitholders:* Identify with specificity that name, address, and contact information for each and every Unitholder who received any money, proceeds, stock, or remuneration as a result of the Closing.

8.

*Closing Date Stock Issuance:* Regarding Article II, Paragraph 2.10 of the Agreement of Merger and Acquisition (entitled Closing Date Stock Issuance), identify the amount or number of Parent Common Shares distributed to or credited on the books to each Unitholder.

9.

*Closing Date Payments:* Regarding Article II, Paragraph 2.11 of the Agreement of Merger and Acquisition (entitled Closing Date Payments), identify by date, category, amount, and recipient each and every payment made under Article II, Paragraph 2.11.

10.

In reference to Article II, Paragraph 2.18, identify with particularity all payments made as a result of the Closing from Parent, or on behalf of Parent, to Blocker Seller pursuant to Section 2.11(f), SWBC Craft, LLC pursuant to Section 2.11(f); and Securityholders' Representative pursuant to Section 2.11(f) for the benefit of the Unitholders (other than the Blocker Members).

11.

Identify the name of the Bank(s) or other Financial Institution(s) in which the initial payment of all or a portion of the Purchase Price was, or will be, paid to you as a result of the Closing, whether such payment was deposited, wired, or transferred to you; and, if different from the ones already listed, the entity used as the Paying Agent, if any, under Article II, Paragraph 2.21 of the Agreement of Merger and Acquisition.

12.

Identify, your residence address, phone numbers (cell and landline), and primary email addresses used by you as of and on September 17, 2021.

13.

Identify your cell phone provider, cell phone account number, name and address of the account owner, and the cell phone number for any and all cell phones owned by you (or principally used by you) from January 1, 2019 to present.

14.

Identify any and all of your email address(es) and email service provider(s) ever used for communications with Plaintiff or with Aphria.

15.

Identify all computers or electronic devices (that is, "desk top" computer, "lap top" computer, tablet, i-phone, i-pad, Android device, or other hand held electronic device, etc.) by providing a reasonable physical description of same, including the manufacturer/brand name, color, model, and address or location, used by you for any and all of the following communications:

    a.   Communications with Plaintiff at any time between January 01, 2019 – September 18, 2021;

    b.   Communicating with any person or entity about the Agreement of Merger and Acquisition, drafts of same, and any and all Intellectual Property referenced therein, including the requests for or providing of written assignments containing present, affirmative assignments of any intellectual property rights under Article III, Paragraph 3.8(e) or otherwise related to Intellectual Property

related to the Agreement of Merger and Acquisition;

c. Communications with Aphria or any of its agents, attorneys, legal or financial advisors or consultants from December 1, 2019 through, and including, December 31, 2020; and

d. Communications by you in association with the reviewing, editing, or drafting process related to the Confidentiality Agreement or the Agreement of Merger and Acquisition.

16.

In relation to business purposes and business activities related to SweetWater, if there is state in which you have spent more time (calculated on either a total hours basis, or number of days of the year basis) than you have spent in the State of Georgia for the calendar years 2018, 2019, 2020, and 2021, for each year please identify such state. [If most of your time has been spent in the State of Georgia in these years in relation to business purposes and business activities related to SweetWater, simply so state as your response to this interrogatory].

17.

Identify the city and state in which you were physically present on and at the time of each of the following acts:

a. you signed the Confidentiality Agreement related to Aphria;

b. you received or sent any text to or from Plaintiff from November 9, 2020 to November 10, 2020;

c. you signed the Agreement of Merger and Acquisition; and

d. you had the phone call with Plaintiff on December 2, 2020.

10

18.

Identify the terms and conditions of any contract, agreement, license, permission, or understanding that you contend you or SweetWater ever had with Plaintiff in any way related to or touching upon the Fuss Intellectual Property or artwork and copyrights related to SweetWater.

19.

Identify all Persons present in your first in-person meeting with Plaintiff.

20.

Identify all written documents, tools, and materials you contend, allege, or believe were given or supplied by you or SweetWater to Plaintiff in the creation or development of the Fuss Intellectual Property.

21.

Identify all Persons who you believe have knowledge of the facts and circumstances related to the request for, drafting of, or execution of the 2002 Agreement.

22.

Describe all conversations, communications and circumstances surrounding you and Plaintiff signing the 2002 Agreement.

23.

Why did you request and obtain possession of the original artwork from Plaintiff in 2002 and, once you received it, what did you do with it?  Please explain.

24.

Identify all persons who you believe have knowledge of the facts and circumstances related to the request for, drafting of, or execution of the 2003 Assignment.

11

In reference to the 2003 Assignment, explain your understanding of the facts, reasons and circumstances for why a request was made for Plaintiff to sign that document.

25.

Identify in detail what you contend, believe, assert, allege, think, suggest, or recall being the Consideration (as defined above) that you, SweetWater, or anyone else on your behalf made, paid, undertook, agreed to undertake, or promised in return for Plaintiff signing the 2003 Assignment.

26.

Identify the insurer, policy number, limits of coverage, deductible or self-insured retention limits, and any related excess or umbrella policies or endorsements, for the R & W Policy referred to in the Agreement of Merger and Acquisition.

27.

Identify any other insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the present action or to indemnify or reimburse for payments made to satisfy the judgment. See O.C.G.A. § 9-11-26.

28.

Identify any reports, statements, recordings, or testimony from any witness concerning the facts of this cause of action by setting forth the name, date, and general substance of the statement.

29.

Identify the names and addresses of any expert witness you may call in this action and as to each such expert witness, please state:

a)   The subject matter on which the expert is expected to testify;

b)   The substance of facts and opinions to which the expert is expected to testify;

c)   A summary of the grounds for each opinion of such expert.

30.

Identify all Persons or entities involved in the creation, design, or authorship of any art, logos, trademarks, copyrights, or written marketing and branding materials for or related to SweetWater.

31.

In reference to Article 3.8(e) in the Agreement of Merger and Acquisition, regarding written agreements including present, affirmative assignments, identify the parties signing or requested by you or SweetWater to sign any such agreement document or assignment prior to, in connection with, or as part of the Agreement of Merger and Acquisition.

32.

For the time period between January 1, 2002 and December 31, 2020, identify all phone calls, conversations, communications, correspondence, or meetings you had with Plaintiff about any intellectual property (including without limitation any ownership, sale, purchase, assignment, license, or permission of or related to intellectual property).

33.

Identify the date of your first communication with anyone at or on behalf of Aphria about a possible purchase, merger or transaction involving SweetWater and Aphria, and, in so doing, identify the initial persons at Aphria with whom you or your agents first spoke or otherwise first communicated.

34.

Identify by date, signatories, and number of pages, any and all Confidentiality Agreements signed by you or anyone else related to the Aphria-SweetWater negotiations and discussions of the merger or potential merger.

35.

Identify all persons, lawyers, law firms, accountants, and financial consultants working for or employed by you, any Defendant, or Sweetwater related to the Closing or the Merger and Acquisition.

36.

In relation to the Enterprise Value, Purchase Price, and the allocation of that Purchase Price, within or based on the Agreement of Merger and Acquisition, identify any and all financial data, business valuations, appraisals, estimates of value, including listing or itemization or valuation of assets, and/or intellectual property, that were used in whole or in part in determining the Purchase Price, or allocations of the Purchase Price, including, without limitation, the allocation of USD 92,000,000 to the Intellectual Property.

37.

Identify how many draft versions, and dates of receipt, of the Agreement of Merger and Acquisition you or your attorneys reviewed, received, or sent to others before you signed the final, Execution Version (dated as of November 4, 2020) in or around November 25, 2020.

38.

Identify all persons working for you or SweetWater in the preparation or review of the list of intellectual property set forth in the Agreement of Merger and Acquisition or in any Disclosure

Letter related to or a part of the Agreement of Merger and Acquisition, including all draft versions thereof.

<div align="center">39.</div>

Identify the name, address, and primary contact of any and all CPAs, accountants, accounting firms, tax lawyers, law firms, financial advisors, bookkeepers, or tax preparers utilized by you or SweetWater for the preparation or filing of any tax return or tax filing for you or SweetWater between 2015 to 2020.

RESPECTFULLY SUBMITTED this 17th day of September, 2021.

BLAINE A. NORRIS, PC

_____
BLAINE A. NORRIS
State Bar No. 545832
JOHN R. AUTRY
State Bar No. 029029
Attorneys for Plaintiff

1143 Prince Ave
Athens, GA 30606
(706) 850-9400
(706) 850-9405 Fax
blaine@NorrisInjuryLaw.com
john@NorrisInjuryLaw.com

SMITH TEMPEL BLAHA LLC


s/Matthew Hoots, by BAN w/permission
_____
GREGORY SCOTT SMITH
State Bar No. 658377
MATTHEW T. HOOTS
State Bar No. 101080
Attorneys for Plaintiff

1055 Prince Ave
Athens, GA 30606
(706) 621-5777
mhoots@srtslaw.com
gsmith@srtslaw.com

16

EXHIBIT 12

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

|  |  |  |
|---|---|---|
| **RAY SCOTT FUSS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FREDRICK M. BENSCH, a/k/a** | ) | |
| **FREDDY BENSCH; CHEESE GRITS,** | ) | **CIVIL ACTION FILE NO.** |
| **LLC; CLASS V, INC.; SWBC CRAFT** | ) | |
| **LLC; SWB MANAGEMENT, LLC;** | ) | **Exhibit 12 to Complaint** |
| **SWBC CRAFT HOLDINGS, LP; SWBC** | ) | |
| **CRAFT MANAGEMENT, LLC; SWBC** | ) | |
| **BLOCKER SELLER, LP; CHILLY** | ) | |
| **WATER, LLC; JOHN DOE** | ) | |
| **UNITHOLDERS 1–3,** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
## TO DEFENDANT FREDRICK M. BENSCH

Plaintiff, by and through counsel, propounds the following Requests for Documents pursuant to the Georgia Civil Practice Act to Defendant FREDRICK M. BENSCH, regardless of misnomer(s), name change(s), and/or alias(es).  Responses to these Requests must be made separately, fully, in writing, under oath, and served upon the undersigned counsel of record for Plaintiff within thirty (30) days of service, unless served with the Complaint, in which case they must be served within fifteen (15) days after the date an Answer to the Complaint is due.

The documents can be produced in person or by mail at the office of Blaine A. Norris, PC, 1143 Prince Ave, Athens, GA 30606.  Defendant is under a duty to seasonably supplement or amend Defendant's responses.  Further, pursuant to O.C.G.A. § 24-10-26, Defendant is directed to produce at trial the documents and materials referenced in these discovery requests.

If privilege is claimed as to any document otherwise covered by this request for production,

1

Plaintiff requests that each document as to which privilege is claimed be identified in a manner such that the Court may determine whether or not such document is entitled to be accorded privileged status. Specifically, state (a) the document's sender or author, recipient, date, type of document (*e.g.*, letter, memorandum, record, etc.), identify the party or third party having custody of it, specify the privilege, and describe the general subject matter; and (b) each basis upon which privilege is claimed.  This request for production seeks inspection and copying of documents in the possession of Defendant and Defendant's agents and attorneys, including both copies and originals, unless otherwise specifically stated.

    a) <u>Document</u> - As used herein, "documents" shall mean any tangible thing upon which information is or has been stored, recorded or communicated in the custody, control or possession of you or of which you have knowledge, including without limitation letters, correspondence, e-mail, facsimile transmissions, invoices, contracts, agreements, purchase orders, memoranda, assignments, licenses, minutes,  tapes, stenographical and handwritten notes, microfilm, books, bulletins, circulars, pamphlets, studies, catalogs, manuals, journals, brochures, reports, notices, diaries, notebooks, books of account, ordered invoices, statements, bills, checks (or check stubs or records), vouchers, summaries, books, messages, instructions, pictures, film, videotapes, graphs, statistical compilations,  records and tapes, and other machine readable records and data, sound records, and every draft or copy of a document which is not identical to the original or which draft or copy contains any commentary or notation whatsoever that does not appear on the original.

    b) <u>Person</u> - As used herein, "person" shall mean a natural person or an artificial person, including partnerships, corporations, proprietorships, unincorporated associations,

governmental bodies or any other legally cognizable entities.

c) <u>Photograph</u> as used herein means the original file created by the camera, in the case of digital still pictures or motion pictures, and still photographs, x-ray films, video tapes, and motion pictures, and all copies or versions of same.

d) <u>Date</u> - As used herein, "date" shall mean the exact day, month and year, if known, or, if the exact date is not known, the best available approximation.

e) <u>Communication</u> - As used herein, "communication" shall include any oral utterance made, heard or overheard, whether in person or by telephone or otherwise, as well as every document and every other mode of intentionally conveyed meaning.

f) <u>Or</u> - As used herein, "or" shall mean and/or.

g) <u>You</u> - As used herein, "you" shall mean Defendant FREDRICK M. BENSCH, regardless of misnomer(s), name change(s), and/or alias(es), listed in the first paragraph hereinabove.

h) <u>Agreement of Merger and Acquisition</u> shall mean that Agreement of Merger and Acquisition, dated as of November 4, 2020, by and among Aphria, Inc., Project Golf Merger Sub, LLC, SW Brewing Company, LLC, SWBC Craft Holdings LP, SWBC Craft Management, LLC, SWBC Blocker Seller, LP and Chilly Water, LLC consisting of the "Entire Agreement" as defined under Article 10.4 of that certain document entitled Agreement of Merger and Acquisition, dated November 4, 2020, which, includes "*This Agreement (together with the Annexes, Exhibits, Disclosure Letter and the other documents delivered pursuant hereto or referenced herein) and the Confidentiality Agreement constitute the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral,*

3

*among the parties, or any of them, with respect to the subject matter hereof."*

i) <u>Incorporation of Annex I, "Definitions" as contained in the Agreement of Merger and Acquisition</u>:  All words defined and set forth in Annex I of the Agreement of Merger and Acquisition, when used and capitalized in these Plaintiff's request for documents, if the request is made in reference to a document referred to in the Agreement of Merger and Acquisition, shall have the meaning set forth in said Annex I.  Questions of a more general nature that might use the same words, but not capitalize said word, shall not be read or defined in the manner defined in the Annex I to the Agreement of Merger and Acquisition, but shall have such other plain and ordinary meaning of the word.

j) <u>Representative(s)</u> – As used herein, "Representative(s)" means, with respect to any person or entity, the directors, officers, employees, advisors (including investment bankers, financial advisors, legal counsel, accountants and consultants), financing sources and other agents and representatives of such person or entity and any of his or its affiliates.

k) <u>Fuss Intellectual Property</u> – As used herein, Fuss Intellectual Property shall mean any combination of the distinctive font for the SweetWater name, the unique aged-looking scrolled banner (with or without the leaping trout behind it) across which the SweetWater literal element commonly appears (the "Trout banner"), the highly detailed fishing scene (the "Fishing Scene") that is dominated by the iconic "SweetWater leaping rainbow trout", and the SweetWater leaping rainbow trout, all of which has been prominently displayed in SweetWater locations and on SweetWater product since their

4

development.

l) <u>2002 Agreement</u> – As used herein, "2002 Agreement" shall mean that certain agreement attached to the Complaint as Exhibit 5.

m) <u>2003 Assignment</u> – As used herein, "2003 Assignment" shall mean that certain assignment attached to the Complaint as Exhibit 6.

n) <u>Aphria</u> – As used herein, "Aphria" shall mean Aphria, Inc., the Canadian-based, publicly traded cannabis company that, by and through the Closing of the Agreement of Merger and Acquisition in late November 2020, acquired SW Brewing Company, LLC.

o) <u>Tilray</u> – As used herein, "Tilray" shall mean Tilray, Inc., the Canadian-based, publicly-traded cannabis company that was the surviving entity in a merger with Aphria sometime in 2021.

p) <u>Virginia Lawsuit</u> shall mean the trademark infringement lawsuit in Virginia brought by SweetWater or Bensch against a Virginia-based restaurant/business that was using at least the marks "Sweetwater Tavern" and "Sweetwater Light" to sell beer, among other goods, in its restaurants and through other nearby retailers.  <u>SweetWater Brewing Co., LLC v. Great American Restaurants, Inc.</u>, 266 F. Supp. 2d. 457 (E. D. Va. 2003).

q) <u>Closing</u> or <u>Merger and Acquisition</u> shall mean that event wherein the parties to the Agreement of Merger and Acquisition fulfilled their various duties, obligations, promises, covenants and the like under the Agreement of Merger and Acquisition, including exchange of consideration, in order to complete the Merger and Acquisition of SweetWater Brewing Company ("SweetWater") by Aphria, Inc.

("Aphria").

r)      <u>Consideration</u> shall mean the price, motive, or matter of inducement of a contract, or that which is bargained for and paid in return for a promise, or the benefits to the party making the promise, or the loss or detriment to the party to whom the promise is made, or a performance or a return promise which is bargained for. (Restatement (Second) of Contracts § 71(1). (4); The Law Dictionary, Copyright (c) 2002 Anderson Publishing Co.).

## <u>REQUESTS</u>

### 1.

All documents reviewed, relied upon, or referenced in response to any factual averment in the Complaint, or in support of any factual assertion or defense contained in your Answer to the Complaint, or in support of or as a basis for any of your responses to the Plaintiff's Interrogatories to you.

### 2.

*Entity Organizational Documents*:  A copy of the Articles of Incorporation, Articles of Association, Bylaws, Shareholder's Agreements, Operating Agreements, Association Agreements, stock, shareholder's or membership ledgers, for each and all of the following:

   a.   CHEESE GRITS, LLC;

   b.   CLASS V, INC.;

   c.   SWBC CRAFT, LLC;

   d.   SWB MANAGEMENT, LLC;

   e.   SWBC CRAFT HOLDINGS, LP;

f.  SWBC CRAFT MANAGEMENT, LLC;

g.  SWBC BLOCKER SELLER, LP;

h.  CHILLY WATER, LLC; and

i.  Any other business entity, corporation, company, partnership, joint venture, association, or trust, regardless of the legal form of said business entity, in which you have or at one time had "control" (that is, possession, directly or indirectly, of the power to direct or cause the direction of the management and policies for said entity whether "through the ownership of voting securities, as trustee, or executor, by Contract or otherwise," or at one time held an ownership interest, owned shares, had a membership interest, managed, or had an economic or beneficiary interest, voting interest, or management rights to said entity, <u>but only for such entity or entities that had involvement in or received proceeds, fees, money, Stock Consideration, compensation, or other remuneration from or in connection with the Closing of the Agreement of Merger and Acquisition, or are receiving any Earn-Out payments under or related to the Agreement of Merger and Acquisition or Bensch Consulting Agreement.</u>

3.

A complete copy of the Agreement of Merger and Acquisition (this request calls for the "Entire Agreement" as delineated by Article 10.3 of the Agreement of Merger and Acquisition). *(Note: Any request herein for individual items that should be produced in response to this Request No. 3 is not a waiver of the request for the Entire Agreement).*

4.

All documents evidencing, reflecting or constituting the Authorization of the Transactions as referred to by Article 1.5 of the Agreement of Merger and Acquisition, and documents referred

7

to by Article 2.6(a)(ii), to include the written consents in lieu of meetings, resolutions approving and adopting the Transactions, entry into the Agreement of Merger and Acquisition, appointment of the Securityholders' Representative as representative for the Unitholders, and certificates directly related to these Agreement of Merger and Acquisition provisions.

<div align="center">5.</div>

The Confidentiality Agreement referenced in the Agreement of Merger and Acquisition – namely, that Confidentiality Agreement purported to be dated *as of December 2, 2019, by and between Parent and the Company* – along with any and all other confidentiality agreements signed or received by you and/or any person, company, corporation or business entity involved and related to negotiations related to the Agreement of Merger and Acquisition.

<div align="center">6.</div>

Any and all written assignments, or documents reflecting assignments, of "all Intellectual Property developed by such employee, contractor or Person rights in such Company Intellectual Property for or on behalf of, or during their employment by the Company of any of its Subsidiaries to the Company or any of its Subsidiaries and a waiver of all moral rights therein" as referred to in the Agreement of Merger and Acquisition as well as all confidentiality provision(s) "protecting the Trade Secrets and other confidential information of the Company or a Subsidiary" as referred to in Article 3.8(e) of the Agreement of Merger and Acquisition.

<div align="center">7.</div>

The Payment Schedule referred to in the Agreement of Merger and Acquisition, and all non-final versions or iterations of same, as well as the final updated versions of same prior to the Closing [which set forth the number and type of Units owned by each Unitholder and the Blocker Seller, the percentage interest of each Unitholder and the Blocker Seller and a breakdown of the

consideration payable to and thereunder (including the Earn-Out Payments, Adjustment Escrow Amount and PPP Escrow Amount) and Stock Consideration issuable to each Unitholder and the Blocker Seller under the scenarios illustrated therein].

8.

The Purchase Price Allocation Schedule referred to in the Agreement of Merger and Acquisition.

9.

The Disclosure Letter referred to by the Agreement of Merger and Acquisition, as well as all working versions, drafts, preliminary or non-final versions or iterations of same.

10.

An executed Certificate of Merger as referred to in the Agreement of Merger and Acquisition, including, if available to you, a copy of the file-stamped copy of the Certificate of Merger as filed with the Secretary of State of Delaware.

11.

The signed certificates, resolutions, consents, authorizations, and approvals, resignations, Adjustment Escrow Agreements, Lease Amendments, and Waiver Agreements, all of which are closing documents referred to in Articles 2.6(a)(i), (ii), (iii), (vi), (vii), (viii), (xi), and (xii) of the Agreement of Merger and Acquisition.

12.

Any and all documents evidencing or reflecting the representing book entry credits for the Stock Consideration pursuant to section 2.10 of the Agreement of Merger and Acquisition, or the other payments made pursuant to Section 2.11 of the Agreement of Merger and Acquisition as well as evidence of the book-entry credits, and such other  certificates and resolutions and

documents, called for by Articles 2.6(b)(i), (ii), (iii), (iv), and (vi) of the Agreement of Merger and Acquisition.

13.

A copy of the Bates Agreement referred to in the Agreement of Merger and Acquisition.

14.

A copy of the Bensch Consulting Agreement referred to in the Agreement of Merger and Acquisition.

15.

A copy of the Lease Agreement by and between SW Brewing Company, LLC and Cheese Grits, LLC, as referred to in the Agreement of Merger and Acquisition.

16.

A copy of the Lease Amendment by and between SW Brewing Company, LLC and Cheese Grits, LLC, as referred to in the Agreement of Merger and Acquisition.

17.

A copy of the Company LLC Agreement referred to in the Agreement of Merger and Acquisition.

18.

A copy of any and all Material Company Intellectual Property Contracts as referred to in the Agreement of Merger and Acquisition.

19.

The R&W Policy referred to in the Agreement of Merger and Acquisition including the declaration page for the R& W Policy and sufficient documents to show the limits, coverages, endorsements, premiums, co-pays, deductibles, self-insured retention amounts, excess insurance,

or co-insurance related to or referring to said R&W Policy.

20.

Any and all applications for the R&W Policy, along with any notices, affirmations, affidavits, warrants, representations, or disclosures related to any application for the R&W Policy.

21.

A copy of the Waiver Agreement referred to in the Agreement of Merger and Acquisition.

22.

The Schedule I ("Redemption/Pre-Closing Blocker Reorganization") referred to in the third Whereas recital paragraph of the Agreement of Merger and Acquisition, and elsewhere in the Agreement of Merger and Acquisition.

23.

Any and all documents that identify, reveal, or reflect the identify of, and amount or number of shares credited or entered in the books, for the Unitholders and/or SWB Members (as allocable to SWB Management, LLC), as referred to in Article 2.10 of the Agreement of Merger and Acquisition, along with any and all Letters of Transmittal related to such book-entry credits or shares comprising the Stock Consideration referred to in Article 2.10 of the Agreement of Merger and Acquisition.

24.

Any and all documents that would identify or contain a list or summary or the name, address, and other contact information of the Unitholders and SWB Members referred to in the Agreement of Merger and Acquisition.

25.

Documents evidencing or reflecting the date and amount of each and all of those Closing

Date Payments or the name and amount of payments, as referred to in Article 2.11(b), (e), and (f)(i-iii) of the Agreement of Merger and Acquisition.

26.

The Company's Final Closing Balance Sheet and Final Calculations, and any and all Acknowledgement or Notice of dispute by the Securityholders' Representative in connection with the Final Closing Balance Sheet and Final Calculations, as referred to under Article 2.12 of the Agreement of Merger and Acquisition.

27.

Any downward or upward adjustment of the Purchase Price made in accordance with Article 2.13 of the Agreement of Merger and Acquisition.

28.

Any and all documents showing the method of computation, conditions, and terms of the Earn-Out Cap, Earn-Out Payments, the 2020 Earn-Out Payment, 2023 Earn-Out Payment, 2024 Earn-Out Payment, or the EBITDA calculations used to determine or make adjustments or determinations of said Earn-Out Payments, as reflected in Article 2.16 of the Agreement of Merger and Acquisition, if said methods, conditions, and terms are not contained within the four corners of the Agreement of Merger and Acquisition.

29.

Any and all documents evidencing or reflecting the payments to Unitholders as Earn-Out Payments.

30.

Any and all documents showing payments facilitated or made by Securityholders' Representative, or made to or on behalf of the Unitholders as a result of the Closing, as referred to

under Article 2.18(a) of the Agreement of Merger and Acquisition, as well as the executed or received Letter of Transmittals from Unitholders referred to in under Article 2.18(b) of the Agreement of Merger and Acquisition.

31.

The Purchase Price Allocation Schedule referred to by Article 2.20(a) of the Agreement of Merger and Acquisition, as well as all objections, if any, by you, any Unitholder, or the Securityholders' Representative to said Purchase Price Allocation Schedule.

32.

Any and all adjustments, edits, addenda, amendments, supplements, modifications, or changes to the Purchase Price Allocation Schedule, as referred to by Article 2.20(c) of the Agreement of Merger and Acquisition.

33.

Any and all documents constituting, evidencing or reflecting any disagreement, objection, notice, letter, email, fax, text, disapproval, rejection, argument, challenge, or other criticism of any kind, any degree, and of any nature whatsoever, in regard to or concerning the Purchase Price Allocation Schedule, including, without limitation, the allocation to Intellectual Property as it relates to the Agreement of Merger and Acquisition.

34.

Any and all documents constituting, evidencing or reflecting any written communication by, between, among, to or from you and any Representative, accountant, tax adviser, or financial advisor or consultant concerning the Purchase Price, Enterprise Value, or Purchase Price Allocation Schedule, including, without limitation, concerning the allocation of funds to Intellectual Property as it relates to the Agreement of Merger and Acquisition.

35.

Any and all appraisals, valuations, reports of appraisals, reports of valuations, created for or referred to in a) negotiations related to the Agreement of Merger and Acquisition, b) arrived at, or agreed to, or used in determining the Purchase Price, or the Enterprise Value, or the Purchase Price Allocation Schedule (as those terms are used in the Agreement of Merger and Acquisition), c) all drafts or preliminary (non-final) versions or iterations of said appraisals, valuations, reports of appraisals, reports of valuations, and d) all documents used to arrive at, support, justify, calculate, determine, or otherwise set forth the Purchase Price Allocation Schedule as referred to in the Agreement of Merger and Acquisition.

36.

All documents used to determine, calculate, estimate, approximate, decide, agree upon, conclude, support, rationalize, explain, or otherwise value or agree as to the Enterprise Value of USD $300,000,000 as set forth in the Agreement of Merger and Acquisition.

37.

Any and all documents showing or evidencing the Estimated Purchase Price, and documents showing any calculations used to arrive at the Estimated Purchase Price, as referred to in Article 2.8(a) of the Agreement of Merger and Acquisition.

38.

Any and all documents related or referring to the identification of, listing of, or valuation of the Company Intellectual Property in or related to the Agreement of Merger and Acquisition.

39.

Any and all documents related or referring to the identification of, listing of, or valuation of any copyright(s), trademark(s), recipe(s), or intellectual property, whether denominated as

14

Company Intellectual Property or otherwise, in or related to the Agreement of Merger and Acquisition.

40.

Any and all documents related to the allocation of USD $92,000,000 to Intellectual Property related to the Agreement of Merger and Acquisition, as well as all underlying or related documents, data, valuations, assumptions, reports, and analysis of information related to said allocation of USD $92,000,000 to Intellectual Property in connection with the Agreement of Merger and Acquisition.

41.

Any and all documents related or referring to the identification of, listing of, or valuation of the goodwill of the Company in or related to the Agreement of Merger and Acquisition.

42.

Any and all documents that evidence, reflect, or document any travel, physical location, and/or travel itinerary or calendar by or for you for the month of November 2020 and through and including December 3, 2020.  (Plaintiff wants to know and see evidence of where you were when you were texting with him in November 2020; when you signed the Agreement of Merger and Acquisition; and when you had the phone call with him on December 2, 2020).

43.

Any and all documents, texts messages, emails, letters, notes, and other communications by and between you and Plaintiff.

44.

Any and all W2s or 1099s ever issued to or for Plaintiff from you or SweetWater Brewing Company, LLC, or any business entity related or affiliated with SW Brewing Company, LLCor

the beer business of SweetWater Brewing Company, LLC.

45.

Any and all W2s issued by SweetWater Brewing Company, LLC, Cheese Grits, LLC, or any entity you had any ownership or management involvement in related to the business of brewing, marketing, and distributing SweetWater branded beer, for any and all employees.

46.

Any and all documents, including, without limitation, any payroll software data or information, that refer or relate to any claim by you of Plaintiff being an employee of SweetWater Brewing Company, LLC, including any documents that substantiate, corroborate, or refute said claim.

47.

Any and all documents that refer or relate to any claim that the Fuss Intellectual Property, or any work done by Plaintiff related to SweetWater Brewing Company, was a "work for hire," including any documents that substantiate, corroborate, or refute said claim.

48.

The 2002 Agreement, and all draft or non-final versions of same.

49.

Any and all documents directly related to or referring to the 2002 Agreement and/or any draft or non-final versions of same.

50.

The 2003 Assignment, and all draft or non-final versions of same.

51.

All documents directly related to or referring to the 2003 Assignment or any draft or non-

16

final versions of same.

52.

All pleadings and non-privileged documents in your possession (or possession of prior or current legal counsel) related to the Virginia Lawsuit.

53.

All photos, video recording, audio recordings, or digital recordings you have of Plaintiff.

54.

All documents referring to, mentioning or pertaining to the hiring or retention of each person whom you expect to call as an expert witness at trial, including without limitations, any expert or person retained to give or respond to or offer evidence or opinions related to value, appraisals, enterprise value, or the value of all or any portion of the Intellectual Property related to the Agreement of Merger and Acquisition, or provide or respond to any expert retained by Plaintiff's counsel in this matter.

55.

All documents referring to, mentioning or pertaining to the opinion of each person whom you expect to call as an expert witness at trial.

56.

Each and every document, photograph, writing, recording, and including the original and any duplicate containing additional writing or which otherwise is not identical to the original, that you identified or specifically refer to in any of your Answer to the Complaint, your responses to the Interrogatories served contemporaneously herewith, or future interrogatories.

57.

Any and all documents referred to or that support or refute all or any portion of your

response to Plaintiff's Interrogatories to you.

<div align="center">58.</div>

Any and all non-privileged documents, texts, or emails or other writings wherein you mention Plaintiff or Plaintiff's attorneys.

<div align="center">59.</div>

All documents and communications by and between, to, from, or among you and Patrick Bates and/or JD Usry referring or related to the Plaintiff, the Complaint, your Answer to the Complaint, your responses to Plaintiff's Interrogatories or Requests for Production of Documents, the December 2, 2020 phone call between you and Plaintiff, the Fuss Intellectual Property, or the value of the Intellectual Property or Fuss Intellectual Property.

<div align="center">60.</div>

All documents, emails, recordings, or statements from or by any employee or former employee of SweetWater Brewing Company, LLC, Cheese Grits, LLC, or any other entity involved in the Agreement of Merger and Acquisition (whether or not a party thereto), referring to Plaintiff, Plaintiff's Intellectual Property, Plaintiff's claims concerning his Intellectual Property, the relationship or contracts between you and/or Sweetwater and Plaintiff related to Plaintiff's Intellectual Property.

<div align="center">61.</div>

Any and all documents, communications, emails, letters, faxes, and text messages by and between you and Irwin Simon, Carl Merton, or Denise Faltischek, or their Representatives, related to Company Registered Intellectual Property, Intellectual Property Rights, Copyrights, Trademarks, or the Fuss Intellectual Property.

62.

Any and all documents that evidence, reflect, prove, or substantiate that you provided notice of or a copy of the 2002 Agreement to Aphria, Parent, Merger Sub, or their Representatives prior to your or their executing of the Agreement of Merger and Acquisition.

63.

Any and all documents that evidence, reflect, prove, or substantiate that you provided notice of or a copy of the 2003 Assignment to Aphria, Parent, Merger Sub, or their Representatives prior to your or their executing of the Agreement of Merger and Acquisition.

64.

Any and all documents that evidence, reflect, prove, or substantiate that you provided or informed Aphria, Parent, Merger Sub, or their Representatives of the name "Ray Scott Fuss," or "Ray Fuss," or "Scott Fuss," or "Mr. Fuss"  prior to your or their executing of the Agreement of Merger and Acquisition.

65.

Any and all documents that evidence, reflect, prove, or substantiate that you informed Aphria, Parent, Merger Sub, or their counsel information about Ray Scott Fuss's registered copyrights, or the possibility of such copyrights, prior to the Closing or prior to your or their executing of the Agreement of Merger and Acquisition.

66.

Any and all documents or communications in your possession that downplay, denigrate, minimize, critique, or disparage the Fuss Intellectual Property, or suggest that the Fuss Intellectual Property was or is not particularly valuable, significant, or important in the branding and marketing efforts of SweetWater Brewing Company, or that it involved little or only slight artistic quality.

67.

Any communications between you and SW Brewing Company, LLC, Aphria, or Tilray, after the Closing, concerning the Fuss Intellectual Property, the value or importance of the Fuss Intellectual Property, or any plans or intent regarding the continued use of the Fuss Intellectual Property by SW Brewing Company, LLC, Aphria, or Tilray after May 18, 2021.

68.

Written or recorded statements from any person related to or referring to Plaintiff, the Complaint, or the Fuss Intellectual Property.

69.

Any and all letters, notices, written inquiries, demands, or other written communications of claims or potential claims from any former or present stockholder or shareholder of Aphria, or Tilray, (of which you are aware) related to the Agreement of Merger and Acquisition; or related to any issue concerning the Fuss Intellectual Property and conduct of the business of SW Brewing Company, LLC arising after the Closing.

70.

Any and all notices or documents related to the Fuss Intellectual Property prior to the Agreement of Merger and Acquisition as it relates to the financial condition and information of SW Brewing Company, LLC and how the Fuss Intellectual Property claims, given the Trademarks cannot be used without violating the Copyrights that are comprised within the Fuss Intellectual Property, might impact the ongoing business operations of SW Brewing Company, LLC as a surviving entity after the Closing.

71.

Any and all documents or communications from you, or on your behalf, about the Fuss Intellectual Property or Plaintiff's claims concerning the Fuss Intellectual Property, to anyone at Aphria or Tilray before the Aphria-Tilray merger, including how said claims might relate to the ability of any person or entity to use the Trademarks without a license to use the Copyrights that are comprised within the Fuss Intellectual Property and upon which the Trademarks are based.

72.

Any and all documents that reveal or evidence you told or informed Aphria about Plaintiff's specific text messages to you in November 2020 about his Intellectual Property before Aphria executed the Agreement of Merger and Acquisition.

73.

Any and all documents known or reviewed by you BEFORE December 2, 2020 that indicated or suggested Aphria had any plans or intent to change, modify, or move away from the marketing and/or branding efforts of SW Brewing Company, LLC after the Closing.

21

RESPECTFULLY SUBMITTED this 17TH day of September, 2021.

BLAINE A. NORRIS, PC

_____
BLAINE A. NORRIS
State Bar No. 545832
JOHN R. AUTRY
State Bar No. 029029
Attorneys for Plaintiff

1143 Prince Ave
Athens, GA 30606
(706) 850-9400
(706) 850-9405 Fax
blaine@NorrisInjuryLaw.com
john@NorrisInjuryLaw.com

SMITH TEMPEL BLAHA LLC


s/Matthew Hoots, by BAN w/permission
_____
GREGORY SCOTT SMITH
State Bar No. 658377
MATTHEW T. HOOTS
State Bar No. 101080
Attorneys for Plaintiff

1055 Prince Ave
Athens, GA 30606
(706) 621-5777
mhoots@srtslaw.com
gsmith@srtslaw.com

22